**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 23-5017**

# United States Court of Appeals
# for the District of Columbia Circuit

_____

NATIONAL SECURITY ARCHIVE,

*Appellant,*

v.

CENTRAL INTELLIGENCE AGENCY,

*Appellee.*

_____

On Appeal from the United States District Court
for the District of Columbia
No. 1:21-cv-02857-JEB
District Judge James E. Boasberg

_____

**BRIEF FOR APPELLANT NATIONAL SECURITY ARCHIVE**
_____

John S. Guttmann
Hilary T. Jacobs
BEVERIDGE & DIAMOND, P.C.
1900 N Street, N.W., Suite 100
Washington, DC 20036
(202) 789-6000
jguttmann@bdlaw.com
hjacobs@bdlaw.com

*Counsel for Appellant National Security
Archive*

May 1, 2023

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

1.    <u>Parties</u>. The parties in this case include Appellant, National Security
Archive, a nongovernmental research institute and library based in the District of
Columbia, and Appellee, Central Intelligence Agency, a federal agency. Appellant
is not aware of any intervenors or entity that has been admitted as an amicus at
this time.

Pursuant to Fed. R. App. P. 26.1 and D.C. Cir. Rule 26.1, the undersigned
counsel for the National Security Archive certifies that the National Security
Archive, a 501(c)(3) non-profit organization with a mission of promoting research
and public education about U.S. governmental and national security decision-
making processes, is not a publicly-held corporation or other publicly-held entity
and does not have a parent corporation. Counsel further certifies that, as a non-
profit organization, the National Security Archive is not a publicly-traded
company and has issued no stock; therefore, no publicly-held corporation, parent
corporation, company, subsidiary, or affiliate owns 10 percent or more of the
National Security Archive's stock.

2.    <u>Rulings Under Review</u>. This is an appeal of the (1) October 4, 2022
Order and accompanying Memorandum Opinion and (2) November 16, 2022
Order and Memorandum Opinion issued by the United States District Court for
the District of Columbia (Hon. James E. Boasberg) in *National Security Archive v.*

*Central Intelligence Agency*, Civil Action No. 21-2857 (JEB). The October 4, 2022 Order and accompanying Memorandum Opinion denied National Security Archive's motion for summary judgement. The Court's November 16, 2022 Order also denied National Security Archive's motion to amend the judgment.

3.     <u>Related Cases</u>. This case has not previously been before this Court or any other court but is related to *National Security Archive v. Defense Intelligence Agency*, No. 1:19-CV-529 (D.D.C., filed Feb. 28, 2019) due to common issues of fact. *See* Notice of Designation of Related Civil Cases (Oct. 28, 2021) (D.D.C. R. Doc. 3).

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND
    RELATED CASES.............................................................................i

TABLE OF AUTHORITIES ........................................................iv

GLOSSARY OF ABBREVIATIONS ......................................... viii

INTRODUCTION ...........................................................................1

STATEMENT OF JURISDICTION.................................................2

STATEMENT OF THE ISSUES.....................................................3

STATUTES AND REGULATIONS.................................................3

STATEMENT OF THE CASE.........................................................3

    I.    Statement of Facts .............................................................3
    II.   Procedural History ............................................................8

SUMMARY OF ARGUMENT .......................................................9

STANDARD OF REVIEW ...........................................................11

ARGUMENT ................................................................................11

    I.    The CIA's Documented Involvement in Volume IV's Publication
        Constitutes Official Acknowledgment.......................................11
    II.   The Public Domain Doctrine Precludes the CIA from Withholding
        the Perroots Memo. ....................................................................14

CONCLUSION .............................................................................18

iii

# TABLE OF AUTHORITIES

## CASES

*Am. Civil Liberties Union v. Cent. Intelligence Agency*,
  710 F.3d 422 (D.C. Cir. 2013) ...............................................................12

*Ameziane v. Obama*,
  951 F. Supp. 2d 1 (D.D.C. 2013) .........................................................14

*Black v. U.S. Dep't of Justice*,
  69 F. Supp. 3d 26 (D.D.C. 2014) .........................................................16

*Buzzfeed, Inc. v. Dep't of Justice*,
  344 F. Supp. 3d 396 (D.D.C. 2018) .....................................................17

*Campaign Legal Ctr. v. U.S. Dep't of Justice*,
  34 F.4th 14 (D.C. Cir. 2022) ................................................................10

*Cottone v. Reno*,
  193 F.3d 550 (D.C. Cir. 1999) ...................................................... 15, 17

*Ctr. for Pub. Integrity v. U.S. Dep't of Energy*,
  287 F. Supp. 3d 50 (D.D.C. 2018) .......................................................14

*Day v. U.S. Dep't of State*,
  No. 20-cv-2004, 2022 WL 3700904 (D.D.C. Aug. 26, 2022)............................17

*Donato v. Exec. Office for U.S. Attorneys*,
  308 F. Supp. 3d 294 (D.D.C. 2018) .....................................................11

*Fitzgibbon v. Cent. Intelligence Agency*,
  911 F.2d 755 (D.C. Cir. 1990) .............................................................12

*Frugone v. Cent. Intelligence Agency*,
  169 F.3d 772 (D.C. Cir. 1999) .............................................................17

*Isley v. Exec. Office for U.S. Attorneys*,
  No. 98-cv-5098, 1999 WL 1021934 (D.C. Cir. Oct. 21, 1999)............................17

*Jackson v. U.S. Dep't of Justice*,
No. 14-cv-0192, 2019 WL 4750261 (D.D.C. Sept. 27, 2019).............................17

*Judicial Watch, Inc. v. U.S. Dep't of Health & Human Servs.*,
525 F. Supp. 3d 90 (D.D.C. 2021) .........................................................................17

*Kleinert v. Bureau of Land Mgmt.*,
132 F. Supp. 3d 79 (D.D.C. 2015) ................................................................... 15, 16

*Knight First Amend. Inst. at Columbia Univ. v. Cent. Intelligence Agency*,
11 F.4th 810 (D.C. Cir. 2021) .......................................................................... 12, 14

*Perioperative Servs. & Logistics, LLC, v. U.S. Dep't of Veterans Affairs*,
57 F.4th 1061 (D.C. Cir. 2023) ..............................................................................11

*Reporters Comm. for Freedom of Press v. Fed. Bureau of Investigation*,
No. 17-cv-1701, 2022 WL 13840088 (D.D.C. Oct. 21, 2022) ...................... 16, 17

*Soto v. U.S. Dep't of State*,
118 F. Supp. 3d 355 (D.D.C. 2015) ......................................................................15

*Story of Stuff Project v. U.S. Forest Serv.*,
345 F. Supp. 3d 79 (D.D.C. 2018) ........................................................................16

*Students Against Genocide v. Dep't of State*,
257 F.3d 828 (D.C. Cir. 2001) ....................................................................... 14, 16

*Weisberg v. U.S. Dep't of Justice*,
627 F.2d 365 (D.C. Cir. 1980) ..............................................................................11

*Wolf v. Cent. Intelligence Agency*,
473 F.3d 370 (D.C. Cir. 2007) ..............................................................................17

## STATUTES

5 U.S.C. § 552(a)(4)(B) ...............................................................................................2

5 U.S.C. § 552(a)(6)(E)(iii)..........................................................................................2

22 U.S.C. § 4351 ...........................................................................................................2

22 U.S.C. § 4351(a) ................................................................5

22 U.S.C. § 4351(c) ................................................................5

22 U.S.C. § 4353(b)(1)........................................................5, 13

28 U.S.C. § 1291 ................................................................3

28 U.S.C. § 1331 ................................................................2

## EXECUTIVE ORDERS

Exec. Order No. 13526 (2009),
    reprinted in 75 Fed. Reg. 707 (Jan. 5, 2010)....................................9, 15

## RULES

Fed. R. Civ. P. 56(a)................................................................11

## OTHER AUTHORITIES

2021 Report of the Advisory Committee on Historic Diplomatic Documentation
    (2021),
    *available at* https://networks.h-net.org/node/28443/discussions/10585773/
    report-advisory-committee-historical-diplomatic-documentation...................6, 13

About the Internet Archive,
    *available at* http://archive.org/about ...................................................16

David Hoffman and Nate Jones, Newly released documents shed light on 1983
    nuclear war scar with Soviets (Feb. 17, 2021),
    *available at* https://www.washingtonpost.com/national-security/
    soviet-nuclear-war-able-archer/2021/02/17/711fa9e2-7166-11eb-93be-
    c10813e358a2_story.html ................................................................4, 7

DOS Office of the Historian, *Foreign Relations of the United States*,
    1981–1988, Volume IV, Soviet Union, January 1983–March 1985,
    *available at* https://history.state.gov/historicaldocuments/frus1981-88v04..........7

DOS Office of the Historian, Toward "Thorough, Accurate, and Reliable":
  History of the *Foreign Relations of the United States* Series, Ch. 12,
  *available at* https://history.state.gov/historicaldocuments/frus-history/
  chapter-12.................................................................................................5

Internet Archive Way Back Machine, DOS Office of the Historian, *Foreign
  Relations of the United States*, 1981–1988, Volume IV, Soviet Union, January
  1983–March 1985, *available at*
  https://web.archive.org/web/20210320083726/https://history.state.gov/
  historicaldocuments/frus1981-88v04/appxA...........................................................7

Jack Murphy, Newly declassified documents reveal the training exercise
  that nearly triggered World War III (Feb. 19, 2021),
  *available at* https://www.audacy.com/connectingvets/news/
  able-archer-the-exercise-that-almost-ended-the-world.........................................7

Jack Newman, Thirty minutes from nuclear war: Newly-declassified US
  documents reveal how paranoid Russians loaded nukes onto fighters in
  East Germany in 1983 over fears NATO exercise was invasion
  (Feb. 18, 2021), *available at* https://www.dailymail.co.uk/news/article-
  9274205/Declassified-documents-reveal-Soviets-readied-nuclear-attack
  -1983-NATO-exercise.html ...............................................................7

National Security Archive, U.S. Air Force, Lt. Gen. Leonard H. Perroots, Letter,
  "End of Tour Report Addendum," January 1989, *available at*
  https://nsarchive.gwu.edu/document/21035-us-air-force-lt-gen-leonard-h-
  perroots-letter-end-tour-report-addendum-january-1989 .....................................7

President's Foreign Intelligence Advisory Board, "The Soviet War Scare"
  at x (Feb. 15, 1990),
  *available at* https://nsarchive.gwu.edu/document/21038-4-pfiab-report-
  2012-0238-mr.........................................................................................4

Report of the Advisory Committee on Historic Diplomatic Documentation
  (2018), *available at*
  https://shafr.org/sites/default/files/2018_hac_annual_report.pdf ..........................5

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| The "Archive" | National Security Archive |
| CIA | Central Intelligence Agency |
| DIA | Defense Intelligence Agency |
| DOS | United States Department of State |
| FOIA | Freedom of Information Act, 5 U.S.C. § 552 |
| *FRUS* | DOS Foreign Relations of the United States Series |
| "Perroots Memorandum" or "Perroots Memo" | The January 9, 1989, End of Tour Report (Addendum) written by General Leonard Perroots |

## INTRODUCTION

This case is far from a standard Freedom of Information Act ("FOIA") lawsuit. The historical background for this case—a narrowly averted nuclear catastrophe—is unusual. The more immediate events leading to this lawsuit—an agency signing off on the publication of a presumptively declassified[1] document then subsequently retracting that sign-off—are also unusual. The district court's ruling was also unusual, in its defiance of logic and binding legal authority.

In 2021, the Department of State ("DOS") published text from a Cold War-era document that it received from the Appellee, the Central Intelligence Agency ("CIA"), thanking the CIA for its assistance in providing access to the document. The CIA now claims that certain contents of the document were published in 2021 "without necessary authorization," and that FOIA exemptions protect the published text from mandatory disclosure. ECF No. 21-1 at 10.[2] The CIA has apparently explained the alleged issues concerning DOS's publication of the document in classified, *ex parte* declarations that it submitted to the district court. The CIA has

---

[1] Under Executive Order 13526, records of historical value that are more than 25 years old are subject to automatic declassification.

[2] Throughout this document, references to ECF numbers refer to the proceeding below, *National Security Archive vs. Central Intelligence Agency*, No. 1:21-cv-02857, unless otherwise stated.

not publicly explained how the document's continued existence in the public domain damages national security.

Even in these unique, murky factual circumstances, the law remains clear. DOS was statutorily required to involve the CIA in the publication of the document, 22 U.S.C. § 4351, *et seq.*, and, as the public record demonstrates, it did. Through its involvement in this publication, the CIA has "officially acknowledged" the now published text and can no longer use FOIA exemptions to avoid disclosure. Putting aside the CIA's role in the publication, the public nature of the document also undercuts the CIA's position by virtue of this Circuit's independently applicable public domain doctrine. With the facts and law so heavily weighted towards disclosure, only one outcome is appropriate: the CIA must disclose public portions of the disputed document.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this action pursuant to 5 U.S.C. §§ 552(a)(4)(B), (a)(6)(E)(iii) and 28 U.S.C. § 1331. The district court entered its final judgment on November 16, 2022 concerning the Central Intelligence Agency's July 27, 2022 Motion for Summary Judgment, and a subsequent November 16, 2022 Order concerning the National Security Archive's (the "Archive") October 21, 2022 Motion to Amend Judgment. Appellant National Security Archive filed a timely

notice of appeal on January 19, 2023. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether the Central Intelligence Agency "officially acknowledged' the Perroots Memorandum.

2.     Whether there is a "public domain" doctrine that applies independent of the official acknowledgment doctrine, and if so, should it have been properly applied to the Perroots Memorandum.

3.     Whether the Perroots Memorandum is a public document unless reclassified by the Central Intelligence Agency pursuant to Executive Order No. 13526.[3]

## STATUTES AND REGULATIONS

All pertinent statutes and regulations are reproduced in the Addendum following this brief.

## STATEMENT OF THE CASE

### I.     Statement of Facts

In 1983, under the mistaken belief that the United States may have been planning to launch a nuclear strike against the Union of Soviet Socialist Republics

---

[3] The Archive originally raised a fourth issue regarding the applicability for the exemptions to the Perroots Memo, which it is no longer pursuing in this appeal.

("Soviet Union"), the Soviet Union put fighter-bombers—loaded with nuclear bombs—on 24-hour alert in East Germany, requiring these fighter bombers to be prepared to fly—and deploy nuclear weapons—at any given point while on alert during the 24-hour period. U.S. Department of State, *Foreign Relations of the United States* ("*FRUS*"), 1981-1988 Volume IV ("Volume IV") at 1421, 1426–27 (reproduced at ECF Nos. 1-2 at 23, 28–29 and 17-2 at 44, 49–50). *See also* David Hoffman and Nate Jones, Newly released documents shed light on 1983 nuclear war scar with Soviets (Feb. 17, 2021), *available at* https://www.washingtonpost.com/national-security/soviet-nuclear-war-able-archer/2021/02/17/711fa9e2-7166-11eb-93be-c10813e358a2_story.html.    The world was pulled back from the brink of nuclear conflict thanks, in large part, due to one U.S. General, who—acting "correctly out of instinct" rather than "informed guidance"—directed U.S. forces to *not* escalate force against the Soviet Union. President's Foreign Intelligence Advisory Board, "The Soviet War Scare" at x (Feb. 15, 1990), *available at* https://nsarchive.gwu.edu/document/21038-4-pfiab-report-2012-0238-mr.

That general, Lieutenant General Leonard Perroots, subsequently wrote an after-action memo detailing how close we came to a "potentially disastrous situation" and the gaps in American intelligence that led to this "war scare." ECF No. 17-2 at 51 (the "Perroots Memo"). Nearly forty years later, DOS published a

transcribed version of the Perroots Memo in a new volume of the DOS series "*Foreign Relations on the United States*" with limited redactions. ECF Nos. 1-2, 17-2. Congress requires DOS to publish the *FRUS* as a "thorough, accurate, and reliable" documentary record of major U.S. foreign policy decisions and diplomatic activities, with events documented in the *FRUS* being published no more than 30 years after their occurrence. 22 U.S.C. §§ 4351(a), (c). Any document that is published in the *FRUS* "shall be submitted to the respective originating agency for declassification review." *Id.* at § 4353(b)(1).

The Perroots Memo transcription in the *FRUS* includes a citation to a CIA source, suggesting that DOS obtained the document from the CIA. ECF No. 17-2 at 52 ("(Central Intelligence Agency, National Intelligence Council, Job 91B00551: Speeches, Lectures, Briefing Files (1988–1989), Box 1, Folder 2: C/NIC (Ermath) Chrons March 1989)"). Indeed, the CIA's involvement in the *FRUS* declassification process generally,[4] and for Volume IV specifically, is well-documented: the volume's preface thanks the CIA staff for "providing access and assistance,"

---

[4] The CIA has signed two Memorandums of Understanding with DOS establishing declassification guidelines and has created a Historical Programs Staff specifically tasked with coordinating *FRUS* reviews. DOS Office of the Historian, Toward "Thorough, Accurate, and Reliable": History of the *Foreign Relations of the United States* Series, Ch. 12, *available at* https://history.state.gov/historicaldocuments/frus-history/chapter-12; Report of the Advisory Committee on Historic Diplomatic Documentation (2018), *available at* https://shafr.org/sites/default/files/2018_hac_annual_report.pdf.

specifically acknowledging History Staff of the CIA's Center for Intelligence "for arranging full access to CIA records." ECF No. 17-2 at 13. *See also* 2021 Report of the Advisory Committee on Historic Diplomatic Documentation (2021), *available at*  https://networks.h-net.org/node/28443/discussions/10585773/report-advisory-committee-historical-diplomatic-documentation ("Historical Advisory Committee 2021 Annual Report") (noting the CIA's involvement in the declassification of the relevant volume).

Original documents may contain information of great historical value that a transcription does not necessarily capture, such as the list of offices within specific agencies that received a document, individual recipients, special security designations, and divisions who were copied on the correspondence. Accordingly, after having previously attempted to obtain the Perroots Memo from the Defense Intelligence Agency ("DIA"),[5] the Archive filed a FOIA request with, and subsequent action against, the CIA in 2021. Despite the almost four decades between the underlying events and the present, in April 2022, the CIA produced a copy of the Perroots Memo redacted *in totem*, asserting the 5 U.S.C. § 552(b)(1) and (b)(3) exemptions.[6] ECF No. 13-1.

---

[5] Case No. 1:19-cv-529.

[6] The CIA also produced a cover letter to the Perroots Memo with several redactions asserting the same exemptions.

Although a copy of the relevant *FRUS* volume is no longer available on DOS's website, *see* DOS Office of the Historian, *Foreign Relations of the United States*, 1981–1988, Volume IV, Soviet Union, January 1983–March 1985, *available at* https://history.state.gov/historicaldocuments/frus1981-88v04, copies of and text from the transcription are still widely available in numerous permanent public records. This includes public court records in two cases,[7] Appellant's website,[8] an archived version of the original posting,[9] and multiple news articles.[10] Despite this,

---

[7] ECF Nos. 1-2, 17-2, 23-1; Case No. 1:19-cv-529, ECF Nos. 35-2, 37-7, 43-1.

[8] National Security Archive, U.S. Air Force, Lt. Gen. Leonard H. Perroots, Letter, "End of Tour Report Addendum," January 1989, *available at* https://nsarchive.gwu.edu/document/21035-us-air-force-lt-gen-leonard-h-perroots-letter-end-tour-report-addendum-january-1989.

[9] Internet Archive Way Back Machine, DOS Office of the Historian, *Foreign Relations of the United States*, 1981–1988, Volume IV, Soviet Union, January 1983–March 1985, *available at* https://web.archive.org/web/20210320083726/https://history.state.gov/historicaldocuments/frus1981-88v04/appxA.

[10] *See, e.g.,* David Hoffman and Nate Jones, Newly released documents shed light on 1983 nuclear war scar with Soviets (Feb. 17, 2021), *available at* https://www.washingtonpost.com/national-security/soviet-nuclear-war-able-archer/2021/02/17/711fa9e2-7166-11eb-93be-c10813e358a2_story.html; Jack Murphy, Newly declassified documents reveal the training exercise that nearly triggered World War III (Feb. 19, 2021), *available at* https://www.audacy.com/connectingvets/news/able-archer-the-exercise-that-almost-ended-the-world; Jack Newman, Thirty minutes from nuclear war: Newly-declassified US documents reveal how paranoid Russians loaded nukes onto fighters in East Germany in 1983 over fears NATO exercise was invasion (Feb. 18, 2021), *available at* https://www.dailymail.co.uk/news/article-9274205/Declassified-documents-reveal-Soviets-readied-nuclear-attack-1983-NATO-exercise.html.

the CIA maintains that its continued withholding of the Perroots Memo is justified,

failing to publicly explain how its release has harmed national security interests.

## II.    Procedural History

The Archive filed this action against the CIA challenging its lack of response

to the Archive's August 2021 FOIA request on October 27, 2021. ECF No. 1. The

CIA produced a completely redacted version of the Perroots Memo in April 2022,

along with an accompanying, partially redacted cover letter. ECF No. 13-1. The

Archive argued that any reason to withhold any portions of the Perroots Memo

appearing in the *FRUS* had been mooted by release, and suggested that the Court

conduct an *in camera* review of both the original, unredacted Perroots Memo and

the DOS transcription, prior to any briefing, in order to assess the redactions'

validity. ECF No. 15. The Court agreed to this, ultimately also requiring

simultaneous briefing at the CIA's request. June 22, 2022 Minute Order. The CIA

moved for summary judgment on July 27, 2022, arguing that FOIA exemptions

(b)(1) and (b)(3) properly apply to the Perroots Memo, submitting two

accompanying classified, *ex parte* declarations as support. ECF Nos. 21-1, 21-3, 21-

4. The CIA also argued that it had not waived the FOIA exemptions' applicability

to the Perroots Memo, omitting any public mention of its statutorily-mandated

involvement in the *FRUS* declassification process, except a cryptic reference to the

8

release of information to DOS "without necessary authorization." ECF No. 21-1 at 10.

In its opposition, the Archive pointed to the robust public record documenting the CIA's involvement in the *FRUS* volume's publication, asserting that the CIA had officially acknowledged the Perroots Memo, thus waiving any right to claim FOIA's applicability. ECF No. 25. After reviewing the Perroots Memo and public transcription *in camera*, as well as the briefs, the district court granted the CIA's motion for summary judgment, relying heavily on the CIA's classified declarations. ECF Nos. 29, 30. The court concluded that the CIA "was not properly involved" in the disclosure of the Perroots Memo, acknowledging the "admittedly cryptic" nature of its analysis. ECF No. 30 at 7.

The Archive moved for the district court to amend its judgment, seeking that the Court require the CIA to subject the Perroots Memo to the reclassification review required by Executive Order 13526. Exec. Order No. 13526 (2009), reprinted in 75 Fed. Reg. 707 (Jan. 5, 2010). The court denied this motion, ECF No. 33, and Appellant now appeals this denial and the dismissal of the case.

## SUMMARY OF ARGUMENT

In this action, the CIA attempts to shield a nearly forty-year old document—much of which is currently in the public domain—from public disclosure in accordance with FOIA. The CIA attempts to distance itself from its involvement in

the publication of the transcription of the Perroots Memo and largely ignores that text from the disputed document now exists in several places readily accessible to the public. Much of the CIA's argument appears to be contained in classified, *ex parte* declarations.

Whatever the CIA stated in its classified submissions, however, cannot change the law dictating the outcome of this case. The law plainly states that where the information requested under FOIA has been made public through an official and documented disclosure by a federal agency (or a component or subcomponent of such agency), that agency can no longer rely on FOIA exemptions to avoid disclosure of the same information. It is undisputed that much of the information that Appellant seeks is identical to the information that has already been made public. Moreover, the CIA's involvement in the publication of the Perroots Memo transcription is well documented. Under such circumstances, the CIA can no longer rely upon the shield of FOIA exemptions to avoid producing portions of the Perroots Memo that are now public. Finally, and crucially, even if the CIA had not been involved in the Perroots Memo transcription's publication, the fact that the transcription remains preserved in a permanent public record preempts the CIA's continued withholding of the public portions of the Perroots Memo.

## STANDARD OF REVIEW

The Court reviews *de novo* the district court's grant of summary judgment. *See Campaign Legal Ctr. v. U.S. Dep't of Justice*, 34 F.4th 14, 22 (D.C. Cir. 2022) (citations omitted). Summary judgment is inappropriate where the movant cannot prove both that there is a dispute of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment should not be granted in FOIA cases where the agency cannot prove that it has "fully discharged its FOIA obligations," *Donato v. Exec. Office for U.S. Attorneys*, 308 F. Supp. 3d 294, 307 (D.D.C. 2018) (citations and quotations omitted), or where there is a genuine dispute of material fact as to whether the agency has inappropriately withheld records. *Weisberg v. U.S. Dep't of Justice*, 627 F.2d 365, 370 (D.C. Cir. 1980). "Where, as here, the government relies on an ex parte submission, [courts] review it with extra care, recognizing that the FOIA plaintiff has had no opportunity to challenge or rebut the government's evidence." *Perioperative Servs. & Logistics, LLC, v. U.S. Dep't of Veterans Affairs*, 57 F.4th 1061, 1067 (D.C. Cir. 2023).

## ARGUMENT

### I.     The CIA's Documented Involvement in Volume IV's Publication Constitutes Official Acknowledgment.

The Archive does not know what the CIA said in its confidential submissions that convinced the district court to grant summary judgment. What the Archive does know, however, is that (1) the record demonstrates that the CIA was involved in the

Perroots Memo transcription's publication, and (2) at least a portion of the text from the Perroots Memo is unquestionably public. *See* notes 7–10, *supra.* These two pieces of information are dispositive of the CIA's official acknowledgment of at least part of the Perroots Memo—and, the disclosure of "officially acknowledged" information can be compelled over an agency's otherwise valid exemption claim. *Am. Civil Liberties Union v. Cent. Intelligence Agency*, 710 F.3d 422, 428 (D.C. Cir. 2013) (citations and quotations omitted).

An "official acknowledgement" occurs where the "information in the public domain" (1) "matches" the information requested, (2) is "as specific" as the information requested, and (3) has "'been made public through an official and documented disclosure.'" *Knight First Amend. Inst. at Columbia Univ. v. Cent. Intelligence Agency*, 11 F.4th 810, 815 (D.C. Cir. 2021) (quoting *Fitzgibbon v. Cent. Intelligence Agency*, 911 F.2d 755, 765 (D.C. Cir. 1990)).

The CIA has not disputed that the Perroots Memo sought by the Archive is "as specific" and "matches" the released transcription of the Perroots Memo. ECF Nos. 21-1 at 9, 23-1.[11] Appellant's FOIA request sought the "January 9, 1989 'End of Tour Report (Addendum) General Perroots,'" and *FRUS* Volume IV lists the

---

[11] The district court, which conducted an *in camera* review of the transcription and the withheld document, also did not comment on any differences between the documents. ECF No. 30.

transcription's source as "a January 1989 'End of Tour Report Addendum' by Lieutenant General Leonard H. Perroots." *Compare* ECF No. 1-2 at 3 *with id.* at 28. CIA refers to the withheld document as the "January 9, 1989 'End of Tour Report (Addendum) General Perroots.'" ECF Nos. 21-1 at 2, 23-1 ¶¶ 6, 12. A January 9, 1989 cover letter signed by Lieutenant General Perroots referring to the subsequent pages as "[t]he enclosed memorandum" precedes the redacted pages in the CIA's production. ECF No. 13-1 at 4.

The CIA's documented involvement in the Volume IV declassification process, combined with the statutorily required process for *FRUS* declassification, undercuts any arguments that the CIA might have conceivably made in its classified, *ex parte* submissions that it did not "officially acknowledge" the Perroots Memo transcription. The statute governing *FRUS* publication mandates that records "shall" be submitted to their originating agencies for declassification review. 22 U.S.C. § 4353(b)(1). Volume IV specifically thanks the CIA for "arranging full access to CIA records." ECF No. 17-2 at 13. The Advisory Committee on Historic Diplomatic Documentation, the entity responsible for overseeing *FRUS* publication, reported that during 2021, DOS not only "completed the final declassification for four *FRUS* volumes with CIA," but also released four *FRUS* publications, including Volume IV. Historical Advisory Committee 2021 Annual Report.

13

Nowhere in the public record has the CIA denied its involvement with the Volume IV declassification process, only stating that "certain information in the [public transcription] was released by [DOS] without necessary authorization . . . ." ECF No. 21 at 10. Whatever happened behind the scenes—which is likely documented in the CIA's confidential submissions—does not change the fact that someone at the CIA provided DOS access to the Perroots Memo for declassification and publication. One can imagine what might have happened—perhaps, someone at CIA did not consult their higher-ups in granting DOS access to this document. Or, maybe, transmission of the document from the CIA to DOS was somehow made in error. Regardless of what CIA contends truly occurred, a "component" or "subcomponent" of the CIA—perhaps the CIA's Historical Programs Staff or its History Staff in the Center for Study of Intelligence—acted on behalf of the entire agency, and that action binds the entire agency. *Knight*, 11 F.4th at 817; *Ctr. for Pub. Integrity v. U.S. Dep't of Energy*, 287 F. Supp. 3d 50, 68 (D.D.C. 2018). Further, even if the disclosure was made in error, the CIA cannot now revoke this disclosure. *Ameziane v. Obama*, 951 F. Supp. 2d 1, 9 (D.D.C. 2013).

## II.    The Public Domain Doctrine Precludes the CIA from Withholding the Perroots Memo.

This Circuit's public domain doctrine also precludes the CIA from continuing to withhold the Perroots Memo. This Court has held that the government "may not rely on an otherwise valid exemption to justify withholding information that is

already in the 'public domain,'" *Students Against Genocide v. Dep't of State,* 257 F.3d 828, 836 (D.C. Cir. 2001) (citations omitted), where the Court is "confident that the information sought is truly public and that the requester receive no more than what is publicly available," and that the information is "disclosed and preserved in a permanent public record." *Cottone v. Reno*, 193 F.3d 550, 554, 555 (D.C. Cir. 1999). Under the public domain doctrine, "materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record." *Id.* at 554 (citations omitted).

As discussed above, the information requested is the same as what is publicly available in Volume IV, *see* p. 12–13, *supra*, is "truly public,"[12] and has been "disclosed and preserved in a permanent public record." *Id*. Volume IV's transcription of the Perroots Memo appears in multiple publicly available court records, *see* note 5, *supra*, which constitutes a permanent public record. *See Soto v.*

---

[12] Executive Order 13526, which governs the classification, declassification, and reclassification of national security information, further supports the indisputably public nature of the Perroots Memo transcription, which, through the DOS publication, has effectively been declassified. Exec. Order No. 13526 (2009), reprinted in 75 Fed. Reg. 707 (Jan. 5, 2010). Per Executive Order 13526, the government can only reclassify information declassified under proper authority or otherwise through specified procedures, including through the personal approval or participation of the agency head or another senior agency official. *Id.* at §§ 1.7(c), (d). Should the CIA decline to produce the Perroots Memo pursuant to any order of this Court, it will have to undertake Executive Order 13526's reclassification procedures.

*U.S. Dep't of State*, 118 F. Supp. 3d 355, 366 (D.D.C. 2015); *Kleinert v. Bureau of Land Mgmt.*, 132 F. Supp. 3d 79, 95 (D.D.C. 2015); *Cottone*, 193 F.3d at 554. Anyone with a Public Access to Court Electronic Records ("PACER") account can access copies of the transcription. Relevant portions of Volume IV have also been memorialized online by the Internet Archive Way Back Machine, a non-profit "digital library of Internet sites" that "archive[s] the Internet itself." *See* About the Internet Archive, *available at* http://archive.org/about; note 9, *supra. See also Reporters Comm. for Freedom of Press v. Fed. Bureau of Investigation*, No. 17-cv-1701, 2022 WL 13840088, at *9, n.6 (D.D.C. Oct. 21, 2022) (unpublished decision) (finding that information on the Internet Archive Way Back Machine has been preserved in a "permanent public record").

 The CIA argued in the district court that there is no public domain doctrine separate from the official acknowledgment doctrine, and that FOIA exemptions apply to public information unless the government has officially disclosed the information at issue. ECF No. 27 at 3.[13] A growing body of case law from this circuit, however, demonstrates the existence of an independent public domain doctrine. *See, e.g., Story of Stuff Project v. U.S. Forest Serv.*, 345 F. Supp. 3d 79, 88–90 (D.D.C. 2018) (considering whether public domain doctrine applied to information released

---

[13] The district court did not address this question. ECF No. 30 at 8.

by third party); *Kleinert*, 132 F. Supp. 3d at 95 (requiring disclosure of redacted information appearing in court filings); *Black v. U.S. Dep't of Justice*, 69 F. Supp. 3d 26, 34–36 (D.D.C. 2014) (applying public domain doctrine to court records); *Students Against Genocide*, 257 F.3d at 836–37 (public domain doctrine inapplicable where relevant information did was not preserved in a permanent public record); *Cottone*, 193 F.3d at 552, 554 (requiring disclosure of recordings introduced into evidence and played in open court); *Isley v. Exec. Office for U.S. Attorneys*, No. 98-cv-5098, 1999 WL 1021934, at *4 (D.C. Cir. Oct. 21, 1999) (unpublished decision) ("[a]s the public domain doctrine stands today, a party can only gain access to information withheld by the government under a FOIA exemption if it can 'point to 'specific' information identical to that being withheld' that is publicly available"; no mention of requirement of official acknowledgment) (citations omitted). This includes several cases post-dating the authorities the CIA relies upon[14] in support of its argument that there is no independent public domain doctrine, all of which describe and apply the public domain doctrine without mentioning or requiring an official disclosure. *Reporters Comm. for Freedom of Press*, 2022 WL 13840088 at *4–5; *Day v. U.S. Dep't of State*, No. 20-cv-2004, 2022 WL 3700904, at *7 (D.D.C.

---

[14] ECF No. 27 at 3 (citing *Buzzfeed, Inc. v. Dep't of Justice*, 344 F. Supp. 3d 396, 407 (D.D.C. 2018); *Wolf v. Cent. Intelligence Agency*, 473 F.3d 370, 378 (D.C. Cir. 2007); *Frugone v. Cent. Intelligence Agency*, 169 F.3d 772, 774–75 (D.C. Cir. 1999).

Aug. 26, 2022) (unpublished decision); *Judicial Watch, Inc. v. U.S. Dep't of Health & Human Servs.*, 525 F. Supp. 3d 90, 99–100 (D.D.C. 2021); *Jackson v. U.S. Dep't of Justice*, No. 14-cv-0192, 2019 WL 4750261, at *7 (D.D.C. Sept. 27, 2019) (unpublished decision).

## CONCLUSION

For all of the foregoing reasons, the Archive respectfully requests that the Court reverse the district court's ruling, and remand the case to the district court with instructions that it require the CIA to release at least the published portions of the Perroots Memo.

Date: May 1, 2023                    Respectfully submitted,


                                     */s/* Hilary T. Jacobs
                                     John S. Guttmann (D.C. Cir. Bar No. 35061)
                                     Hilary T. Jacobs (D.C. Cir. Bar No. 63256)
                                     BEVERIDGE & DIAMOND, P.C.
                                     1900 N Street, N.W., Suite 100
                                     Washington, DC  20036
                                     (202) 789-6020
                                     jguttmann@bdlaw.com
                                     hjacobs@bdlaw.com

                                     *Counsel for Appellant National Security
                                     Archive*

19

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.    This document complies with the type-volume limitations of Circuit Rule 32(e)(2)(B).  According to the word processing system used in this office, this document, not including sections excluded by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1), contains 4,241 words.

2.    This document complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because this document has been prepared in proportionally spaced, 14-point Times New Roman typeface using Microsoft Word.

*/s/* Hilary T. Jacobs
    Hilary T. Jacobs

20

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system, which will send and serve notifications of the foregoing to all counsel of record.

*/s/* Hilary T. Jacobs
Hilary T. Jacobs

# ADDENDUM

## STATUTES AND REGULATIONS

5 U.S.C. § 552. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

22 U.S.C. §§ 4351–4357. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-9

Executive Order No. 13526, Classified National Security Information, 75 Fed. Reg. 707 (Dec. 29, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-14

HISTORICAL AND REVISION NOTES—CONTINUED

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| (2)–(13) ....... | 5 U.S.C. 1001 (less (a)). | Mar. 30, 1948, ch. 161, §301, 62 Stat. 99. June 11, 1946, ch. 324, §2 (less (a)), 60 Stat. 237. |

In paragraph (1), the sentence "Nothing in this Act shall be construed to repeal delegations of authority as provided by law," is omitted as surplusage since there is nothing in the Act which could reasonably be so construed.

In paragraph (1)(G), the words "or naval" are omitted as included in "military".

In paragraph (1)(H), the words "functions which by law expire on the termination of present hostilities, within any fixed period thereafter, or before July 1, 1947" are omitted as executed. Reference to the "Selective Training and Service Act of 1940" is omitted as that Act expired Mar. 31, 1947. Reference to the "Sugar Control Extension Act of 1947" is omitted as that Act expired on Mar. 31, 1948. References to the "Housing and Rent Act of 1947, as amended" and the "Veterans' Emergency Housing Act of 1946" have been consolidated as they are related. The reference to former section 1641(b)(2) of title 50, appendix, is retained notwithstanding its repeal by §111(a)(1) of the Act of Sept. 21, 1961, Pub. L. 87–256, 75 Stat. 538, since §111(c) of the Act provides that a reference in other Acts to a provision of law repealed by §111(a) shall be considered to be a reference to the appropriate provisions of Pub. L. 87–256.

In paragraph (2), the words "of any character" are omitted as surplusage.

In paragraph (3), the words "and a person or agency admitted by an agency as a party for limited purposes" are substituted for "but nothing herein shall be construed to prevent an agency from admitting any person or agency as a party for limited purposes".

In paragraph (9), a comma is supplied between the words "limitation" and "amendment" to correct an editorial error of omission.

In paragraph (10)(C), the words "of any form" are omitted as surplusage.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

CODIFICATION

Section 551 of former Title 5, Executive Departments and Government Officers and Employees, was transferred to section 2242 of Title 7, Agriculture.

AMENDMENTS

2011—Par. (1)(H). Pub. L. 111–350 struck out "chapter 2 of title 41;" after "title 12;".

1994—Par. (1)(H). Pub. L. 103–272 substituted "subchapter II of chapter 471 of title 49; or sections" for "or sections 1622,".

1976—Par. (14). Pub. L. 94–409 added par. (14).

EFFECTIVE DATE OF 1976 AMENDMENT

Amendment by Pub. L. 94–409 effective 180 days after Sept. 13, 1976, see section 6 of Pub. L. 94–409, set out as an Effective Date note under section 552b of this title.

STUDY AND REPORTS ON ADMINISTRATIVE SUBPOENAS

Pub. L. 106–544, §7, Dec. 19, 2000, 114 Stat. 2719, provided that:

"(a) STUDY ON USE OF ADMINISTRATIVE SUBPOENAS.—Not later than December 31, 2001, the Attorney General, in consultation with the Secretary of the Treasury, shall complete a study on the use of administrative subpoena power by executive branch agencies or entities and shall report the findings to the Committees on the Judiciary of the Senate and the House of Representatives. Such report shall include—

"(1) a description of the sources of administrative subpoena power and the scope of such subpoena power within executive branch agencies;

"(2) a description of applicable subpoena enforcement mechanisms;

"(3) a description of any notification provisions and any other provisions relating to safeguarding privacy interests;

"(4) a description of the standards governing the issuance of administrative subpoenas; and

"(5) recommendations from the Attorney General regarding necessary steps to ensure that administrative subpoena power is used and enforced consistently and fairly by executive branch agencies.

"(b) REPORT ON FREQUENCY OF USE OF ADMINISTRATIVE SUBPOENAS.—

"(1) IN GENERAL.—The Attorney General and the Secretary of the Treasury shall report in January of each year to the Committees on the Judiciary of the Senate and the House of Representatives on the number of administrative subpoenas issued by them under this section and the identity of the agency or component of the Department of Justice or the Department of the Treasury issuing the subpoena and imposing the charges.

"(2) EXPIRATION.—The reporting requirement of this subsection shall terminate in 3 years after the date of the enactment of this section [Dec. 19, 2000]."

## § 552. Public information; agency rules, opinions, orders, records, and proceedings

(a) Each agency shall make available to the public information as follows:

(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

(A) descriptions of its central and field organization and the established places at which, the employees (and in the case of a uniformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

(B) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

(C) rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

(E) each amendment, revision, or repeal of the foregoing.

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

(2) Each agency, in accordance with published rules, shall make available for public inspection and copying—

(A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;

(B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register;

(C) administrative staff manuals and instructions to staff that affect a member of the public;

(D) copies of all records, regardless of form or format, which have been released to any person under paragraph (3) and which, because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records; and

(E) a general index of the records referred to under subparagraph (D);

unless the materials are promptly published and copies offered for sale. For records created on or after November 1, 1996, within one year after such date, each agency shall make such records available, including by computer telecommunications or, if computer telecommunications means have not been established by the agency, by other electronic means. To the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, staff manual, instruction, or copies of records referred to in subparagraph (D). However, in each case the justification for the deletion shall be explained fully in writing, and the extent of such deletion shall be indicated on the portion of the record which is made available or published, unless including that indication would harm an interest protected by the exemption in subsection (b) under which the deletion is made. If technically feasible, the extent of the deletion shall be indicated at the place in the record where the deletion was made. Each agency shall also maintain and make available for public inspection and copying current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and required by this paragraph to be made available or published. Each agency shall promptly publish, quarterly or more frequently, and distribute (by sale or otherwise) copies of each index or supplements thereto unless it determines by order published in the Federal Register that the publication would be unnecessary and impracticable, in which case the agency shall nonetheless provide copies of such index on request at a cost not to exceed the direct cost of duplication. Each agency shall make the index referred to in subparagraph (E) available by computer telecommunications by December 31, 1999. A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public may be relied on, used, or cited as precedent by an agency against a party other than an agency only if—

(i) it has been indexed and either made available or published as provided by this paragraph; or

(ii) the party has actual and timely notice of the terms thereof.

(3)(A) Except with respect to the records made available under paragraphs (1) and (2) of this subsection, and except as provided in subparagraph (E), each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

(B) In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format. Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this section.

(C) In responding under this paragraph to a request for records, an agency shall make reasonable efforts to search for the records in electronic form or format, except when such efforts would significantly interfere with the operation of the agency's automated information system.

(D) For purposes of this paragraph, the term ''search'' means to review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request.

(E) An agency, or part of an agency, that is an element of the intelligence community (as that term is defined in section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a(4))) shall not make any record available under this paragraph to—

(i) any government entity, other than a State, territory, commonwealth, or district of the United States, or any subdivision thereof; or

(ii) a representative of a government entity described in clause (i).

(4)(A)(i) In order to carry out the provisions of this section, each agency shall promulgate regulations, pursuant to notice and receipt of public comment, specifying the schedule of fees applicable to the processing of requests under this section and establishing procedures and guidelines for determining when such fees should be waived or reduced. Such schedule shall conform to the guidelines which shall be promulgated, pursuant to notice and receipt of public comment, by the Director of the Office of Management and Budget and which shall provide for a uniform schedule of fees for all agencies.

(ii) Such agency regulations shall provide that—

(I) fees shall be limited to reasonable standard charges for document search, duplication, and review, when records are requested for commercial use;

(II) fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by an educational or noncommercial scientific institution, whose purpose is scholarly or scientific research; or a representative of the news media; and

(III) for any request not described in (I) or (II), fees shall be limited to reasonable standard charges for document search and duplication.

In this clause, the term ''a representative of the news media'' means any person or entity that

gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. In this clause, the term ''news'' means information that is about current events or that would be of current interest to the public. Examples of news-media entities are television or radio stations broadcasting to the public at large and publishers of periodicals (but only if such entities qualify as disseminators of ''news'') who make their products available for purchase by or subscription by or free distribution to the general public. These examples are not all-inclusive. Moreover, as methods of news delivery evolve (for example, the adoption of the electronic dissemination of newspapers through telecommunications services), such alternative media shall be considered to be news-media entities. A freelance journalist shall be regarded as working for a news-media entity if the journalist can demonstrate a solid basis for expecting publication through that entity, whether or not the journalist is actually employed by the entity. A publication contract would present a solid basis for such an expectation; the Government may also consider the past publication record of the requester in making such a determination.

(iii) Documents shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.

(iv) Fee schedules shall provide for the recovery of only the direct costs of search, duplication, or review. Review costs shall include only the direct costs incurred during the initial examination of a document for the purposes of determining whether the documents must be disclosed under this section and for the purposes of withholding any portions exempt from disclosure under this section. Review costs may not include any costs incurred in resolving issues of law or policy that may be raised in the course of processing a request under this section. No fee may be charged by any agency under this section—

(I) if the costs of routine collection and processing of the fee are likely to equal or exceed the amount of the fee; or

(II) for any request described in clause (ii) (II) or (III) of this subparagraph for the first two hours of search time or for the first one hundred pages of duplication.

(v) No agency may require advance payment of any fee unless the requester has previously failed to pay fees in a timely fashion, or the agency has determined that the fee will exceed $250.

(vi) Nothing in this subparagraph shall supersede fees chargeable under a statute specifically providing for setting the level of fees for particular types of records.

(vii) In any action by a requester regarding the waiver of fees under this section, the court shall determine the matter de novo: *Provided,* That the court's review of the matter shall be limited to the record before the agency.

(viii) An agency shall not assess search fees (or in the case of a requester described under clause (ii)(II), duplication fees) under this subparagraph if the agency fails to comply with any time limit under paragraph (6), if no unusual or exceptional circumstances (as those terms are defined for purposes of paragraphs (6)(B) and (C), respectively) apply to the processing of the request.

(B) On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B).

(C) Notwithstanding any other provision of law, the defendant shall serve an answer or otherwise plead to any complaint made under this subsection within thirty days after service upon the defendant of the pleading in which such complaint is made, unless the court otherwise directs for good cause shown.

[(D) Repealed. Pub. L. 98–620, title IV, § 402(2), Nov. 8, 1984, 98 Stat. 3357.]

(E)(i) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed.

(ii) For purposes of this subparagraph, a complainant has substantially prevailed if the complainant has obtained relief through either—

(I) a judicial order, or an enforceable written agreement or consent decree; or

(II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial.

(F)(i) Whenever the court orders the production of any agency records improperly withheld from the complainant and assesses against the United States reasonable attorney fees and other litigation costs, and the court additionally issues a written finding that the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding, the Special Counsel shall promptly initiate a proceeding to determine whether disciplinary action is warranted against the officer or employee who was primarily responsible for the withholding. The Special Counsel, after investigation and consideration of the evidence submitted, shall submit his findings and recommendations to the administrative authority of the agency concerned and shall send copies of

the findings and recommendations to the officer or employee or his representative. The administrative authority shall take the corrective action that the Special Counsel recommends.

(ii) The Attorney General shall—

(I) notify the Special Counsel of each civil action described under the first sentence of clause (i); and

(II) annually submit a report to Congress on the number of such civil actions in the preceding year.

(iii) The Special Counsel shall annually submit a report to Congress on the actions taken by the Special Counsel under clause (i).

(G) In the event of noncompliance with the order of the court, the district court may punish for contempt the responsible employee, and in the case of a uniformed service, the responsible member.

(5) Each agency having more than one member shall maintain and make available for public inspection a record of the final votes of each member in every agency proceeding.

(6)(A) Each agency, upon any request for records made under paragraph (1), (2), or (3) of this subsection, shall—

(i) determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefor, and of the right of such person to appeal to the head of the agency any adverse determination; and

(ii) make a determination with respect to any appeal within twenty days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of such appeal. If on appeal the denial of the request for records is in whole or in part upheld, the agency shall notify the person making such request of the provisions for judicial review of that determination under paragraph (4) of this subsection.

The 20-day period under clause (i) shall commence on the date on which the request is first received by the appropriate component of the agency, but in any event not later than ten days after the request is first received by any component of the agency that is designated in the agency's regulations under this section to receive requests under this section. The 20-day period shall not be tolled by the agency except—

(I) that the agency may make one request to the requester for information and toll the 20-day period while it is awaiting such information that it has reasonably requested from the requester under this section; or

(II) if necessary to clarify with the requester issues regarding fee assessment. In either case, the agency's receipt of the requester's response to the agency's request for information or clarification ends the tolling period.

(B)(i) In unusual circumstances as specified in this subparagraph, the time limits prescribed in either clause (i) or clause (ii) of subparagraph (A) may be extended by written notice to the person making such request setting forth the unusual circumstances for such extension and the date on which a determination is expected to be dispatched. No such notice shall specify a date that would result in an extension for more than ten working days, except as provided in clause (ii) of this subparagraph.

(ii) With respect to a request for which a written notice under clause (i) extends the time limits prescribed under clause (i) of subparagraph (A), the agency shall notify the person making the request if the request cannot be processed within the time limit specified in that clause and shall provide the person an opportunity to limit the scope of the request so that it may be processed within that time limit or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request. To aid the requester, each agency shall make available its FOIA Public Liaison, who shall assist in the resolution of any disputes between the requester and the agency. Refusal by the person to reasonably modify the request or arrange such an alternative time frame shall be considered as a factor in determining whether exceptional circumstances exist for purposes of subparagraph (C).

(iii) As used in this subparagraph, "unusual circumstances" means, but only to the extent reasonably necessary to the proper processing of the particular requests—

(I) the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request;

(II) the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or

(III) the need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject-matter interest therein.

(iv) Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for the aggregation of certain requests by the same requestor, or by a group of requestors acting in concert, if the agency reasonably believes that such requests actually constitute a single request, which would otherwise satisfy the unusual circumstances specified in this subparagraph, and the requests involve clearly related matters. Multiple requests involving unrelated matters shall not be aggregated.

(C)(i) Any person making a request to any agency for records under paragraph (1), (2), or (3) of this subsection shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph. If the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records. Upon any determination by an agency to comply with a request for records, the records shall be made promptly available to such person making such request. Any notification of denial of any request for

records under this subsection shall set forth the names and titles or positions of each person responsible for the denial of such request.

(ii) For purposes of this subparagraph, the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests.

(iii) Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing a request (or a modified request) under clause (ii) after being given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

(D)(i) Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for multitrack processing of requests for records based on the amount of work or time (or both) involved in processing requests.

(ii) Regulations under this subparagraph may provide a person making a request that does not qualify for the fastest multitrack processing an opportunity to limit the scope of the request in order to qualify for faster processing.

(iii) This subparagraph shall not be considered to affect the requirement under subparagraph (C) to exercise due diligence.

(E)(i) Each agency shall promulgate regulations, pursuant to notice and receipt of public comment, providing for expedited processing of requests for records—

(I) in cases in which the person requesting the records demonstrates a compelling need; and

(II) in other cases determined by the agency.

(ii) Notwithstanding clause (i), regulations under this subparagraph must ensure—

(I) that a determination of whether to provide expedited processing shall be made, and notice of the determination shall be provided to the person making the request, within 10 days after the date of the request; and

(II) expeditious consideration of administrative appeals of such determinations of whether to provide expedited processing.

(iii) An agency shall process as soon as practicable any request for records to which the agency has granted expedited processing under this subparagraph. Agency action to deny or affirm denial of a request for expedited processing pursuant to this subparagraph, and failure by an agency to respond in a timely manner to such a request shall be subject to judicial review under paragraph (4), except that the judicial review shall be based on the record before the agency at the time of the determination.

(iv) A district court of the United States shall not have jurisdiction to review an agency denial of expedited processing of a request for records after the agency has provided a complete response to the request.

(v) For purposes of this subparagraph, the term "compelling need" means—

(I) that a failure to obtain requested records on an expedited basis under this paragraph could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

(II) with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity.

(vi) A demonstration of a compelling need by a person making a request for expedited processing shall be made by a statement certified by such person to be true and correct to the best of such person's knowledge and belief.

(F) In denying a request for records, in whole or in part, an agency shall make a reasonable effort to estimate the volume of any requested matter the provision of which is denied, and shall provide any such estimate to the person making the request, unless providing such estimate would harm an interest protected by the exemption in subsection (b) pursuant to which the denial is made.

(7) Each agency shall—

(A) establish a system to assign an individualized tracking number for each request received that will take longer than ten days to process and provide to each person making a request the tracking number assigned to the request; and

(B) establish a telephone line or Internet service that provides information about the status of a request to the person making the request using the assigned tracking number, including—

(i) the date on which the agency originally received the request; and

(ii) an estimated date on which the agency will complete action on the request.

(b) This section does not apply to matters that are—

(1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order;

(2) related solely to the internal personnel rules and practices of an agency;

(3) specifically exempted from disclosure by statute (other than section 552b of this title), if that statute—

(A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

(ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

(B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual;

(8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(9) geological and geophysical information and data, including maps, concerning wells.

Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection. The amount of information deleted, and the exemption under which the deletion is made, shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by the exemption in this subsection under which the deletion is made. If technically feasible, the amount of the information deleted, and the exemption under which the deletion is made, shall be indicated at the place in the record where such deletion is made.

(c)(1) Whenever a request is made which involves access to records described in subsection (b)(7)(A) and—

(A) the investigation or proceeding involves a possible violation of criminal law; and

(B) there is reason to believe that (i) the subject of the investigation or proceeding is not aware of its pendency, and (ii) disclosure of the existence of the records could reasonably be expected to interfere with enforcement proceedings,

the agency may, during only such time as that circumstance continues, treat the records as not subject to the requirements of this section.

(2) Whenever informant records maintained by a criminal law enforcement agency under an informant's name or personal identifier are requested by a third party according to the informant's name or personal identifier, the agency may treat the records as not subject to the requirements of this section unless the inform-

ant's status as an informant has been officially confirmed.

(3) Whenever a request is made which involves access to records maintained by the Federal Bureau of Investigation pertaining to foreign intelligence or counterintelligence, or international terrorism, and the existence of the records is classified information as provided in subsection (b)(1), the Bureau may, as long as the existence of the records remains classified information, treat the records as not subject to the requirements of this section.

(d) This section does not authorize withholding of information or limit the availability of records to the public, except as specifically stated in this section. This section is not authority to withhold information from Congress.

(e)(1) On or before February 1 of each year, each agency shall submit to the Attorney General of the United States a report which shall cover the preceding fiscal year and which shall include—

(A) the number of determinations made by the agency not to comply with requests for records to such agency under subsection (a) and the reasons for each such determination;

(B)(i) the number of appeals made by persons under subsection (a)(6), the result of such appeals, and the reason for the action upon each appeal that results in a denial of information; and

(ii) a complete list of all statutes that the agency relies upon to authorize the agency to withhold information under subsection (b)(3), the number of occasions on which each statute was relied upon, a description of whether a court has upheld the decision of the agency to withhold information under each such statute, and a concise description of the scope of any information withheld;

(C) the number of requests for records pending before the agency as of September 30 of the preceding year, and the median and average number of days that such requests had been pending before the agency as of that date;

(D) the number of requests for records received by the agency and the number of requests which the agency processed;

(E) the median number of days taken by the agency to process different types of requests, based on the date on which the requests were received by the agency;

(F) the average number of days for the agency to respond to a request beginning on the date on which the request was received by the agency, the median number of days for the agency to respond to such requests, and the range in number of days for the agency to respond to such requests;

(G) based on the number of business days that have elapsed since each request was originally received by the agency—

(i) the number of requests for records to which the agency has responded with a determination within a period up to and including 20 days, and in 20-day increments up to and including 200 days;

(ii) the number of requests for records to which the agency has responded with a determination within a period greater than 200 days and less than 301 days;

(iii) the number of requests for records to which the agency has responded with a determination within a period greater than 300 days and less than 401 days; and

(iv) the number of requests for records to which the agency has responded with a determination within a period greater than 400 days;

(H) the average number of days for the agency to provide the granted information beginning on the date on which the request was originally filed, the median number of days for the agency to provide the granted information, and the range in number of days for the agency to provide the granted information;

(I) the median and average number of days for the agency to respond to administrative appeals based on the date on which the appeals originally were received by the agency, the highest number of business days taken by the agency to respond to an administrative appeal, and the lowest number of business days taken by the agency to respond to an administrative appeal;

(J) data on the 10 active requests with the earliest filing dates pending at each agency, including the amount of time that has elapsed since each request was originally received by the agency;

(K) data on the 10 active administrative appeals with the earliest filing dates pending before the agency as of September 30 of the preceding year, including the number of business days that have elapsed since the requests were originally received by the agency;

(L) the number of expedited review requests that are granted and denied, the average and median number of days for adjudicating expedited review requests, and the number adjudicated within the required 10 days;

(M) the number of fee waiver requests that are granted and denied, and the average and median number of days for adjudicating fee waiver determinations;

(N) the total amount of fees collected by the agency for processing requests; and

(O) the number of full-time staff of the agency devoted to processing requests for records under this section, and the total amount expended by the agency for processing such requests.

(2) Information in each report submitted under paragraph (1) shall be expressed in terms of each principal component of the agency and for the agency overall.

(3) Each agency shall make each such report available to the public including by computer telecommunications, or if computer telecommunications means have not been established by the agency, by other electronic means. In addition, each agency shall make the raw statistical data used in its reports available electronically to the public upon request.

(4) The Attorney General of the United States shall make each report which has been made available by electronic means available at a single electronic access point. The Attorney General of the United States shall notify the Chairman and ranking minority member of the Committee on Government Reform and Oversight of the House of Representatives and the Chairman and ranking minority member of the Committees on Governmental Affairs and the Judiciary of the Senate, no later than April 1 of the year in which each such report is issued, that such reports are available by electronic means.

(5) The Attorney General of the United States, in consultation with the Director of the Office of Management and Budget, shall develop reporting and performance guidelines in connection with reports required by this subsection by October 1, 1997, and may establish additional requirements for such reports as the Attorney General determines may be useful.

(6) The Attorney General of the United States shall submit an annual report on or before April 1 of each calendar year which shall include for the prior calendar year a listing of the number of cases arising under this section, the exemption involved in each case, the disposition of such case, and the cost, fees, and penalties assessed under subparagraphs (E), (F), and (G) of subsection (a)(4). Such report shall also include a description of the efforts undertaken by the Department of Justice to encourage agency compliance with this section.

(f) For purposes of this section, the term—

(1) ''agency'' as defined in section 551(1) of this title includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency; and

(2) ''record'' and any other term used in this section in reference to information includes—

(A) any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format; and

(B) any information described under subparagraph (A) that is maintained for an agency by an entity under Government contract, for the purposes of records management.

(g) The head of each agency shall prepare and make publicly available upon request, reference material or a guide for requesting records or information from the agency, subject to the exemptions in subsection (b), including—

(1) an index of all major information systems of the agency;

(2) a description of major information and record locator systems maintained by the agency; and

(3) a handbook for obtaining various types and categories of public information from the agency pursuant to chapter 35 of title 44, and under this section.

(h)(1) There is established the Office of Government Information Services within the National Archives and Records Administration.

(2) The Office of Government Information Services shall—

(A) review policies and procedures of administrative agencies under this section;

(B) review compliance with this section by administrative agencies; and

(C) recommend policy changes to Congress and the President to improve the administration of this section.

(3) The Office of Government Information Services shall offer mediation services to resolve disputes between persons making requests under this section and administrative agencies as a non-exclusive alternative to litigation and, at the discretion of the Office, may issue advisory opinions if mediation has not resolved the dispute.

(i) The Government Accountability Office shall conduct audits of administrative agencies on the implementation of this section and issue reports detailing the results of such audits.

(j) Each agency shall designate a Chief FOIA Officer who shall be a senior official of such agency (at the Assistant Secretary or equivalent level).

(k) The Chief FOIA Officer of each agency shall, subject to the authority of the head of the agency—

(1) have agency-wide responsibility for efficient and appropriate compliance with this section;

(2) monitor implementation of this section throughout the agency and keep the head of the agency, the chief legal officer of the agency, and the Attorney General appropriately informed of the agency's performance in implementing this section;

(3) recommend to the head of the agency such adjustments to agency practices, policies, personnel, and funding as may be necessary to improve its implementation of this section;

(4) review and report to the Attorney General, through the head of the agency, at such times and in such formats as the Attorney General may direct, on the agency's performance in implementing this section;

(5) facilitate public understanding of the purposes of the statutory exemptions of this section by including concise descriptions of the exemptions in both the agency's handbook issued under subsection (g), and the agency's annual report on this section, and by providing an overview, where appropriate, of certain general categories of agency records to which those exemptions apply; and

(6) designate one or more FOIA Public Liaisons.

(l) FOIA Public Liaisons shall report to the agency Chief FOIA Officer and shall serve as supervisory officials to whom a requester under this section can raise concerns about the service the requester has received from the FOIA Requester Center, following an initial response from the FOIA Requester Center Staff. FOIA Public Liaisons shall be responsible for assisting in reducing delays, increasing transparency and understanding of the status of requests, and assisting in the resolution of disputes.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 383; Pub. L. 90–23, §1, June 5, 1967, 81 Stat. 54; Pub. L. 93–502, §§1–3, Nov. 21, 1974, 88 Stat. 1561–1564; Pub. L. 94–409, §5(b), Sept. 13, 1976, 90 Stat. 1247; Pub. L. 95–454, title IX, §906(a)(10), Oct. 13, 1978, 92 Stat. 1225; Pub. L. 98–620, title IV, §402(2), Nov. 8, 1984, 98 Stat. 3357; Pub. L. 99–570, title I, §§1802, 1803, Oct. 27, 1986, 100 Stat. 3207–48, 3207–49; Pub. L. 104–231, §§3–11, Oct. 2, 1996, 110 Stat. 3049–3054; Pub. L. 107–306, title III, §312, Nov. 27, 2002, 116 Stat. 2390; Pub. L. 110–175, §§3, 4(a), 5, 6(a)(1), (b)(1), 7(a), 8–10(a), 12, Dec. 31, 2007, 121 Stat. 2525–2530; Pub. L. 111–83, title V, §564(b), Oct. 28, 2009, 123 Stat. 2184.)

HISTORICAL AND REVISION NOTES
1966 ACT

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1002. | June 11, 1946, ch. 324, §3, 60 Stat. 238. |

In subsection (b)(3), the words "formulated and" are omitted as surplusage. In the last sentence of subsection (b), the words "in any manner" are omitted as surplusage since the prohibition is all inclusive.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

1967 ACT

Section 1 [of Pub. L. 90–23] amends section 552 of title 5, United States Code, to reflect Public Law 89–487.

In subsection (a)(1)(A), the words "employees (and in the case of a uniformed service, the member)" are substituted for "officer" to retain the coverage of Public Law 89–487 and to conform to the definitions in 5 U.S.C. 2101, 2104, and 2105.

In the last sentence of subsection (a)(2), the words "A final order * * * may be relied on * * * only if" are substituted for "No final order * * * may be relied upon * * * unless"; and the words "a party other than an agency" and "the party" are substituted for "a private party" and "the private party", respectively, on authority of the definition of "private party" in 5 App. U.S.C. 1002(g).

In subsection (a)(3), the words "the responsible employee, and in the case of a uniformed service, the responsible member" are substituted for "the responsible officers" to retain the coverage of Public Law 89–487 and to conform to the definitions in 5 U.S.C. 2101, 2104, and 2105.

In subsection (a)(4), the words "shall maintain and make available for public inspection a record" are substituted for "shall keep a record * * * and that record shall be available for public inspection".

In subsection (b)(5) and (7), the words "a party other than an agency" are substituted for "a private party" on authority of the definition of "private party" in 5 App. U.S.C. 1002(g).

In subsection (c), the words "This section does not authorize" and "This section is not authority" are substituted for "Nothing in this section authorizes" and "nor shall this section be authority", respectively.

5 App. U.S.C. 1002(g), defining "private party" to mean a party other than an agency, is omitted since the words "party other than an agency" are substituted for the words "private party" wherever they appear in revised 5 U.S.C. 552.

5 App. U.S.C. 1002(h), prescribing the effective date, is omitted as unnecessary. That effective date is prescribed by section 4 of this bill.

REFERENCES IN TEXT

The date of enactment of the OPEN FOIA Act of 2009, referred to in subsec. (b)(3)(B), is the date of enactment of Pub. L. 111–83, which was approved Oct. 28, 2009.

CODIFICATION

Section 552 of former Title 5, Executive Departments and Government Officers and Employees, was transferred to section 2243 of Title 7, Agriculture.

AMENDMENTS

2009—Subsec. (b)(3). Pub. L. 111–83 added par. (3) and struck out former par. (3), which read as follows: "spe-

EFFECTIVE DATE

Section effective 180 days after Dec. 22, 1987, see section 186(b) of Pub. L. 100–204, set out as a note under section 4741 of this title.

## CHAPTER 53B—FOREIGN RELATIONS OF THE UNITED STATES HISTORICAL SERIES

Sec.
4351.    General authority and contents of publication.
4352.    Responsibility for preparation of FRUS series.
4353.    Procedures for identifying records for FRUS series; declassification, revisions, and summaries.
4354.    Declassification of State Department records.
4355.    Relationship to Privacy Act and Freedom of Information Act.
4356.    Advisory Committee.
4357.    Definitions.

## § 4351. General authority and contents of publication

**(a) Charter of publication**

The Department of State shall continue to publish the ''Foreign Relations of the United States historical series'' (hereafter in this chapter referred to as the ''FRUS series''), which shall be a thorough, accurate, and reliable documentary record of major United States foreign policy decisions and significant United States diplomatic activity. Volumes of this publication shall include all records needed to provide a comprehensive documentation of the major foreign policy decisions and actions of the United States Government, including the facts which contributed to the formulation of policies and records providing supporting and alternative views to the policy position ultimately adopted.

**(b) Editing principles**

The editing of records for preparation of the FRUS series shall be guided by the principles of historical objectivity and accuracy. Records shall not be altered and deletions shall not be made without indicating in the published text that a deletion has been made. The published record shall omit no facts which were of major importance in reaching a decision, and nothing shall be omitted for the purpose of concealing a defect of policy.

**(c) Deadline for publication of records**

The Secretary of State shall ensure that the FRUS series shall be published not more than 30 years after the events recorded.

(Aug. 1, 1956, ch. 841, title IV, § 401, as added Pub. L. 102–138, title I, § 198(a), Oct. 28, 1991, 105 Stat. 685.)

COMPLIANCE WITH DEADLINE FOR PUBLICATION OF FRUS SERIES; NOTIFICATION TO CONGRESSIONAL COMMITTEES ON FAILURE TO COMPLY; FINAL DEADLINE

Pub. L. 102–138, title I, § 198(c)(2), Oct. 28, 1991, 105 Stat. 691, provided that:

''(A) In order to come into compliance with section 401(c) of the State Department Basic Authorities Act of 1956 [22 U.S.C. 4351(c)] (as amended by this section) the Secretary of State shall ensure that, by the end of the 3-year period beginning on the date of the enactment of this Act [Oct. 28, 1991], all volumes of the Foreign Relations of the United States historical series (FRUS) for the years that are more than 30 years before the end of that 3-year period have been published.

''(B) If the Secretary cannot reasonably meet the requirements of subparagraph (A), the Secretary shall notify the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives and describe how the Department of State plans to meet the requirements of subparagraph (A). In no event shall volumes subject to subparagraph (A) be published later than 5 years after the date of the enactment of this Act.''

## § 4352. Responsibility for preparation of FRUS series

**(a) In general**

(1)(A) The Historian of the Department of State shall be responsible for the preparation of the FRUS series, including the selection of records, in accordance with the provisions of this chapter.

(B) The Advisory Committee on Historical Diplomatic Documentation shall review records, and shall advise and make recommendations to the Historian concerning all aspects of preparation and publication of the FRUS series, including, in accordance with the procedures contained in section 4353 of this title, the review and selection of records for inclusion in volumes of the series.

(2) Other departments, agencies, and other entities of the United States Government shall cooperate with the Office of the Historian by providing full and complete access to the records pertinent to United States foreign policy decisions and actions and by providing copies of selected records in accordance with the procedures developed under section 4353 of this title, except that no access to any record, and no provision of any copy of a record, shall be required in the case of any record that was prepared less than 20 years before the date of a request for such access or copy made by the Office of the Historian.

**(b) National Archives and Records Administration**

Notwithstanding any other provision of this chapter, the requirement for the National Archives and Records Administration to provide access to, and copies of, records to the Department of State for the FRUS series shall be governed by chapter 21 of title 44, by any agreement concluded between the Department of State and the National Archives and Records Administration, and, in the case of Presidential records, by section 2204 of such title.

(Aug. 1, 1956, ch. 841, title IV, § 402, as added Pub. L. 102–138, title I, § 198(a), Oct. 28, 1991, 105 Stat. 685; amended Pub. L. 117–81, div. E, title LV, § 5504(1), Dec. 27, 2021, 135 Stat. 2376.)

### Editorial Notes

AMENDMENTS

2021—Subsec. (a)(2). Pub. L. 117–81 substituted ''20'' for ''26''.

AUTHORITY OF SECRETARY OF STATE

Except as otherwise provided, Secretary of State to have and exercise any authority vested by law in any

official or office of Department of State and references to such officials or offices deemed to refer to Secretary of State or Department of State, as appropriate, see section 2651a of this title and section 161(d) of Pub. L. 103–236, set out as a note under section 2651a of this title.

## § 4353. Procedures for identifying records for FRUS series; declassification, revisions, and summaries

### (a) Development of procedures

Not later than 180 days after October 28, 1991, each department, agency, or other entity of the United States Government engaged in foreign policy formulation, execution, or support shall develop procedures for its historical office (or a designated individual in the event that there is no historical office)—

(1) to coordinate with the State Department's Office of the Historian in selecting records for possible inclusion in the FRUS series;

(2) to permit full access to the original, unrevised records by such individuals holding appropriate security clearances as have been designated by the Historian as liaison to that department, agency, or entity, for purposes of this chapter, and by members of the Advisory Committee; and

(3) to permit access to specific types of records not selected for inclusion in the FRUS series by the individuals identified in paragraph (2) when requested by the Historian in order to confirm that records selected by that department, agency, or entity accurately represent the policymaking process reflected in the relevant part of the FRUS series.

### (b) Declassification review

(1) Subject to the provisions of this subsection, records selected by the Historian for inclusion in the FRUS series shall be submitted to the respective originating agency for declassification review in accordance with that agency's procedures for such review, except that such declassification review shall be completed by the originating agency within 120 days after such records are submitted for review. If the originating agency determines that any such record is not declassifiable because of a continuing need to protect sources and methods for the collection of intelligence information or to protect other sensitive national security information, then the originating agency shall attempt to make such deletions in the text as will make the record declassifiable.

(2) If the Historian determines that the meaning of the records proposed for inclusion in a volume of the FRUS series would be so altered or changed by deletions made under paragraph (1) that publication in that condition could be misleading or lead to an inaccurate or incomplete historical record, then the Historian shall take steps to achieve a satisfactory resolution of the problem with the originating agency. Within 60 days of receiving a proposed solution from the Historian, the originating agency shall furnish the Historian a written response agreeing to the solution or explaining the reasons for the alteration or deletion.

(3) The Historian shall inform the Advisory Committee of any failure by an originating

agency to complete its declassification review of a record within 120 days and of any steps taken under paragraph (2).

(4) If the Advisory Committee determines that the meaning of the records proposed for inclusion in a volume of the FRUS series would be so altered or changed by deletions made under paragraph (1), or if the Advisory Committee determines as a result of inspection of other documents under subsection (a)(3) that the selection of documents could be misleading or lead to an inaccurate or incomplete historical record, then the Advisory Committee shall so advise the Secretary of State and submit recommendations to resolve the issue.

(5)(A) The Advisory Committee shall have full and complete access to the original text of any record in which deletions have been made. In the event that the head of any originating agency considers it necessary to deny access by the Advisory Committee to the original text of any record, that agency head shall promptly notify the Advisory Committee in writing, describing the nature of the record in question and the justification for withholding that record.

(B) The Historian shall provide the Advisory Committee with a complete list of the records described in subparagraph (A).

(6) If a record is deleted in whole or in part as a result of review under this subsection then a note to that effect shall be inserted at the appropriate place in the FRUS volume.

(Aug. 1, 1956, ch. 841, title IV, § 403, as added Pub. L. 102–138, title I, § 198(a), Oct. 28, 1991, 105 Stat. 686.)

STATUTORY NOTES AND RELATED SUBSIDIARIES

AUTHORITY OF SECRETARY OF STATE

Except as otherwise provided, Secretary of State to have and exercise any authority vested by law in any official or office of Department of State and references to such officials or offices deemed to refer to Secretary of State or Department of State, as appropriate, see section 2651a of this title and section 161(d) of Pub. L. 103–236, set out as a note under section 2651a of this title.

## § 4354. Declassification of State Department records

### (a) Deadline for declassification

(1) Except as provided in subsection (b), each classified record of permanent historical value (as determined by the Secretary of State and the Archivist of the United States) which was published, issued, or otherwise prepared by the Department of State (or any officer or employee thereof acting in an official capacity) shall be declassified not later than 25 years after the record was prepared, shall be transferred to the National Archives and Records Administration, and shall be made available at the National Archives for public inspection and copying.

(2) Nothing in this subsection may be construed to require the declassification of a record wholly prepared by a foreign government.

### (b) Exempted records

Subsection (a) shall not apply to any record (or portion thereof) the publication of which the Secretary of State, in coordination with any

agency that originated information in the records, determines—

(1) would compromise weapons technology important to the national defense of the United States or reveal sensitive information relating to the design of United States or foreign military equipment or relating to United States cryptologic systems or activities;

(2) would disclose the names or identities of living persons who provided confidential information to the United States and would pose a substantial risk of harm to such persons;

(3) would demonstrably impede current diplomatic negotiations or other ongoing official activities of the United States Government or would demonstrably impair the national security of the United States; or

(4) would disclose matters that are related solely to the internal personnel rules and practices of the Department of State or are contained in personnel, medical, or similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

**(c) Review**

(1) The Advisory Committee shall review—

(A) the State Department's declassification procedures,

(B) all guidelines used in declassification, including those guidelines provided to the National Archives and Records Administration which are in effect on October 28, 1991, and

(C) by random sampling, records representative of all Department of State records published, issued, or otherwise prepared by the Department of State that remain classified after 30 years.

(2) In the event that the Secretary of State considers it necessary to deny access to records under paragraph (1)(C), the Secretary shall notify the Advisory Committee in writing, describing the nature of the records in question and the justification for withholding them.

**(d) Annual reports by the Advisory Committee**

The Advisory Committee shall annually submit to the Secretary of State and to the Committee on Foreign Relations of the Senate and the Committee on International Relations of the House of Representatives a report setting forth its findings from the review conducted under subsection (c).

**(e) Annual reports by the Secretary**

**(1) In general**

Not later than March 1 of each year, the Secretary shall submit a report to the Committee on Foreign Relations of the Senate and the Committee on International Relations of the House of Representatives on the compliance of the Department of State with the provisions of this chapter, including—

(A) the volumes published in the previous calendar year;

(B) the degree to which the Department is not in compliance with the deadline set forth in section 4351(c) of this title; and

(C) the factors relevant to the inability of the Department to comply with the provisions of this chapter, including section 4351(c) of this title.

**(2) Form of reports**

Each report required to be submitted by paragraph (1) shall be submitted in unclassified form, together with a classified annex if necessary.

(Aug. 1, 1956, ch. 841, title IV, §404, as added Pub. L. 102–138, title I, §198(a), Oct. 28, 1991, 105 Stat. 687; amended Pub. L. 107–228, div. A, title II, §205, Sept. 30, 2002, 116 Stat. 1363; Pub. L. 117–81, div. E, title LV, §5504(2), Dec. 27, 2021, 135 Stat. 2376.)

### Editorial Notes

#### Amendments

2021—Subsec. (a)(1). Pub. L. 117–81 substituted "25" for "30".

2002—Subsec. (d). Pub. L. 107–228, §205(a), substituted "Annual reports by the Advisory Committee" for "Reporting requirement" in heading and inserted "and to the Committee on Foreign Relations of the Senate and the Committee on International Relations of the House of Representatives" after "Secretary of State" in text.

Subsec. (e). Pub. L. 107–228, §205(b), substituted "Annual reports by the Secretary" for "Report to Congress" in heading and amended text generally. Prior to amendment, text read as follows: "Not later than 180 days after October 28, 1991, the Secretary of State shall prepare and submit a written report to the Committee on Foreign Affairs of the House of Representatives and the Committee on Foreign Relations of the Senate on factors relevant to compliance with this section, and the procedures to be used for implementing the requirements of this section."

### Statutory Notes and Related Subsidiaries

#### Change of Name

Committee on International Relations of House of Representatives changed to Committee on Foreign Affairs of House of Representatives by House Resolution No. 6, One Hundred Tenth Congress, Jan. 5, 2007.

#### Compliance With Declassification of State Department Records; Notification To Congressional Committees on Inability To Comply; Final Deadline

Pub. L. 102–138, title I, §198(c)(1), Oct. 28, 1991, 105 Stat. 691, provided that: "The Secretary of State shall ensure that the requirements of section 404 of the State Department Basic Authorities Act of 1956 [22 U.S.C. 4354] (as amended by this section) are met not later than one year after the date of enactment of this Act [Oct. 28, 1991]. If the Secretary cannot reasonably meet the requirements of such section, he shall so notify the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives, and describe how the Department of State intends to meet the requirements of that section. In no event shall full compliance with the requirements of such section take place later than 2 years after the date of enactment of this Act."

### § 4355. Relationship to Privacy Act and Freedom of Information Act

**(a) Privacy Act**

Nothing in this chapter may be construed as requiring the public disclosure of records or portions of records protected under section 552a of title 5 (relating to the privacy of personal records).

**(b) Freedom of Information Act**

(1) Except as provided in paragraph (2), no record (or portion thereof) shall be excluded

from publication in the FRUS series under section 4353 of this title, or exempted from the declassification requirement of section 4354 of this title, solely by virtue of the application of section 552(b) of title 5 (relating to the exemption of certain matters from freedom of information requirements).

(2) Records described in section 1202(f) of title 8 (relating to visa records) shall be excluded from publication in the FRUS series under section 4353 of this title and, to the extent applicable, exempted from the declassification requirement of section 4354 of this title.

(Aug. 1, 1956, ch. 841, title IV, § 405, as added Pub. L. 102–138, title I, § 198(a), Oct. 28, 1991, 105 Stat. 688.)

§ 4356. Advisory Committee

(a) Establishment

(1) There is established on a permanent basis the Advisory Committee on Historical Diplomatic Documentation for the Department of State. The activities of the Advisory Committee shall be coordinated by the Office of the Historian of the Department of State.

(2) The Advisory Committee shall be composed of 9 members and an executive secretary. The Historian shall serve as executive secretary.

(3)(A) The members of the Advisory Committee shall be appointed by the Secretary of State from among distinguished historians, political scientists, archivists, international lawyers, and other social scientists who have a demonstrable record of substantial research pertaining to the foreign relations of the United States. No officer or employee of the United States Government shall be appointed to the Advisory Committee.

(B)(i) Six members of the Advisory Committee shall be appointed from lists of individuals nominated by the American Historical Association, the Organization of American Historians, the American Political Science Association, Society of American Archivists, the American Society of International Law, and the Society for Historians of American Foreign Relations. One member shall be appointed from each list.

(ii) If an organization does not submit a list of nominees under clause (i) in a timely fashion, the Secretary of State shall make an appointment from among the nominees on other lists.

(b) Terms of service for appointments

(1) Except as provided in paragraph (2), members of the Advisory Committee shall be appointed for terms of three years.

(2) Of the members first appointed, as designated by the Secretary of State at the time of their appointment (after consultation with the appropriate organizations) three shall be appointed for terms of one year, three shall be appointed for terms of two years, and three shall be appointed for terms of three years.

(3) Each term of service under paragraph (1) shall begin on September 1 of the year in which the appointment is made.

(4) A vacancy in the membership of the Advisory Committee shall be filled in the same manner as provided under this subsection to make the original appointment. A member appointed to fill a vacancy occurring before the expiration of a term shall serve for the remainder of that term. A member may continue to serve when his or her term expires until a successor is appointed. A member may be appointed to a new term upon the expiration of his or her term.

(c) Selection of chairperson

The Advisory Committee shall select, from among its members, a chairperson to serve a term of 1 year. A chairperson may be reelected upon expiration of his or her term as chairperson.

(d) Meetings

A majority of the members of the Advisory Committee shall constitute a quorum. The Advisory Committee shall meet at least quarterly or as frequently as may be necessary to carry out its duties.

(e) Security clearances

(1) All members of the Advisory Committee shall be granted the necessary security clearances, subject to the standard procedures for granting such clearances.

(2) For purposes of any law or regulation governing access to classified records, a member of the Advisory Committee seeking access under this paragraph to a record shall be deemed to have a need to know.

(f) Compensation

(1) Members of the Advisory Committee—

(A) shall each receive compensation at a rate of not to exceed the daily equivalent of the annual rate of basic pay payable for positions at GS–15 of the General Schedule under section 5332 of title 5 for each day such member is engaged in the actual performance of the duties of the Advisory Committee; and

(B) shall be allowed travel expenses, including per diem in lieu of subsistence at rates authorized for employees of agencies under subchapter I of chapter 57 of title 5, while away from their homes or regular places of business in the performance of services of the Advisory Committee.

(2) The Secretary of State is authorized to provide for necessary secretarial and staff assistance for the Advisory Committee.

(3) The Federal Advisory Committee Act shall not apply to the Advisory Committee to the extent that the provisions of this chapter are inconsistent with that Act.

(Aug. 1, 1956, ch. 841, title IV, § 406, as added Pub. L. 102–138, title I, § 198(a), Oct. 28, 1991, 105 Stat. 688.)

### Editorial Notes

REFERENCES IN TEXT

The Federal Advisory Committee Act, referred to in subsec. (f)(3), is Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 770, as amended, which is set out in the Appendix to Title 5, Government Organization and Employees.

### Statutory Notes and Related Subsidiaries

TERMINATION OF PREVIOUS ADVISORY COMMITTEE ON HISTORICAL DIPLOMATIC DOCUMENTATION

Pub. L. 102–138, title I, § 198(b), Oct. 28, 1991, 105 Stat. 691, provided that: "The Advisory Committee on His-

torical Documentation for the Department of State established before the date of enactment of this Act [Oct. 28, 1991] shall terminate on such date.''

### § 4357. Definitions

For purposes of this chapter—

(1) the term ''Advisory Committee'' means the Advisory Committee on Historical Diplomatic Documentation for the Department of State;

(2) the term ''Historian'' means the Historian of the Department of State or any successor officer of the Department of State responsible for carrying out the functions of the Office of the Historian, Bureau of Public Affairs, of the Department of State, as in effect on October 28, 1991;

(3) the term ''originating agency'' means, with respect to a record, the department, agency, or entity of the United States (or any officer or employee thereof of acting in his official capacity) that originates, develops, publishes, issues, or otherwise prepares that record or receives that record from outside the United States Government; and

(4) the term ''record'' includes any written material (including any document, memorandum, correspondence, statistical data, book, or other papers), map, photograph, machine readable material, or other documentary material, regardless of physical form or characteristics, made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government or because of the informational value in them, and such term does not include library or museum material made or acquired and preserved solely for reference or exhibition purposes, any extra copy of a document preserved only for convenience of reference, or any stocks of publications or of processed documents.

(Aug. 1, 1956, ch. 841, title IV, § 407, as added Pub. L. 102–138, title I, § 198(a), Oct. 28, 1991, 105 Stat. 690.)

#### Statutory Notes and Related Subsidiaries

##### AUTHORITY OF SECRETARY OF STATE

Except as otherwise provided, Secretary of State to have and exercise any authority vested by law in any official or office of Department of State and references to such officials or offices deemed to refer to Secretary of State or Department of State, as appropriate, see section 2651a of this title and section 161(d) of Pub. L. 103–236, set out as a note under section 2651a of this title.

## CHAPTER 54—PRIVATE ORGANIZATION ASSISTANCE

### SUBCHAPTER I—THE ASIA FOUNDATION

Sec.
4401.    Findings.
4402.    Grants; authorization; purposes; terms and conditions; deposit of interest.
4403.    Funding.

Sec.
SUBCHAPTER II—NATIONAL ENDOWMENT FOR DEMOCRACY

4411.    Findings; statement of purposes.
4412.    Grants to the Endowment.
4413.    Eligibility of the Endowment for grants.
4414.    Requirements relating to the Endowment and its grantees.
4415.    Freedom of information.
4416.    Retention of interest.

### SUBCHAPTER I—THE ASIA FOUNDATION

#### § 4401. Findings

The Congress finds that—

(1) The Asia Foundation, a private nonprofit corporation incorporated in 1954 in the State of California, has long been active in promoting Asian-American friendship and cooperation and in lending encouragement and assistance to Asians in their own efforts to develop more open, more just, and more democratic societies;

(2) The Asia Foundation's commitment to strengthening indigenous Asian institutions which further stable national development, constructive social change, equitable economic growth, and cooperative international relationships is fully consistent with and supportive of long-term United States interests in Asia;

(3) The Asia Foundation, as a private organization, is able to conduct programs in response to Asian initiatives that would be difficult or impossible for an official United States instrumentality, and it is in a position in Asia to respond quickly and flexibly to meet new opportunities;

(4) in recognition of the valuable contributions of The Asia Foundation to long-range United States foreign policy interests, the United States Government has, through a variety of agencies, provided financial support for The Asia Foundation; and

(5) it is in the interest of the United States, and the further strengthening of Asian-American friendship and cooperation, to establish a more permanent mechanism for United States Government financial support for the ongoing activities of The Asia Foundation, while preserving the independent character of the Foundation.

(Pub. L. 98–164, title IV, § 402, Nov. 22, 1983, 97 Stat. 1038.)

#### Statutory Notes and Related Subsidiaries

##### SHORT TITLE

Pub. L. 98–164, title IV, § 401, Nov. 22, 1983, 97 Stat. 1038, provided that: ''This title [enacting this subchapter] may be cited as 'The Asia Foundation Act'.''

For short title of title V of Pub. L. 98–164, which enacted subchapter II of this chapter, as the ''National Endowment for Democracy Act'', see section 501 of Pub. L. 98–164, set out as a Short Title note under section 4411 of this title.

#### § 4402. Grants; authorization; purposes; terms and conditions; deposit of interest

(a) The Secretary of State shall make an annual grant to The Asia Foundation with the funds made available under section 4403 of this

Federal Register

Vol. 75, No. 2

Tuesday, January 5, 2010

# Presidential Documents

Title 3—

The President

Executive Order 13526 of December 29, 2009

## Classified National Security Information

This order prescribes a uniform system for classifying, safeguarding, and declassifying national security information, including information relating to defense against transnational terrorism. Our democratic principles require that the American people be informed of the activities of their Government. Also, our Nation's progress depends on the free flow of information both within the Government and to the American people. Nevertheless, throughout our history, the national defense has required that certain information be maintained in confidence in order to protect our citizens, our democratic institutions, our homeland security, and our interactions with foreign nations. Protecting information critical to our Nation's security and demonstrating our commitment to open Government through accurate and accountable application of classification standards and routine, secure, and effective declassification are equally important priorities.

NOW, THEREFORE, I, BARACK OBAMA, by the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

## PART 1—ORIGINAL CLASSIFICATION

**Section 1.1.** *Classification Standards.* (a) Information may be originally classified under the terms of this order only if all of the following conditions are met:

(1) an original classification authority is classifying the information;

(2) the information is owned by, produced by or for, or is under the control of the United States Government;

(3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and

(4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

(b) If there is significant doubt about the need to classify information, it shall not be classified. This provision does not:

(1) amplify or modify the substantive criteria or procedures for classification; or

(2) create any substantive or procedural rights subject to judicial review.

(c) Classified information shall not be declassified automatically as a result of any unauthorized disclosure of identical or similar information.

(d) The unauthorized disclosure of foreign government information is presumed to cause damage to the national security.

**Sec. 1.2.** *Classification Levels.* (a) Information may be classified at one of the following three levels:

(1) ''Top Secret'' shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to the national security that the original classification authority is able to identify or describe.

(2) ''Secret'' shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to the

national security that the original classification authority is able to identify or describe.

(3) ''Confidential'' shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause damage to the national security that the original classification authority is able to identify or describe.

(b) Except as otherwise provided by statute, no other terms shall be used to identify United States classified information.

(c) If there is significant doubt about the appropriate level of classification, it shall be classified at the lower level.

**Sec. 1.3.** *Classification Authority.* (a) The authority to classify information originally may be exercised only by:

(1) the President and the Vice President;

(2) agency heads and officials designated by the President; and

(3) United States Government officials delegated this authority pursuant to paragraph (c) of this section.

(b) Officials authorized to classify information at a specified level are also authorized to classify information at a lower level.

(c) Delegation of original classification authority.

(1) Delegations of original classification authority shall be limited to the minimum required to administer this order. Agency heads are responsible for ensuring that designated subordinate officials have a demonstrable and continuing need to exercise this authority.

(2) ''Top Secret'' original classification authority may be delegated only by the President, the Vice President, or an agency head or official designated pursuant to paragraph (a)(2) of this section.

(3) ''Secret'' or ''Confidential'' original classification authority may be delegated only by the President, the Vice President, an agency head or official designated pursuant to paragraph (a)(2) of this section, or the senior agency official designated under section 5.4(d) of this order, provided that official has been delegated ''Top Secret'' original classification authority by the agency head.

(4) Each delegation of original classification authority shall be in writing and the authority shall not be redelegated except as provided in this order. Each delegation shall identify the official by name or position.

(5) Delegations of original classification authority shall be reported or made available by name or position to the Director of the Information Security Oversight Office.

(d) All original classification authorities must receive training in proper classification (including the avoidance of over-classification) and declassification as provided in this order and its implementing directives at least once a calendar year. Such training must include instruction on the proper safeguarding of classified information and on the sanctions in section 5.5 of this order that may be brought against an individual who fails to classify information properly or protect classified information from unauthorized disclosure. Original classification authorities who do not receive such mandatory training at least once within a calendar year shall have their classification authority suspended by the agency head or the senior agency official designated under section 5.4(d) of this order until such training has taken place. A waiver may be granted by the agency head, the deputy agency head, or the senior agency official if an individual is unable to receive such training due to unavoidable circumstances. Whenever a waiver is granted, the individual shall receive such training as soon as practicable.

(e) Exceptional cases. When an employee, government contractor, licensee, certificate holder, or grantee of an agency who does not have original classification authority originates information believed by that person to require classification, the information shall be protected in a manner consistent

*Federal Register*/Vol. 75, No. 2/Tuesday, January 5, 2010/Presidential Documents    **709**

with this order and its implementing directives. The information shall be transmitted promptly as provided under this order or its implementing directives to the agency that has appropriate subject matter interest and classification authority with respect to this information. That agency shall decide within 30 days whether to classify this information.

**Sec. 1.4.** *Classification Categories.* Information shall not be considered for classification unless its unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security in accordance with section 1.2 of this order, and it pertains to one or more of the following:

(a) military plans, weapons systems, or operations;

(b) foreign government information;

(c) intelligence activities (including covert action), intelligence sources or methods, or cryptology;

(d) foreign relations or foreign activities of the United States, including confidential sources;

(e) scientific, technological, or economic matters relating to the national security;

(f) United States Government programs for safeguarding nuclear materials or facilities;

(g) vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security; or (h) the development, production, or use of weapons of mass destruction.

**Sec. 1.5.** *Duration of Classification.* (a) At the time of original classification, the original classification authority shall establish a specific date or event for declassification based on the duration of the national security sensitivity of the information. Upon reaching the date or event, the information shall be automatically declassified. Except for information that should clearly and demonstrably be expected to reveal the identity of a confidential human source or a human intelligence source or key design concepts of weapons of mass destruction, the date or event shall not exceed the time frame established in paragraph (b) of this section.

(b) If the original classification authority cannot determine an earlier specific date or event for declassification, information shall be marked for declassification 10 years from the date of the original decision, unless the original classification authority otherwise determines that the sensitivity of the information requires that it be marked for declassification for up to 25 years from the date of the original decision.

(c) An original classification authority may extend the duration of classification up to 25 years from the date of origin of the document, change the level of classification, or reclassify specific information only when the standards and procedures for classifying information under this order are followed.

(d) No information may remain classified indefinitely. Information marked for an indefinite duration of classification under predecessor orders, for example, marked as ''Originating Agency's Determination Required,'' or classified information that contains incomplete declassification instructions or lacks declassification instructions shall be declassified in accordance with part 3 of this order.

**Sec. 1.6.** *Identification and Markings.* (a) At the time of original classification, the following shall be indicated in a manner that is immediately apparent:

(1) one of the three classification levels defined in section 1.2 of this order;

(2) the identity, by name and position, or by personal identifier, of the original classification authority;

(3) the agency and office of origin, if not otherwise evident;

(4) declassification instructions, which shall indicate one of the following:

(A) the date or event for declassification, as prescribed in section 1.5(a);

(B) the date that is 10 years from the date of original classification, as prescribed in section 1.5(b);

(C) the date that is up to 25 years from the date of original classification, as prescribed in section 1.5(b); or

(D) in the case of information that should clearly and demonstrably be expected to reveal the identity of a confidential human source or a human intelligence source or key design concepts of weapons of mass destruction, the marking prescribed in implementing directives issued pursuant to this order; and

(5) a concise reason for classification that, at a minimum, cites the applicable classification categories in section 1.4 of this order.

(b) Specific information required in paragraph (a) of this section may be excluded if it would reveal additional classified information.

(c) With respect to each classified document, the agency originating the document shall, by marking or other means, indicate which portions are classified, with the applicable classification level, and which portions are unclassified. In accordance with standards prescribed in directives issued under this order, the Director of the Information Security Oversight Office may grant and revoke temporary waivers of this requirement. The Director shall revoke any waiver upon a finding of abuse.

(d) Markings or other indicia implementing the provisions of this order, including abbreviations and requirements to safeguard classified working papers, shall conform to the standards prescribed in implementing directives issued pursuant to this order.

(e) Foreign government information shall retain its original classification markings or shall be assigned a U.S. classification that provides a degree of protection at least equivalent to that required by the entity that furnished the information. Foreign government information retaining its original classification markings need not be assigned a U.S. classification marking provided that the responsible agency determines that the foreign government markings are adequate to meet the purposes served by U.S. classification markings.

(f) Information assigned a level of classification under this or predecessor orders shall be considered as classified at that level of classification despite the omission of other required markings. Whenever such information is used in the derivative classification process or is reviewed for possible declassification, holders of such information shall coordinate with an appropriate classification authority for the application of omitted markings.

(g) The classification authority shall, whenever practicable, use a classified addendum whenever classified information constitutes a small portion of an otherwise unclassified document or prepare a product to allow for dissemination at the lowest level of classification possible or in unclassified form.

(h) Prior to public release, all declassified records shall be appropriately marked to reflect their declassification.

**Sec. 1.7.** *Classification Prohibitions and Limitations.* (a) In no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to:

(1) conceal violations of law, inefficiency, or administrative error;

(2) prevent embarrassment to a person, organization, or agency;

(3) restrain competition; or

(4) prevent or delay the release of information that does not require protection in the interest of the national security.

(b) Basic scientific research information not clearly related to the national security shall not be classified.

(c) Information may not be reclassified after declassification and release to the public under proper authority unless:

(1) the reclassification is personally approved in writing by the agency head based on a document-by-document determination by the agency that reclassification is required to prevent significant and demonstrable damage to the national security;

(2) the information may be reasonably recovered without bringing undue attention to the information;

(3) the reclassification action is reported promptly to the Assistant to the President for National Security Affairs (National Security Advisor) and the Director of the Information Security Oversight Office; and

(4) for documents in the physical and legal custody of the National Archives and Records Administration (National Archives) that have been available for public use, the agency head has, after making the determinations required by this paragraph, notified the Archivist of the United States (Archivist), who shall suspend public access pending approval of the reclassification action by the Director of the Information Security Oversight Office. Any such decision by the Director may be appealed by the agency head to the President through the National Security Advisor. Public access shall remain suspended pending a prompt decision on the appeal.

(d) Information that has not previously been disclosed to the public under proper authority may be classified or reclassified after an agency has received a request for it under the Freedom of Information Act (5 U.S.C. 552), the Presidential Records Act, 44 U.S.C. 2204(c)(1), the Privacy Act of 1974 (5 U.S.C. 552a), or the mandatory review provisions of section 3.5 of this order only if such classification meets the requirements of this order and is accomplished on a document-by-document basis with the personal participation or under the direction of the agency head, the deputy agency head, or the senior agency official designated under section 5.4 of this order. The requirements in this paragraph also apply to those situations in which information has been declassified in accordance with a specific date or event determined by an original classification authority in accordance with section 1.5 of this order.

(e) Compilations of items of information that are individually unclassified may be classified if the compiled information reveals an additional association or relationship that:

(1) meets the standards for classification under this order; and

(2) is not otherwise revealed in the individual items of information.

**Sec. 1.8.** *Classification Challenges.* (a) Authorized holders of information who, in good faith, believe that its classification status is improper are encouraged and expected to challenge the classification status of the information in accordance with agency procedures established under paragraph (b) of this section.

(b) In accordance with implementing directives issued pursuant to this order, an agency head or senior agency official shall establish procedures under which authorized holders of information, including authorized holders outside the classifying agency, are encouraged and expected to challenge the classification of information that they believe is improperly classified or unclassified. These procedures shall ensure that:

(1) individuals are not subject to retribution for bringing such actions;

(2) an opportunity is provided for review by an impartial official or panel; and

(3) individuals are advised of their right to appeal agency decisions to the Interagency Security Classification Appeals Panel (Panel) established by section 5.3 of this order.

(c) Documents required to be submitted for prepublication review or other administrative process pursuant to an approved nondisclosure agreement are not covered by this section.

**Sec. 1.9.** *Fundamental Classification Guidance Review.* (a) Agency heads shall complete on a periodic basis a comprehensive review of the agency's classification guidance, particularly classification guides, to ensure the guidance reflects current circumstances and to identify classified information that no longer requires protection and can be declassified. The initial fundamental classification guidance review shall be completed within 2 years of the effective date of this order.

(b) The classification guidance review shall include an evaluation of classified information to determine if it meets the standards for classification under section 1.4 of this order, taking into account an up-to-date assessment of likely damage as described under section 1.2 of this order.

(c) The classification guidance review shall include original classification authorities and agency subject matter experts to ensure a broad range of perspectives.

(d) Agency heads shall provide a report summarizing the results of the classification guidance review to the Director of the Information Security Oversight Office and shall release an unclassified version of this report to the public.

**PART 2—DERIVATIVE CLASSIFICATION**

**Sec. 2.1.** *Use of Derivative Classification.* (a) Persons who reproduce, extract, or summarize classified information, or who apply classification markings derived from source material or as directed by a classification guide, need not possess original classification authority.

(b) Persons who apply derivative classification markings shall:

(1) be identified by name and position, or by personal identifier, in a manner that is immediately apparent for each derivative classification action;

(2) observe and respect original classification decisions; and

(3) carry forward to any newly created documents the pertinent classification markings. For information derivatively classified based on multiple sources, the derivative classifier shall carry forward:

(A) the date or event for declassification that corresponds to the longest period of classification among the sources, or the marking established pursuant to section 1.6(a)(4)(D) of this order; and

(B) a listing of the source materials.

(c) Derivative classifiers shall, whenever practicable, use a classified addendum whenever classified information constitutes a small portion of an otherwise unclassified document or prepare a product to allow for dissemination at the lowest level of classification possible or in unclassified form.

(d) Persons who apply derivative classification markings shall receive training in the proper application of the derivative classification principles of the order, with an emphasis on avoiding over-classification, at least once every 2 years. Derivative classifiers who do not receive such training at least once every 2 years shall have their authority to apply derivative classification markings suspended until they have received such training. A waiver may be granted by the agency head, the deputy agency head, or the senior agency official if an individual is unable to receive such training due to unavoidable circumstances. Whenever a waiver is granted, the individual shall receive such training as soon as practicable.

**Sec. 2.2.** *Classification Guides.* (a) Agencies with original classification authority shall prepare classification guides to facilitate the proper and uniform derivative classification of information. These guides shall conform to standards contained in directives issued under this order.

(b) Each guide shall be approved personally and in writing by an official who:

(1) has program or supervisory responsibility over the information or is the senior agency official; and

(2) is authorized to classify information originally at the highest level of classification prescribed in the guide.

(c) Agencies shall establish procedures to ensure that classification guides are reviewed and updated as provided in directives issued under this order.

(d) Agencies shall incorporate original classification decisions into classification guides on a timely basis and in accordance with directives issued under this order.

(e) Agencies may incorporate exemptions from automatic declassification approved pursuant to section 3.3(j) of this order into classification guides, provided that the Panel is notified of the intent to take such action for specific information in advance of approval and the information remains in active use.

(f) The duration of classification of a document classified by a derivative classifier using a classification guide shall not exceed 25 years from the date of the origin of the document, except for:

(1) information that should clearly and demonstrably be expected to reveal the identity of a confidential human source or a human intelligence source or key design concepts of weapons of mass destruction; and

(2) specific information incorporated into classification guides in accordance with section 2.2(e) of this order.

## PART 3—DECLASSIFICATION AND DOWNGRADING

**Sec. 3.1.** *Authority for Declassification.* (a) Information shall be declassified as soon as it no longer meets the standards for classification under this order.

(b) Information shall be declassified or downgraded by:

(1) the official who authorized the original classification, if that official is still serving in the same position and has original classification authority;

(2) the originator's current successor in function, if that individual has original classification authority;

(3) a supervisory official of either the originator or his or her successor in function, if the supervisory official has original classification authority; or (4) officials delegated declassification authority in writing by the agency head or the senior agency official of the originating agency.

(c) The Director of National Intelligence (or, if delegated by the Director of National Intelligence, the Principal Deputy Director of National Intelligence) may, with respect to the Intelligence Community, after consultation with the head of the originating Intelligence Community element or department, declassify, downgrade, or direct the declassification or downgrading of information or intelligence relating to intelligence sources, methods, or activities.

(d) It is presumed that information that continues to meet the classification requirements under this order requires continued protection. In some exceptional cases, however, the need to protect such information may be outweighed by the public interest in disclosure of the information, and in these cases the information should be declassified. When such questions arise, they shall be referred to the agency head or the senior agency official. That official will determine, as an exercise of discretion, whether the public interest in disclosure outweighs the damage to the national security that might reasonably be expected from disclosure. This provision does not:

(1) amplify or modify the substantive criteria or procedures for classification; or

(2) create any substantive or procedural rights subject to judicial review.

(e) If the Director of the Information Security Oversight Office determines that information is classified in violation of this order, the Director may require the information to be declassified by the agency that originated the classification. Any such decision by the Director may be appealed to the President through the National Security Advisor. The information shall remain classified pending a prompt decision on the appeal.

USCA Case #23-5017    Document #1997396    Filed: 05/01/2023    Page 53 of 70

(f) The provisions of this section shall also apply to agencies that, under the terms of this order, do not have original classification authority, but had such authority under predecessor orders.

(g) No information may be excluded from declassification under section 3.3 of this order based solely on the type of document or record in which it is found. Rather, the classified information must be considered on the basis of its content.

(h) Classified nonrecord materials, including artifacts, shall be declassified as soon as they no longer meet the standards for classification under this order.

(i) When making decisions under sections 3.3, 3.4, and 3.5 of this order, agencies shall consider the final decisions of the Panel.

**Sec. 3.2.** *Transferred Records.*

(a) In the case of classified records transferred in conjunction with a transfer of functions, and not merely for storage purposes, the receiving agency shall be deemed to be the originating agency for purposes of this order.

(b) In the case of classified records that are not officially transferred as described in paragraph (a) of this section, but that originated in an agency that has ceased to exist and for which there is no successor agency, each agency in possession of such records shall be deemed to be the originating agency for purposes of this order. Such records may be declassified or downgraded by the agency in possession of the records after consultation with any other agency that has an interest in the subject matter of the records.

(c) Classified records accessioned into the National Archives shall be declassified or downgraded by the Archivist in accordance with this order, the directives issued pursuant to this order, agency declassification guides, and any existing procedural agreement between the Archivist and the relevant agency head.

(d) The originating agency shall take all reasonable steps to declassify classified information contained in records determined to have permanent historical value before they are accessioned into the National Archives. However, the Archivist may require that classified records be accessioned into the National Archives when necessary to comply with the provisions of the Federal Records Act. This provision does not apply to records transferred to the Archivist pursuant to section 2203 of title 44, United States Code, or records for which the National Archives serves as the custodian of the records of an agency or organization that has gone out of existence.

(e) To the extent practicable, agencies shall adopt a system of records management that will facilitate the public release of documents at the time such documents are declassified pursuant to the provisions for automatic declassification in section 3.3 of this order.

**Sec. 3.3** *Automatic Declassification.*

(a) Subject to paragraphs (b)–(d) and (g)–(j) of this section, all classified records that (1) are more than 25 years old and (2) have been determined to have permanent historical value under title 44, United States Code, shall be automatically declassified whether or not the records have been reviewed. All classified records shall be automatically declassified on December 31 of the year that is 25 years from the date of origin, except as provided in paragraphs (b)–(d) and (g)–(j) of this section. If the date of origin of an individual record cannot be readily determined, the date of original classification shall be used instead.

(b) An agency head may exempt from automatic declassification under paragraph (a) of this section specific information, the release of which should clearly and demonstrably be expected to:

(1) reveal the identity of a confidential human source, a human intelligence source, a relationship with an intelligence or security service of a foreign

A-21

government or international organization, or a nonhuman intelligence source; or impair the effectiveness of an intelligence method currently in use, available for use, or under development;

(2) reveal information that would assist in the development, production, or use of weapons of mass destruction;

(3) reveal information that would impair U.S. cryptologic systems or activities;

(4) reveal information that would impair the application of state-of-the-art technology within a U.S. weapon system;

(5) reveal formally named or numbered U.S. military war plans that remain in effect, or reveal operational or tactical elements of prior plans that are contained in such active plans;

(6) reveal information, including foreign government information, that would cause serious harm to relations between the United States and a foreign government, or to ongoing diplomatic activities of the United States;

(7) reveal information that would impair the current ability of United States Government officials to protect the President, Vice President, and other protectees for whom protection services, in the interest of the national security, are authorized;

(8) reveal information that would seriously impair current national security emergency preparedness plans or reveal current vulnerabilities of systems, installations, or infrastructures relating to the national security; or

(9) violate a statute, treaty, or international agreement that does not permit the automatic or unilateral declassification of information at 25 years.

(c)(1) An agency head shall notify the Panel of any specific file series of records for which a review or assessment has determined that the information within that file series almost invariably falls within one or more of the exemption categories listed in paragraph (b) of this section and that the agency proposes to exempt from automatic declassification at 25 years.

(2) The notification shall include:

(A) a description of the file series;

(B) an explanation of why the information within the file series is almost invariably exempt from automatic declassification and why the information must remain classified for a longer period of time; and

(C) except when the information within the file series almost invariably identifies a confidential human source or a human intelligence source or key design concepts of weapons of mass destruction, a specific date or event for declassification of the information, not to exceed December 31 of the year that is 50 years from the date of origin of the records.

(3) The Panel may direct the agency not to exempt a designated file series or to declassify the information within that series at an earlier date than recommended. The agency head may appeal such a decision to the President through the National Security Advisor.

(4) File series exemptions approved by the President prior to December 31, 2008, shall remain valid without any additional agency action pending Panel review by the later of December 31, 2010, or December 31 of the year that is 10 years from the date of previous approval.

(d) The following provisions shall apply to the onset of automatic declassification:

(1) Classified records within an integral file block, as defined in this order, that are otherwise subject to automatic declassification under this section shall not be automatically declassified until December 31 of the year that is 25 years from the date of the most recent record within the file block.

A-22

(2) After consultation with the Director of the National Declassification Center (the Center) established by section 3.7 of this order and before the records are subject to automatic declassification, an agency head or senior agency official may delay automatic declassification for up to five additional years for classified information contained in media that make a review for possible declassification exemptions more difficult or costly.

(3) Other than for records that are properly exempted from automatic declassification, records containing classified information that originated with other agencies or the disclosure of which would affect the interests or activities of other agencies with respect to the classified information and could reasonably be expected to fall under one or more of the exemptions in paragraph (b) of this section shall be identified prior to the onset of automatic declassification for later referral to those agencies.

(A) The information of concern shall be referred by the Center established by section 3.7 of this order, or by the centralized facilities referred to in section 3.7(e) of this order, in a prioritized and scheduled manner determined by the Center.

(B) If an agency fails to provide a final determination on a referral made by the Center within 1 year of referral, or by the centralized facilities referred to in section 3.7(e) of this order within 3 years of referral, its equities in the referred records shall be automatically declassified.

(C) If any disagreement arises between affected agencies and the Center regarding the referral review period, the Director of the Information Security Oversight Office shall determine the appropriate period of review of referred records.

(D) Referrals identified prior to the establishment of the Center by section 3.7 of this order shall be subject to automatic declassification only in accordance with subparagraphs (d)(3)(A)–(C) of this section.

(4) After consultation with the Director of the Information Security Oversight Office, an agency head may delay automatic declassification for up to 3 years from the date of discovery of classified records that were inadvertently not reviewed prior to the effective date of automatic declassification.

(e) Information exempted from automatic declassification under this section shall remain subject to the mandatory and systematic declassification review provisions of this order.

(f) The Secretary of State shall determine when the United States should commence negotiations with the appropriate officials of a foreign government or international organization of governments to modify any treaty or international agreement that requires the classification of information contained in records affected by this section for a period longer than 25 years from the date of its creation, unless the treaty or international agreement pertains to information that may otherwise remain classified beyond 25 years under this section.

(g) The Secretary of Energy shall determine when information concerning foreign nuclear programs that was removed from the Restricted Data category in order to carry out provisions of the National Security Act of 1947, as amended, may be declassified. Unless otherwise determined, such information shall be declassified when comparable information concerning the United States nuclear program is declassified.

(h) Not later than 3 years from the effective date of this order, all records exempted from automatic declassification under paragraphs (b) and (c) of this section shall be automatically declassified on December 31 of a year that is no more than 50 years from the date of origin, subject to the following:

(1) Records that contain information the release of which should clearly and demonstrably be expected to reveal the following are exempt from automatic declassification at 50 years:

(A) the identity of a confidential human source or a human intelligence source; or

(B) key design concepts of weapons of mass destruction.

(2) In extraordinary cases, agency heads may, within 5 years of the onset of automatic declassification, propose to exempt additional specific information from declassification at 50 years.

(3) Records exempted from automatic declassification under this paragraph shall be automatically declassified on December 31 of a year that is no more than 75 years from the date of origin unless an agency head, within 5 years of that date, proposes to exempt specific information from declassification at 75 years and the proposal is formally approved by the Panel.

(i) Specific records exempted from automatic declassification prior to the establishment of the Center described in section 3.7 of this order shall be subject to the provisions of paragraph (h) of this section in a scheduled and prioritized manner determined by the Center.

(j) At least 1 year before information is subject to automatic declassification under this section, an agency head or senior agency official shall notify the Director of the Information Security Oversight Office, serving as Executive Secretary of the Panel, of any specific information that the agency proposes to exempt from automatic declassification under paragraphs (b) and (h) of this section.

(1) The notification shall include:

(A) a detailed description of the information, either by reference to information in specific records or in the form of a declassification guide;

(B) an explanation of why the information should be exempt from automatic declassification and must remain classified for a longer period of time; and

(C) a specific date or a specific and independently verifiable event for automatic declassification of specific records that contain the information proposed for exemption.

(2) The Panel may direct the agency not to exempt the information or to declassify it at an earlier date than recommended. An agency head may appeal such a decision to the President through the National Security Advisor. The information will remain classified while such an appeal is pending.

(k) For information in a file series of records determined not to have permanent historical value, the duration of classification beyond 25 years shall be the same as the disposition (destruction) date of those records in each Agency Records Control Schedule or General Records Schedule, although the duration of classification shall be extended if the record has been retained for business reasons beyond the scheduled disposition date.

**Sec. 3.4.** *Systematic Declassification Review.*

(a) Each agency that has originated classified information under this order or its predecessors shall establish and conduct a program for systematic declassification review for records of permanent historical value exempted from automatic declassification under section 3.3 of this order. Agencies shall prioritize their review of such records in accordance with priorities established by the Center.

(b) The Archivist shall conduct a systematic declassification review program for classified records:

(1) accessioned into the National Archives; (2) transferred to the Archivist pursuant to 44 U.S.C. 2203; and (3) for which the National Archives serves as the custodian for an agency or organization that has gone out of existence.

**Sec. 3.5.** *Mandatory Declassification Review.*

(a) Except as provided in paragraph (b) of this section, all information classified under this order or predecessor orders shall be subject to a review for declassification by the originating agency if:

(1) the request for a review describes the document or material containing the information with sufficient specificity to enable the agency to locate it with a reasonable amount of effort;

(2) the document or material containing the information responsive to the request is not contained within an operational file exempted from search and review, publication, and disclosure under 5 U.S.C. 552 in accordance with law; and

(3) the information is not the subject of pending litigation.

(b) Information originated by the incumbent President or the incumbent Vice President; the incumbent President's White House Staff or the incumbent Vice President's Staff; committees, commissions, or boards appointed by the incumbent President; or other entities within the Executive Office of the President that solely advise and assist the incumbent President is exempted from the provisions of paragraph (a) of this section. However, the Archivist shall have the authority to review, downgrade, and declassify papers or records of former Presidents and Vice Presidents under the control of the Archivist pursuant to 44 U.S.C. 2107, 2111, 2111 note, or 2203. Review procedures developed by the Archivist shall provide for consultation with agencies having primary subject matter interest and shall be consistent with the provisions of applicable laws or lawful agreements that pertain to the respective Presidential papers or records. Agencies with primary subject matter interest shall be notified promptly of the Archivist's decision. Any final decision by the Archivist may be appealed by the requester or an agency to the Panel. The information shall remain classified pending a prompt decision on the appeal.

(c) Agencies conducting a mandatory review for declassification shall declassify information that no longer meets the standards for classification under this order. They shall release this information unless withholding is otherwise authorized and warranted under applicable law.

(d) If an agency has reviewed the requested information for declassification within the past 2 years, the agency need not conduct another review and may instead inform the requester of this fact and the prior review decision and advise the requester of appeal rights provided under subsection (e) of this section.

(e) In accordance with directives issued pursuant to this order, agency heads shall develop procedures to process requests for the mandatory review of classified information. These procedures shall apply to information classified under this or predecessor orders. They also shall provide a means for administratively appealing a denial of a mandatory review request, and for notifying the requester of the right to appeal a final agency decision to the Panel.

(f) After consultation with affected agencies, the Secretary of Defense shall develop special procedures for the review of cryptologic information; the Director of National Intelligence shall develop special procedures for the review of information pertaining to intelligence sources, methods, and activities; and the Archivist shall develop special procedures for the review of information accessioned into the National Archives.

(g) Documents required to be submitted for prepublication review or other administrative process pursuant to an approved nondisclosure agreement are not covered by this section.

(h) This section shall not apply to any request for a review made to an element of the Intelligence Community that is made by a person other than an individual as that term is defined by 5 U.S.C. 552a(a)(2), or by a foreign government entity or any representative thereof.

**Sec. 3.6.** *Processing Requests and Reviews.* Notwithstanding section 4.1(i) of this order, in response to a request for information under the Freedom of Information Act, the Presidential Records Act, the Privacy Act of 1974, or the mandatory review provisions of this order:

(a) An agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors.

(b) When an agency receives any request for documents in its custody that contain classified information that originated with other agencies or the disclosure of which would affect the interests or activities of other agencies with respect to the classified information, or identifies such documents in the process of implementing sections 3.3 or 3.4 of this order, it shall refer copies of any request and the pertinent documents to the originating agency for processing and may, after consultation with the originating agency, inform any requester of the referral unless such association is itself classified under this order or its predecessors. In cases in which the originating agency determines in writing that a response under paragraph (a) of this section is required, the referring agency shall respond to the requester in accordance with that paragraph.

(c) Agencies may extend the classification of information in records determined not to have permanent historical value or nonrecord materials, including artifacts, beyond the time frames established in sections 1.5(b) and 2.2(f) of this order, provided:

(1) the specific information has been approved pursuant to section 3.3(j) of this order for exemption from automatic declassification; and

(2) the extension does not exceed the date established in section 3.3(j) of this order.

**Sec. 3.7.** *National Declassification Center.* (a) There is established within the National Archives a National Declassification Center to streamline declassification processes, facilitate quality-assurance measures, and implement standardized training regarding the declassification of records determined to have permanent historical value. There shall be a Director of the Center who shall be appointed or removed by the Archivist in consultation with the Secretaries of State, Defense, Energy, and Homeland Security, the Attorney General, and the Director of National Intelligence.

(b) Under the administration of the Director, the Center shall coordinate:

(1) timely and appropriate processing of referrals in accordance with section 3.3(d)(3) of this order for accessioned Federal records and transferred presidential records.

(2) general interagency declassification activities necessary to fulfill the requirements of sections 3.3 and 3.4 of this order;

(3) the exchange among agencies of detailed declassification guidance to enable the referral of records in accordance with section 3.3(d)(3) of this order;

(4) the development of effective, transparent, and standard declassification work processes, training, and quality assurance measures;

(5) the development of solutions to declassification challenges posed by electronic records, special media, and emerging technologies;

(6) the linkage and effective utilization of existing agency databases and the use of new technologies to document and make public declassification review decisions and support declassification activities under the purview of the Center; and

(7) storage and related services, on a reimbursable basis, for Federal records containing classified national security information.

(c) Agency heads shall fully cooperate with the Archivist in the activities of the Center and shall:

(1) provide the Director with adequate and current declassification guidance to enable the referral of records in accordance with section 3.3(d)(3) of this order; and

(2) upon request of the Archivist, assign agency personnel to the Center who shall be delegated authority by the agency head to review and exempt

or declassify information originated by their agency contained in records accessioned into the National Archives, after consultation with subject-matter experts as necessary.

(d) The Archivist, in consultation with representatives of the participants in the Center and after input from the general public, shall develop priorities for declassification activities under the purview of the Center that take into account the degree of researcher interest and the likelihood of declassification.

(e) Agency heads may establish such centralized facilities and internal operations to conduct internal declassification reviews as appropriate to achieve optimized records management and declassification business processes. Once established, all referral processing of accessioned records shall take place at the Center, and such agency facilities and operations shall be coordinated with the Center to ensure the maximum degree of consistency in policies and procedures that relate to records determined to have permanent historical value.

(f) Agency heads may exempt from automatic declassification or continue the classification of their own originally classified information under section 3.3(a) of this order except that in the case of the Director of National Intelligence, the Director shall also retain such authority with respect to the Intelligence Community.

(g) The Archivist shall, in consultation with the Secretaries of State, Defense, Energy, and Homeland Security, the Attorney General, the Director of National Intelligence, the Director of the Central Intelligence Agency, and the Director of the Information Security Oversight Office, provide the National Security Advisor with a detailed concept of operations for the Center and a proposed implementing directive under section 5.1 of this order that reflects the coordinated views of the aforementioned agencies.

## PART 4—SAFEGUARDING

**Sec. 4.1.** *General Restrictions on Access.*

(a) A person may have access to classified information provided that: (1) a favorable determination of eligibility for access has been made by an agency head or the agency head's designee;

(2) the person has signed an approved nondisclosure agreement; and

(3) the person has a need-to-know the information.

(b) Every person who has met the standards for access to classified information in paragraph (a) of this section shall receive contemporaneous training on the proper safeguarding of classified information and on the criminal, civil, and administrative sanctions that may be imposed on an individual who fails to protect classified information from unauthorized disclosure.

(c) An official or employee leaving agency service may not remove classified information from the agency's control or direct that information be declassified in order to remove it from agency control.

(d) Classified information may not be removed from official premises without proper authorization.

(e) Persons authorized to disseminate classified information outside the executive branch shall ensure the protection of the information in a manner equivalent to that provided within the executive branch.

(f) Consistent with law, executive orders, directives, and regulations, an agency head or senior agency official or, with respect to the Intelligence Community, the Director of National Intelligence, shall establish uniform procedures to ensure that automated information systems, including networks and telecommunications systems, that collect, create, communicate, compute, disseminate, process, or store classified information:

(1) prevent access by unauthorized persons;

(2) ensure the integrity of the information; and

(3) to the maximum extent practicable, use:

(A) common information technology standards, protocols, and interfaces that maximize the availability of, and access to, the information in a form and manner that facilitates its authorized use; and

(B) standardized electronic formats to maximize the accessibility of information to persons who meet the criteria set forth in section 4.1(a) of this order.

(g) Consistent with law, executive orders, directives, and regulations, each agency head or senior agency official, or with respect to the Intelligence Community, the Director of National Intelligence, shall establish controls to ensure that classified information is used, processed, stored, reproduced, transmitted, and destroyed under conditions that provide adequate protection and prevent access by unauthorized persons.

(h) Consistent with directives issued pursuant to this order, an agency shall safeguard foreign government information under standards that provide a degree of protection at least equivalent to that required by the government or international organization of governments that furnished the information. When adequate to achieve equivalency, these standards may be less restrictive than the safeguarding standards that ordinarily apply to U.S. "Confidential" information, including modified handling and transmission and allowing access to individuals with a need-to-know who have not otherwise been cleared for access to classified information or executed an approved non-disclosure agreement.

(i)(1) Classified information originating in one agency may be disseminated to another agency or U.S. entity by any agency to which it has been made available without the consent of the originating agency, as long as the criteria for access under section 4.1(a) of this order are met, unless the originating agency has determined that prior authorization is required for such dissemination and has marked or indicated such requirement on the medium containing the classified information in accordance with implementing directives issued pursuant to this order.

(2) Classified information originating in one agency may be disseminated by any other agency to which it has been made available to a foreign government in accordance with statute, this order, directives implementing this order, direction of the President, or with the consent of the originating agency. For the purposes of this section, "foreign government" includes any element of a foreign government, or an international organization of governments, or any element thereof.

(3) Documents created prior to the effective date of this order shall not be disseminated outside any other agency to which they have been made available without the consent of the originating agency. An agency head or senior agency official may waive this requirement for specific information that originated within that agency.

(4) For purposes of this section, the Department of Defense shall be considered one agency, except that any dissemination of information regarding intelligence sources, methods, or activities shall be consistent with directives issued pursuant to section 6.2(b) of this order.

(5) Prior consent of the originating agency is not required when referring records for declassification review that contain information originating in more than one agency.

**Sec. 4.2** *Distribution Controls.*

(a) The head of each agency shall establish procedures in accordance with applicable law and consistent with directives issued pursuant to this order to ensure that classified information is accessible to the maximum extent possible by individuals who meet the criteria set forth in section 4.1(a) of this order.

(b) In an emergency, when necessary to respond to an imminent threat to life or in defense of the homeland, the agency head or any designee

may authorize the disclosure of classified information (including information marked pursuant to section 4.1(i)(1) of this order) to an individual or individuals who are otherwise not eligible for access. Such actions shall be taken only in accordance with directives implementing this order and any procedure issued by agencies governing the classified information, which shall be designed to minimize the classified information that is disclosed under these circumstances and the number of individuals who receive it. Information disclosed under this provision or implementing directives and procedures shall not be deemed declassified as a result of such disclosure or subsequent use by a recipient. Such disclosures shall be reported promptly to the originator of the classified information. For purposes of this section, the Director of National Intelligence may issue an implementing directive governing the emergency disclosure of classified intelligence information.

(c) Each agency shall update, at least annually, the automatic, routine, or recurring distribution mechanism for classified information that it distributes. Recipients shall cooperate fully with distributors who are updating distribution lists and shall notify distributors whenever a relevant change in status occurs.

**Sec. 4.3.** *Special Access Programs.* (a) Establishment of special access programs. Unless otherwise authorized by the President, only the Secretaries of State, Defense, Energy, and Homeland Security, the Attorney General, and the Director of National Intelligence, or the principal deputy of each, may create a special access program. For special access programs pertaining to intelligence sources, methods, and activities (but not including military operational, strategic, and tactical programs), this function shall be exercised by the Director of National Intelligence. These officials shall keep the number of these programs at an absolute minimum, and shall establish them only when the program is required by statute or upon a specific finding that:

(1) the vulnerability of, or threat to, specific information is exceptional; and

(2) the normal criteria for determining eligibility for access applicable to information classified at the same level are not deemed sufficient to protect the information from unauthorized disclosure.

(b) Requirements and limitations.

(1) Special access programs shall be limited to programs in which the number of persons who ordinarily will have access will be reasonably small and commensurate with the objective of providing enhanced protection for the information involved.

(2) Each agency head shall establish and maintain a system of accounting for special access programs consistent with directives issued pursuant to this order.

(3) Special access programs shall be subject to the oversight program established under section 5.4(d) of this order. In addition, the Director of the Information Security Oversight Office shall be afforded access to these programs, in accordance with the security requirements of each program, in order to perform the functions assigned to the Information Security Oversight Office under this order. An agency head may limit access to a special access program to the Director of the Information Security Oversight Office and no more than one other employee of the Information Security Oversight Office or, for special access programs that are extraordinarily sensitive and vulnerable, to the Director only.

(4) The agency head or principal deputy shall review annually each special access program to determine whether it continues to meet the requirements of this order.

(5) Upon request, an agency head shall brief the National Security Advisor, or a designee, on any or all of the agency's special access programs.

(6) For the purposes of this section, the term ''agency head'' refers only to the Secretaries of State, Defense, Energy, and Homeland Security, the

Attorney General, and the Director of National Intelligence, or the principal deputy of each.

(c) Nothing in this order shall supersede any requirement made by or under 10 U.S.C. 119.

**Sec. 4.4.** *Access by Historical Researchers and Certain Former Government Personnel.*

(a) The requirement in section 4.1(a)(3) of this order that access to classified information may be granted only to individuals who have a need-to-know the information may be waived for persons who:

(1) are engaged in historical research projects;

(2) previously have occupied senior policy-making positions to which they were appointed or designated by the President or the Vice President; or

(3) served as President or Vice President.

(b) Waivers under this section may be granted only if the agency head or senior agency official of the originating agency:

(1) determines in writing that access is consistent with the interest of the national security;

(2) takes appropriate steps to protect classified information from unauthorized disclosure or compromise, and ensures that the information is safeguarded in a manner consistent with this order; and

(3) limits the access granted to former Presidential appointees or designees and Vice Presidential appointees or designees to items that the person originated, reviewed, signed, or received while serving as a Presidential or Vice Presidential appointee or designee.

## PART 5—IMPLEMENTATION AND REVIEW

**Sec. 5.1.** *Program Direction.* (a) The Director of the Information Security Oversight Office, under the direction of the Archivist and in consultation with the National Security Advisor, shall issue such directives as are necessary to implement this order. These directives shall be binding on the agencies. Directives issued by the Director of the Information Security Oversight Office shall establish standards for:

(1) classification, declassification, and marking principles;

(2) safeguarding classified information, which shall pertain to the handling, storage, distribution, transmittal, and destruction of and accounting for classified information;

(3) agency security education and training programs;

(4) agency self-inspection programs; and

(5) classification and declassification guides.

(b) The Archivist shall delegate the implementation and monitoring functions of this program to the Director of the Information Security Oversight Office.

(c) The Director of National Intelligence, after consultation with the heads of affected agencies and the Director of the Information Security Oversight Office, may issue directives to implement this order with respect to the protection of intelligence sources, methods, and activities. Such directives shall be consistent with this order and directives issued under paragraph (a) of this section.

**Sec. 5.2.** *Information Security Oversight Office.* (a) There is established within the National Archives an Information Security Oversight Office. The Archivist shall appoint the Director of the Information Security Oversight Office, subject to the approval of the President.

(b) Under the direction of the Archivist, acting in consultation with the National Security Advisor, the Director of the Information Security Oversight Office shall:

(1) develop directives for the implementation of this order;

(2) oversee agency actions to ensure compliance with this order and its implementing directives;

(3) review and approve agency implementing regulations prior to their issuance to ensure their consistency with this order and directives issued under section 5.1(a) of this order;

(4) have the authority to conduct on-site reviews of each agency's program established under this order, and to require of each agency those reports and information and other cooperation that may be necessary to fulfill its responsibilities. If granting access to specific categories of classified information would pose an exceptional national security risk, the affected agency head or the senior agency official shall submit a written justification recommending the denial of access to the President through the National Security Advisor within 60 days of the request for access. Access shall be denied pending the response;

(5) review requests for original classification authority from agencies or officials not granted original classification authority and, if deemed appropriate, recommend Presidential approval through the National Security Advisor;

(6) consider and take action on complaints and suggestions from persons within or outside the Government with respect to the administration of the program established under this order;

(7) have the authority to prescribe, after consultation with affected agencies, standardization of forms or procedures that will promote the implementation of the program established under this order;

(8) report at least annually to the President on the implementation of this order; and

(9) convene and chair interagency meetings to discuss matters pertaining to the program established by this order.

**Sec. 5.3.** *Interagency Security Classification Appeals Panel.*

(a) Establishment and administration.

(1) There is established an Interagency Security Classification Appeals Panel. The Departments of State, Defense, and Justice, the National Archives, the Office of the Director of National Intelligence, and the National Security Advisor shall each be represented by a senior-level representative who is a full-time or permanent part-time Federal officer or employee designated to serve as a member of the Panel by the respective agency head. The President shall designate a Chair from among the members of the Panel.

(2) Additionally, the Director of the Central Intelligence Agency may appoint a temporary representative who meets the criteria in paragraph (a)(1) of this section to participate as a voting member in all Panel deliberations and associated support activities concerning classified information originated by the Central Intelligence Agency.

(3) A vacancy on the Panel shall be filled as quickly as possible as provided in paragraph (a)(1) of this section.

(4) The Director of the Information Security Oversight Office shall serve as the Executive Secretary of the Panel. The staff of the Information Security Oversight Office shall provide program and administrative support for the Panel.

(5) The members and staff of the Panel shall be required to meet eligibility for access standards in order to fulfill the Panel's functions.

(6) The Panel shall meet at the call of the Chair. The Chair shall schedule meetings as may be necessary for the Panel to fulfill its functions in a timely manner.

(7) The Information Security Oversight Office shall include in its reports to the President a summary of the Panel's activities.

(b) Functions. The Panel shall:

(1) decide on appeals by persons who have filed classification challenges under section 1.8 of this order;

(2) approve, deny, or amend agency exemptions from automatic declassification as provided in section 3.3 of this order;

(3) decide on appeals by persons or entities who have filed requests for mandatory declassification review under section 3.5 of this order; and

(4) appropriately inform senior agency officials and the public of final Panel decisions on appeals under sections 1.8 and 3.5 of this order.

(c) Rules and procedures. The Panel shall issue bylaws, which shall be published in the *Federal Register*. The bylaws shall establish the rules and procedures that the Panel will follow in accepting, considering, and issuing decisions on appeals. The rules and procedures of the Panel shall provide that the Panel will consider appeals only on actions in which:

(1) the appellant has exhausted his or her administrative remedies within the responsible agency;

(2) there is no current action pending on the issue within the Federal courts; and

(3) the information has not been the subject of review by the Federal courts or the Panel within the past 2 years.

(d) Agency heads shall cooperate fully with the Panel so that it can fulfill its functions in a timely and fully informed manner. The Panel shall report to the President through the National Security Advisor any instance in which it believes that an agency head is not cooperating fully with the Panel.

(e) The Panel is established for the sole purpose of advising and assisting the President in the discharge of his constitutional and discretionary authority to protect the national security of the United States. Panel decisions are committed to the discretion of the Panel, unless changed by the President.

(f) An agency head may appeal a decision of the Panel to the President through the National Security Advisor. The information shall remain classified pending a decision on the appeal.

**Sec. 5.4.** *General Responsibilities.* Heads of agencies that originate or handle classified information shall:

(a) demonstrate personal commitment and commit senior management to the successful implementation of the program established under this order;

(b) commit necessary resources to the effective implementation of the program established under this order;

(c) ensure that agency records systems are designed and maintained to optimize the appropriate sharing and safeguarding of classified information, and to facilitate its declassification under the terms of this order when it no longer meets the standards for continued classification; and

(d) designate a senior agency official to direct and administer the program, whose responsibilities shall include:

(1) overseeing the agency's program established under this order, provided an agency head may designate a separate official to oversee special access programs authorized under this order. This official shall provide a full accounting of the agency's special access programs at least annually;

(2) promulgating implementing regulations, which shall be published in the *Federal Register* to the extent that they affect members of the public;

(3) establishing and maintaining security education and training programs;

(4) establishing and maintaining an ongoing self-inspection program, which shall include the regular reviews of representative samples of the agency's

original and derivative classification actions, and shall authorize appropriate agency officials to correct misclassification actions not covered by sections 1.7(c) and 1.7(d) of this order; and reporting annually to the Director of the Information Security Oversight Office on the agency's self-inspection program;

(5) establishing procedures consistent with directives issued pursuant to this order to prevent unnecessary access to classified information, including procedures that:

(A) require that a need for access to classified information be established before initiating administrative clearance procedures; and

(B) ensure that the number of persons granted access to classified information meets the mission needs of the agency while also satisfying operational and security requirements and needs;

(6) developing special contingency plans for the safeguarding of classified information used in or near hostile or potentially hostile areas;

(7) ensuring that the performance contract or other system used to rate civilian or military personnel performance includes the designation and management of classified information as a critical element or item to be evaluated in the rating of:

(A) original classification authorities;

(B) security managers or security specialists; and

(C) all other personnel whose duties significantly involve the creation or handling of classified information, including personnel who regularly apply derivative classification markings;

(8) accounting for the costs associated with the implementation of this order, which shall be reported to the Director of the Information Security Oversight Office for publication;

(9) assigning in a prompt manner agency personnel to respond to any request, appeal, challenge, complaint, or suggestion arising out of this order that pertains to classified information that originated in a component of the agency that no longer exists and for which there is no clear successor in function; and

(10) establishing a secure capability to receive information, allegations, or complaints regarding over-classification or incorrect classification within the agency and to provide guidance to personnel on proper classification as needed.

**Sec. 5.5.** *Sanctions.* (a) If the Director of the Information Security Oversight Office finds that a violation of this order or its implementing directives has occurred, the Director shall make a report to the head of the agency or to the senior agency official so that corrective steps, if appropriate, may be taken.

(b) Officers and employees of the United States Government, and its contractors, licensees, certificate holders, and grantees shall be subject to appropriate sanctions if they knowingly, willfully, or negligently:

(1) disclose to unauthorized persons information properly classified under this order or predecessor orders;

(2) classify or continue the classification of information in violation of this order or any implementing directive;

(3) create or continue a special access program contrary to the requirements of this order; or

(4) contravene any other provision of this order or its implementing directives.

(c) Sanctions may include reprimand, suspension without pay, removal, termination of classification authority, loss or denial of access to classified information, or other sanctions in accordance with applicable law and agency regulation.

(d) The agency head, senior agency official, or other supervisory official shall, at a minimum, promptly remove the classification authority of any individual who demonstrates reckless disregard or a pattern of error in applying the classification standards of this order.

(e) The agency head or senior agency official shall:

(1) take appropriate and prompt corrective action when a violation or infraction under paragraph (b) of this section occurs; and

(2) notify the Director of the Information Security Oversight Office when a violation under paragraph (b)(1), (2), or (3) of this section occurs.

## PART 6—GENERAL PROVISIONS

**Sec. 6.1.** *Definitions.* For purposes of this order:

(a) ''Access'' means the ability or opportunity to gain knowledge of classified information.

(b) ''Agency'' means any ''Executive agency,'' as defined in 5 U.S.C. 105; any ''Military department'' as defined in 5 U.S.C. 102; and any other entity within the executive branch that comes into the possession of classified information.

(c) ''Authorized holder'' of classified information means anyone who satisfies the conditions for access stated in section 4.1(a) of this order.

(d) ''Automated information system'' means an assembly of computer hardware, software, or firmware configured to collect, create, communicate, compute, disseminate, process, store, or control data or information.

(e) ''Automatic declassification'' means the declassification of information based solely upon:

(1) the occurrence of a specific date or event as determined by the original classification authority; or

(2) the expiration of a maximum time frame for duration of classification established under this order.

(f) ''Classification'' means the act or process by which information is determined to be classified information.

(g) ''Classification guidance'' means any instruction or source that prescribes the classification of specific information.

(h) ''Classification guide'' means a documentary form of classification guidance issued by an original classification authority that identifies the elements of information regarding a specific subject that must be classified and establishes the level and duration of classification for each such element.

(i) ''Classified national security information'' or ''classified information'' means information that has been determined pursuant to this order or any predecessor order to require protection against unauthorized disclosure and is marked to indicate its classified status when in documentary form.

(j) ''Compilation'' means an aggregation of preexisting unclassified items of information.

(k) ''Confidential source'' means any individual or organization that has provided, or that may reasonably be expected to provide, information to the United States on matters pertaining to the national security with the expectation that the information or relationship, or both, are to be held in confidence.

(l) ''Damage to the national security'' means harm to the national defense or foreign relations of the United States from the unauthorized disclosure of information, taking into consideration such aspects of the information as the sensitivity, value, utility, and provenance of that information.

(m) ''Declassification'' means the authorized change in the status of information from classified information to unclassified information.

(n) ''Declassification guide'' means written instructions issued by a declassification authority that describes the elements of information regarding

a specific subject that may be declassified and the elements that must remain classified.

(o) ''Derivative classification'' means the incorporating, paraphrasing, restating, or generating in new form information that is already classified, and marking the newly developed material consistent with the classification markings that apply to the source information. Derivative classification includes the classification of information based on classification guidance. The duplication or reproduction of existing classified information is not derivative classification.

(p) ''Document'' means any recorded information, regardless of the nature of the medium or the method or circumstances of recording.

(q) ''Downgrading'' means a determination by a declassification authority that information classified and safeguarded at a specified level shall be classified and safeguarded at a lower level.

(r) ''File series'' means file units or documents arranged according to a filing system or kept together because they relate to a particular subject or function, result from the same activity, document a specific kind of transaction, take a particular physical form, or have some other relationship arising out of their creation, receipt, or use, such as restrictions on access or use.

(s) ''Foreign government information'' means:

(1) information provided to the United States Government by a foreign government or governments, an international organization of governments, or any element thereof, with the expectation that the information, the source of the information, or both, are to be held in confidence;

(2) information produced by the United States Government pursuant to or as a result of a joint arrangement with a foreign government or governments, or an international organization of governments, or any element thereof, requiring that the information, the arrangement, or both, are to be held in confidence; or

(3) information received and treated as ''foreign government information'' under the terms of a predecessor order.

(t) ''Information'' means any knowledge that can be communicated or documentary material, regardless of its physical form or characteristics, that is owned by, is produced by or for, or is under the control of the United States Government.

(u) ''Infraction'' means any knowing, willful, or negligent action contrary to the requirements of this order or its implementing directives that does not constitute a ''violation,'' as defined below.

(v) ''Integral file block'' means a distinct component of a file series, as defined in this section, that should be maintained as a separate unit in order to ensure the integrity of the records. An integral file block may consist of a set of records covering either a specific topic or a range of time, such as a Presidential administration or a 5-year retirement schedule within a specific file series that is retired from active file use as a group. For purposes of automatic declassification, integral file blocks shall contain only records dated within 10 years of the oldest record in the file block.

(w) ''Integrity'' means the state that exists when information is unchanged from its source and has not been accidentally or intentionally modified, altered, or destroyed.

(x) ''Intelligence'' includes foreign intelligence and counterintelligence as defined by Executive Order 12333 of December 4, 1981, as amended, or by a successor order.

(y) ''Intelligence activities'' means all activities that elements of the Intelligence Community are authorized to conduct pursuant to law or Executive Order 12333, as amended, or a successor order.

(z) ''Intelligence Community'' means an element or agency of the U.S. Government identified in or designated pursuant to section 3(4) of the National Security Act of 1947, as amended, or section 3.5(h) of Executive Order 12333, as amended.

(aa) ''Mandatory declassification review'' means the review for declassification of classified information in response to a request for declassification that meets the requirements under section 3.5 of this order.

(bb) ''Multiple sources'' means two or more source documents, classification guides, or a combination of both.

(cc) ''National security'' means the national defense or foreign relations of the United States.

(dd) ''Need-to-know'' means a determination within the executive branch in accordance with directives issued pursuant to this order that a prospective recipient requires access to specific classified information in order to perform or assist in a lawful and authorized governmental function.

(ee) ''Network'' means a system of two or more computers that can exchange data or information.

(ff) ''Original classification'' means an initial determination that information requires, in the interest of the national security, protection against unauthorized disclosure.

(gg) ''Original classification authority'' means an individual authorized in writing, either by the President, the Vice President, or by agency heads or other officials designated by the President, to classify information in the first instance.

(hh) ''Records'' means the records of an agency and Presidential papers or Presidential records, as those terms are defined in title 44, United States Code, including those created or maintained by a government contractor, licensee, certificate holder, or grantee that are subject to the sponsoring agency's control under the terms of the contract, license, certificate, or grant.

(ii) ''Records having permanent historical value'' means Presidential papers or Presidential records and the records of an agency that the Archivist has determined should be maintained permanently in accordance with title 44, United States Code.

(jj) ''Records management'' means the planning, controlling, directing, organizing, training, promoting, and other managerial activities involved with respect to records creation, records maintenance and use, and records disposition in order to achieve adequate and proper documentation of the policies and transactions of the Federal Government and effective and economical management of agency operations.

(kk) ''Safeguarding'' means measures and controls that are prescribed to protect classified information.

(ll) ''Self-inspection'' means the internal review and evaluation of individual agency activities and the agency as a whole with respect to the implementation of the program established under this order and its implementing directives.

(mm) ''Senior agency official'' means the official designated by the agency head under section 5.4(d) of this order to direct and administer the agency's program under which information is classified, safeguarded, and declassified.

(nn) ''Source document'' means an existing document that contains classified information that is incorporated, paraphrased, restated, or generated in new form into a new document.

(oo) ''Special access program'' means a program established for a specific class of classified information that imposes safeguarding and access requirements that exceed those normally required for information at the same classification level.

A-36

(pp) ''Systematic declassification review'' means the review for declassification of classified information contained in records that have been determined by the Archivist to have permanent historical value in accordance with title 44, United States Code.

(qq) ''Telecommunications'' means the preparation, transmission, or communication of information by electronic means.

(rr) ''Unauthorized disclosure'' means a communication or physical transfer of classified information to an unauthorized recipient.

(ss) ''U.S. entity'' includes:

(1) State, local, or tribal governments;

(2) State, local, and tribal law enforcement and firefighting entities;

(3) public health and medical entities;

(4) regional, state, local, and tribal emergency management entities, including State Adjutants General and other appropriate public safety entities; or

(5) private sector entities serving as part of the nation's Critical Infrastructure/Key Resources.

(tt) ''Violation'' means:

(1) any knowing, willful, or negligent action that could reasonably be expected to result in an unauthorized disclosure of classified information;

(2) any knowing, willful, or negligent action to classify or continue the classification of information contrary to the requirements of this order or its implementing directives; or

(3) any knowing, willful, or negligent action to create or continue a special access program contrary to the requirements of this order.

(uu) ''Weapons of mass destruction'' means any weapon of mass destruction as defined in 50 U.S.C. 1801(p).

**Sec. 6.2.** *General Provisions.* (a) Nothing in this order shall supersede any requirement made by or under the Atomic Energy Act of 1954, as amended, or the National Security Act of 1947, as amended. ''Restricted Data'' and ''Formerly Restricted Data'' shall be handled, protected, classified, downgraded, and declassified in conformity with the provisions of the Atomic Energy Act of 1954, as amended, and regulations issued under that Act.

(b) The Director of National Intelligence may, with respect to the Intelligence Community and after consultation with the heads of affected departments and agencies, issue such policy directives and guidelines as the Director of National Intelligence deems necessary to implement this order with respect to the classification and declassification of all intelligence and intelligence-related information, and for access to and dissemination of all intelligence and intelligence-related information, both in its final form and in the form when initially gathered. Procedures or other guidance issued by Intelligence Community element heads shall be in accordance with such policy directives or guidelines issued by the Director of National Intelligence. Any such policy directives or guidelines issued by the Director of National Intelligence shall be in accordance with directives issued by the Director of the Information Security Oversight Office under section 5.1(a) of this order.

(c) The Attorney General, upon request by the head of an agency or the Director of the Information Security Oversight Office, shall render an interpretation of this order with respect to any question arising in the course of its administration.

(d) Nothing in this order limits the protection afforded any information by other provisions of law, including the Constitution, Freedom of Information Act exemptions, the Privacy Act of 1974, and the National Security Act of 1947, as amended. This order is not intended to and does not create any right or benefit, substantive or procedural, enforceable at law

by a party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. The foregoing is in addition to the specific provisos set forth in sections 1.1(b), 3.1(c) and 5.3(e) of this order.

(e) Nothing in this order shall be construed to obligate action or otherwise affect functions by the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(f) This order shall be implemented subject to the availability of appropriations.

(g) Executive Order 12958 of April 17, 1995, and amendments thereto, including Executive Order 13292 of March 25, 2003, are hereby revoked as of the effective date of this order.

**Sec. 6.3.** *Effective Date.* This order is effective 180 days from the date of this order, except for sections 1.7, 3.3, and 3.7, which are effective immediately.

**Sec. 6.4.** *Publication.* The Archivist of the United States shall publish this Executive Order in the *Federal Register*.

THE WHITE HOUSE,
*December 29, 2010.*

[FR Doc. E9–31418

Filed 1–4–10; 11:15 am]

Billing code 7515–01–P

A-38