**ORAL ARGUMENT NOT YET SCHEDULED**
No. 23-5017

# United States Court of Appeals
# for the District of Columbia Circuit

———————

NATIONAL SECURITY ARCHIVE,

*Appellant,*

v.

CENTRAL INTELLIGENCE AGENCY,

*Appellee.*

———————

On Appeal from the United States District Court
for the District of Columbia
No. 1:21-cv-02857-JEB
District Judge James E. Boasberg

———————

**DEFERRED JOINT APPENDIX**
JA001 − JA385

———————

John S. Guttmann
Hilary T. Jacobs
BEVERIDGE & DIAMOND, P.C.
1900 N Street, N.W., Suite 100
Washington, DC 20036
(202) 789-6000
jguttmann@bdlaw.com
hjacobs@bdlaw.com

*Counsel for Appellant National
Security Archive*

Brian M. Boynton
Sharon Swingle
Lewis S. Yelin
Attorneys, Appellate Staff Civil
Division
U.S. Department of Justice
950 Pennsylvania Ave. NW, Rm. 7239
Washington, DC 20530
(202) 514-3425

*Counsel for Appellee Central
Intelligence Agency*

# TABLE OF CONTENTS

**VOLUME I**

| CASE 1:21-CV-02857 | Page |
|---|---|
| Complaint, ECF No. 1 (October 27, 2021) | JA001 |
| Answer to Complaint, ECF No. 10 (January 4, 2022) | JA010 |
| Joint Status Report, ECF No. 13 (April 29, 2022) | JA020 |
| Transcript of Video Status Conference, ECF No. 15 (May 6, 2022) | JA025 |
| Minute Order (June 22, 2022) | JA033 |
| CIA Motion for Summary Judgment, ECF No. 21 (July 27, 2022) | JA039 |
| CIA's Statement of Points and Authorities in Support of Motion for Summary Judgment, ECF No. 21-1 (July 27, 2022) | JA040 |
| Declaration of Lauren Holm, Acting Information Review Officer for the Litigation Information Review Office, ECF No. 21-3 (July 27, 2022) | JA050 |
| NSA's Memorandum in Opposition to CIA's Motion for Summary Judgment, ECF No. 25 (August 16, 2022) | JA060 |
| CIA's Reply in Support of Motion for Summary Judgment, ECF No. 27 (September 1, 2022) | JA072 |
| Notice of Lodging of Classified Submission for *Ex Parte, In Camera Review*, ECF No. 28 (September 1, 2022) | JA077 |
| Order Granting CIA's Motion to Dismiss, ECF No. 29 (October 4, 2022) | JA079 |
| Memorandum Opinion re Order Granting CIA's Motion to Dismiss, ECF No. 30 (October 4, 2022) | JA080 |
| Order Denying Motion to Amend Judgment, ECF No. 33 (November 16, 2022) | JA089 |

| | |
|---|---|
| NSA Notice of Appeal, ECF No. 34 (January 13, 2023) | JA092 |
| NSA Notice of Appeal [Re-filed], ECF No. 35 (January 19, 2023) | JA094 |

## VOLUME II

| EXHIBITS | Page |
|---|---|
| Appendix D to Joint Status Report, ECF No. 35-2 (1:19-CV-00529) (April 7, 2021) | JA096 |
| Appendix G to Joint Status Report, ECF No. 37-7 (1:19-CV-00529) (May 11, 2021) | JA128 |
| Appendix A to Joint Status Report, ECF No. 43-1 (1:19-CV-00529) (August 5, 2021) | JA160 |
| Exhibit A to Complaint, ECF No. 1-1 (1:21-CV-02857) (October 27, 2021) | JA201 |
| Exhibit B to Complaint, ECF No. 1-2 (1:21-CV-02857) (October 27, 2021) | JA207 |
| Exhibit C to Complaint, ECF No. 1-3 (1:21-CV-02857) (October 27, 2021) | JA244 |
| Exhibits to Joint Status Report, ECF No. 13-1 (1:21-CV-02857) (April 29, 2022) | JA247 |
| Exhibit 1 to NSA's Opposition to CIA's Expedited Motion for Reconsideration, ECF No. 17-2 (1:21-CV-02857) (May 24, 2022) | JA257 |
| Exhibit B to CIA's Motion for Summary Judgment, ECF No. 21-4 (1:21-CV-02857) (July 27, 2022) | JA332 |
| Attachment 1 to CIA's Corrected Declaration, ECF No. 23-1 (1:21-CV-02857) (July 28, 2022) | JA337 |

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system, which will send and serve notifications of the foregoing to all counsel of record.

/s/ Hilary T. Jacobs
Hilary T. Jacobs

# VOLUME I

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL SECURITY ARCHIVE
2130 H Street, N.W., Suite 701
The Gelman Library
Washington, DC 20037,

                **Plaintiff,**

  v.

CENTRAL INTELLIGENCE AGENCY
Washington, DC 20505

                **Defendant.**

**C.A. No. 21-2857**

## COMPLAINT

1.      This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  Plaintiff the National Security Archive ("Plaintiff" or the "Archive") seeks injunctive and other appropriate relief for the processing and release of agency records requested by Plaintiff from Defendant Central Intelligence Agency ("CIA" or "Defendant") on August 2, 2021. Specifically, the Archive seeks disclosure of a limited number of Lieutenant General Leonard Perroots' 1989 records related to the "1983 Soviet 'War Scare'."  More than 85 days after submitting its FOIA request, the Archive has yet to receive a single responsive document from the CIA.

## JURISDICTION AND VENUE

2.      This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. §§ 552(a)(4)(B), (a)(6)(E)(iii) and 28 U.S.C. § 1331.

3.      Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

JA001

**THE PARTIES**

4.      Plaintiff the National Security Archive is an independent non-governmental research institute and library.  The Archive was established in 1985 to promote research and public education about the U.S. governmental and national security decision-making process.  It collects, analyzes, and publishes documents acquired through FOIA in order to promote and encourage openness and government accountability.  The Archive serves as a repository of government records on a wide range of topics pertaining to the national security, foreign, intelligence, and economic policies of the United States.  The Archive is a representative of the news media within the meaning of 5 U.S.C. § 552(a)(4)(A)(ii).  *See Nat'l Sec. Archive v. U.S. Dep't of Defense*, 880 F.2d 1381 (D.C. Cir. 1989), *cert denied*, 110 S. Ct. 1478 (1990).

5.      Defendant Central Intelligence Agency is an independent agency and member of the U.S. Intelligence Community.  CIA is an "agency" within the meaning of 5 U.S.C. § 552(f)(1) and is headquartered in Langley, Virginia.

**BACKGROUND**

*The 1983 Soviet "War Scare"*

6.      During the tense years of the Cold War, the American public lived in near constant fear of nuclear threats posed by the Union of Socialist Soviet Republics ("Soviet" or "Soviet Union").  What many do not know, however, is that in 1983 the world narrowly averted a nuclear crisis, thanks in part to one U.S. general acting "correctly out of instinct, not informed guidance."[1]

---

[1] The Soviet "War Scare," President's Foreign Intelligence Advisory Board (Feb. 15, 1990) at x, *available at* https://nsarchive2.gwu.edu/nukevault/ebb533-The-Able-Archer-War-Scare-Declassified-PFIAB-Report-Released/2012-0238-MR.pdf ("1990 Presidential Report").

2

7.      During November 1983, North Atlantic Treaty Organization ("NATO") forces conducted their annual command post exercise to practice nuclear release procedures named as "Able Archer 83."  1990 Presidential Report at 69-70.  While these exercises were routinely monitored by Soviet intelligence, certain hallmarks of the 1983 exercise provoked a heightened alert.  *Id.* at 70.

8.      Specifically, the 1983 Able Archer exercise ("Able Archer 1983") tested new procedures for releasing nuclear weaponry that "emphasized command communications from headquarters to subordinate units," and featured "pre-exercise communications that notionally moved forces from normal readiness . . . to a General Alert."  *Id.*

9.      In response to their detection of Able Archer 1983, Soviet intelligence initiated a "major mobilization" of their intelligence and military forces.  *Id.*  This included placing Soviet air forces in Germany and Poland on heightened alert, conducting over 36 intelligence flights, and transporting nuclear weapons from storage sites to launch pads by helicopter.  *Id.* at vi, 71-72.

10.     The scale of the Soviet response was "unparalleled" and had only been previously observed "during actual crises."  *Id.* at vi, 71.

### Lieutenant General Leonard Perroots' De-escalation of the 1983 Soviet "War Scare"

11.     In 1983, then-Major General Leonard Perroots served as the Assistant Chief of Staff for Intelligence at Ramstein Air Base in West Germany, the U.S. Air Force's European headquarters.  1990 Presidential Report at 27-28.

12.     Observing the signs of the elevated Soviet military alert, he chose not to respond, thus averting further escalation of the 1983 Soviet "War Scare": "[T]he military officers in charge of the Able Archer exercise minimized" risks to the United States "by doing nothing in the face of evidence that parts of the Soviet armed forces were moving to an unusual level of alert."  *Id.* at x.

3

JA003

*See also, id.* at 28 (it was Perroots' decision "not to raise US [sic] readiness in response" to "detection of the Soviet Air Forces' increased alert status").

13.     After being promoted to Lieutenant General in 1985, Lieutenant General Perroots subsequently served as the Director of the Defense Intelligence Agency from 1985 to 1988.  In 1989, he wrote a letter to the President's Foreign Intelligence Advisory Board ("PFIAB") requesting an investigation into Able Archer 1983 and his concerns with the intelligence community's inadequate treatment of the Soviet Union's response.  *Id.* at 27.

14.     PFIAB conducted an investigation which resulted in a 1990 report confirming the Soviet Union's fears that the U.S. would launch a nuclear strike (i.e., the "1990 Presidential Report").  *Id.* at vii.  The Board's report concluded: "In 1983 we may have inadvertently placed our relations with the Soviet Union on a hair trigger," and that "Soviet military leaders may have been seriously concerned that the US would use Able Archer 83 as a cover of launching a real attack."  *Id.* at xii, 71.

15.     Although the 1990 Presidential Report was declassified in 2015 after 12 years of FOIA requests, declassification review efforts, and advocacy by the Archive,[2] many of Lieutenant General Perroots' historically valuable files remain classified.  This includes the letter in which he documented his concerns surrounding the 1983 Soviet "War Scare" and a related document (January 1989 "End of Tour Report Addendum" and March 1989 "End of Tour Report," collectively, the "Perroots Files").  These files likely tell the cautionary and relevant tale of the dangers of nuclear war by miscalculation and miscommunication.

---

[2] *1983 War Scare Declassified and For Real*, the Archive (Oct. 24, 2015), available at https://nsarchive2.gwu.edu/nukevault/ebb533-The-Able-Archer-War-Scare-Declassified-PFIAB-Report-Released/.

*Plaintiff's Efforts to Obtain The Perroots Files*

16.     Plaintiff's August 2, 2021 FOIA Request to the CIA ("the 2021 Request"), which is the subject of this lawsuit, seeks disclosure of the Perroots Files.  But this is not the first time Plaintiff has tried to obtain these historically significant documents from a government agency.

17.     On August 15, 2018, the Archive submitted to the Defense Intelligence Agency ("DIA") a FOIA request ("2018 Request") seeking files that likely included a copy of the Perroots Files.  Ex. A.  The 2018 Request identified the records by accession number, volume, location, file name, date, and box number, and included a copy of Standard Form 135, the form prescribed by the National Archives and Records Administration for the request of records, which identifies the specific location of the files in the Suitland, Maryland federal records facility.  *Id.* at 2, 4.  The 2018 Request specifically identified three individual boxes.  *Id* at 4.

18.     After DIA failed to timely produce a single document in response to the 2018 Request, the Archive filed an action against DIA on February 28, 2019.  *National Security Archive v. Defense Intelligence Agency*, Case No. 1:19-cv-529 (D.D.C. 2021).  Plaintiff's complaint made clear that it was most interested in obtaining copies of the Perroots Files.  *See* Case No. 1:19-cv-529, Docket Entry No. 1.  As an initial step in the litigation, DIA produced 26 indices between August and September, 2019 purporting to list the documents contained in the three boxes that were the subject of the 2018 Request.  *See* Docket Entry Nos. 14, 19.

19.     One of the indices produced by DIA indicated that the Perroots Files were housed in one of the three boxes, listing: 1/9/89 "End of Tour Report (Addendum) General Perroots"; and 3/17/89 "End of Tour Report (LtGen Perroots)."

5

20.     After over two years of working with DIA to produce the documents requested, in May 2021, Plaintiff learned of inconsistencies in the documents DIA that had processed in response to the 2018 FOIA Request and subsequent lawsuit.  The discovery of these discrepancies prompted the Archive to request that DIA confirm whether the Perroots Files were, in fact, included in the documents processed, and whether the Perroots Files were even in the three boxes at all.

21.     After submitting a second FOIA request to DIA, pursuant to the Court's June 8, 2021 directive, DIA confirmed that the Perooots Files were not in their possession.  *See* Case No. 1:19-cv-529, Docket Entry No. 43.

### *Department of State's Publication of a Partial Transcription of the Perroots Files*

22.     On February 16, 2021, the Department of State's ("DOS") Office of the Historian published a transcribed version of the January 1989 End of Tour Addendum by Lieutenant General Perrooots in a new volume of the DOS series "Foreign Relations of the United States."  A transcription of this document, with limited redactions, is available to the public at the following DOS link: https://history.state.gov/historicaldocuments/frus1981-88v04/a.[3]

23.     The DOS transcription includes the following citation for the End of Tour Addendum, from the CIA: "(Central Intelligence Agency, National Intelligence Council, Job 90T00435R: Chronological Files (1988), Box 1, Folder 12: C/NIC Chrono for December 1988)."

---

[3] Any reasons for withholding parts of the Perroots Files that are now public have been mooted by its release.  Any redactions should be limited to those included in the DOS transcription. *Judicial Watch v. U.S. Department of Justice*, 878 F. Supp. 2d 225, 238 (D.D.C. 2012) ("information that is "already in the public domain" indicates that the agency is "legally required to disclose the documents.")

6

24.     This transcription confirms the Archive's instinct that the Perroots Files would contain information of significant historical value.

25.     There is likely information of great historical value to the Archive that was not included in the transcription, but may be in the original form of the document.  For instance, original documents often list the offices within specific agencies that received a document, specific individual recipients, special security designations, and individuals who were copied on the correspondence — information that is not necessarily captured in a transcription.

## PLAINTIFF'S 2021 FOIA REQUEST

26.     On August 10, 2021, the Archive submitted to CIA the 2021 Request seeking the Perroots files.  Ex. B, Aug. 10, 2021 Fax Transmission from W. Valdes, National Security Archive, to Information and Privacy Coordinator, CIA.

27.     Specifically, the Archive requested the End of Tour Report as identified by the DOS Office of Historian's February 2021 volume of the Foreign Relations of the United States series.  *Id.*  The 2021 Request sought the document wherever it may be found in CIA's files — whether listed at the location listed in the citation included in the February 2021 volume of the Foreign Relations of the United States series, or elsewhere.  *Id.*

28.     On August 11, 2021, CIA acknowledged receipt of the 2021 Request at issue and assigned the request a reference number.  Ex. C, Aug. 11, 2021 Letter from M. Lilly, Information and Privacy Coordinator, CIA, to N. Jones, National Security Archive.  The August 11 letter from the CIA indicated that Plaintiff could check the status of the 2021 Request through the CIA website, https://www.cia.gov/readingroom/request/status.  *Id.*

29.     As of October 19, 2021, the CIA's website indicates that the 2021 Request remains "in process."

7

JA007

30.     Pursuant to 5 U.S.C. § 552(a)(6)(A)(ii), an agency "shall . . . determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request."

31.     Neither CIA's August 11 acknowledgement letter nor its website identify an expected time frame for its ultimate response to the 2021 Request.

32.     CIA's 2020 Annual FOIA Report indicates that their oldest pending FOIA request dates back to 2009, and that, as of the date of the report, it had 2,736 backlogged requests.  Ex. D.

33.     To this date, CIA has not made a determination on the Archive's August 10, 2021 request and has not produced any records in response to the 2021 Request.

## CAUSE OF ACTION

*Violation of the Freedom of Information Act for*
*Wrongful Withholding of Agency Records*

34.     Plaintiff repeats and realleges Paragraphs 1 – 33.

35.     Defendant has wrongfully withheld agency records requested by Plaintiff.

36.     Plaintiff has exhausted the applicable administrative remedies with respect to Defendant's wrongful withholding of the requested records.

37.     Plaintiff is entitled to injunctive relief with respect to the release and disclosure of the requested records.

## REQUESTED RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

8

JA008

1)   order Defendant to promptly disclose the requested records and make a copy available to Plaintiff;

2)   provide for expeditious proceedings in this action;

3)   award Plaintiff costs and reasonable fees incurred in this action; and

4)   grant such other relief as the Court may deem just and proper.

Date: October 27, 2021

Respectfully submitted,

/s/ John S. Guttmann_____
John S. Guttmann (D.C. Bar No.: 251934)
Hilary T. Jacobs (D.C. Bar No. 1021353)
Beveridge & Diamond, P.C.
1900 N Street, N.W., Suite 100
Washington, D.C. 20036
Telephone: (202) 789-6020
Facsimile:  (202) 789-6190
Email: jguttmann@bdlaw.com
      hjacobs@bdlaw.com

*Counsel for Plaintiff*

JA009

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL SECURITY ARCHIVE

*Plaintiff,*

v.

CENTRAL INTELLIGENCE AGENCY,

*Defendant.*

Civil Action No. 21-02857 (JEB)

## ANSWER

Defendant, the Central Intelligence Agency ("CIA"), by undersigned counsel, respectfully submits this Answer to the Complaint filed by Plaintiff, National Security Archive ("Plaintiff"), which makes claims under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. All allegations in the Complaint, including the relief sought, are denied except when specifically admitted.

## RESPONSES TO THE NUMBERED PARAGRAPHS OF THE COMPLAINT[1]

To the extent the Complaint refers to or quotes from external documents, statutes, or other sources, Defendant may refer to such materials for their accurate and complete contents in its responses; however, Defendant's references are not intended to be, and should not be construed to be, an admission that the cited materials: (a) are correctly cited or quoted by Plaintiff; (b) are relevant to this, or any other, action; or (c) are admissible in this, or any other, action. Defendant

---

[1] For ease of reference, Defendant's Answer replicates the headings contained in the Complaint. Although Defendant believes no response is required to such headings, to the extent a response is deemed required and to the extent those headings and titles may be construed to contain factual allegations, those allegations are denied.

JA010

expressly denies the allegations in the Complaint that are not expressly admitted or otherwise qualified in this Answer.  Defendant responds to the Complaint in like-numbered paragraphs as follows:

1.      This paragraph contains Plaintiff's description of this action to which no response is required. To the extent that a response is required, Defendant admits only that this action purports to be brought under the Freedom of Information of Act ("FOIA"), 5 U.S.C. § 552.

## JURISDICTION AND VENUE

2.      Defendant admits that the Court has jurisdiction over this FOIA matter.

3.      Defendant admits that the venue is proper in this judicial district.

## PARTIES

4.      The allegations contained in this paragraph consist of Plaintiff's characterization of itself and do not set forth a claim for relief or aver facts in support of a claim to which a response is required. To the extent that a response is required, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations.

5.      Defendant admits it is an agency pursuant to 5 U.S.C. §§ 551(1) and 552 (f).

## BACKGROUND

### The 1983 Soviet "War Scare"

6.      This paragraph does not set forth a claim for relief or allege facts in support of a claim to which a response is required. To the extent a response is required, Defendant denies the allegations in this paragraph to the extent they are inconsistent with the full text of the cited document and Defendant respectfully refers the Court to the cited document for its full and accurate contents.

2

JA011

7.      This paragraph does not set forth a claim for relief or allege facts in support of a claim to which a response is required. To the extent a response is required, Defendant denies the allegations in this paragraph to the extent they are inconsistent with the full text of the cited document and Defendant respectfully refers the Court to the cited document for its full and accurate contents.

8.      This paragraph does not set forth a claim for relief or allege facts in support of a claim to which a response is required. To the extent a response is required, Defendant denies the allegations in this paragraph to the extent they are inconsistent with the full text of the cited document and Defendant respectfully refers the Court to the cited document for its full and accurate contents.

9.      This paragraph does not set forth a claim for relief or allege facts in support of a claim to which a response is required. To the extent a response is required, Defendant denies the allegations in this paragraph to the extent they are inconsistent with the full text of the cited document and Defendant respectfully refers the Court to the cited document for its full and accurate contents.

***Lieutenant General Leonard Perroots' De-escalation of the 1983 Soviet "War Scare"***

10.     This paragraph does not set forth a claim for relief or allege facts in support of a claim to which a response is required. To the extent a response is required, Defendant denies the allegations in this paragraph to the extent they are inconsistent with the full text of the cited document and Defendant respectfully refers the Court to the cited document for its full and accurate contents.

11.     This paragraph does not set forth a claim for relief or allege facts in support of a claim to which a response is required. To the extent a response is required, Defendant denies the

JA012

allegations in this paragraph to the extent they are inconsistent with the full text of the cited document and Defendant respectfully refers the Court to the cited document for its full and accurate contents.

12. This paragraph does not set forth a claim for relief or allege facts in support of a claim to which a response is required. To the extent a response is required, Defendant denies the allegations in this paragraph to the extent they are inconsistent with the full text of the cited document and Defendant respectfully refers the Court to the cited document for its full and accurate contents.

13. This paragraph does not set forth a claim for relief or allege facts in support of a claim to which a response is required. To the extent a response is required, Defendant denies the allegations in this paragraph to the extent they are inconsistent with the full text of the cited document and Defendant respectfully refers the Court to the cited document for its full and accurate contents.

14. This paragraph does not set forth a claim for relief or allege facts in support of a claim to which a response is required. To the extent a response is required, Defendant denies the allegations in this paragraph to the extent they are inconsistent with the full text of the cited document and Defendant respectfully refers the Court to the cited document for its full and accurate contents.

15. This paragraph does not set forth a claim for relief or allege facts in support of a claim to which a response is required. To the extent a response is required, Defendant denies the allegations in this paragraph to the extent they are inconsistent with the full text of the cited document and Defendant respectfully refers the Court to the cited document for its full and accurate contents.

JA013

### *Plaintiff's Efforts to Obtain the Perroots' Files*

16.    Defendant admits the first sentence of this paragraph.  The remaining allegations in this paragraph consist of Plaintiff's characterization of its prior FOIA request to the Defense Intelligence Agency, and Defendant respectfully refers the Court to the underlying FOIA case docket for its full and accurate substance and content.  Defendant denies the allegations in this paragraph to the extent that they are inconsistent with the underlying FOIA case docket.

17.    The allegations in this paragraph consist of Plaintiff's characterization of its prior FOIA request to the Defense Intelligence Agency, and Defendant respectfully refers the Court to the underlying FOIA case docket for its full and accurate substance and content.  Defendant denies the allegations in this paragraph to the extent that they are inconsistent with the underlying FOIA case docket.

18.    The allegations in this paragraph consist of Plaintiff's characterization of its prior FOIA request to the Defense Intelligence Agency, and Defendant respectfully refers the Court to the underlying FOIA case dockets for its full and accurate substance and content.  Defendant denies the allegations in this paragraph to the extent that they are inconsistent with the underlying FOIA case docket.

19.    The allegations in this paragraph consist of Plaintiff's characterization of its prior FOIA request to the Defense Intelligence Agency, and Defendant respectfully refers the Court to the underlying FOIA case dockets for its full and accurate substance and content.  Defendant denies the allegations in this paragraph to the extent that they are inconsistent with the underlying FOIA case docket.

20.    The allegations in this paragraph consist of Plaintiff's characterization of its prior FOIA request to the Defense Intelligence Agency, and Defendant respectfully refers the Court to

the underlying FOIA case dockets for its full and accurate substance and content.  Defendant denies the allegations in this paragraph to the extent that they are inconsistent with the underlying FOIA case docket.

21.     The allegations in this paragraph consist of Plaintiff's characterization of its prior FOIA request to the Defense Intelligence Agency, and Defendant respectfully refers the Court to the underlying FOIA case dockets for its full and accurate substance and content.  Defendant denies the allegations in this paragraph to the extent that they are inconsistent with the underlying FOIA case docket.

### *Department of State's Publication of a Partial Transcription of the Perroots Files*

22.     This paragraph constitutes Plaintiff's characterization of the referenced document to which no response is required.  To extent a response is necessary, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies the allegations.

23.     This paragraph constitutes Plaintiff's characterization of the referenced document to which no response is required.  To extent a response is necessary, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies the allegations.

24.     This paragraph constitutes Plaintiff's characterization of the referenced document to which no response is required.  To extent a response is necessary, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies the allegations.

25.     This paragraph constitutes Plaintiff's characterization of the referenced document to which no response is required.  To extent a response is necessary, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies the allegations.

**PLAINTIFF'S 2021 FOIA REQUEST**

26.     Defendant admits that Plaintiff submitted a FOIA request to Defendant dated August 10, 2021.   The remainder of the allegations in this paragraph consist of Plaintiff's characterization of its request, and Defendant respectfully refers the Court to the August 10, 2021 FOIA request for a complete and accurate statement of its content.   Defendant denies the allegations in this paragraph to the extent they are inconsistent with the full content of the FOIA request.

27.     The allegations in this paragraph consist of Plaintiff's characterization of its FOIA request, and Defendant respectfully refers the Court to the request for complete and accurate statements of its content. Defendant denies the allegations in this paragraph to the extent they are inconsistent with the full content of the FOIA request.

28.     Defendant admits that on August 11, 2021, Defendant sent a letter to Plaintiff acknowledging receipt of Plaintiff's FOIA request and assigning it a reference number.   The remainder of the allegations in this paragraph consist of Plaintiff's characterization of the Defendant's letter, and Defendant respectfully refers the Court to the August 11, 2021 letter for a complete and accurate statement of its content.   Defendant denies the allegations in this paragraph to the extent they are inconsistent with the full content of the letter.

29.     The allegations in this paragraph consist Plaintiff's characterizations of the website to which no response is required.   To the extent a response is required, Defendant lacks sufficient knowledge or information to form a belief about the truth of the allegations contained in this paragraph, and therefore denies the allegations.

30.     The allegations in this paragraph consist of legal conclusions to which no response is required.

7

JA016

31.     Defendant admits it acknowledged receipt of Plaintiff's request by letter dated August 11, 2021. The remaining allegations in this paragraph contain Plaintiff's characterization of Defendant's August 11, 2021 letter.  To the extent a response is required, Defendant respectfully refers the Court to the August 11, 2021 letter for a full and accurate statement of its content.

32.     The allegations in this paragraph consist of Plaintiff's characterizations of Defendants' 2020 Annual Report, and Defendant respectfully refers the Court to the Report for complete and accurate statements of its content. Defendant denies the allegations in this paragraph to the extent they are inconsistent with the full content of the Report.

33.     Defendant admits only that it has not issued a final determination in response to Plaintiff's FOIA request. To the extent that this paragraph alleges that Defendant has unlawfully withheld responsive records, Defendant denies the allegations in this paragraph.

## CAUSE OF ACTION

### *Violation of the Freedom of Information Act for Wrongful Withholding of Agency Records*

34.     Defendant incorporates by reference its responses to paragraphs 1-33.

35.     The allegations in this paragraph consist of Plaintiff's conclusion of law, to which no response is required. To the extent a response is required, Defendant denies that it has unlawfully withheld records responsive to Plaintiff's FOIA request.

36.     The allegations in this paragraph consist of Plaintiff's conclusion of law, to which no response is required. To the extent a response is required, Defendant denies that it has unlawfully withheld records responsive to Plaintiff's FOIA request.

37.     The allegations in this paragraph consist of Plaintiff's conclusion of law, to which no response is required.  To the extent a response is required, Defendant denies that Plaintiff is entitled to any relief.

## REQUESTED RELIEF

Paragraphs 1 – 4 of Plaintiff's "Requested Relief" contain Plaintiff's prayer for relief to which no response is required. To the extent a response is required, Defendant denies that Plaintiff is entitled to any relief.

## DEFENSES

In further response to the Complaint, Defendant raises the following defenses. Defendant respectfully requests and reserves the right to amend, alter, and supplement the defenses contained in this Answer as the facts and circumstances giving rise to the Complaint become known to Defendant throughout the course of this litigation.

## FIRST DEFENSE

Any document or information that Defendant has withheld, or will withhold, in response to Plaintiff's FOIA request may be exempt in whole or in part from public disclosure under the FOIA, 5 U.S.C. § 552 *et seq*., and the Privacy Act, 5 U.S.C. § 552a.

## SECOND DEFENSE

Plaintiff is not entitled to information or records protected from disclosure by one or more exemptions to the FOIA. 5 U.S.C. § 552.

## THIRD DEFENSE

The Court lacks subject-matter jurisdiction to award relief that exceeds that authorized by FOIA.

## FOURTH DEFENSE

To the extent Plaintiff's FOIA requests seek matters that are not "agency records," or seek matters exempt from disclosure under the FOIA, the Court lacks subject matter jurisdiction to compel the agency to produce such matters.

9

JA018

**FIFTH DEFENSE**

To the extent Plaintiff's FOIA requests seek matters that are not "agency records," or seek matters exempt from disclosure under the FOIA, the Complaint fails to state a claim upon which relief can be granted with respect to such matters.

**SIXTH DEFENSE**

At all times alleged in the Complaint, Defendant was acting in good faith, with justification, and pursuant to authority. Defendant respectfully requests and reserves the right to amend, alter, and supplement the defenses contained in this Answer as the facts and circumstances giving rise to the Complaint become known through the course of the litigation.

Dated: January 4, 2021

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

BRIAN HUDAK
Acting Chief, Civil Division

_____/S/_____
T. ANTHONY QUINN
Assistant United States Attorney
D.C. Bar No. 415213
United States Attorney's Office
Civil Division
555 Fourth Street, NW
Washington, D.C. 20530
202-252-7558
Tony.Quinn2@USDoJ.Gov

*Counsel for Defendant*

10

JA019

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL SECURITY ARCHIVE,

*Plaintiff*,

v.

CENTRAL INTELLIGENCE AGENCY,

*Defendant*.

Civil Action No. 21-2857 (JEB)

## JOINT STATUS REPORT

Pursuant to the Court's Minute Order entered on March 31, 2022, Plaintiff, the National Security Archive ("NSA") and the Central Intelligence Agency ("Defendant"), by and through undersigned counsel, hereby provide the Court with the following Joint Status Report.

1.  This matter arises out of a Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, request seeking the disclosure of a record, specifically Lieutenant General Leonard Perroots' January 1989 "End of Tour Report Addendum" (the "2021 FOIA Request").

2.  Plaintiff filed this action against Defendant on October 27, 2021. Docket Entry No. 1. *See also, id.*, ¶¶ 16–21. Defendant answered the Complaint on January 4, 2022. Docket Entry No. 2.

3.  After coordinating with external agency stakeholders between January and April 2022, *see* Docket Entry Nos. 11, 12, CIA produced the document at issue to Plaintiff in redacted form on April 15, 2022. *See* Exhibit 1.

JA020

4.      CIA's production consists of a four-page PDF.  One page includes a cover letter to the End of Tour Addendum, with several redactions asserting the 5 U.S.C. § 552 (b)(1)[1] and (b)(3)[2]FOIA exemptions.  *Id.*  The final three pages of the PDF are redacted *in totem*, and include citations to the same statutory exemptions.  *Id.*

## Plaintiff's Position

5.      Defendant is now taking the position that End of Tour Addendum is entirely exempt from disclosure under FOIA pursuant to FOIA Exemptions (b)(1) and (b)(3).  *See* Ex. 1.  *See also* Ex. 2 (Apr. 28, 2022, Correspondence between T. Quinn and H. Jacobs).  However, the text of this document, in a transcribed form, has been made available to the public in multiple locations, undermining any claims that it is subject to FOIA exemptions.

6.      As described in Plaintiff's Complaint, on February 16, 2021, the Department of State ("DOS") published a transcribed version of the End of Tour Addendum in a new volume of the DOS Series "Foreign Relations of the United States."  *See* Complaint, Docket Entry No. 1 at ¶¶ 22–23 and Ex. B to Complaint (copy of the 2021 FOIA Request).

7.      The DOS transcription of the text of the End of Tour Addendum has limited redactions.  *Id.*

8.      Plaintiff referenced and attached a copy of relevant excerpts of this publication to its 2021 FOIA Request which is the subject of this action.  *Id.* at ¶¶ 26–27, Ex. B to Complaint.

---

[1]      FOIA Exemption (b)(1) applies to information which is currently and properly classified in the interest of national defense or foreign policy, as specifically authorized under the criteria established by Executive Order and implemented by regulations.

[2]      FOIA Exemption (b)(3) incorporates certain nondisclosure provisions contained in federal statutes other than the FOIA.

2

JA021

9.     Plaintiff also attached a copy of the transcribed version to its Complaint, which it filed with this Court.  *Id.* at Ex. B to Complaint.

10.     In addition to the above locations, the DOS publication (or relevant portions thereof) is available in the following public locations:

   a.   Plaintiff's website, at the following link:

        https://nsarchive.gwu.edu/document/21035-us-air-force-lt-gen-leonard-h-perroots-letter-end-tour-report-addendum-january-1989.

   b.   The following website, which includes a cached version of the DOS's website with this publication:

        https://web.archive.org/web/20210320083726/https://history.state.gov/historicald ocuments/frus1981-88v04/appxA.

11.     Additionally, the Washington Post published a story on the DOS's release of the End of Tour Report Addendum on February 17, 2021, which includes quotes from the transcription. *See* David Hoffman and Nate Jones, Newly released documents shed light on 1983 nuclear war scar with Soviets (Feb. 17, 2021), https://www.washingtonpost.com/national-security/soviet-nuclear-war-able-archer/2021/02/17/711fa9e2-7166-11eb-93be-c10813e358a2_story.html.   Other news outlets and websites have published stories on this declassification, and additional publications may have also occurred.  *See, e.g.*, Jack Murphy, Newly declassified documents reveal the training exercise that nearly triggered World War III (Feb. 19, 2021), https://www.audacy.com/connectingvets/news/able-archer-the-exercise-that-almost-ended-the-world; Jack Newman, Thirty minutes from nuclear war: Newly-declassified US documents reveal how period Russians loaded nukes onto fighters in East Germany in 1983 over fears NATO exercise was invasion (Feb. 18, 2021), https://www.dailymail.co.uk/news/article-

3

JA022

9274205/Declassified-documents-reveal-Soviets-readied-nuclear-attack-1983-NATO-exercise.html.

12.     Plaintiff's position is that any reasons for withholding parts of the End of Tour Report Addendum that are public have been mooted by release. *Judicial Watch v. U.S. Department of Justice*, 878 F. Supp. 2d 225, 248 (D.D.C. 2012) ("information that is already in the public domain indicates that the agency is legally required to *disclose* the documents.") (emphasis in original); *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 836 (D.C. Cir. 2001) ("the government may not rely on an otherwise valid [FOIA] exemption to justify withholding information that is already in the 'public domain.'").

13.     Accordingly, Plaintiff seeks the Court's guidance regarding how to most efficiently tee up the merits of this issue for the Court's consideration.

### Defendant's Position

14.     The previously released version of the document–the referenced publication of a transcript by the State Department–is different from the version that is the subject of Plaintiff's request to Defendant in that Plaintiff is requesting CIA's document.  Therefore, different equities are involved.   The government will further inform the Court as to the justifications for the withholding at briefing.

### Next Steps

15. The Parties request a conference before this Court to address these issues.

4

Dated: April 29, 2022          Respectfully submitted,

*/s/ Hilary Jacobs*
John S. Guttmann
D.C. Bar No. 251934
Hilary T. Jacobs
D.C. Bar No. 1021353
Beveridge & Diamond, P.C.
1900 N Street, NW, Suite 100
Washington, D.C. 20036
(202) 789-6020
jguttmann@bdlaw.com
hjacobs@bdlaw.com

*Counsel for Plaintiff*

MATTHEW M. GRAVES
D.C. Bar No. 481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

*/s/ T Anthony Quinn*
T. ANTHONY QUINN
Assistant United States Attorney
D.C. Bar No. 415213
601 D Street, NW Washington,
D.C. 20530
(202) 252-7558
tony.quinn2@usdoj.gov

*Counsel for Defendant*

5

JA024

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------X

 NATIONAL SECURITY ARCHIVE,

           Plaintiff

           v.              Civil Action 21-2857 (JEB)

CENTRAL INTELLIGENCE AGENCY,

           Defendant

---------------------------X

                                    Washington, D.C
                                    Friday, May 6, 2022
                                    2:00 p.m.

        TRANSCRIPT OF A VIDEO STATUS CONFERENCE
        BEFORE THE HONORABLE JAMES E. BOASBERG
             UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: Hilary Jacobs, Esq.
                   John Stephen Guttmann, Jr., Esq.
                   BEVERIDGE & DIAMOND, P.C.
                   1900 N Street, NW, Suite 100
                   Washington, DC 20036
                   (202) 789-6086

For the Defendant: Thomas Anthony Quinn, Esq.
                   DOJ-USAO, Civil Division
                   555 4th Street, NW
                   Washington, DC 20530
                   (202) 252-7558

Court Reporter:      Lisa Walker Griffith, RPR
                     U.S. District Courthouse, Room 6507
                     Washington, D.C.  20001
                     (202) 354-3247

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  Good afternoon.  We're here for civil status hearing in 21-2857.  National Security Archive versus Central Intelligence Agency.  Beginning with counsel for plaintiff, please identify yourselves for the record.

MS. JACOBS:  Good afternoon, Your Honor.  I'm Hilary Jacobs, counsel for National Security Archives, here with me are my colleagues, John Guttmann, who is also counsel for the Archives on this case, and Mary Crowell, who has been helping out with this case but has not entered an appearance.  I would like to quickly ask permission for her to observe this hearing if that is okay with you.

THE COURT:  Okay.  She may do so.

MS. JACOBS:  Thank you.

MR. QUINN:  Tony Quinn for the defendant.

THE COURT:  All right.  Thank you, Mr. Quinn.

I understand that there is a dispute about three pages of this document, I guess, which has been redacted total.

I guess the first question, Ms. Jacobs, is you say your main basis is that they have already been released, right?

MS. JACOBS:  Yes.

THE COURT:  You have them.  So what do you need

JA026

these for if you already have them?

MS. JACOBS:  It is a fair question.  So yes, Your Honor, so the Department of State Office of the Historian I understand released a transcription of the document that we're seeking in I think February of this year.  And the transcription, while it includes presumably, it's supposed to be verbatim text of the document that we're seeking, there is also lots of historical value, information of historical value in the original documents that my client would find of use.

I think that the production that CIA released just now is a perfect example of how not everything gets put into the transcription.  So the one thing that got new information, even though most of it was redacted, we received this cover letter to the document that we're seeking, which was not included in the transcription in the Department of State publication.  There is a lot of other information that is of historic value that is in the original document that historians like my client really finds valuable.  I could go on but that's the gist.

THE COURT:  Okay.  So you are saying, Mr. Quinn, that the transcript is different from the document that you have?

MR. QUINN:  Yes, Your Honor.  As Ms. Jacobs pointed out, I personally have not seen it but I am so

advised.

THE COURT:  This isn't something that you folks can reach some agreement on here?  It seems like your differences are rather negligible, Mr. Quinn.

MR. QUINN:  I'm told that the withholding was pursuant to the national security aspect of FOIA part one.  And I'm not able to speak further on it.

In addition, I have to advise the Court that, due to my level of security, the matter is being -- or inadequate level of security clearance, the matter is going to be transferred over to an attorney at the Department of Justice's Fed Programs.  So to the extent any further negotiation could be possible, I'm not the government attorney who would be capable of doing so.

THE COURT:  Okay.  Is that, can you give me a sense of when that is happening?

MR. QUINN:  I'm told that that has been requested.  I have not received a confirmation from Fed Programs.  And I advised my supervisors, as the CIA agency contact for me has advised me, that that is in process, but it has not given me the contact information.

THE COURT:  So I'm wondering, Ms. Jacobs, whether your powers of persuasion could be employed in saying to Mr. Quinn's successor: Look, what is the big national security interest?  We already have this, we already have

JA028

all the content.  It's just the form that you are holding on to.  And maybe you can reach some agreement with that person.  If you can't, then I guess we'll just have to brief it, although it seems to me that is spending a lot of effort where it might not be necessary.

MS. JACOBS:  Your Honor, I hope my powers of persuasion can achieve such goals, such reality.  So we'll see what happens.  I'm fully amenable to that.  That would be ideal.

As Mr. Quinn stated, there has been some shifting with counsel.  We'll hang tight to see how that resolves itself and then work with them.  But we feel the same way as you, that briefing could be a real waste of judicial resources and everyone's time when this is really kind of a super straightforward issue.  The contents of the document is public, period.

THE COURT:  I'm sorry, to interrupt.  The only thing left in dispute in the case is this issue?

MS. JACOBS:  Correct.  We're talking about this two page document, and whether or not it is subject to FOIA exemptions or not.  We contend that it's not.  We're prepared to brief that if we have to.  But we contend that it is not because it's public, and evidently the CIA is arguing that it still is, despite the fact that the information in the document is now in the public.

THE COURT:  How about we do this?  Why don't we do a joint status report and we'll pick a reasonable time, in which you will alert me as to how successful you have been in trying to persuade Mr. Quinn's successor about release.  Then if you have not persuaded that person, what might be helpful -- although maybe not -- is for me to get in camera the document, the contested document, as well as what is in the public domain, so that I can make a comparison and be in better shape to give everybody my opinion on whether this is worth briefing or not.  How does that sound?

MS. JACOBS:  Your Honor, that is perfect for us and you read my mind because I was going to suggest the same thing.

THE COURT:  Okay.  So what do you think, Mr. Quinn, is three weeks reasonable?  What is reasonable?  What I want to do is give a time in which your successor can be appointed and Ms. Jacobs can speak to that person.  Then you folks can file this.

MR. QUINN:  I think so, Your Honor, the 27th of May for joint status report would be fine for my successor.

THE COURT:  Okay.  Ms. Jacobs, is that all right with you?

MS. JACOBS:  Yes, Your Honor.  That works for me.

THE COURT:  Okay.  So what I am going to say is that, in that joint status report, if resolution is not been

reached, then the government must also provide in camera the disputed document.  And you can produce in camera, Ms. Jacobs, what you contend is public.

I'm going to be away at that point for a little while thereafter so I may not be able to review it for a little bit.  But I will do so as soon as I get back.  Again, if there is not agreement, I can have a hearing where I can chat with both sides about what I see.  And then if that still doesn't yield resolution, then we'll just have to brief it I guess.  Okay?

MR. QUINN:  Yes.  Your Honor, may we contact your chambers in order to arrange for delivery of the document?

THE COURT:  Please.  Because it's classified.

MR. QUINN:  Right.

THE COURT:  So it's possible then they may not deliver it until I get back because I don't want it sitting around.  I have some cleared clerks but I don't know if there is a basis for -- well, yes, you can contact chambers to arrange that, that would be great.

MR. QUINN:  Thank you.

THE COURT:  Anything else I should address today, Ms. Jacobs?

MS. JACOBS:  Nothing on our end, Your Honor. Thank you for this hearing.

THE COURT:  My pleasure.

Mr. Quinn?

MR. QUINN:  Nothing, thank you, Your Honor.

THE COURT:  Have a nice weekend.

(Whereupon, at 2:12 p.m., the hearing concluded.)

CERTIFICATE OF REPORTER

I, Lisa Walker Griffith, certify that the foregoing is a correct transcript from the record of the remotely reported proceedings in the above-entitled matter, and is subject to the technological limitations of court reporting remotely, including signal interference and other restrictions.

_____  5-17-2022
Lisa Walker Griffith, RPR              Date

JA032

Query    Reports    Utilities    Help    Log Out

APPEAL,CLOSED,TYPE I-FOIA

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: 1:21-cv-02857-JEB

| | |
|---|---|
| NATIONAL SECURITY ARCHIVE v. CENTRAL INTELLIGENCE AGENCY<br>Assigned to: Chief Judge James E. Boasberg<br> Case: 1:19-cv-00529-CJN<br>Case in other court: USCA for the DC Circuit, 23-05017<br>Cause: 05:552 Freedom of Information Act | Date Filed: 10/27/2021<br>Date Terminated: 10/04/2022<br>Jury Demand: None<br>Nature of Suit: 895 Freedom of Information Act<br>Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**NATIONAL SECURITY ARCHIVE**      represented by   **John Stephen Guttmann , Jr.**
BEVERIDGE & DIAMOND PC
1900 N Street NW
Suite 100
Washington, DC 20036
202-789-6020
Fax: 202-789-6190
Email: jguttmann@bdlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hilary Jacobs**
BEVERIDGE & DIAMOND, P.C.
1900 N Street, NW
Ste 100
Washington, DC 20036
202-789-6086
Email: HJacobs@bdlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**CENTRAL INTELLIGENCE AGENCY**      represented by   **James R. Powers**
U.S. DEPARTMENT OF JUSTICE
Federal Programs Branch, Civil Division
1100 L Street NW
Room 11218
Washington, DC 20005
(202) 353-0543
Fax: (202) 616-8470
Email: james.r.powers@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA033

USCA Case #23-5017      Document #2005450      Filed: 06/28/2023      Page 39 of 391

Thomas Anthony Quinn
DOJ-USAO
Civil Division
555 4th Street, NW
Washington, DC 20530
(202) 252-7558
Fax: (202) 252-2599
Email: tony.quinn2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/27/2021 | 1 | COMPLAINT against CENTRAL INTELLIGENCE AGENCY ( Filing fee $ 402 receipt number ADCDC-8828501) filed by NATIONAL SECURITY ARCHIVE. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Civil Cover Sheet, # 6 Summons, # 7 Summons)(Jacobs, Hilary) (Entered: 10/27/2021) |
| 10/28/2021 | | Case Assigned to Judge James E. Boasberg. (adh, ) (Entered: 10/28/2021) |
| 10/28/2021 | 2 | SUMMONS (2) Issued Electronically as to CENTRAL INTELLIGENCE AGENCY and U.S. Attorney General (Attachments: # 1 Notice and Consent)(adh, ) (Entered: 10/28/2021) |
| 10/28/2021 | 3 | NOTICE OF RELATED CASE by NATIONAL SECURITY ARCHIVE. Case related to Case No. 19-cv-529. (Jacobs, Hilary) (Main Document 3 replaced on 11/1/2021) (znmw). (Entered: 10/28/2021) |
| 10/28/2021 | 4 | REQUEST for Summons to Issue by NATIONAL SECURITY ARCHIVE. (Jacobs, Hilary); Modified docketing event and text on 10/29/2021 (ztth). (Entered: 10/28/2021) |
| 10/29/2021 | 5 | SUMMONS (1) Issued Electronically as to U.S. Attorney. (ztth) (Entered: 10/29/2021) |
| 11/24/2021 | 6 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 11/4/2021. Answer due for ALL FEDERAL DEFENDANTS by 12/4/2021. (Attachments: # 1 Proof of Service)(Jacobs, Hilary) (Entered: 11/24/2021) |
| 11/24/2021 | 7 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 11/1/2021., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. CENTRAL INTELLIGENCE AGENCY served on 11/1/2021. (See Docket Entry 6 to view document). (znmw) (Entered: 12/02/2021) |
| 12/05/2021 | 8 | NOTICE of Appearance by Thomas Anthony Quinn on behalf of All Defendants (Quinn, Thomas) (Entered: 12/05/2021) |
| 12/05/2021 | 9 | Unopposed MOTION for Extension of Time to File Answer re 1 Complaint, by CENTRAL INTELLIGENCE AGENCY. (Attachments: # 1 Text of Proposed Order) (Quinn, Thomas) (Entered: 12/05/2021) |
| 12/06/2021 | | MINUTE ORDER GRANTING Unopposed 9 Motion for Extension of Time. The Court ORDERS that Defendant shall file its Answer or otherwise respond to Plaintiff's Complaint by January 7, 2022. So ORDERED by Judge James E. Boasberg on 12/6/2021. (lcjeb2) (Entered: 12/06/2021) |
| 12/06/2021 | | Set/Reset Deadlines: Answer due by 1/7/2022. (nbn) (Entered: 12/06/2021) |

JA034

USCA Case #23-5017     Document #2005450     Filed: 06/28/2023     Page 40 of 391

| 01/04/2022 | 10 | ANSWER to Complaint by CENTRAL INTELLIGENCE AGENCY.(Quinn, Thomas) (Entered: 01/04/2022) |
|---|---|---|
| 01/04/2022 | | MINUTE ORDER: The Court ORDERS that the parties shall confer and submit a joint proposed briefing schedule by January 18, 2022. So ORDERED by Judge James E. Boasberg on 1/4/2022. (lcjeb2) (Entered: 01/04/2022) |
| 01/04/2022 | | Set/Reset Deadlines: Joint Proposed Briefing Schedule due by 1/18/2022. (nbn) (Entered: 01/04/2022) |
| 01/18/2022 | 11 | Joint STATUS REPORT by CENTRAL INTELLIGENCE AGENCY. (Quinn, Thomas) (Entered: 01/18/2022) |
| 01/19/2022 | | MINUTE ORDER: The Court ADOPTS the parties' 11 Joint Status Report and ORDERS that they shall file a further joint status report by March 31, 2022. So ORDERED by Judge James E. Boasberg on 1/19/2022. (lcjeb2) (Entered: 01/19/2022) |
| 01/19/2022 | | Set/Reset Deadlines: Joint Status Report due by 3/31/2022. (nbn) (Entered: 01/20/2022) |
| 03/31/2022 | 12 | Joint STATUS REPORT by CENTRAL INTELLIGENCE AGENCY. (Quinn, Thomas) (Entered: 03/31/2022) |
| 03/31/2022 | | MINUTE ORDER: The Court ADOPTS the parties' 12 Joint Status Report and ORDERS that they shall file a further joint status report by April 29, 2022. So ORDERED by Judge James E. Boasberg on 3/31/2022. (lcjeb2) (Entered: 03/31/2022) |
| 03/31/2022 | | Set/Reset Deadlines: Status Report due by 4/29/2022. (nbn) (Entered: 03/31/2022) |
| 03/31/2022 | | ENTERED IN ERROR ON THE WRONG CASE #.....Set/Reset Deadlines: Status Report due by 5/13/2022. (nbn) Modified on 3/31/2022 (znbn). (Entered: 03/31/2022) |
| 04/29/2022 | 13 | Joint STATUS REPORT by CENTRAL INTELLIGENCE AGENCY. (Attachments: # 1 Exhibit)(Quinn, Thomas) (Entered: 04/29/2022) |
| 05/02/2022 | | MINUTE ORDER: The Court ORDERS that the parties shall appear for a Zoom hearing to discuss their latest Joint Status Report on May 6, 2022, at 2:00 p.m. So ORDERED by Judge James E. Boasberg on 5/2/2022. (lcjeb2) (Entered: 05/02/2022) |
| 05/02/2022 | | Set/Reset Hearings: Status Conference set for 5/6/2022 at 02:00 PM in Telephonic/VTC before Judge James E. Boasberg. (nbn) (Entered: 05/02/2022) |
| 05/06/2022 | | Minute Entry for proceedings held before Judge James E. Boasberg: Video Status Conference held on 5/6/2022. Joint Status Report due by 5/27/2022. (Court Reporter Lisa Griffith) (nbn) (Entered: 05/06/2022) |
| 05/06/2022 | | MINUTE ORDER: As discussed in today's hearing, the Court ORDERS that: 1) By May 27, 2022, the parties shall submit a further Joint Status Report; and 2) If a resolution has not been reached, they shall submit *in camera* by the same date the disputed document and the transcription that is in the public domain. So ORDERED by Judge James E. Boasberg on 5/6/2022. (lcjeb2) (Entered: 05/06/2022) |
| 05/09/2022 | 14 | NOTICE of Appearance by James R. Powers on behalf of CENTRAL INTELLIGENCE AGENCY (Powers, James) (Entered: 05/09/2022) |
| 05/17/2022 | 15 | TRANSCRIPT OF PROCEEDINGS before Judge James E. Boasberg held on 5-6-2022; Page Numbers: 1-8. Date of Issuance:5-17-2022. Court Reporter/Transcriber Lisa Walker Griffith, Telephone number (202) 354-3247, Transcripts may be ordered by submitting the Transcript Order Form |

JA035

USCA Case #23-5017      Document #2005450      Filed: 06/28/2023      Page 41 of 391

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter reference d above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 6/7/2022. Redacted Transcript Deadline set for 6/17/2022. Release of Transcript Restriction set for 8/15/2022.(Griffith, Lisa) (Entered: 05/17/2022)

| 05/20/2022 | 16 | MOTION for Reconsideration re Order, *(Expedited)* by CENTRAL INTELLIGENCE AGENCY. (Attachments: # 1 Proposed Order)(Powers, James) (Entered: 05/20/2022) |
| 05/24/2022 | 17 | Memorandum in opposition to re 16 MOTION for Reconsideration re Order, *(Expedited)* filed by NATIONAL SECURITY ARCHIVE. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit)(Jacobs, Hilary) (Entered: 05/24/2022) |
| 05/25/2022 | 18 | REPLY to opposition to motion re 16 MOTION for Reconsideration re Order, *(Expedited)* filed by CENTRAL INTELLIGENCE AGENCY. (Powers, James) (Entered: 05/25/2022) |
| 05/27/2022 | 19 | Joint STATUS REPORT by NATIONAL SECURITY ARCHIVE. (Jacobs, Hilary) (Entered: 05/27/2022) |
| 05/27/2022 | 20 | NOTICE *of Lodging Classified Submissions* by CENTRAL INTELLIGENCE AGENCY re Order, (Powers, James) (Entered: 05/27/2022) |
| 06/22/2022 | | MINUTE ORDER: Given the CIA's position regarding the disputed document, the Court believes that briefing is inevitable and should commence. The Court, accordingly, ORDERS that: 1) Defendant's 16 Motion for Reconsideration is GRANTED; 2) Defendant shall file its Motion for Summary Judgment on July 27, 2022; and 3) The Court will conduct an *in camera* review after reading all the briefs. So ORDERED by Judge James E. Boasberg on 6/22/2022. (lcjeb2) (Entered: 06/22/2022) |
| 06/22/2022 | | Set/Reset Deadlines: Summary Judgment motions due by 7/27/2022. (nbn) (Entered: 06/22/2022) |
| 07/27/2022 | 21 | MOTION for Summary Judgment by CENTRAL INTELLIGENCE AGENCY. (Attachments: # 1 Memorandum in Support, # 2 Statement of Undisputed Material Facts, # 3 Exhibit A, # 4 Exhibit B, # 5 Proposed Order)(Powers, James) (Entered: 07/27/2022) |
| 07/27/2022 | 22 | NOTICE *of Lodging Classified Submission* by CENTRAL INTELLIGENCE AGENCY re 21 Motion for Summary Judgment (Powers, James) (Entered: 07/27/2022) |
| 07/28/2022 | 23 | ERRATA *and Notice of Filing Corrected Declaration* by CENTRAL INTELLIGENCE AGENCY re 21 MOTION for Summary Judgment filed by CENTRAL INTELLIGENCE AGENCY. (Attachments: # 1 Corrected Declaration)(Powers, James) (Entered: 07/28/2022) |
| 07/28/2022 | 24 | Unopposed MOTION for Extension of Time to *File Opposition to Plaintiff's Motion for Summary Judgment* by NATIONAL SECURITY ARCHIVE. (Attachments: # 1 Text of Proposed Order)(Jacobs, Hilary) (Entered: 07/28/2022) |
| 07/29/2022 | | MINUTE ORDER GRANTING Consent 24 Motion for Extension of Time. The Court ORDERS that Plaintiff shall file its opposition to Defendant's motion for summary |

JA036

USCA Case #23-5017     Document #2005450          Filed: 06/28/2023     Page 42 of 391

| | | |
|---|---|---|
| | | judgment by August 17, 2022. So ORDERED by Judge James E. Boasberg on 7/29/2022. (lcjeb2) (Entered: 07/29/2022) |
| 07/29/2022 | | Set/Reset Deadlines: Opposition due by 8/17/2022 (nbn) (Entered: 07/29/2022) |
| 08/16/2022 | 25 | Memorandum in opposition to re 21 Motion for Summary Judgment filed by NATIONAL SECURITY ARCHIVE. (Attachments: # 1 Text of Proposed Order, # 2 Statement of Facts) (Jacobs, Hilary) (Entered: 08/16/2022) |
| 08/19/2022 | 26 | Consent MOTION for Extension of Time to File Response/Reply as to 21 MOTION for Summary Judgment by CENTRAL INTELLIGENCE AGENCY. (Attachments: # 1 Proposed Order)(Powers, James) (Entered: 08/19/2022) |
| 08/19/2022 | | MINUTE ORDER GRANTING Consent 26 Motion for Extension of Time. The Court ORDERS that Defendant shall file its reply in support of its Motion for Summary Judgment by September 1, 2022. So ORDERED by Judge James E. Boasberg on 08/19/2022. (lcjeb3) (Entered: 08/19/2022) |
| 08/19/2022 | | Set/Reset Deadlines: Reply to Motion for Summary Judgment due by 9/1/2022. (nbn) (Entered: 08/23/2022) |
| 09/01/2022 | 27 | REPLY to opposition to motion re 21 MOTION for Summary Judgment filed by CENTRAL INTELLIGENCE AGENCY. (Powers, James) (Entered: 09/01/2022) |
| 09/01/2022 | 28 | NOTICE of Lodging of Classified Submission for Ex Parte, In Camera Review by CENTRAL INTELLIGENCE AGENCY re 27 Reply to opposition to Motion (Powers, James) (Entered: 09/01/2022) |
| 10/04/2022 | 29 | ORDER: For the reasons set forth in the accompanying Memorandum Opinion, the Court ORDERS that: 1) Defendant's Motion for Summary Judgment is GRANTED; and 2) Judgment is ENTERED in favor of Defendant. Signed by Judge James E. Boasberg on 10/4/2022. (lcjeb1) (Entered: 10/04/2022) |
| 10/04/2022 | 30 | MEMORANDUM OPINION re. 29 Order on Motion for Summary Judgment. Signed by Judge James E. Boasberg on 10/4/2022. (lcjeb1) (Entered: 10/04/2022) |
| 10/21/2022 | 31 | MOTION to Amend/Correct Order on Motion for Summary Judgment by NATIONAL SECURITY ARCHIVE. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Jacobs, Hilary) (Entered: 10/21/2022) |
| 11/04/2022 | 32 | Memorandum in opposition to re 31 Motion to Amend/Correct filed by CENTRAL INTELLIGENCE AGENCY. (Attachments: # 1 Proposed Order)(Powers, James) (Entered: 11/04/2022) |
| 11/16/2022 | 33 | ORDER DENYING Plaintiff's 31 Motion to Amend/Correct Order on Motion for Summary Judgment. Signed by Judge James E. Boasberg on 11/16/2022. (lcjeb1) (Entered: 11/16/2022) |
| 01/13/2023 | 34 | ENTERED IN ERROR.....NOTICE of Appeal by NATIONAL SECURITY ARCHIVE (Jacobs, Hilary); Modified on 1/18/2023 (ztth). (Entered: 01/13/2023) |
| 01/18/2023 | | RESOLVED...NOTICE of Provisional/Government Not Certified Status re 34 NOTICE of Appeal by NATIONAL SECURITY ARCHIVE (Jacobs, Hilary). Your attorney renewal has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney-renewal. |

JA037

USCA Case #33-5017     Document #2005450     Filed: 06/28/2023     Page 43 of 391

| | | |
|---|---|---|
| | | Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 1/25/2023. (zbaj) Modified on 1/19/2023 (zbaj). (Entered: 01/18/2023) |
| 01/18/2023 | | NOTICE OF ERROR re 34 Notice (Other); emailed to HJacobs@bdlaw.com, cc'd 11 associated attorneys -- The PDF file you docketed contained errors: 1. **Please note the following deficiency and file/refile document as instructed**, 2. Incorrect (Entered: 01/18/2023) |
| 01/18/2023 | | ENTERED IN ERROR - DUPLICATE ENTRY.....NOTICE OF ERROR re 34 Notice (Other); emailed to HJacobs@bdlaw.com, cc'd 11 associated attorneys -- The PDF file you docketed contained errors: 1. **Please note the following deficiency and file/refile document as instructed**, 2. Incorrect; Modified on 1/20/2023 (ztth). (Entered: 01/18/2023) |
| 01/19/2023 | 35 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 33 Order on Motion to Amend/Correct, 29 Order on Motion for Summary Judgment, 30 Memorandum & Opinion by NATIONAL SECURITY ARCHIVE. Filing fee $ 505, receipt number ADCDC-9796405. Fee Status: Fee Paid. Parties have been notified. (rj) (Entered: 01/20/2023) |
| 01/20/2023 | 36 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 35 Notice of Appeal to DC Circuit Court. (ztth) (Entered: 01/20/2023) |
| 01/25/2023 | | USCA Case Number 23-5017 for 35 Notice of Appeal to DC Circuit Court, filed by NATIONAL SECURITY ARCHIVE. (ztth) (Entered: 01/25/2023) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/23/2023 09:45:42 | | | |
| **PACER Login:** | bd0019 | **Client Code:** | 99999-18466 |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-02857-JEB |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

JA038

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| NATIONAL SECURITY ARCHIVE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 21-2857 (JEB) |
| CENTRAL INTELLIGENCE AGENCY, | ) ) | |
| Defendant. | ) ) ) | |

**<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

Defendant, the Central Intelligence Agency, hereby moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h).  For the reasons stated in Defendant's statement of points and authorities and as supported by Defendant's statement of undisputed material facts, each filed today, Defendant respectfully requests that the Court enter judgment on their behalf as to all claims against them in this litigation.

Dated:  July 27, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ James R. Powers*
JAMES R. POWERS (TX Bar No. 24092989)
Trial Attorney
U.S. Department of Justice,
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-0543
Email: james.r.powers@usdoj.gov

*Counsel for Defendant*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL SECURITY ARCHIVE,

        Plaintiff,

        v.

CENTRAL INTELLIGENCE AGENCY,

        Defendant.

Civil Action No. 21-2857 (JEB)

**DEFENDANT'S STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

JA040

## INTRODUCTION

This action arises from a Freedom of Information Act ("FOIA") request submitted by the National Security Archive to the Central Intelligence Agency ("CIA" or "Agency"). In its request, Plaintiff seeks the disclosure by the CIA of Lieutenant General Leonard Perroots' January 1989 "End of Tour Report Addendum." Compl., ECF No. 1; ECF No. 1-2 (request to the CIA). On April 15, 2022, the CIA produced the document with redactions pursuant to FOIA exemptions 1 and 3. These exemptions permit the withholding of classified national security information and information specifically exempted from disclosure by statute. 5 U.S.C. § 552(b)(1), (3).

The only dispute before the Court are the redactions applied by the CIA to this document. *See* Tr. of May 6, 2022 Hearing at 5:17–19, ECF No. 15. As explained in the declaration of Lauren Holm on behalf of the CIA, Ex. A, and the Government's accompanying classified submission, the Government's application of these exemptions is well taken. Moreover, CIA has released all reasonably segregable information not subject to FOIA's exemptions. Nor does the official acknowledgment doctrine apply to defeat the exemption claims here. CIA is therefore entitled to summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 2, 2021, Plaintiff the National Security Archive submitted a FOIA request to CIA, requesting only one document, the "January 9, 1989 'End of Tour Report (Addendum) General Perroots.'" Holm Decl. ¶ 6. CIA acknowledged receipt of Plaintiff's request on August 11, 2021. Holm Decl. ¶ 7. Plaintiff filed this lawsuit on October 27, 2021, pursuant to its FOIA request. Compl., ECF No. 1.

CIA searched for and located the requested document, which consisted of a cover letter and the requested memorandum. Holm Decl. ¶ 8. The cover letter explains that the requested

memorandum, written concurrent with Lt. Gen. Perroots' retirement as Director of the Defense Intelligence Agency, "documents a chain of events and an important analytical problem that I believe the U.S. Intelligence Community has never adequately addressed." Ex. B. Following coordination with external agency stakeholders, CIA sent a letter on April 15, 2022, stating that the document could be released in segregable form with redactions made on the basis of FOIA exemptions (b)(1) and (b)(3). Holm Decl. ¶ 9. More specifically, CIA released the cover letter to the memorandum with minor redactions but withheld the substance of the memorandum itself in full. *See* Ex. B.

On April 29, 2022, the parties filed a Joint Status Report in which Plaintiff alleged that in February, 2021, the Department of State published a transcribed version of the memorandum with fewer redactions than the version of the document produced by the CIA. Joint Status Report, ECF No. 13. Plaintiff argued that the release by the State Department waived the withholdings made by the CIA. *Id*. at ¶ 13. Following a status conference in which the parties discussed Plaintiff's contention, the Court ordered the Parties to submit for *in camera* review the responsive document, "as well as what is in the public domain." Tr. of May 6, 2022 Hearing at 6:1–10; May 6, 2022 Minute Order. CIA subsequently moved for reconsideration of that order and the Court granted the motion, ordering that it would conduct an *in camera* review in association with summary judgment briefing to commence July 27, 2022. June 22, 2022 Minute Order.

## STATUTORY STANDARDS

### I.     The Freedom of Information Act

FOIA reflects a "general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citations omitted). "Congress recognized, however, that public disclosure

3

is not always in the public interest." *CIA v. Sims*, 471 U.S. 159, 166–67 (1985). Accordingly, although FOIA "strongly favors prompt disclosure, its nine enumerated exemptions are designed to protect those 'legitimate governmental and private interests' that might be 'harmed by release of certain types of information.'" *August v. FBI*, 328 F.3d 697, 699 (D.C. Cir. 2003) (quoting *John Doe Agency*, 493 U.S. at 152). Thus, the exemptions must be given "meaningful reach and application" in order to achieve the "workable balance" that Congress has struck "between the right of the public to know and the need of the Government to keep information in confidence." *John Doe Agency*, 493 U.S. at 152 (citations omitted). The agency bears the burden of justifying the withholding of material responsive to a FOIA request, and a court reviews the agency's response to the request *de novo*. 5 U.S.C. § 552(a)(4)(B).

"Most FOIA cases are appropriately resolved on motions for summary judgment." *Gilliam v. DOJ*, 128 F. Supp. 3d 134, 138 (D.D.C. 2015) (citing *Brayton v. Office of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011)). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court may award summary judgment in a FOIA action solely on the basis of information provided by the agency through declarations that "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted). This is not a high bar: "[u]ltimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.*; *see also SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (agencies' FOIA

4

declarations are accorded "a presumption of good faith, which cannot be rebutted by purely speculative claims.").

## II.    Special Considerations in National Security Cases

The issues presented in this case directly "implicat[e] national security, a uniquely executive purview." *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 926-27 (D.C. Cir. 2003). Courts "accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record[s] [in a FOIA suit] because the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse [e]ffects might occur as a result of [the disclosure of] a particular classified record." *Larson*, 565 F.3d at 864 (citation omitted); *see also ACLU v. DoD*, 628 F.3d 612, 619 (D.C. Cir. 2011) (explaining that "courts lack the expertise to second-guess such agency opinions in the typical national security FOIA case"); *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927 ("[I]n the FOIA context, we have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review."). FOIA "bars the courts from prying loose from the government even the smallest bit of information that is properly classified or would disclose intelligence sources or methods." *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983).

## ARGUMENT

**CIA's Withholding of the Requested Document is Proper under FOIA Exemptions 1 and 3.**

## I.    CIA Properly Withheld Information under Exemption 1.

Exemption 1 protects from disclosure records that are "(A) specifically authorized … by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Executive

Order No. 13526, which currently governs the classification of national security information, establishes four prerequisites: (1) an original classification authority classifies the information; (2) the U.S. Government owns, produces, or controls the information; (3) the information is within one of eight protected categories listed in Section 1.4 of the Order ("Section 1.4"); and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, and identifies or describes that damage. Exec. Order No. 13526, § 1.1(a). The information must also "pertain[] to" one of the categories of information specified in the Executive Order, including "intelligence activities (including covert action), intelligence sources or methods." Exec. Order No. 13,526 § 1.4(c); *see also Judicial Watch, Inc. v. DoD*, 715 F.3d 937, 941 (D.C. Cir. 2013) ("'[P]ertains' is 'not a very demanding verb.'") (citation omitted). As addressed above, in matters affecting national security, the courts afford "substantial weight" to an agency's declarations addressing classified information and defer to the expertise of agencies involved in national security and foreign relations. *ACLU v. DoD*, 628 F.3d at 619 (citing *Wolf*, 473 F.3d at 374).

Here, CIA determined that certain information in the responsive record is currently and properly classified, and thus exempt from disclosure under Exemption 1. Holm Decl. ¶ 11, 15. CIA has provided a declaration from an individual who is authorized to classify national security information, who has personally reviewed the information at issue and confirmed that it is owned and under the control of the United States. *Id.* Further, the declarant has determined that the information warrants classification to protect "'intelligence activities (including covert action), [or] intelligence sources or methods.'" *Id.* (quoting Exec. Order No. 13526 § 1.4(c)). As the Holm Declaration explains, the information withheld under Exemption 1 "consists of information that would tend to reveal specific intelligence activities, sources, and methods that are either still

6

actively in use or which remain viable for use today."  Holm Decl. ¶ 12.  CIA's invocation of

Exemption 1 is further supported by the Government's classified submission provided today for

the Court's *ex parte*, *in camera* review.  *See* Holm Decl. ¶ 15.

Based on CIA's declaration, and the deference owed to national security officials in this

context, *see Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003), the Court should uphold the

Exemption 1 redactions and withholdings by CIA.

**II.**     **CIA Properly Withheld Information under Exemption 3.**

Exemption 3 incorporates into FOIA "the protections of other shield statutes," *ACLU v.*

*DoD*, 628 F.3d at 617–18, by excluding from FOIA's purview matters that are "specifically

exempted from disclosure by statute" if the statute "requires that the matters be withheld from the

public in such a manner as to leave no discretion on the issue," or "establishes particular criteria

for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3).  The

Government's mandate to withhold information under Exemption 3 is broader than its authority

under Exemption 1, as it does not have to demonstrate that the disclosure will harm national

security.  Instead, "[t]o invoke Exemption 3, the government need only show that the withheld

material falls within a statute meeting the exemption's conditions."  *DiBacco v. U.S. Dep't of the*

*Army*, 926 F.3d 827, 835 (D.C. Cir. 2019) (citation omitted).  "If an agency's statements supporting

exemption contain reasonable specificity of detail as to demonstrate that the withheld information

logically falls within the claimed exemption and evidence in the record does not suggest otherwise

. . . the court should not conduct a more detailed inquiry to test the agency's judgment and expertise

or to evaluate whether the court agrees with the agency's opinions."  *Id.*

Here, CIA invokes Exemption 3 to withhold certain information under the National

Security Act of 1947.  It is well established that this statute "qualifies as an exemption statute

under [E]xemption 3." *ACLU v. DoD*, 628 F. 3d at 619.  As amended, Section 102A(i)(1) of this Act provides that the Director of National Intelligence "shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1).  The Supreme Court, recognizing the "wide-ranging authority" provided by the National Security Act, has held that it is "the responsibility of the Director of Central Intelligence, not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process." *Sims*, 471 U.S. at 180.  As the Court observed, the Act "simply and pointedly protect[s] all sources of intelligence that provide, or are engaged to provide, information [that] the Agency needs to perform its statutory duties with respect to foreign intelligence." *Id.* at 169–70.

Here, CIA has invoked the National Security Act to withhold information that, for the same reasons set forth above regarding CIA's Exemption 1 withholdings, "would reveal intelligence sources and methods." Holm Decl. ¶¶ 17–20.  CIA has further withheld information that, although not necessarily classified, would be revealing of intelligence sources and methods if released. Holm Decl. ¶ 19 (explaining for example the rationale for withholding "dissemination control methods" from the challenged document).  Such information is expressly protected by Section 102A(i)(1) of this Act, and is correspondingly exempt from disclosure under Exemption 3.  CIA's invocation of Exemption 3 is further supported by the Government's classified submission provided today for the Court's *ex parte*, *in camera* review.  Holm Decl. ¶ 20.

III.   **CIA Processed and Released All Reasonably Segregable Information**

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b)(9).  But an agency need not disclose records in which the

nonexempt information remaining is meaningless. *See Nat'l Sec. Archive Fund, Inc. v. CIA*, 402 F. Supp. 2d 211, 220-21 (D.D.C. 2005) (concluding that no reasonably segregable information existed, where "the non-exempt information would produce only incomplete, fragmented, unintelligible sentences composed of isolated, meaningless words."). "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). And as with other aspects of its review under FOIA, a court "may rely on government affidavits that show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated." *Juarez v. DOJ*, 518 F.3d 54, 61 (D.C. Cir. 2008).

Here, CIA conducted a careful, line-by-line review of the responsive document, and withheld information only after the agency concluded that there was no additional reasonably segregable factual or non-exempt information responsive to the request that could be released. Holm Decl. ¶ 21. CIA is entitled to summary judgment on that issue as well.

## IV.     **CIA Has Not Officially Acknowledged the Exempt Information**

Plaintiff has argued that CIA has waived its invocation of Exemptions (b)(1) and (b)(3) because of a State Department publication that Plaintiff contends reflects information contained within the responsive document. Plaintiff here invokes the "official acknowledgment" doctrine, which requires a Plaintiff to show that "information in the public domain [] (1) matches the information requested, (2) is as specific [as the information sought under FOIA], and (3) has been made public through an official and documented disclosure." *Knight First Amendment Inst. v. CIA*, 11 F.4th 810, 815 (D.C. Cir. 2021).

At minimum, Plaintiff cannot prevail under this doctrine because of the third element regarding official disclosure. That element will not be met by a plaintiff where the disclosure was

"made by someone other than the agency from which the information is being sought." *Id.* at 816.

The only exception is where disclosure comes not from the agency itself but from an authorized

representative of the agency's parent. *Id.* at 816–17. The D.C. Circuit has found this exception

met where disclosure comes from a different component of the same agency or where disclosure

comes from the President as head of the entire Executive Branch. *See id.*

The State Department document Plaintiff reliefs on cannot defeat the exemption claims

here. Under the foregoing precedent, the State Department cannot cause an "official disclosure"

of information belonging to another Executive Branch agency. Moreover, certain information in

the document to which Plaintiffs point was released by State without necessary authorization and

it therefore could not constitute an official disclosure in any event. The Government's classified

submission provides additional information regarding this point.

## CONCLUSION

For all the foregoing reasons, the CIA respectfully requests that the Court grant its motion

for summary judgment and enter judgment in its favor on all claims.

Dated:  July 27, 2022                    Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Principal Deputy Assistant Attorney General

                                         MARCIA BERMAN
                                         Assistant Branch Director

                                         */s/ James R. Powers*
                                         JAMES R. POWERS (TX Bar No. 24092989)
                                         Trial Attorney
                                         U.S. Department of Justice,
                                         Civil Division, Federal Programs Branch
                                         1100 L Street, NW
                                         Washington, DC 20005
                                         Telephone: (202) 353-0543
                                         Email: james.r.powers@usdoj.gov
                                         *Counsel for Defendant*

10

JA049

# Exhibit A

UNCLASSIFIED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL SECURITY ARCHIVE,

     Plaintiff,

        v.                              Case No. 1:21-cv-2857 (JEB)

CENTRAL INTELLIGENCE AGENCY,

     Defendant.

**DECLARATION OF LAUREN HOLM, ACTING INFORMATION REVIEW OFFICER FOR
THE LITIGATION INFORMATION REVIEW OFFICE,
CENTRAL INTELLIGENCE AGENCY**

I, LAUREN HOLM, hereby declare and state:

I.    **INTRODUCTION**

1.   I currently serve as the Freedom of Information Act ("FOIA")/ Privacy Act ("PA") Team Lead for the Litigation Information Review Office ("LIRO") at the Central Intelligence Agency ("CIA" or "Agency"). I assumed this position in July 2022.

2.   Prior to becoming the FOIA/PA Team Lead for LIRO, I served as a Data Management Officer/Classification Officer for 23 months. In that role, I was responsible for making initial classification determinations, as well as second-line reviews, of Agency-wide information. Prior to that, I was an archivist with the George W. Bush Presidential Library and Museum, part of the National Archives and Records Administration for over ten years.

3.   As the FOIA/PA Team Lead for LIRO, I serve as the Acting IRO for that office in the IRO's absence. As Acting IRO for LIRO, I hold original classification authority at the TOP SECRET level under written

UNCLASSIFIED

UNCLASSIFIED

delegation of authority pursuant to section 1.3(c) of Executive Order 13526, 75 Fed. Reg. 707 (Jan. 5, 2010). This means I am authorized to assess the current, proper classification of CIA information, up to and including TOP SECRET information, based on the classification criteria of Executive Order 13526 and applicable regulations. Among other things, I am responsible for the classification review of CIA documents and information that may be the subject of court proceedings or public requests for information under FOIA, 5 U.S.C. Section 552, and the Privacy Act of 1974, 5 U.S.C. Section 552a.

4.    Through the exercise of my official duties, I have become familiar with this civil action and the underlying FOIA request. I make the following statements based upon my personal knowledge and information made available to me in my official capacity.

5.    I submit this declaration in support of the Motion for Summary Judgment the United States Department of Justice has filed in this proceeding. The purpose of this declaration is to explain and justify, to the greatest extent possible on the public record, the Central Intelligence Agency's ("CIA" or "Agency") application of Freedom of Information Act ("FOIA") Exemptions (b)(1) and (b)(3) to protect classified and statutorily protected information. Part II of this declaration provides the administrative history of the case, and Part III explains the basis for CIA's FOIA Exemptions.

## II.    **PLAINTIFF'S FOIA REQUEST**

6.    By letter dated 2 August 2021, Plaintiff submitted a FOIA request to the CIA seeking the:

2

UNCLASSIFIED

UNCLASSIFIED

"January 9, 1989 'End of Tour Report (Addendum) General Perroots.'"

A true and correct copy of Plaintiff's FOIA request is attached as Exhibit A.

7.    By a letter dated 11 August 2021, the CIA acknowledged receipt of Plaintiff's request.  A true and correct copy of CIA's receipt is attached as Exhibit B.

8.    The CIA searched for and located the responsive document.  By a letter dated 15 December 2021, the CIA referred the responsive document to external agency stakeholders.

9.    By a letter dated 15 April 2022, the CIA reported that it had reviewed the document and determined that the document could be released in segregable form with redactions made on the basis of FOIA exemptions (b)(1) and (b)(3).  A true and correct copy of this letter is attached as Exhibit C.

## III.  EXEMPTIONS CLAIMED

### A.    FOIA Exemption (b)(1)

10.  Exemption (b)(1) provides that FOIA does not require the production of records that are: "(A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive Order."  5. U.S.C. § 552(b)(1).  Here, the information withheld pursuant to Exemption (b)(1) satisfies the procedural and the substantive requirements of E.O. 13526, which governs the classification of national security information.  See E.O. 13526 § 1.1 (a), § 1.4 (c), §1.6, §1.7 (a).

3

UNCLASSIFIED

JA053

UNCLASSIFIED

11.  As an original classification authority, I have determined that discrete portions of the document at issue here are currently and properly classified and appropriately withheld from disclosure. Additionally, this information is owned by and is under the control of the U.S. Government.  As described below, the information falls under classification category § 1.4(c) of the Executive Order because it concerns "intelligence activities (including covert action), [or] intelligence sources or methods."  Further, its unauthorized disclosure could reasonably be expected to result in serious, and in some cases exceptionally grave, damage to U.S. national security.  In accordance with § 1.7(a) of the Order, none of the information at issue has been classified in order to conceal violations of law, inefficiency or administrative error; prevent embarrassment to a person, organization or agency; restrain competition; or prevent or delay the release of information that does not require protection in the interests of national security.  Moreover, the responsive document that contains classified information is properly marked in accordance with § 1.6 of the Executive Order.

12.  In his January 9, 1989 End of Tour Report (Addendum), General Perroots provided observations and commentary on indications and warnings capabilities and exercise planning.  This information, withheld pursuant to Exemption (b)(1), contain and, as a result, would tend to reveal specific intelligence activities, sources, and methods that are either still actively in use or which remain viable for use today, despite the age of the document.   The CIA must guard against the

4

UNCLASSIFIED

**JA054**

UNCLASSIFIED

disclosure of the clandestine methods it uses to collect and analyze intelligence. Intelligence methods are the techniques and means by which an intelligence agency accomplishes its mission, to include how the CIA trains officers to accomplish the mission, and the classified internal regulations, approvals, and authorities that govern CIA officers' conduct. Such intelligence sources and methods must be protected to prevent foreign adversaries, terrorist organizations, and others from learning about the ways in which the CIA operates, that would allow them to use countermeasures to undermine U.S. intelligence capabilities and render collection efforts ineffective. Clandestine intelligence collection methods are effective as long as they remain unknown and unsuspected. If the techniques or sources used are disclosed, their usefulness expires, and the CIA's ability to employ them in other operations is significantly downgraded. Even revealing intelligence methods that are identified as "prohibited" can provide insight into the ways in which the CIA does or does not operate. In any case, such information tends to be particularly valuable to our adversaries in their attempts to interfere with the CIA's intelligence operations.

13. Consequently, the CIA must carefully evaluate whether its response to a particular FOIA request could jeopardize the clandestine nature of its intelligence activities or otherwise reveal previously undisclosed information about its sources, capabilities, authorities, interests, strengths, weaknesses, personnel, or resources. I have made this evaluation here and have determined that disclosure of the information at issue would jeopardize these interests despite the age

5

UNCLASSIFIED

JA055

UNCLASSIFIED

of the information.  The passage of time does not, in and of itself, necessarily obviate the damage to national security that may be reasonably likely to result from disclosure of the information and the need to protect this information.

14.  The information withheld from the challenged document consists of observations and commentary on specific intelligence sources and collection methods, and revealing those observations and commentary would tend to reveal the underlying sources and methods.  I have determined that the unauthorized disclosure of such information is reasonably likely to cause damage to the national security, for the reasons stated above.  As a result, I have determined that this information remains currently and properly classified pursuant to the criteria of Executive Order 13526.  As described in further detail below, Exemption (b)(3) in conjunction with the National Security Act of 1947 applies to all of the information protected by Exemption (b)(1).

15.  I have also reviewed the Government's classified submission and hereby incorporate it by reference.  That submission further supports my invocation of Exemption (b)(1) above.

B.   **FOIA Exemption (b)(3)**

16.   FOIA Exemption (b)(3) provides that FOIA does not apply to matters that are:

> Specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the  public  in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld. . .

5  U.S.C. § 552(b)(3).

6

UNCLASSIFIED

**JA056**

UNCLASSIFIED

17. Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 403- 1(i)(1) (the "National Security Act"), which provides that the Director of National Intelligence ("DNI") "shall protect intelligence sources and methods from unauthorized disclosure," applies to the withheld classified information described above. As an initial matter, the National Security Act is well-established as an Exemption (b)(3) withholding statute that both refers to particular types of matters to be withheld, and "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue." 5 U.S.C. § 552(b)(3). Under the direction of the DNI pursuant to section 102A of the National Security Act, as amended, and in accordance and consistent with section 1.6(d) of Executive Order 12333, the Director of the CIA is required to protect CIA sources and methods from unauthorized disclosure. Accordingly, the CIA relies on the National Security Act to withhold information that would reveal intelligence sources and methods.

18. The National Security Act's statutory requirement to protect intelligence sources and methods does not require the CIA to identify or describe the damage to national security that reasonably could be expected to result from their unauthorized disclosure. Nonetheless, in this case, the protections of the National Security Act Exemption (b)(3) apply to the same information for which Exemption (b)(1) was asserted. Disclosure of such information could significantly impair the CIA's ability to carry out its core mission of gathering and analyzing foreign

7

UNCLASSIFIED

JA057

UNCLASSIFIED

intelligence, and is precisely the type of intelligence information, the disclosure of which the statute prohibits.

19. In addition, the CIA withheld additional unclassified intelligence methods pertaining to the manner in which the Agency protects its intelligence. The Agency protects intelligence methods that may be unclassified, but nevertheless if disclosed, would reveal sensitive intelligence sources and methods. For example, the dissemination control methods were redacted from the challenged document. Disclosure of the dissemination controls used for particular information itself risks revealing the sources or methods from which the information was derived.

20. I have also reviewed the Government's classified submission and hereby incorporate it by reference. That submission further supports my invocation of Exemption (b)(3) above.

C. **SEGREGABILITY**

21. In evaluating a responsive document, the CIA conducts a line-by-line review and releases all reasonably segregable, non-exempt information. In this case, after conducting a line-by-line review of the record at issue, I have determined that no additional information contained in the document that was released in part, may be released without jeopardizing classified intelligence sources and methods and/or other statutorily-protected information that falls within the scope of one or more FOIA exemptions.

22. Therefore, the Agency has segregated all non-exempt, reasonably segregable material.

8

UNCLASSIFIED

JA058

UNCLASSIFIED

\*    \*    \*

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of July 2022.

Lauren C. Holm
Acting Information Review Officer
Litigation Information Review Office
Central Intelligence Agency

9

UNCLASSIFIED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL SECURITY ARCHIVE,

*Plaintiff*,

v.

CENTRAL INTELLIGENCE AGENCY,

*Defendant*.

Civil Action No. 21-2857 (JEB)

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The National Security Archive ("Archive" or "Plaintiff") does not contest that, in an alternate universe, the Freedom of Information Act ("FOIA") exemptions that the Central Intelligence Agency ("Defendant" or "CIA") claims protect the disputed document could arguably have been properly applied.  In *this* universe, however, in which CIA has signed off on the declassification and release of the disputed document in a statutorily-mandated Department of State ("DOS") publication, CIA has waived the right to claim any exemption over at least the published portions of the document.

Defendant's motion for summary judgment and the accompanying declaration by CIA's Acting Information Review Officer read as if DOS's publication of the document—and the corresponding, statutorily-mandated CIA involvement in the document's declassification—never happened.  CIA's attempt to frame this dispute as a typical FOIA case that can be easily resolved through its allegedly straightforward application of FOIA exemptions, in the context of a motion for summary judgment, omits essential dispositive facts and is legally wrong.  The CIA's well-documented involvement in the publication of the disputed document's text renders the claimed

FOIA exemptions inapplicable here.  Although CIA pretends (by omission) that it was not involved in this document's declassification, the public record strongly suggests otherwise, and demonstrates, at least, that there is a genuine dispute of material fact between the parties that precludes summary judgment, and, at most, that CIA's withholding should be overturned.

## STATEMENT OF FACTS

Plaintiff filed this FOIA action against the CIA on October 27, 2021, seeking a copy of Lieutenant General Leonard Perroots' January 1989 "End of Tour Report Addendum" ("Perroots Memo").  Complaint, Docket Entry No. 1 ("Complaint").  As described in the Complaint, on February 16, 2021, DOS published a transcribed version of the Perroots Memo in a new volume of the DOS Series "*Foreign Relations of the United States*" ("*FRUS* Series"), with limited redactions ("Volume IV").  *See* Complaint, Docket Entry Nos. 1 at ¶¶ 22–23; 1-2 (copy of the National Security Archive's 2021 FOIA Request including relevant extracts of Volume IV).  *See also* Docket Entry No. 17-1 (copy of additional pages extracted from Volume IV).

The process through which DOS obtained, reviewed, and declassified the text of the Perroots Memo for inclusion in the *FRUS* Series is governed by statute and overseen by the Advisory Committee on Historical Diplomatic Documentation ("HAC").  22 U.S.C. § 4351, *et seq*.  Publication of the *FRUS* Series began in 1861 and now comprises over 450 individual volumes containing declassified records from all the foreign affairs agencies.  DOS Office of the Historian, About the *Foreign Relations of the United States* Series, https://history.state.gov/historicaldocuments/about-frus.  Federal law requires DOS to publish the *FRUS* Series as a "thorough, accurate, and reliable documentary record of major United States foreign policy decisions and significant United States diplomatic activity" that includes "all records needed to provide a comprehensive documentation of the major foreign policy decisions

2

JA061

and actions of the United States Government . . . ."  22 U.S.C. § 4351(a).  DOS must ensure that events documented in the *FRUS* Series are published no more than 30 years after they occurred. *Id.* at § 4351(c).

Agencies must cooperate with DOS "by providing full and complete access to the records pertinent to United States foreign policy decisions and actions and by providing copies of selected records . . . ."  *Id.* § 4352(a)(2).  Records selected for inclusion in the *FRUS* Series "shall be submitted to the respective originating agency for declassification review in accordance with that agency's procedures for such review, except that such declassification review shall be completed by the originating agency within 120 days after such records are submitted for review."  *Id.* at § 4353(b).  *See also* DOS Office of the Historian, Stages in the Creation of a Foreign Relations Volume, https://history.state.gov/historicaldocuments/frus-history/stages ("All documents selected by *FRUS* compilers for publication undergo a vetting process to ensure that sensitive or protected material is not divulged.")  If the originating agency determines that any such portion of the record is not declassifiable, then that agency must attempt to "make such deletions in the text as will make the record declassifiable."  22 U.S.C. § 4353(b).

CIA's involvement in the *FRUS* Series declassification process is well documented: In 1992 and again in 2002, CIA signed a Memorandum of Understanding with DOS establishing declassification guidelines.  *See* DOS Office of the Historian, Toward "Thorough, Accurate, and Reliable": History of the *Foreign Relations of the United States* Series, Ch. 12, https://history.state.gov/historicaldocuments/frus-history/chapter-12.  *See also* Report of the Advisory Committee on Historical Diplomatic Documentation (2015), *available at* https://sgp.fas.org/advisory/state/hac2015.html.  CIA has established a Historical Programs Staff specifically tasked with coordinating *FRUS* Series reviews.  Report of the Advisory Committee

3

on Historic Diplomatic Documentation (2018), *available at*

https://shafr.org/sites/default/files/2018_hac_annual_report.pdf.  In recent years, the HAC has

repeatedly—and publicly—commended the CIA for its role in facilitating the *FRUS* Series

declassification.[1]

Declassification review of Volume IV started in 2015 and was completed in 2019.

Volume IV at VI.  Declassification decisions for Volume IV "entailed concurrence of  . . . other

concerned agencies of the U.S. Government . . . ."  Docket Entry No. 1-2 at p. 12.  The

publication itself evinces CIA's involvement: the pages in which the Perroots Memo appear are

followed by a citation to a box of CIA documents.  *Id.* at 1426–29.  *See also* Docket Entry No.

17-2 at p. 17 – 20 (listing sources for Volume IV, including CIA documents).  Volume IV's

preface thanks CIA staff for "providing access and assistance," and specifically acknowledges

History Staff of the CIA's Center for the Study of Intelligence "for arranging full access to CIA

records," all of which implies that the CIA History Staff provided DOS access to the Perroots

Memo.  Docket Entry No. 1-2 at p. 17.

---

[1] *See, e.g.*, Report of the Advisory Committee on Historical Diplomatic Documentation (2018) ("HAC 2018 Annual Report"), *available at* https://sgp.fas.org/advisory/state/hac2018.pdf (urging the Department of Defense to follow the CIA's lead in "establish[ing] a centralized *FRUS* declassification coordination team"); Report of the Advisory Committee on Historical Diplomatic Documentation (2019) ("HAC 2019 Annual Report"), *available at* https://sgp.fas.org/advisory/state/hac2019.html ("the CIA's declassification reviews . . . are of the highest quality"); Report of the Advisory Committee on Historical Diplomatic Documentation (2020) ("HAC 2020 Annual Report"), *available* at https://sgp.fas.org/advisory/state/hac2020.html ("FRUS production also benefited from the excellent work of . . . in recent years, the Central Intelligence Agency"); Report of the Advisory Committee on Historical Diplomatic Documentation (2021) ("HAC 2021 Annual Report"), *available at* https://networks.h-net.org/node/28443/discussions/10585773/report-advisory-committee-historical-diplomatic-documentation (referring to the CIA as one of three "principal interagency declassification partners").

4

Despite this, the CIA's April 15, 2022 production of the Perroots Memo in this case "withheld the substance of the memorandum itself in full."  Defendant's Statement of Points and Authorities in Support of Motion for Summary Judgment, Docket Entry No. 21-1 at 3.  CIA's four-page production consists of a partially redacted one-page cover letter to the Perroots Memo, followed by three pages redacted *in totem*.  Docket Entry No. 13-1.

## ARGUMENT

### I.      Standard of Review

FOIA creates a "judicially enforceable public right to secure" government documents, subject to nine enumerated exemptions.  *Env't Prot. Agency v. Mink*, 410 U.S. 73, 80 (1970); *Wolf v. Central Intell. Agency*, 473 F.3d 370, 374 (D.D.C. 2007); *see also* 5 U.S.C. § 552.  "At all times, courts must bear in mind that FOIA mandates a strong presumption in favor of disclosure and that the statutory exemptions, which are exclusive, are to be narrowly construed." *Am. C. L. Union v. Dep't of Just.*, 655 F.3d 1, 5, (D.C. Cir. 2011) (internal quotations and citations omitted).

As in all cases, summary judgment is inappropriate in FOIA actions—including cases dealing with national security issues—where the movant cannot prove that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if a reasonable fact-finder could find for the non-moving party; a fact is "material" if it affects the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In evaluating motions for summary judgment, courts "analyze all underlying facts and inferences in the light most favorable to the FOIA requester," the non-moving party.  *Donato v. Exec. Office for U.S. Att'ys*, 308 F.Supp.3d 294, 307 (D.D.C. 2018) (citing *Willis v. Dep't of Just.*, 581 F.Supp.2d 57, 65 (D.D.C. 2008)).  Under FOIA, the

burden is on the agency to sustain its action, and courts review *de novo* the agency's use of an exemption to withhold documents. *Wolf*, 473 F.3d at 374.

Although courts routinely resolve FOIA disputes in the summary judgment context, summary judgment cannot be granted where there is a genuine dispute regarding an issue of material fact. *Gov't Accountability Project v. Food and Drug Admin.*, 206 F.Supp.3d 420, 430 (D.D.C. 2016). Summary judgment should not be granted in FOIA actions where there is a genuine dispute of material fact as to whether the agency has inappropriately withheld records. *Weisberg v. Dep't of Just.*, 627 F.2d 365, 370 (D.C. Cir. 1980). Nor should summary judgment be granted where the agency cannot prove that it has "fully discharged its FOIA obligations." *Donato*, 308 F.Supp.3d at 307 (internal quotations and citations omitted).

## II.     CIA Has Officially Acknowledged the Transcribed Text of the Perroots Memo Appearing in Volume IV of the *FRUS* Series.

The CIA would have this Court believe that its review of the Perroots Memo occurred in a vacuum. As explained above, however, reality belies that fiction: DOS's publication of a transcription of the Perroots Memo in the *FRUS* Series occurred pursuant to statutorily-mandated procedures requiring the CIA's involvement and approval—none of which is mentioned in CIA's submissions.[2] In situations like this, in which an agency has "officially acknowledged" otherwise exempt information through prior disclosure, the agency waives its right to claim an exemption with respect to the disclosed information. *Knight First Amendment Inst. v. Central Intell. Agency*, 11 F.4th 810, 813 (D.D.C. 2021). The disclosure of "officially acknowledged" information can be compelled—even over an agency's otherwise valid exemption claim. *Am. C.*

---

[2] CIA asserts that it is entitled to substantial deference in this case because of the alleged national security issues involved. Docket Entry No. 21-1 at 5. Plaintiff respectfully suggests that the CIA's omission of dispositive facts in this case undermines any claim it has to such deference.

*L. Union v. Central Intell. Agency*, 710 F.3d 422, 427 (D.C. Cir. 2013) (quotations and citations omitted).

An "official acknowledgment" occurs where (1) the information requested is "as specific" as the information previously released, (2) the information requested "match[es] the information previously" released, and (3) the information requested has already been public through "an official and documented disclosure." *Fitzgibbon v. Central Intell. Agency*, 911 F.2d 755, 765 (D.C. Cir. 1990). Here, all three of these criteria are readily satisfied by virtue of the CIA's involvement in Volume IV's publication.

The information requested—the Perroots Memo—is "as specific" and "match[es]" the information released—text from the Peroots Memo. *Id.* Plaintiff's FOIA request specifically sought the "9 January 1989 End of Tour Report (Addendum) General Perroots," and the released information in Volume IV of the *FRUS* Series describes the disputed transcription's source as "a January 1989 'End of Tour Report Addendum' by Lieutenant General Leonard H. Perroots." *Compare* Docket Entry No. 1-2 at p. 3 *with id.* at p. 28. A January 9, 1989 cover letter signed by Lieutenant General Perroots referring to the subsequent pages as "[t]he enclosed memorandum" precedes the three fully redacted pages in CIA's production. Docket Entry No. 13-1 at p. 4. Nowhere in its Statement of Points and Authorities In Support of its Motion for Summary Judgment ("CIA Motion"), nor in its supporting declaration, does the CIA contest that the released transcription and the withheld document are not one and the same. *See* Docket Entry Nos. 21-1, 23-1. In fact, both CIA's Motion and declaration refer to the document withheld as

7

the "January 9, 1989 End of Tour Report Addendum."  Docket Entry Nos. 21-1 at p. 2, 23-1 at ¶¶ 6, 9, 12.[3]

The withheld information was made public via an "official and documented disclosure" when the CIA, through its formally established channels, signed off on the declassification of the text of the Perroots Memo for inclusion and publication in Volume IV of the DOS's *FRUS* Series.  Pursuant to the statute governing the publication of the *FRUS* Series, records "shall" be submitted to their originating agencies for declassification review.  22 U.S.C. § 4353(b).  CIA's "dedicated FRUS coordination team" which includes a Historic Programs Staff specifically tasked with coordinating *FRUS* Series reviews, serves this purpose within the agency.  HAC 2018 Annual Report; HAC 2019 Annual Report.  The 2021 HAC Annual Report states that during 2021, DOS not only "completed the final declassification for four FRUS volumes with CIA" but also released four *FRUS* Series publications, including Volume IV.  2021 HAC Annual Report.  The preface to Volume IV thanks CIA staff for "arranging full access to CIA records."  Docket Entry No. 1-2 at p. 17.  Thus, the text of the Perroots Memo could not have made it into the Volume IV without, per 22 U.S.C. § 4353, CIA's cooperation and involvement.[4]

---

[3] If and to the extent any doubt remains that the released transcription and the withheld document are not one and the same, the Court's *in camera* review of the withheld document will confirm that it is the Perroots Memo.  This Court has on multiple occasions used *in camera* reviews to determine whether information withheld has already been revealed to the public.  *See, e.g., Protect Democracy Project v. Nat'l Sec. Agency*, 10 F.4th 879, 891 (D.C. Cir. 2021); *Mehl v. Env't Prot. Agency*, 797 F.Supp. 43, 48 (D.D.C. 1992).

[4] The CIA does not deny its involvement in declassification consultation and authorization of the inclusion of the text of the Perroots Memo in Volume IV and instead largely sidesteps the issue. *See* Docket Nos. 21-1, 23-1. In fact, the CIA actually implies that *some* information in Volume IV was properly released, by stating that "certain information in the document . . . was released by State without necessary authorization . . . ." *Id.* at 10 (emphasis added).  Nowhere in CIA's declaration does the Acting Information Review Officer mention the Perroots Memo's inclusion in Volume IV.

As the CIA states in its motion, this Court has found an official acknowledgment to have occurred "where disclosure comes from a different component of the same agency . . . ."  Docket Entry No. 21-1 at p. 10 (citing *Knight*, 11 F.4th at 816–17).  A disclosure "by one component of an executive department may bind 'another component within' the same department," *Knight*, 11 F.4th at 817 (emphasis in original).  This Court has held that one "component" of an agency triggered an official acknowledgment "on behalf of other [agency] subcomponents" where both components fell under the parent agency's auspices.  *Ctr. for Pub. Integrity v. Dep't of Energy*, 287 F.Supp.3d 50, 68 (D.D.C. 2018) (DOE's National Nuclear Safety Administration's disclosures trigger an official acknowledgment waiver by other DOE subcomponents).[5]  Disclosures made by an "authorized representative of the agency's parent" also constitute the parent agency's own disclosure.  *ACLU*, 710 F.3d at 429 n.7.

The decision of the CIA's dedicated *FRUS* Series declassification staff to permit the publication of the transcribed Perroots Memo in Volume IV was an "official acknowledgment" on behalf of the entire agency, including the CIA's FOIA Staff who withheld the Perroots Memo in full.  The CIA's Historical Programs Staff, its History Staff in the Center for Study of Intelligence, any other staff involved in the *FRUS* Series declassification process, the Acting Information Review Officer for CIA's Litigation Information Review Office, and any other staff

---

[5] *See also Bartko v. Dep't of Just.*, 62 F.Supp.3d 134, 143 (D.C. Cir. 2014) (federal prosecutor's disclosure constituted an official acknowledgment by the Department of Justice's Office of Professional Responsibility); *Marino v. Drug Enf't Admin.*, 685 F.3d 1076, 1082 (D.D.C. 2012) (same for U.S. Attorney and Drug Enforcement Administration as component of the Department of Justice); *Am. C. L. Union*, 710 F.3d at 430 (same for CIA Director's statement at a conference); *Wolf*, 473 F.3d at 379 (same for CIA Director's Congressional testimony); *Memphis Pub. Co. v Fed. Bureau of Investigation*, 879 F.Supp.2d 1, 10–11 (D.D.C. 2012) (same for FBI's FOIA Office's FOIA response).  Other circuits have recognized this principle as well.  *See, e.g.*, *Osen LLC v. U.S. Central Command*, 969 F.3d 102, 109 n. 3 (2d Cir. 2020) (same for different components of the Department of Defense).

in its FOIA Office all operate under the auspices of one parent agency: the CIA.  Thus, per

binding precedent, CIA's agreement to release the text of the Perroots Memo means that all other

groups within the agency have also disclosed the information contained in the transcription.  The

CIA cannot now rescind that disclosure through this action or otherwise.[6]  Allowing the agency

to do so would render the *FRUS* Series enabling statute meaningless and undermine DOS's

ability to publish future volumes of the *FRUS* Series.

III.   **CIA Must Justify the Continued Withholding of the Perroots Memo Text That Is in the Public Domain.**

As this Court has stated, "information cannot be 'confidential' if it is already in the public

domain," in recognition of "the commonsense intuition that an open secret is no secret at all."

*Jud. Watch, Inc. v. Dep't. of Just.*, 525 F.Supp.3d 90, 99 (D.D.C. 2021) (citations omitted).  "[I]f

identical information is truly public, then enforcement of an exemption [under FOIA] cannot

fulfill its purposes."  *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 19

(D.C. Cir. 1999); *see also Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1990) ("[M]aterials

normally immunized from disclosure under FOIA lose their protective cloak once disclosed and

preserved in a permanent public record.").  Where requested information is "truly public" and the

requester can point to specific information in the public domain, preserved in a permanent public

record that appears to duplicate that being withheld, strict application of FOIA exemptions loses

its efficacy.  *See Cottone*, 193 F.3d at 555; *Students Against Genocide v. U.S. Dep't of State*, 257

---

[6] By continuing to claim that the published transcribed text of the Perroots Memo is subject to FOIA exemptions, CIA is effectively attempting to reclassify the information contained therein. Executive Order No. 13526, however, establishes strict standards and procedures governing the reclassification of information, including limiting reclassifiable information to that information which "may be reasonably recovered without bringing undue attention to the information," which is impossible here.  Exec. Order No. 13526 (2009), *reprinted in* 75 Fed. Reg. 705 (Jan. 5, 2010).  This lawsuit and the media attention given to the Perroots Memorandum's publication in the *FRUS* Series all but guarantees that any attempt to reclassify here would attract "undue attention."  *See generally* n. 7, *infra*.

F.3d 828, 836 (D.C. Cir. 2001) (citing *Cottone*, 193 F.3d at 554); *Afshar v. U.S. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983).

Agencies must provide a "specific explanation for continued withholding of information" that has been made public, even when the public information was released unofficially, by a non-government entity.  *Washington Post v. Dep't of Def.*, 766 F.Supp. 1, 10 (D.D.C. 1991) ("this Court never held that the presence of information in the public domain could be ignored by an agency when considering whether an official release of such information would harm the national security. To the contrary, where the harm from official release of information was not apparent, the Court required the [agency] to explain its justification for classifying the material.") In this instance, DOS has published language from the Perroots Memo in Volume IV of the *FRUS* Series, and this text is widely available to the public.[7]  Rather than explaining why the precise text contained in the published transcription merits continued withholding, the CIA has largely ignored the publication and instead offers arguments regarding why Exemptions 1 and 3 apply to the entire Perroots Memo.  At a minimum, the CIA must justify its rationale for withholding the information that is already in the public domain, even in the unlikely event that

---

[7] Anyone with a PACER account can access excerpts of Volume IV that has been filed as exhibits in this case.  *See* Docket Entry Nos. 1-2, 17-2, 23-1.  Additionally, Volume IV or portions thereof is available in the following public locations: (1) Plaintiff's website, at the following link: https://nsarchive.gwu.edu/document/21035-us-air-force-lt-gen-leonard-hperroots-letter-end-tour-report-addendum-january-1989, (2) in cached form from DOS's website: https://web.archive.org/web/20210320083726/https://history.state.gov/historicaldocuments/frus1981-88v04/appxA, (3) in stories written by the Washington Post: https://www.washingtonpost.com/national-security/soviet-nuclear-war-able-archer/2021/02/17/711fa9e2-7166-11eb-93be-c10813e358a2_story.html, Slate: https://slate.com/news-and-politics/2021/02/able-archer-nuclear-war-reagan.html, the Daily Mail UK: https://www.dailymail.co.uk/news/article-9274205/Declassified-documents-reveal-Soviets-readied-nuclear-attack-1983-NATO-exercise.html, and other online news outlets: https://www.audacy.com/connectingvets/news/able-archer-the-exercise-that-almost-ended-the-world.

its role in the *FRUS* Series declassification does not constitute an "official acknowledgment."

Not only has the CIA not attempted to explain why the text specifically included in the publish

transcription of the Perroots Memo should be withheld, but, as explained above, it likely cannot.

**Conclusion**

This is an unusual case.  Defendant has presented this Court with a motion for summary

judgment and a supporting declaration, without mentioning a critical piece of the story: its own

role in the *FRUS* Series declassification and publication process.  Remarkably, Defendant asserts

that there are no disputed facts.  What cannot be disputed is that the CIA has not presented all of

the facts to the Court.

Summary judgment is inappropriate here in light of the dispute of material fact regarding

the CIA's involvement in the publication of the text of the Perroots Memo.  The Archive

accordingly requests that the Court deny Defendant's motion for summary judgment.  The

Archive believes that the Court's *in camera* review of the two documents will demonstrate, if

anything, that Plaintiff is entitled to judgment in this case.

Dated: August 17, 2022                    Respectfully submitted,

                                          */s/ Hilary Jacobs*
                                          John S. Guttmann
                                          D.C. Bar No. 251934
                                          Hilary T. Jacobs
                                          D.C. Bar No. 1021353
                                          Beveridge & Diamond, P.C.
                                          1900 N Street, NW, Suite 100
                                          Washington, D.C. 20036
                                          (202) 789-6020
                                          jguttmann@bdlaw.com
                                          hjacobs@bdlaw.com

                                          *Counsel for Plaintiff*

12

JA071

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| NATIONAL SECURITY ARCHIVE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 21-2857 (JEB) |
| CENTRAL INTELLIGENCE AGENCY, | ) ) | |
| Defendant. | ) ) | |

## DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

The only dispute before the Court in this Freedom of Information Act case concerns the redactions applied by the CIA to one document on the basis of FOIA Exemptions 1 and 3, which govern the withholding of classified national security information and information specifically exempted from disclosure by statute.  5 U.S.C. § 552(b)(1), (3).  These exemptions are well taken here and support the withholding of the memorandum at issue.  Specifically, as shown by the Government's motion for summary judgment, the accompanying declaration, and the accompanying classified submission, the withheld information is currently and properly classified—and thus exempt from disclosure under Exemption 1—and its public release would be revealing of intelligence sources and methods—thus rendering it exempt from disclosure under Exemption 3 pursuant to the National Security Act of 1947, 50 U.S.C. § 3024(i)(1).  ECF No. 21.  Plaintiff's brief in opposition fails to engage with nearly all of these points, essentially conceding most of the issues raised in the Government's motion.  *See* Opp'n, ECF No. 25.  As to the issue Plaintiff does engage on, that of official acknowledgement, the Government's summary judgment submission rebuts that argument.  Accordingly, Defendant is entitled to summary judgment.

1

JA072

## ARGUMENT

Plaintiff responds to the Government's motion by hanging its hat almost entirely on the "official acknowledgment" doctrine, contending that a State Department publication reflects information contained within the responsive document and, accordingly, the FOIA exemptions relied upon by the CIA have been waived. *E.g.*, Opp'n at 1–2. But a Plaintiff invoking this doctrine must show that the withheld information "has been made public through an official and documented disclosure" by the "agency from which the information is being sought" or by an authorized representative of the agency's parent. MSJ Mem. at 9–10, ECF No. 21-1 (quoting *Knight First Amendment Inst. v. CIA*, 11 F.4th 810, 815–17 (D.C. Cir. 2021)). As explained in the Government's opening brief and accompanying submissions, the State Department cannot cause an "official disclosure" of information belonging to another Executive Branch agency and, in any case, certain information in the publication to which Plaintiff points was released by State without necessary authorization and it therefore could not constitute an official disclosure in any event. *Id.* The Government filed a classified submission to provide additional information about these points that it could not state on the public record.

In response, Plaintiff argues that the State Department publication "occurred pursuant to statutorily-mandated procedures requiring the CIA's involvement and approval," and that the CIA signed off on the declassification of the withheld information through those procedures. Opp'n at 6, 8. The Government submits today a Supplemental Classified, *Ex Parte*, *In Camera* Declaration from Vanna Blaine, Information Review Officer for the Litigation Information Review Office, CIA. This declaration addresses points made in Plaintiff's response, including by further elaborating the CIA's role in the classification review process as it concerns the Department of

2

State's Volume IV of the FRUS.[1]  Ms. Blaine's declaration underscores Plaintiff's failure to hurdle the bar of the official acknowledgment doctrine and the propriety of the CIA's claims of Exemptions 1 and 3 here.  The declaration also explains why the CIA cannot further address this issue on the public record.

Plaintiff also contends that information "already in the public domain" generally cannot be withheld pursuant to FOIA's exemptions.  Opp'n at 10–12.  It appears here that Plaintiff is attempting to skirt the official acknowledgment issue by arguing that the Court may ignore that issue whenever information has allegedly been published already.  But there is no "public domain" exception to the official acknowledgment doctrine.  Instead, the D.C. Circuit has interchangeably referred to the "public domain exception" and the "official acknowledgment" doctrine.  *See BuzzFeed, Inc. v. Dep't of Justice*, 344 F. Supp. 3d 396, 407 (D.D.C. 2018) (citing *ACLU v. CIA*, 710 F.3d 422, 426–27 (D.C. Cir. 2013)).

Whatever terminology is used, the Court of Appeals has made clear that information in the "public domain" will only effectuate a waiver of a FOIA exemption where the information sought by the plaintiff has been released "by official disclosure."  *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007) (interchangeably using terms official acknowledgment, official disclosure, and public domain).  Moreover, it makes no difference whether a disclosure comes from the media, Congress, or even a different Executive Branch agency: none suffice to waive an agency's ability to invoke applicable FOIA exemptions. *See, e.g.*, *Frugone v. CIA*, 169 F.3d 772, 774–75 (D.C. Cir. 1999) (explaining and citing cases holding that FOIA Exemptions 1 and 3 are not waived by a non-

---

[1] Ms. Blaine did not serve as declarant on behalf of the CIA with respect to the motion for summary judgment because of her personal unavailability on the date of the Government's prior filing.  She is serving as declarant in association with today's filing because it is an ordinary part of her duties to serve as a declarant on behalf of the CIA in FOIA litigation matters.

official disclosure of information, whether that disclosure came from the media, Congress, or a different Executive Branch agency).  The three-element test cited in the Government's opening brief governs Plaintiff's reference to public domain information.  Mem. at 9 (citing *Knight First Amendment Inst. v. CIA*, 11 F.4th 810, 815 (D.C. Cir. 2021).  There is no end run around that test or its dispositive implications for Plaintiff's claim.

Nor does *Washington Post v. Department of Defense*, 766 F. Supp. 1, 10 (D.D.C. 1991), help Plaintiff.  *See* Opp'n at 11 (citing *Washington Post* for the proposition that "[a]gencies must provide a 'specific explanation for continued withholding of information' that has been made public, even when the public information was released unofficially, by a non-government entity").  The court in that case highlighted that it "does not . . . follow that agencies must always disclose information already in the public domain," going on to describe in substance, *inter alia*, the three elements of the official acknowledgment test as possible grounds for withholding public domain information.  *See id.* at 9–10; *see also Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) ("[T]he fact that information resides in the public domain does not eliminate the possibility that further disclosures can cause harm to intelligence sources, methods, and operations.").  In any event, the Government's initial classified submission explained why the withheld information must be protected notwithstanding the State Department's publication.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in the Government's opening brief and classified submissions, the CIA respectfully requests that the Court grant its motion for summary judgment and enter judgment in its favor on all claims.

Dated:  September 1, 2022                    Respectfully submitted,

                                             BRIAN M. BOYNTON
                                             Principal Deputy Assistant Attorney General

4

JA075

MARCIA BERMAN
Assistant Branch Director

*/s/ James R. Powers*
JAMES R. POWERS (TX Bar No. 24092989)
Trial Attorney
U.S. Department of Justice,
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-0543
Email: james.r.powers@usdoj.gov

*Counsel for Defendant*

5

JA076

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATIONAL SECURITY ARCHIVE, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 21-2857 (JEB) |
| CENTRAL INTELLIGENCE AGENCY, | ) | |
| Defendant. | ) | |

## NOTICE OF LODGING OF CLASSIFIED SUBMISSION
### FOR *EX PARTE*, *IN CAMERA* REVIEW

Defendant provides notice that it is lodging with the Department of Justice classified information security officer a classified submission solely for *in camera*, *ex parte* review by the presiding District Judge in connection with the above-captioned case.  This submission is provided in support of the reply in support of Defendant's Motion for Summary Judgment filed today.

The above-referenced submission is classified pursuant to Executive Order 13,526, 75 Fed. Reg. 707 (Jan. 5, 2010), and cannot be disclosed to any person, other than the presiding District Judge in this matter, without proper authorization by the United States.  The submission has been lodged for secure storage and secure transmission to the Court upon request with the United States Department of Justice Litigation Security Group.  The Court may contact the Litigation Security Group directly at 145 N Street NE, Suite 2W115, Washington, D.C., (202) 514-9016, or contact undersigned counsel for the United States to arrange for secure delivery of this submission, in accordance with applicable handling requirements, for *ex parte*, *in camera* review at the Court's convenience.

Dated:  September 1, 2022                    Respectfully submitted,

                                           BRIAN M. BOYNTON

JA077

Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ James R. Powers*
JAMES R. POWERS (TX Bar No. 24092989)
Trial Attorney
U.S. Department Of Justice,
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-0543
Email: james.r.powers@usdoj.gov

*Counsel for Defendant*

2

JA078

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**NATIONAL SECURITY ARCHIVE,**

    **Plaintiff,**

      **v.**

    **Civil Action No. 21-2857 (JEB)**

**CENTRAL INTELLIGENCE AGENCY,**

    **Defendant.**

---

**ORDER**

    For the reasons set forth in the accompanying Memorandum Opinion, the Court

ORDERS that:

1.  Defendant's Motion for Summary Judgment is GRANTED; and

2.  Judgment is ENTERED in favor of Defendant.

                        /s/ *James E. Boasberg*
                        JAMES E. BOASBERG
                        United States District Judge

Date:  October 4, 2022

1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL SECURITY ARCHIVE,

Plaintiff,

v.                                                    Civil Action No. 21-2857 (JEB)

CENTRAL INTELLIGENCE AGENCY,

Defendant.

**MEMORANDUM OPINION**

In 1989, as he retired as Director of the Defense Intelligence Agency, Lieutenant General

Leonard Perroots wrote a Memo documenting an unaddressed "analytical problem" for the U.S.

Intelligence Community.  Now, over three decades later, Plaintiff National Security Archive

(NSA) would like a copy of that Memo, and it has deployed the Freedom of Information Act in

its suit to obtain it.  The CIA produced the document (a cover letter and accompanying Memo) in

response to NSA's FOIA request, but it redacted the full text of the Memo, citing national-

security and intelligence concerns.  It now moves for summary judgment.  NSA rejoins that

notwithstanding the validity of the CIA's interests in secrecy, the Agency may not continue to

withhold the Perroots Memo because (according to NSA) the Memo's text was already made

public with CIA permission in a Department of State publication.  Any interests in secrecy are

thus moot.  The Court disagrees and will accordingly grant summary judgment to the CIA.

**I.     Background**

On August 2, 2021, NSA, a non-governmental organization that promotes research about

U.S. national-security decisionmaking processes, submitted a FOIA request to the CIA for a

1

JA080

single document: the so-called "January 9, 1989 'End of Tour Report (Addendum) General Perroots.'"  ECF No. 21-2 (Def. Statement of Undisputed Material Facts), ¶ 1 (citing ECF 21-3 (Decl. of Lauren Holm), ¶ 6).  After being met with silence from the CIA, Plaintiff filed this suit against the Agency in October of that year.  See ECF No. 1 (Compl.), ¶ 33.  The CIA located the document in December 2021, see Holm Decl., ¶ 8, and sent a letter in April 2022 telling Plaintiff that the Agency could release the document in segregable form with redactions as appropriate under FOIA Exemptions 1 and 3.  See SUMF, ¶ 5 (citing Holm Decl., ¶ 9).

The CIA accordingly released the cover letter to the Memorandum with minor redactions but redacted the substance of the Memo in full.  See SUMF, ¶ 5 (citing ECF No. 21-4 (Redacted Perroots Memo and Cover Letter)).  The Agency concluded that the redacted information needed to be withheld because it could "reveal specific intelligence activities, sources, and methods that are either still actively in use or which remain viable for use today."  Holm Decl., ¶ 12; see also id., ¶ 19 ("The Agency protects intelligence methods that may be unclassified, but nevertheless if disclosed, would reveal sensitive intelligence sources and methods.").  Based on its "line-by-line review of the record at issue," the CIA also determined that it had segregated "all non-exempt, reasonably segregable material."  Id., ¶¶ 21–22.

Plaintiff objects to the scope of the redactions — but not because the CIA's national-security concerns are illegitimate.  Rather, NSA maintains that the CIA may no longer plausibly assert an interest in keeping the document under wraps because the Agency already disclosed, albeit in a different form and with some redactions, the same document it is now seeking to conceal.  According to NSA, the Department of State previously published, with CIA sign-off, the transcribed text of the Perroots Memo with very minor redactions in Volume IV of the DOS Series "Foreign Relations of the United States" (FRUS).  See ECF No. 13 (Joint Status Report,

2

JA081

April 29, 2022), ¶¶ 6–7; ECF 1-2 (FOIA Request) at 28–31 (FRUS Perroots Transcript).  The FRUS series "presents the official documentary historical record of major U.S. foreign policy decisions and significant diplomatic activity."  Dep't of State, Off. of the Historian, "Historical Documents."  Plaintiff's position is thus that "any reasons for withholding parts of the [Perroots Memo] that are public have been mooted by [its] release" in the FRUS.  See Apr. JSR, ¶ 12.  The CIA, of course, disagrees.

Following several procedural developments not relevant here, Defendant now moves for summary judgment.

## II.    Legal Standard

Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it can affect the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Liberty Lobby, 477 U.S. at 248; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

FOIA cases typically and appropriately are decided on motions for summary judgment. See Brayton v. Off. of the U.S. Trade Representative, 641 F.3d 521, 527 (D.C. Cir. 2011).  In a

3

FOIA case, a court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted). Such affidavits or declarations "are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981)). "FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'" Dep't of Justice v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).

**III.  Analysis**

Congress enacted FOIA "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976) (citation omitted). The statute promotes these aims by providing that "each agency, upon any [compliant] request for records[,] . . . shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A). The Government need not, however, turn over requested information that falls into one of nine statutorily created exemptions from FOIA's broad directive. Id. § 552(b)(1)–(9). The CIA here invokes Exemptions 1 and 3, which respectively exempt materials "authorized . . . by an Executive order to be kept secret in the interest of national defense or foreign policy" and materials "specifically exempted from disclosure by statute." Id. § 552(b)(1), (3).

4

This Court has spilled much ink in prior Opinions over the scope of those exemptions. Unlike in many FOIA cases, however, the exemptions play but a supporting role here. Plaintiff concedes that "in an alternate universe" — that is, one where the text of the Perroots Memo has not purportedly been released into the public domain — the exemptions that the CIA "claims protect the disputed document could arguably have been properly applied." ECF No. 25 (Plaintiff Opposition to MSJ) at 1. But, NSA contends, we are not in such a universe. On our planet, "CIA has signed off on the declassification and release of the disputed document" in a DOS publication and has thus "waived the right to claim any exemption over at least the published portions of the document." Id.

The focus of this dispute is therefore the effect of the FRUS publication on the CIA's ability to invoke any FOIA exemptions. Plaintiff puts forth two reasons why the CIA may not rely on those exemptions here: first, under Circuit precedent, the disclosure of information that an agency has "officially acknowledged" may be compelled over objection, see Opp. at 6–10; second, and relatedly, even in the absence of any official acknowledgment, the CIA must explain with far more specificity than it has why the already-public portions of the Perroots Memo should continue to be withheld. Id. at 10–12.

The Court will take each theory in turn.

A. Official Acknowledgment

The official-acknowledgment doctrine provides that "when an agency has officially acknowledged otherwise exempt information through prior disclosure, the agency has waived its right to claim an exemption with respect to that information." ACLU v. CIA, 710 F.3d 422, 426 (D.C. Cir. 2013). "To establish official acknowledgment, a plaintiff must identify information in the public domain that (1) matches the information requested, (2) is as specific, and (3) has been

5

made public through an official and documented disclosure . . . [by] the Agency from which the information is being sought." Knight First Amend. Inst. v. CIA, 11 F.4th 810, 815–16 (D.C. Cir. 2021) (internal quotations omitted).

According to NSA, the so-called transcript of the Perroots Memo in Volume IV of the FRUS satisfies all three criteria. Plaintiff asserts that information in the DOS publication both matches, and is as specific as, the requested information. See Opp. at 7. It submits, moreover, that the CIA must have formally "signed off on the declassification of the text of the Perroots Memo" for it to appear in the FRUS. Id. at 8. This is so because DOS is required by statute to submit any records selected for inclusion in the FRUS series "to the respective originating agency for declassification review in accordance with that agency's procedures for such review." 22 U.S.C. § 4353(b)(1); Opp. at 8. That agency here was the CIA, id. at 8, which has a "Historical Programs Staff specifically tasked with coordinating [FRUS] Series reviews." Opp. at 3. Plaintiff also points out that "the preface to Volume IV thanks CIA staff for 'arranging full access to CIA records.'" Id. (citing FOIA Request at 15–18 (Preface to FRUS Vol. IV) at 17). In sum, all signs suggest that "the text of the Perroots Memo could not have made it into [] Volume IV without . . . CIA's cooperation and involvement." Id. And that, Plaintiff submits, must mean that the CIA officially acknowledged the portion of the Perroots Memo that was published in the FRUS. Id. at 9.

While NSA recognizes that courts "do not deem official a disclosure made by someone other than the agency from which the information is being sought," Knight First Amend. Inst., 11 F.4th at 816 (internal quotations omitted), it also points out that "a disclosure by one component of an executive department may bind another component within the same department." Id. at 817 (internal quotations omitted). Plaintiff here maintains that the decision of the "CIA's

6

JA085

dedicated FRUS Series declassification staff" to permit publication of the Memo in the FRUS was a decision on behalf of the entire agency. See Opp. at 9.

The CIA has a rebuttal. In response to NSA's arguments, the Agency submitted supplemental, classified, *ex parte*, *in camera* declarations, including one from Vanna Blaine, an officer in the Litigation Information Review Office, and one from Donald J. Blersch, the Senior Coordinator of the Diplomatic Security Service for Security Infrastructure in the Bureau of Diplomatic Security from the State Department. Blaine's declaration, for instance, "elaborat[es] the CIA's role in the classification review process" for Volume IV of the FRUS. See ECF No. 27 (Defendant Reply) at 2–3. "The declaration also explains why the CIA cannot further address this issue on the public record." Id. at 3.

The Court has reviewed the Government's classified, *ex parte* declarations, along with a copy of the requested Memo. Having done so, it concludes that the transcript contained in Volume IV was not made public through an "official and documented disclosure" by the CIA. The Government's declarations confirm that the CIA — and this includes the agency and its "components" — was not properly involved in the document's disclosure. Plaintiff's failure to show that the third precondition of the official-acknowledgment doctrine was satisfied is enough to render the doctrine inapplicable here. The Court therefore need not address whether the first two requirements of sameness and specificity are satisfied.

The Court is acutely aware of the frustration its admittedly cryptic analysis may engender. But FOIA requires it to remain parsimonious in its explanation, lest it "pry[] loose from the government even the smallest bit of information that is properly classified or would disclose intelligence sources or methods." Afshar v. Dep't of State, 702 F.2d 1125, 1130 (D.C. Cir. 1983). The Court assures NSA, however, that the CIA has sufficiently shown its lack of

7

involvement in the FRUS publication and supported that position with declarations that must be accorded "a presumption of good faith." SafeCard, 926 F.2d at 1200.

B. Public Domain

Plaintiff next contends that notwithstanding who disclosed the material that ended up in the FRUS, the CIA must still explain why it continues to withhold information that is already public. See Opp. at 11. Defendant, for its part, submits that not just any public disclosure suffices to waive a FOIA exemption or weaken its applicability; rather, as the official-acknowledgment doctrine provides, only those public disclosures that are "officially" made public affect an agency's ability to invoke an exemption. See Reply at 3. In other words, Defendant's position is that there is no "public disclosure" exception that exists separate from the "official acknowledgment" exception.

This Court need not resolve whether public disclosure of a document via unofficial channels could ever suffice to waive an agency's ability to invoke a FOIA exemption. All NSA requests in this case is a "'specific explanation for continued withholding of information' that has been made public, even when the public information was released unofficially." Opp. at 11 (quoting Washington Post v. Dep't of Def., 766 F. Supp. 1, 10 (D.D.C. 1991)) (emphasis added). The CIA has provided that to the Court here.

Once again, the Court begs Plaintiff's indulgence, as it must be vague. It assures NSA, based on its review in camera of the documents, that the Agency has diligently explained in those declarations why it must continue to withhold the contents of the Perroots Memo despite the FRUS publication, and it has done so with specific reasons and support. The Court's confidence is buttressed by the fact that it must give "substantial weight" to the CIA's declarations "concerning the details of the classified status of the disputed record because the

8

JA087

Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse [effects] might occur as a result of a particular classified record." Larson, 565 F.3d at 864 (quoting Ctr. for Nat'l Sec. Studs. v. Dep't of Just., 331 F.3d 918, 927 (D.C. Cir. 2003)).  The CIA has sufficiently explained why classification of the information is still warranted to protect "intelligence activities" or "intelligence sources or methods."  MSJ at 6.

<div align="center">*     *     *</div>

Having dispensed with Plaintiff's general objections to withholding here, the Court is left with the CIA's reliance on Exemptions 1 and 3.  As Plaintiff does not contest the applicability of those exemptions on their merits, summary judgment for Defendant is appropriate.

## IV.    Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment.  A separate Order so stating shall issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  October 4, 2022

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL SECURITY ARCHIVE,<br><br>    Plaintiff,<br><br>        v.<br><br>CENTRAL INTELLIGENCE AGENCY,<br><br>    Defendant. | Civil Action No. 21-2857 (JEB) |

## ORDER

Last October, Plaintiff National Security Archive brought a Freedom of Information Act suit to compel Defendant Central Intelligence Agency to disclose a Memo written by now-deceased Lieutenant General Leonard Perroots. This Court ultimately issued a separate Memorandum Opinion and Order granting Defendant's Motion for Summary Judgment, which Plaintiff now moves to amend. According to NSA, the Court's Order "sanction[ed] a reclassification" of a Memo that was effectively declassified by its release in the Department of State's "Foreign Relations of the United States" series early last year. See ECF No. 31-1 (Motion to Amend) at 1–2. Plaintiff therefore requests that the Court "require Defendant to subject the Perroots Memorandum to a reclassification review under Executive Order No. 13526," which governs agency efforts to reclassify certain information. Id. at 1. The Court will deny the Motion.

Plaintiff invokes § 1.7(c) of that Executive Order, which provides that "[i]nformation may not be reclassified after declassification and release to the public under proper authority unless" four conditions are met, including that "the information may be reasonably recovered

1

JA089

without bringing undue attention to the information." 75 Fed. Reg. 705, 710–11 (2010)

(emphasis added). Central to this Court's October Opinion, however, was its conclusion that the

Perroots Memo was not released to the public under proper authority. Nat'l Sec. Archive v. CIA,

No. 21-2857, 2022 WL 5062523, at *3–4 (D.D.C. Oct. 4, 2022). It is therefore not clear that the

specific requirements Plaintiff seeks to enforce here are applicable to the Perroots Memo.

In any event, this Court doubts that it has the authority under FOIA to order the relief that

NSA seeks in its Motion. See ECF No. 32 (Opposition to Motion) at 2. FOIA gives district

courts the "jurisdiction to enjoin [an] agency from withholding agency records and to order the

production of any agency records improperly withheld from the complainant." 5 U.S.C.

§ 552(a)(4)(B). Plaintiff's Motion, conversely, requests a very different type of injunction:

compliance with procedures outlined by Executive Order 13526, a source of law separate from

FOIA. NSA identifies no authority under which this Court could order such compliance from an

agency in a FOIA suit.

Finally, even if NSA had identified such authority, a Rule 59(e) motion would be an

improper vehicle by which to ask the Court to use that power in this case. Rule 59(e) permits a

court to amend a judgment in light of an "intervening change of controlling law, the availability

of new evidence, or the need to correct a clear error or prevent manifest injustice." Firestone v.

Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996). Plaintiff's request does not fall into any of those

categories. NSA brought this suit to obtain an injunction ordering "Defendant to promptly

disclose" the Perroots Memo, which is relief that the Court could have ordered under FOIA. See

ECF No. 1 (Complaint) at 9; 5 U.S.C. § 552(a)(4)(B). This Court declined to issue such an

injunction, however, and upheld the CIA's invocation of FOIA Exemptions 1 and 3. Nat'l Sec.

2

Archive, 2022 WL 5062523, at *5.  Having lost the battle under FOIA, NSA may not now wield

Rule 59(e) to seek an entirely new remedy under a separate set of requirements.

 For these reasons, the Court ORDERS that Plaintiff's Motion to Amend the Judgment is

DENIED.

<div align="right">

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

</div>

Date:  November 16, 2022

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| NATIONAL SECURITY ARCHIVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 21-2857 (JEB) |
| | ) | |
| CENTRAL INTELLIGENCE AGENCY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>NOTICE OF APPEAL</u>

Notice is given that Plaintiff National Security Archive appeals to the United States Court of Appeals for the District of Columbia Circuit this Court's (1) October 4, 2022 Order and accompanying Memorandum Opinion and (2) November 16, 2022 Order in the above-referenced matter (Docket Nos. 29, 30, and 33).

Dated: January 13, 2023                    Respectfully submitted,


                                           */s/ Hilary Jacobs*
                                           John S. Guttmann
                                           D.C. Bar No. 251934
                                           Hilary T. Jacobs
                                           D.C. Bar No. 1021353
                                           Beveridge & Diamond, P.C.
                                           1900 N Street, NW, Suite 100
                                           Washington, D.C. 20036
                                           (202) 789-6020
                                           jguttmann@bdlaw.com
                                           hjacobs@bdlaw.com

                                           *Counsel for Plaintiff*


JA092

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2023, a true and correct copy of the foregoing was filed

with the Clerk of Court using the CM/ECF system on the following:

James R. Powers
Trial Attorney
U.S. Department of Justice, Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005

*Counsel for Central Intelligence Agency*

                    */s/ Hilary Jacobs*
                    Hilary T. Jacobs

                    *Counsel for Plaintiff the National Security Archive*

2

**JA093**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL SECURITY ARCHIVE,

      Plaintiff,

      v.

CENTRAL INTELLIGENCE AGENCY,

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 21-2857 (JEB)

## NOTICE OF APPEAL

    Notice is given that Plaintiff National Security Archive appeals to the United States Court of Appeals for the District of Columbia Circuit this Court's (1) October 4, 2022 Order and accompanying Memorandum Opinion and (2) November 16, 2022 Order in the above-referenced matter (Docket Nos. 29, 30, and 33).

Dated: January 13, 2023

        Respectfully submitted,

      */s/ Hilary Jacobs*
      John S. Guttmann
      D.C. Bar No. 251934
      Hilary T. Jacobs
      D.C. Bar No. 1021353
      Beveridge & Diamond, P.C.
      1900 N Street, NW, Suite 100
      Washington, D.C. 20036
      (202) 789-6020
      jguttmann@bdlaw.com
      hjacobs@bdlaw.com

      *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2023, a true and correct copy of the foregoing was filed

with the Clerk of Court using the CM/ECF system on the following:

James R. Powers
Trial Attorney
U.S. Department of Justice, Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005

*Counsel for Central Intelligence Agency*

　　　　　　　　　　　　　　　　　*/s/ Hilary Jacobs*
　　　　　　　　　　　　　　　　　Hilary T. Jacobs

　　　　　　　　　　　　　　　　　*Counsel for Plaintiff the National Security Archive*

2

**JA095**

# VOLUME II

# Appendix D

# FOREIGN
# RELATIONS
## OF THE
# UNITED
# STATES

## 1981–1988

## VOLUME IV

## SOVIET UNION,
## JANUARY 1983–
## MARCH 1985



## DEPARTMENT
## OF
## STATE

**Washington**

JA097



**Foreign Relations of the
United States, 1981–1988**

**Volume IV**

# Soviet Union, January 1983– March 1985

| | |
|---|---|
| *Editor* | Elizabeth C. Charles |
| *General Editor* | Kathleen B. Rasmussen |

United States Government Publishing Office
Washington
2021

DEPARTMENT OF STATE

OFFICE OF THE HISTORIAN

FOREIGN SERVICE INSTITUTE

For sale by the Superintendent of Documents, U.S. Government Publishing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512-1800;   DC area (202) 512-1800
Fax: (202) 512-2250 Mail: Stop IDCC, Washington, DC 20402-0001

JA099

# About the Series

The *Foreign Relations of the United States* series presents the official documentary historical record of major foreign policy decisions and significant diplomatic activity of the U.S. Government. The Historian of the Department of State is charged with the responsibility for the preparation of the *Foreign Relations* series. The staff of the Office of the Historian, Foreign Service Institute, under the direction of the General Editor of the *Foreign Relations* series, plans, researches, compiles, and edits the volumes in the series. Secretary of State Frank B. Kellogg first promulgated official regulations codifying specific standards for the selection and editing of documents for the series on March 26, 1925. These regulations, with minor modifications, guided the series through 1991.

Public Law 102–138, the Foreign Relations Authorization Act, established a new statutory charter for the preparation of the series which was signed by President George H.W. Bush on October 28, 1991. Section 198 of P.L. 102–138 added a new Title IV to the Department of State's Basic Authorities Act of 1956 (22 U.S.C. 4351, et seq.).

The statute requires that the *Foreign Relations* series be a thorough, accurate, and reliable record of major U.S. foreign policy decisions and significant U.S. diplomatic activity. The volumes of the series should include all records needed to provide comprehensive documentation of major foreign policy decisions and actions of the U.S. Government. The statute also confirms the editing principles established by Secretary Kellogg: the *Foreign Relations* series is guided by the principles of historical objectivity and accuracy; records should not be altered or deletions made without indicating in the published text that a deletion has been made; the published record should omit no facts that were of major importance in reaching a decision; and nothing should be omitted for the purposes of concealing a defect in policy. The statute also requires that the *Foreign Relations* series be published not more than 30 years after the events recorded. The editors are convinced that this volume meets all regulatory, statutory, and scholarly standards of selection and editing.

*Sources for the* Foreign Relations *Series*

The *Foreign Relations* statute requires that the published record in the *Foreign Relations* series include all records needed to provide comprehensive documentation of major U.S. foreign policy decisions and significant U.S. diplomatic activity. It further requires that government agencies, departments, and other entities of the U.S. Government en-

III

gaged in foreign policy formulation, execution, or support cooperate with the Department of State historians by providing full and complete access to records pertinent to foreign policy decisions and actions and by providing copies of selected records. Most of the sources consulted in the preparation of this volume were located at the Department of State in Washington and the National Archives and Records Administration.

The editors of the *Foreign Relations* series have complete access to all the retired records and papers of the Department of State: the central files of the Department; the special decentralized files ("lot files") of the Department at the bureau, office, and division levels; the files of the Department's Executive Secretariat, which contain the records of international conferences and high-level official visits, correspondence with foreign leaders by the President and Secretary of State, and the memoranda of conversations between the President and the Secretary of State and foreign officials; and the files of overseas diplomatic posts. All of the Department's central files for 1981–1989, which were stored in electronic and microfilm formats, will eventually be transferred to the National Archives. Once these files are declassified and processed, they will be accessible. All of the Department's decentralized office files from this period that the National Archives deems worthy of permanent preservation will also eventually be transferred to the National Archives where they will be available for use after declassification and processing.

Research for *Foreign Relations* volumes in this subseries is undertaken through special access to restricted documents at the Ronald Reagan Presidential Library and other agencies. While all the material printed in this volume has been declassified, some of it is extracted from still-classified documents. The staff of the Reagan Library is processing and declassifying many of the documents used in this volume, but they may not be available in their entirety at the time of publication. Presidential papers maintained and preserved at the Reagan Library include some of the most significant foreign affairs related documentation from White House offices, the Department of State, and other Federal agencies including the National Security Council, the Central Intelligence Agency, the Department of Defense, and the Joint Chiefs of Staff.

Some of the research for volumes in this subseries was done in Reagan Library record collections scanned for the Remote Archive Capture (RAC) project. This project, which is administered by the National Archives and Records Administration's Office of Presidential Libraries, was designed to coordinate the declassification of still-classified records held in various Presidential libraries. As a result of the way in which records were scanned for the RAC, the editors of the

A Case #23-5017    Document #2005450    Filed: 06/28/2023    Page 108 o

*Foreign Relations* series were not always able to determine whether attachments to a given document were in fact attached to the paper copy of the document in the Reagan Library file. In such cases, some editors of the *Foreign Relations* volumes have indicated this ambiguity by stating that the attachments were "Not found attached."

*Editorial Methodology*

The documents are presented chronologically according to time in Washington, DC. Memoranda of conversation are placed according to the time and date of the conversation, rather than the date the memorandum was drafted.

Editorial treatment of the documents published in the *Foreign Relations* series follows Office style guidelines, supplemented by guidance from the General Editor and the Chiefs of the Declassification and Publishing Divisions. The original document is reproduced as exactly as possible, including marginalia or other notations, which are described in the footnotes. Texts are transcribed and printed according to accepted conventions for the publication of historical documents within the limitations of modern typography. A heading has been supplied by the editors for each document included in the volume. Spelling, capitalization, and punctuation are retained as found in the original text, except that obvious typographical errors are silently corrected. Other mistakes and omissions in the documents are corrected by bracketed insertions: a correction is set in italic type; an addition in roman type. Words or phrases underlined in the original document are printed in italics. Abbreviations and contractions are preserved as found in the original text, and a list of abbreviations and terms is included in the front matter of each volume. In telegrams, the telegram number (including special designators such as Secto) is printed at the start of the text of the telegram.

Bracketed insertions are also used to indicate omitted text that deals with an unrelated subject (in roman type) or that remains classified after declassification review (in italic type). The amount and, where possible, the nature of the material not declassified has been noted by indicating the number of lines or pages of text that were omitted. Entire documents withheld after declassification review have been accounted for and are listed in their chronological place with headings, source notes, and the number of pages not declassified.

All brackets that appear in the original document are so identified in the footnotes. All ellipses are in the original documents.

The first footnote to each document indicates the source of the document and its original classification, distribution, and drafting information. This note also provides the background of important docu-

ments and policies and indicates whether the President or his major policy advisers read the document.

Editorial notes and additional annotation summarize pertinent material not printed in the volume, indicate the location of additional documentary sources, provide references to important related documents printed in other volumes, describe key events, and provide summaries of and citations to public statements that supplement and elucidate the printed documents. Information derived from memoirs and other first-hand accounts has been used when appropriate to supplement or explicate the official record.

The numbers in the index refer to document numbers rather than to page numbers.

*Advisory Committee on Historical Diplomatic Documentation*

The Advisory Committee on Historical Diplomatic Documentation, established under the *Foreign Relations* statute, monitors the overall compilation and editorial process of the series and advises on all aspects of the preparation of the series and declassification of records. The Advisory Committee does not necessarily review the contents of individual volumes in the series, but it makes recommendations on issues that come to its attention and reviews volumes as it deems necessary to fulfill its advisory and statutory obligations.

*Declassification Review*

The Office of Information Programs and Services, Bureau of Administration, conducted the declassification review for the Department of State of the documents published in this volume. The review was conducted in accordance with the standards set forth in Executive Order 13526 on Classified National Security Information and applicable laws.

The principle guiding declassification review is to release all information, subject only to the current requirements of national security as embodied in law and regulation. Declassification decisions entailed concurrence of the appropriate geographic and functional bureaus in the Department of State, other concerned agencies of the U.S. Government, and the appropriate foreign governments regarding specific documents of those governments. The declassification review of this volume, which began in 2015 and was completed in 2019, resulted in the decision to withhold 1 document in full, excise a paragraph or more in 13 documents, and make minor excisions of less than a paragraph in 20 documents.

The Office of the Historian is confident, on the basis of the research conducted in preparing this volume and as a result of the declassification review process described above, that the documentation and edito-

rial notes presented here provide a thorough, accurate, and reliable record of the Reagan administration's policy toward the Soviet Union, January 1983–March 1985.

**Adam M. Howard, Ph.D.**                    **Kathleen B. Rasmussen, Ph.D.**
*The Historian*                                              *General Editor*

Foreign Service Institute
February 2021

# Preface

*Structure and Scope of the* Foreign Relations *Series*

This volume is part of a subseries of volumes of the *Foreign Relations* series that documents the most important issues in the foreign policy of the administration of Ronald Reagan. This volume documents U.S. bilateral relations with the Soviet Union from January 1983 to March 1985. Due to the importance of U.S.-Soviet relations during the Reagan administration, the Reagan subseries includes an extensive examination of U.S. bilateral relations with the Soviet Union in four volumes: *Foreign Relations*, 1981–1988, Volume III, Soviet Union, January 1981–January 1983; Volume IV, Soviet Union, January 1983–March 1985; Volume V, Soviet Union, March 1985–October 1986; and Volume VI, Soviet Union, October 1986–January 1989. In conjunction with these volumes, several other volumes in the subseries will provide the reader with a fuller understanding of how U.S.-Soviet relations impacted the global character of the Cold War and U.S. strategy during the Reagan era. For documentation on U.S.-Soviet nuclear arms control negotiations, see *Foreign Relations*, 1981–1988, Volume XI, START I, and Volume XII, INF, 1984–1988. *Foreign Relations*, 1977–1980, Volume V, European Security, 1977–1983, documents the NATO dual-track decision and TNF/INF negotiations through 1983. Documentation dealing with nuclear non-proliferation, nuclear testing, chemical and biological weapons, and space arms control, including anti-satellite systems, will be published in *Foreign Relations*, 1981–1988, Volume XL, Global Issues I. The development of the Strategic Defense Initiative and ABM-related issues and other strategic considerations are addressed in *Foreign Relations*, 1981–1988, Volume XLIII, National Security Policy, 1981–1984, and Volume XLIV, Parts 1 and 2, National Security Policy, 1985–1988. For selected documentation on the human rights situation in the Soviet Union, see *Foreign Relations*, 1981–1988, Volume XLI, Global Issues II.

*Focus of Research and Principles of Selection for* Foreign Relations, *1981–1988, Volume IV*

This volume documents the development of the Reagan administration's policies toward the Soviet Union from January 1983 to March 1985. With Reagan's signature of National Security Decision Directive (NSDD) 75 on January 17, 1983, the administration's approaches and policies toward the Soviet Union were codified in a specific four-part agenda: arms control, human rights, regional issues, and bilateral relations. This volume examines the efforts of administration officials,

IX

namely Secretary of State George Shultz, President's Assistants for National Security Affairs William Clark and later Robert McFarlane, and NSC Staff member Jack Matlock, to implement the four-part agenda in dealing with the Soviet Union. The documentation demonstrates how administration officials developed policies related to the four-part agenda, mainly in the National Security Council (NSC) and Department of State, and then promoted these various tracks during meetings between Shultz, and on occasion Reagan, and Soviet Ambassador Anatoly Dobrynin and Soviet Foreign Minister Andrei Gromyko in various fora. Although no high-level meeting took place between Reagan and either Soviet General Secretaries Yuri Andropov or Konstantin Chernenko during their short tenures, the documents provide a window into how the Reagan administration viewed the Soviet leadership and formulated policies to deal with whomever was in charge.

The volume also documents the bureaucratic struggle Shultz faced against the NSC in implementing the four-part agenda laid out by NSDD 75 and in gaining access to President Reagan. After some wrangling, by June 1983 an understanding emerged between Shultz and Clark, which allowed Shultz regular weekly meetings with Reagan. When Jack Matlock joined the NSC Staff as primary adviser on the Soviet Union, Shultz gained a like-minded ally in approaches to dealing with the USSR. While some administration officials, such as Secretary of Defense Caspar Weinberger, consistently argued that negotiating with the Soviet Union seemed futile, Shultz, Matlock, and others pushed President Reagan to see the value in keeping lines of communication open with the Soviets. Even during tragic events, such as the Soviet downing of the KAL 007 airliner in September 1983, Shultz kept his meeting with Gromyko a few days later in Madrid and used this as an opportunity to admonish the Foreign Minister for this inexplicable act and the inability of the Soviet Union to admit fault on the international stage.

The volume documents several Cold War flashpoints during the contentious months of 1983. The announcement in March 1983 of Reagan's Strategic Defense Initiative (SDI) caused concern for the Soviet Union because it shifted the strategic balance from the theory of mutually assured destruction toward a defensive nuclear posture. Aside from the downing of the KAL airliner, the Euromissiles crisis came to a head with U.S. deployments of INF missiles to several NATO allies in late November 1983. While the bulk of the documentation dealing with these negotiations is covered in two other volumes, the scheduled deployments permeated all other aspects of U.S.-Soviet relations in 1983. The volume also presents selective documentation related to the 1983 Soviet "War Scare" and the November 1983 NATO nuclear exercise, Able Archer (see Appendix A). The volume attempts to dem-

onstrate that even with these challenges, Shultz and others pressed to keep moving ahead with the four-part agenda and promote greater dialogue in U.S.-Soviet relations.

After the Soviet walkout of the INF negotiations in Geneva in late 1983, the administration focused throughout 1984 on developing a framework to restart arms control negotiations; the documents in this volume demonstrate the difficulties involved in opening new talks with the Soviet Union. Reagan's SDI program continued to cause problems. The Soviets believed SDI would "militarize space," and therefore the debates over how SDI would be dealt with during negotiations were a major point of contention during this period. When Shultz and Gromyko met in January 1985, they finally reached an agreement on a new round of umbrella negotiations. The Nuclear and Space Talks (NST), scheduled to begin in Geneva in March 1985, would have three tracks, START, INF, and Defense and Space. The documents in the volume trace how various positions from the Department of State, NSC, the Department of Defense, and the Central Intelligence Agency impacted the decision to move forward with the three arms control tracks. While the other parts of the four-part agenda remained in play during this period and were discussed in bilateral meetings, restarting arms control talks seemed to trump the other areas of concern. Little did the U.S. or Soviet negotiators know that on the eve of these new NST negotiations, Chernenko would die, and a younger, more ambitious Soviet leader would emerge and dramatically change the course of U.S.-Soviet relations.

*Acknowledgments*

The editor wishes to acknowledge the invaluable assistance of officials at the Ronald Reagan Presidential Library in Simi Valley, California, especially Lisa Jones and Cate Sewell. A special thanks to the Central Intelligence Agency staff for providing access and assistance with Reagan Library materials scanned for the Remote Archive Capture project, and to the History Staff of the CIA's Center for the Study of Intelligence for arranging full access to CIA records. The editor wishes to acknowledge the staff at Information Programs and Services at the Department of State for facilitating access to Department of State records and coordinating the review of this volume within the Department. Sandy Meagher was helpful in providing access to Department of Defense materials. The editor extends thanks to the family and executor of the Estate of former Secretary of Defense Caspar W. Weinberger for granting Department of State historians access to the personal papers of Secretary Weinberger deposited at the Library of Congress. Additional thanks are due to officials of the Library of Congress Manuscript Division for facilitating that access.

Elizabeth C. Charles collected, selected, and annotated the documentation for this volume under the supervision of David Geyer, Chief of the Europe Division, and Adam Howard, then General Editor of the *Foreign Relations* series. The volume was reviewed by David Geyer and then Historian Stephen Randolph. Kerry Hite and Chris Tudda coordinated the declassification review under the supervision of Carl Ashley, Chief of the Declassification Coordination Division. Kerry Hite also performed the copy and technical editing under the supervision of Mandy Chalou, Chief of the Editing and Publishing Division.

**Elizabeth C. Charles, Ph.D.**
*Historian*

# Contents

About the Series ……………………………………………… III

Preface ………………………………………………………… IX

Sources ………………………………………………………… XV

Abbreviations and Terms ………………………………… XIX

Persons ………………………………………………………… XXV

Note on U.S. Covert Actions …………………………… XXXI

Soviet Union, January 1983–March 1985

January 1983–April 1983

"Dobrynin seemed like he wanted to run. But the
Secretary is a jogger": Shultz and the Four-Part
Agenda …………………………………………………… 1

April 1983–August 1983

Preparing the Next Steps in U.S.-Soviet Relations:
Human Rights and Arms Control …………………… 120

September 1983–October 1983

"Controlled Fury": Shootdown of KAL 007 …………… 291

October 1983–February 1984

"The Winter of Soviet Discontent": INF Walkout, the
War Scare, and the 'Ivan and Anya' Speech ………… 429

February 1984–June 1984

"Talking about each other rather than to each other":
Reagan, Chernenko, and U.S.-Soviet Stalemate ……… 606

June 1984–October 1984

"Sitting on Mountains of Nuclear Weapons": The
Reagan-Gromyko Meeting ……………………………… 845

October 1984–January 1985

"An iron-ass Secretary of State": Shultz and Gromyko
in Geneva ………………………………………………… 1079

January 1985–March 1985

"The principal menace to our security?": Reagan and
the Ambiguities of Soviet Leadership ..................... 1355

Appendix ........................................................ 1420

JA112

# Appendix

## A.    Editorial Note

Stark deviations in assessments by the U.S. Intelligence Community of the November 1983 NATO exercise Able Archer and the Soviet "war scare" led to a much later 1990 investigation by the President's Foreign Intelligence Advisory Board during the George H.W. Bush administration, resulting in the report, "The Soviet 'War Scare.'" (George H.W. Bush Library, Bush Presidential Records, President's Foreign Intelligence Advisory Board, Subject Files; Reports to the President-War Scare Report 1990 [OA/IDCF01830–020]) The February 15, 1990, PFIAB report analyzed intelligence and reporting on the Soviet war scare, Able Archer, and other related activities. The PFIAB report stated: "During the past year, the President's Foreign Intelligence Advisory Board has carefully reviewed the events of that period to learn what we (the U.S. intelligence community) knew, when we knew it, and how we interpreted it. The Board has read hundreds of documents, conducted more than 75 interviews with American and British officials, and studied the series of National Intelligence Estimates (NIE's) and other intelligence assessments that have attempted over the last six years to interpret the war scare data. Additionally, we have offered our own interpretation of the war scare events." (PFIAB, pages vi–vii) Although outside the normal scope of this volume, the 1990 PFIAB report and other memoranda from 1988 and 1989 are addressed in this editorial note because the documents focus upon crucial events from 1983 to 1984.

Reactions from the Intelligence Community (IC) and policymakers to the events surrounding Able Archer and the Soviet "war scare" differed significantly and evolved over time. The contemporaneous reporting in 1983–1984 from the Central Intelligence Agency (CIA), National Intelligence Council (NIC), [*text not declassified*] drew varied conclusions about Soviet anxieties. While some reporting assessed that "Contrary to the impression conveyed by Soviet propaganda, Moscow does not appear to anticipate a near-term military confrontation with the United States" (see Document 157), another analysis presented evidence that [*text not declassified*].

Retrospective assessments of these events seem to conflate the NATO Able Archer exercise with the broader "war scare" talk emanating from Moscow related to INF deployments. The Soviet military unquestionably reacted to Able Archer differently than to previous NATO exercises. (See Document 134.) Whether the Soviet response was attributable to the circumstances of the time, to the "war scare"

1420

(whether real or Soviet propaganda), or to a credible belief within the Soviet military leadership or the Politburo that the United States was planning to launch a nuclear first strike against the USSR, under the guise of a NATO exercise or otherwise, remains unclear on the basis of the available evidence.

After a year of research and a reassessment of the relevant intelligence and documentation, the PFIAB report stated: "We believe that the Soviets perceived that the correlation of forces had turned against the USSR, that the US was seeking military superiority, and that the chances of the US launching a nuclear first strike—perhaps under cover of a routine training exercise—were growing. We also believe that the US intelligence community did not at the time, and for several years afterwards, attach sufficient weight to the possibility that the war scare was real. As a result, the President was given assessments of Soviet attitudes and actions that understated the risks to the United States. Moreover, these assessments did not lead us to reevaluate our own military and intelligence actions that might be perceived by the Soviets as signaling war preparations.

"In two separate Special National Intelligence Estimates (SNIEs) in May and August 1984, the intelligence community said: 'We believe strongly that Soviet actions are not inspired by, and Soviet leaders do not perceive, a genuine danger of imminent conflict or confrontation with the United States.' Soviet statements to the contrary were judged to be 'propaganda.' [See Documents 221 and 264.]

"The Board believes that the evidence then did not, and certainly does not now, support such categoric conclusions. Even without the benefit of subsequent reporting and looking at the 1984 analysis of then available information, the tone of the intelligence judgments was not adequate to the needs of the President." (PFIAB, pages vi–vii)

During November 1983, Able Archer and the Soviet responses to this exercise received little immediate attention in the U.S. Intelligence Community. (See Document 135.) However, by spring 1984, some in the intelligence communities in the United States [*text not declassified*] believed the Reagan administration should have recognized Soviet sensitivities and anxieties about a potential U.S. first strike. [*text not declassified*].

According to the PFIAB report, [*text not declassified*] "KGB Deputy Resident Colonel Oleg Gordiyevskiy, [*text not declassified*] had witnessed what he saw as Soviet paranoia over a US nuclear first strike; [*text not declassified*] As one of the most senior KGB officers in London, [*text not declassified*]." (PFIAB, page 10)

In a covering memorandum [*less than 1 line not declassified*] to Director of Central Intelligence William Casey and others, Herbert Meyer, Vice Chairman of the National Intelligence Council, wrote: [*text not

A Case #23-5017   Document #2005450   Filed: 06/28/2023   Page 121 o

*declassified*]. The PFIAB report commented that the [*text not declassified*] report was "not well received in the US intelligence community." (PFIAB, pages 10–11)

Another contemporaneous analysis from the CIA, the May 1984 SNIE 11–10–84/JX concluded: "We believe strongly that Soviet actions are not inspired by, and Soviet leaders do not perceive, a genuine danger of imminent conflict or confrontation with the United States." (See Document 221.) The PFIAB report commented on this SNIE: "The estimate boldly declared that 'Recent Soviet war scare propaganda . . . is aimed primarily at discrediting US policies and mobilizing 'peace' pressures among various audiences abroad.' In a more piecemeal fashion, it was judged that 'Each Soviet action has its own military or political purpose sufficient to explain it.' The accelerated tempo of Soviet live exercise activity was explained simply as a reflection of 'long-term Soviet military objectives.'

"The Soviet reaction to Able Archer 83 was dismissed as a 'counter-exercise,' but analysts acknowledged that the 'elaborate Soviet reaction' was 'somewhat greater than usual.' [*less than 1 line not declassified*] prior to and during the exercise indicated that the Warsaw Pact Intelligence services, especially the KGB, were admonished 'to look for any indication that the United States was about to launch a first nuclear strike,' analysts concluded that 'by confining heightened readiness to selected air units, Moscow clearly revealed that it did not, in fact, think there was a possibility at this time of a NATO attack.' The assessment, however, was not specific about what type of defensive or precautionary Soviet activity might be expected—and detected—were they preparing for an offensive NATO move." (PFIAB, page 13)

The PFIAB report continued its critique of SNIE 11–10–84/JX: IC "analysts dismissed [*less than 1 line not declassified*] on the war scare, including the KGB's formal tasking to its Residencies. 'This war scare propaganda has reverberated in Soviet security bureaucracies and emanated through other channels such as human sources. [See for example, Document 144.] We do not believe it reflects authentic leadership fears of imminent conflict.'" The report contended: "Such judgments were made even though the analysis was tempered 'by some uncertainty as to current Soviet leadership perceptions of the United States, by continued uncertainty about the Politburo decisionmaking processes, and by our inability at this point to conduct a detailed examination of how the Soviets might have assessed recent US/NATO military exercises and reconnaissance operations'—which, of course, included the previous Able Archer exercise. In other words, US analysts were unsure of what the Kremlin leadership thought or how it made decisions, nor had they adequately assessed the Soviet reaction to Able Archer 83. This notwithstanding, the estimate concluded: 'We are confident that,

as of now, the Soviets see not an imminent military clash but a costly and—to some extent—more perilous strategic and political struggle over the rest of the decade.'" (PFIAB, page 14)

The Board had similar criticisms of the August 1984 SNIE 11–9–84, "Soviet Policy Toward the United States in 1984" (see Document 264), for its "categorical and unqualified" judgments "about the likelihood of the war scare," and the analysts' conclusions: "We strongly believe that the Soviet actions are not inspired by, and Soviet leaders do not perceive, a genuine danger of imminent conflict or confrontation with the United States. Also, we do not believe that the Soviet war talk and other actions 'mask' Soviet preparations for an imminent move toward confrontation on the part of the USSR." (PFIAB, page 19–20) The PFIAB report continued: "Analysts readily acknowledged that the previous six months had seen extraordinary, unprecedented Soviet activities. Large scale military exercise, 'anomalous behavior' during the troop rotation, withdrawn military support for the harvest (last seen prior to the 1968 Czech invasion), new, deployed weapons systems (termed 'in response to INF deployments'), and heightened internal vigilance and security activities were noted. These events, however, were judged to be 'in line with long-evolving plans and patterns, rather than with sharp acceleration of preparations for major war.'" (PFIAB, page 19)

The PFIAB report acknowledged that its assessment and criticism of the May and August 1984 SNIEs "derives from information not known at the time. Our purpose in presenting this report is not so much to criticize the conclusions of the 1984 SNIE's as to raise questions about the ways these estimates were made and subsequently reassessed." (PFIAB, page ix) The PFIAB report concluded: "Reasonable people can disagree about the conclusions of the 1984 SNIE's. The PFIAB does disagree with many of them. More worrisome to us, however, is the process by which the estimates were made and subsequently reassessed. Although both estimates were reportedly reviewed by outside readers—and both, but particularly the first, contained alternative scenarios—strongly worded interpretations were defended by explaining away facts inconsistent with them. Consequently, both estimates contained, in essence, single outcome forecasting based in large part on near-term anomalous behavior. Moreover, neither alerted the reader to the risks erroneously rejecting the correct scenario." (PFIAB, page 30) The PFIAB report criticized the performance of the IC in 1983–1984, showing that contemporary assessments of Soviet intentions after Able Archer did not go far enough in providing President Reagan with alternative scenarios, explaining that the anxiety from the Soviet leadership could have been real.

In criticizing contemporary estimates, the PFIAB report emphasized intelligence that had not been available to the IC during these

A Case #23-5017    Document #2005450    Filed: 06/28/2023    Page 123 o

years, principally information provided by Gordiyevskiy after he defected in 1985. Robert McFarlane's thoughts on the influence of Gordiyevskiy's information on the President are recorded in a December 16, 1988, memorandum for the record:

**Memorandum for the Record**

<div align="right">16 December 1988</div>

SUBJECT

[*less than 1 line not declassified*] Robert F. McFarlane Regarding the Influence of Oleg Gordiyevskiy's Reporting on President Reagan

On 15 December [*less than 1 line not declassified*] Robert F. ("Bud") McFarlane, formerly National Security Advisor to the President, as to the veracity of claims [*less than 1 line not declassified*] that the reporting of KGB officer [*less than 1 line not declassified*] Oleg Gordiyevskiy about the Kremlin's fear of war greatly influenced President Reagan in the mid-1980s to seek better relations with the USSR. In response, Bud made several points:

He definitely remembered the reporting associated (later) with Gordiyevskiy that conveyed the Kremlin's fear of war. He also specifically recalled [*less than 1 line not declassified*] on Gordiyevskiy's assessments given to the President [*less than 1 line not declassified*].

He noted that he discussed this reporting with the President on several occasions. This was in the course of numerous discussions extending throughout 1983 and part of 1984 about the apparent anxieties being transmitted by Moscow through many channels, [*less than 1 line not declassified*].

The President, according to Bud, saw this reporting attributed to Gordiyevskiy in the larger context of a Soviet "war-scare" campaign arising from the NATO decision to deploy INF and from Reagan's hard line on defense, SDI, etc. In the President's view, either the Soviets were paranoid in strange ways we could not let bother us, or they were fabricating the appearance of fear to intimidate and sway us, which we should even more be prepared to ignore.

Often in these conversations, according to Bud, the President outlined his sustained intention to concentrate on building US strength and credibility in the first term and to move toward diplomatic reengagement in the second. The President's key speech of January 1984 [see Document 158] was a natural step in a long-planned shift of policy. Neither Gordiyevskiy's reporting nor the Soviet "war-scare" campaign in general were responsible for the evolution of the President's policy.

Bud said he'd been queried before on this matter by [*name not declassified*], a journalist, who might be (or have been) writing an article on it. Against the background of the above, Bud said he discounted Gordiyevskiy's impact on the President [*less than 1 line not declassified*].

[*1 paragraph (8½ lines) not declassified*]

[*name not declassified*]

(Central Intelligence Agency, National Intelligence Council, Job 90T00435R: Chronological Files (1988), Box 1, Folder 12: C/NIC Chrono for December 1988)

McFarlane's recollections in this memorandum for the record correlate with a January 1984 memorandum by Jack Matlock, Soviet specialist on the NSC Staff, which demonstrated an awareness of potential Soviet concerns, but concluded:

"—The Soviet leadership is not overly nervous about the immediate prospect of armed confrontation with the U.S.;

"—They are however very nervous about the prospects five to ten years down the road—not so much of a confrontation as such, as of a decisive shift in the balance of military power." (See Document 157.)

As mentioned in the 1988 memorandum for the record, McFarlane did recall "later" reporting to Reagan about Gordiyevskiy. The PFIAB report addressed Gordiyevskiy's situation in relation to the war scare and the 1984 SNIE assessments: "The Board found that after the 1984 assessments were issued, the intelligence community did not again address the war scare until after the defection to Great Britain of KGB Colonel Oleg Gordiyevskiy in July, 1985. Gordiyevskiy had achieved the rank of Acting Resident in the United Kingdom, but he fell under suspicion as a Western agent. Recalled to the Soviet Union, he was placed under house arrest and intensely interrogated. Able to flee his watchers, Gordiyevskiy was exfiltrated from Moscow by the British Secret Intelligence Service."

The report continued: "During lengthy debriefing sessions that followed, Gordiyevskiy supplied a fuller report on the Soviet war hysteria. This report, complete with documentation from KGB Headquarters and entitled 'KGB Response to Soviet Leadership Concern over US Nuclear Attack,' was first disseminated in a restricted manner within the US intelligence community in October 1985. Gordiyevskiy described the extraordinary KGB collection plan, initiated in 1981, to look for signs that the US would conduct a surprise nuclear attack on the Soviet Union. He identified and reviewed factors driving leadership fears. Based on the perception the US was achieving a strategic advantage, those in the Kremlin were said to believe that the US was likely to resort to nuclear weapons much earlier in a crisis than previously expected. They also were concerned the US might seek to exploit its first-strike capability outside the context of a crisis, probably during a

A Case #23-5017    Document #2005450    Filed: 06/28/2023    Page 125 o

military exercise. He described the leadership's worries of a 'decapitating' strike from the Pershing II's, and its belief that the US could mobilize for a surprise attack in a mere seven to ten days. He explained how the London Residency responded to the requirements, and the effects that reporting had back at Moscow Center in reinforcing Soviet fears. He described conversations he had held with colleagues from Center and from the GRU. The next month, President Reagan held his first summit with Mikhail Gorbachev and relations began to thaw." (PFIAB, pages 22–23)

The PFIAB report also cited a January 1989 "End of Tour Report Addendum" by Lieutenant General Leonard H. Perroots, who had served as Assistant Chief of Staff for Intelligence, US Air Forces Europe, during the 1983 Able Archer exercise, to emphasize the potential consequences of the intelligence gap during the Able Archer exercise. Perroots addressed Able Archer as well as Gordiyevskiy's reporting in that memorandum:

1. (U) In 1983, I was assigned as the DCS for Intelligence, US Air Forces, Europe, Ramstein AB, Germany. The annual NATO Command and Control exercise ABLE ARCHER was scheduled to begin during the first week of November. The context of this nuclear command and control exercise was relatively benign; the scenario had been purposely chosen to be non-controversial, and the exercise itself was a routine annual event. This exercise closely followed the bombing of air defense sites in Lebanon and directly followed the invasion of Grenada. As I recall, however, there was no particular feeling of tension in the European Theater beyond that which is normal.

2. [*portion marking not declassified*] Only the fact that Soviet Intelligence collection assets (primarily low level signals intercept units) had failed to return to garrison after their normal concentrated coverage of NATO's AUTUMN FORGE exercise series could be reckoned strange at all. As the kickoff date of ABLE ARCHER neared it was clear that there was a great deal of Soviet interest in the forthcoming events. Again, this seemed nothing out of the ordinary. We knew that there was a history of intensive Soviet collection against practice Emergency Action Messages (EAM's) related to nuclear release.

3. [*portion marking not declassified*] ABLE ARCHER started in the morning of 3 November, and progressed immediately in the scenario to NATO STATE ORANGE. At 2100Z on 04 November NSA issued an electrical product report G/00/3083-83, entitled "SOVIET AIR FORCES, GSFG, PLACED ON HEIGHTENED READINESS, 2 NOVEMBER 1983." I saw this message on the morning of 5 November and discussed it with my air analysts. It stated that as of 1900Z on 02 November the fighter-bomber divisions of the air force of Group Soviet Forces, Germany had been placed in a status of heightened alert. All

divisional and regimental command posts and supporting command and control elements were to be manned around-the-clock by augmented teams.

4. [*portion marking not declassified*] In addition to the directed command and control changes the fighter-bomber divisions were also ordered to load out one squadron of aircraft in each regiment (if this order applied equally across GSFG the result would have been at least 108 fighter-bombers on alert). These aircraft were to be armed and placed at readiness 3 (30 minute alert) to "destroy first-line enemy targets." The alert aircraft were to be equipped with a self-protection jamming pod. We knew from subsequent NSA reporting that a squadron at Neuruppin, East Germany sought and was apparently granted permission to configure its aircraft without the ECM pod because of an unexpected weight and balance problem. My air analysts opined that this message meant that at least this particular squadron was loading a munitions configuration that they had never actually loaded before, i.e., a warload.

5. [*portion marking not declassified*] At this point, I spoke to CinC-USAFE, General Billy Minter. I told him we had some unusual activity in East Germany that was probably a reaction to the ongoing ABLE ARCHER. He asked if I thought we should increase the real force generation. I said that we would carefully watch the situation, but there was insufficient evidence to justify increasing our real alert posture. At this point in the exercise our forces were in a simulated posture of NATO State ORANGE and local SALTY NATION tests involving simulated generation of combat aircraft were underway at various locations including Ramstein AB. If I had known then what I later found out I am uncertain what advice I would have given.

6. [*portion marking not declassified*] An NSA message dated 022229Z DEC 83 provided the rest of the picture as far as we knew it—at least until the reports began to surface from the British penetration of the KGB, Oleg Gordievskiy. This GAMMA message was entitled "SOVIET 4th AIR ARMY AT HEIGHTENED READINESS IN REACTION TO NATO EXERCISE ABLE ARCHER, 2–11 NOVEMBER 1983." This report stated that the alert had been ordered by the Chief of the Soviet Air Forces, Marshal Kutakhov, and that all units of the Soviet 4th Air Army were involved in the alert "which included preparations for immediate use of nuclear weapons." This report described activity that was contemporaneous with that reflected in East Germany, but because of the specific source of this material it was not available in near realtime. The two pieces taken together present a much more ominous picture.

7. [*portion marking not declassified*] Equally ominous in its own way was the fact that this alert was never reflected at all by the I&W system.

A Case #23-5017    Document #2005450    Filed: 06/28/2023    Page 127 o

At the time of this occurrence there was no distribution of electrically reported GAMMA material to the Tactical Fusion Center at Boerfink. I remedied that shortfall in the aftermath of this activity. Secondly, a real standdown of aircraft was secretly ordered in at least the Soviet Air Forces units facing the Central Region, and that standdown was not detected. The Soviet alert in response to ABLE ARCHER began after nightfall on Wednesday evening, there was no flying on the following two days which led to the weekend, and then the following Monday was 7 November, the revolution holiday. The absence of flying could always be explained, although a warning condition was raised finally on about the ninth of November when overhead photography showed fully armed FLOGGER aircraft on air defense alert at a base in East Germany. When this single indicator was raised, the standdown had been underway for a week.

8. [*portion marking not declassified*] For the next six months I was on a soapbox about ABLE ARCHER whenever I could discuss it at the appropriate classification level. I spoke to the Senior Military Intelligence Officers' Conference (SMIOC), and I buttonholed a lot of people. I suggested that perhaps we should move our annual exercise away from the November 7 holiday, because it is clear to me that the conjunction of the two events causes a warning problem that can never be solved. Our problem here was that we had a couple of very highly classified bits of intelligence evidence about a potentially disastrous situation that never actually came to fruition. For decision-makers it was always difficult to believe that there could have been any serious reaction by the Soviets to such a "benign" exercise as ABLE ARCHER. From the Soviet perspective, however, it might have appeared very different. It was difficult for all of us to grasp that, but Oleg Gordievskiy's reporting began to provide a somewhat more frightening perspective when it became available in the Fall of 1985.

9. (S) By the time Gordievskiy's reporting began to surface for analytical review I was the Director of DIA. Gordievskiy's initial reporting about a "war scare" in 1983 immediately caught my attention. It should be pointed out at the outset that Gordievskiy knew nothing of a military alert during ABLE ARCHER. He did, however, tell us something of a chilling story about Moscow Center's Intelligence tasking during 1983. He related that there was a project called either "RYaN" or "VRYaN," the latter probably being the full form of a Russian acronym meaning "sudden rocket nuclear attack." There was a cadre of specialists in Moscow Center charged with, among other things, finding the evidence of planning for a western attack on the Soviet Union. Beginning in 1982 and continuing into 1983 Gordievskiy says that this group became ever more insistent that an attack was being planned by the West. By March 1983 the KGB officers in Moscow

had decided that ABLE ARCHER 83 would provide an excellent cover for the planned attack, and KGB and GRU residencies around the world were being directed to find the evidence. Gordievskiy, living in London at the time, states that he never believed there was really a threat, and that the London residency of the KGB simply ignored the collection requirements until it began to become clear that Moscow was serious. During the summer of 1983 the London residency sent some reports that, in retrospect, Gordievskiy believed might have hyped the war hysteria. He never really believed in the threat, however, and reported during his debriefing in 1985 that he thought the VRYaN hysteria might have been some kind of internal political ploy. I must reiterate again that Gordievskiy did not know about the secret military alert of November 1983.

10. [*portion marking not declassified*] The US intelligence community has never really closed with this analytical problem. A SNIE addressed this subject, [*1½ lines not declassified*]. The position has been taken again and again that had there been a real alert we would have detected more of it, but this may be whistling through the graveyard. It is not certain that we looked hard enough or broadly enough for information. For Western collectors the context was peacetime without even the most basic ripples of crisis. For the Soviets, however, the view may have looked quite different. It is uncertain how close to war we came or even if that was a possibility at all, but we know from Gordievskiy that the analysts in Moscow had predicted that the West would launch the attack from a posture of NATO State ORANGE. What might have happened that day in November 1983 if we had begun a precautionary generation of forces rather than waiting for further information?

(Central Intelligence Agency, National Intelligence Council, Job 91B00551: Speeches, Lectures, Briefing Files (1988–1989), Box 1, Folder 2: C/NIC (Ermarth) Chrons March 1989)

The PFIAB report commented that "as his parting shot before retirement," Perroots, who served as DIA Director from 1985 to 1989, sent a January 1989 "letter outlining his disquiet over the inadequate treatment of the Soviet war scare to, among others, the DCI and this Board." The report continued: "Following the detection of the Soviet Air Forces' increased alert status, it was his [Perroots's] recommendation, made in ignorance, not to raise US readiness in response—a fortuitous, if ill-informed, decision given the changed political environment at the time." (PFIAB, pages 27–28) In further accord with Perroots's report, the PFIAB report concluded: "As it happened, the military officers in charge of the Able Archer exercise minimized the risk by doing nothing in the face of evidence that parts of the Soviet armed forces were moving to an unusual alert level. But these officials acted correctly out of instinct, not informed guidance, for in the years leading up to Able

Archer they had received no guidance as to the possible significance of apparent changes in Soviet military and political thinking." (PFIAB, page x)

[*name not declassified*] the National Warning Staff and [*name not declassified*] of the Office of Soviet Analysis prepared an undated memorandum reacting to Perroots's comments, which was distributed by Ermarth to the DCI and DDCI for consideration:

SUBJECT

Comments on Memorandum of Lieutenant General Perroots

*Summary*

1. General Perroots's memorandum describes in detail a worrisome episode in which Soviet Air Forces in Central Europe assumed an abnormally high alert posture in early November 1983 in response to a routine NATO command post and communications exercise. Two Special National Intelligence Estimates (SNIEs)—written in May and August 1984 respectively—treated the events described in the General's memorandum in the larger context of US-Soviet relations. Those Estimates judged that the Soviets displayed a heightened sense of concern in many areas of national life primarily because of the more aggressive policies of the US Administration in the early 1980s, the US strategic modernization program that included the peacekeeper ICBM and the D–5 SLBM, the actual implementation of NATO's 1979 decision for Intermediate Range Nuclear Force (INF) modernization by deployment of the first Pershing–II missile systems to Europe, and because of the leadership instability in the USSR from the successive deaths of three general secretaries between 1981 and 1985. A National Intelligence Estimate in 1988 assessed the significance of the events in 1983 with the benefit of a longer time perspective and reached the same broad conclusions. General Perroots's memorandum and its enclosure neither raises no new issues nor contains new data that change the strategic judgements already written. [*portion marking not declassified*]

2. At the tactical and theater level, however, General Perroots's memorandum surfaces a long-standing warning problem, i.e., the need for the Intelligence Community in Washington to provide more timely, discriminating, and accurate warning in support of the theater commander. Perroots, who at the time was Assistant Chief of Staff for Intelligence, US Air Forces Europe (USAFE), describes three serious problems for which there are only partial answers. First, he believes that, despite the enormous amount of resources and energy spent in guarding against a strategic surprise attack, USAFE was not well informed in that the US warning systems did not detect in a timely fashion the extent of Soviet precautionary readiness measures undertaken in November 1983 in response to NATO exercise Able Archer.

Secondly, he believes that Washington-based agencies had relevant information which was not available to the European Command when he recommended against a precautionary US alert by US Air Forces Europe in response to the detection of the increased alert status of the Soviet Air Forces. Finally, [*1½ lines not declassified*], General Perroots is concerned that in similar circumstances—even if there is better intelligence—another officer in his position might recommend a precautionary US Air Force alert in Europe that could have serious escalatory consequences, unless there are timely, national level assessments available. [*portion marking not declassified*]

3. The dilemma that General Perroots has described is characteristic of the warning problems faced by senior US military intelligence chiefs in many past crises, in which decisions about US force posture were dependent upon threat assessments prepared rapidly and based on fragmentary and incomplete intelligence. General Perroots's memorandum reinforces two long-standing lessons of warning: warning systems are no substitute for seasoned, professional judgment and assessments; and they require constant attention and improvement. In terms of process, however, his memorandum reinforces the requests of successive SACEURs and other US theater commanders for better ways to provide more timely national-level warning assessments to the theater intelligence staffs.

*The Setting of Exercise Able Archer, 1983*

4. The larger context of the period, often referred to as the "war scare," reflected increasing Soviet concern over the drift in superpower relations, which some in the Soviet leadership felt indicated an increased threat of war and increased likelihood of the use of nuclear weapons. These concerns were shaped in part by a Soviet perception that the correlation of forces was shifting against the Soviet Union and that the United States was taking steps to achieve military superiority. These fears were exacerbated by planned improvements in US strategic forces, as well as by progress made by NATO to implement its 1979 decision began with NATO's deliberations in the late 1970s to modernize its theater nuclear forces by deploying Pershing–II missiles and Ground Launched Cruise Missiles (GLCMs) to Europe. By 1981, after the new US Administration was inaugurated, the Soviet concern intensified almost concurrently with General Secretary Brezhnev's decline in health [*portion marking not declassified*]

5. [*1½ lines not declassified*] the increased Soviet concern stemmed from a fear by some Soviet leaders that the West might seek to exploit its new capability in Europe for a preemptive nuclear surprise attack against the USSR, for which the Soviets had no defense. From a national security standpoint, this Western capability led to questions about the

A Case #23-5017   Document #2005450   Filed: 06/28/2023   Page 131 o

long-standing Soviet view that crises and other adverse developments in international affairs would precede the outbreak of war and be the basis for long-term early warning. The Soviets had concern that the West might decide to attack the USSR without warning during a time of vulnerability—such as when military transport was used to support the harvest—thus compelling the Soviets to consider a preemptive strike at the first sign of US preparations for a nuclear strike. [*portion marking not declassified*]

6. From Brezhnev's death in 1982 through late 1984, the Soviets ordered a number of unusual measures not previously detected except during periods of crisis with the West. These included: disruption of the normal troop rotation cycle for Soviet forces in central Europe in 1984; updating civil defense procedures in the USSR from 1982 through 1984; in the spring of 1984 the first, and apparently only, time that Soviet military trucks were not sent to support the harvest since the end of World War II; and increased alert reactions even to routine NATO training from 1982 to 1984. The cumulative effect of these and other measures was to reduce the Soviet and Warsaw Pact vulnerability to a surprise attack. The abnormal Soviet reaction to NATO Exercise Able Archer in November 1983 occurred within this setting. [*portion marking not declassified*]

7. Concurrent with the military dimension, [*less than 1 line not declassified*] other precautionary measures taken by the Soviets probably were a reflection of the political maneuvering in the Kremlin in 1982 and 1983 associated with Andropov's rise to power. In exchange for military support for his bid to become General Secretary, Andropov, then KGB Chairman, may have promised greater allocations of resources for military industrial expansion, improved civil defense readiness, and military modernization. All of these were espoused by the Chief of the General Staff at the time, Marshal Ogarkov. Successful manipulation of threat perceptions by the KGB at Andropov's direction would have helped cultivate the strong military backing Andropov enjoyed when he came to power. In this environment, the heightened Soviet military reactions to NATO exercises would have been expected. [*portion marking not declassified*]

8. Finally, [*less than 1 line not declassified*] the Soviets wanted the new US Administration to tone down its anti-Soviet rhetoric, moderate its hostile attitudes, and begin serious business on trade and arms control. Some analysts believe that the Soviet activities, [*1 line not declassified*], were intended to be detected and were contrived to nudge Washington toward a more conciliatory and cooperative attitude in dealings with Moscow. [*less than 1 line not declassified*]

*Intelligence Community Performance*

9. Since 1983, the Intelligence Community, CIA's Office of Soviet Analysis, and the Defense Intelligence Agency have treated the events

surrounding the Able Archer episode in a number of in-house publica-tions and national estimates. When General Perroots was Director, DIA, analysts concurred in the Community assessments in 1988 that the "war scare" period of heightened Soviet concern was triggered by the change of the US Administration and its policy decisions toward the Soviet threat; that at least some Soviet leaders concluded that a surprise nuclear attack by NATO was possible outside the context of a crisis; and that this led to a number of Soviet responses consistent with such a conclusion, including high priority intelligence collection taskings. DIA believes, however, that the Soviet measures were primar-ily a function of the internal leadership instability from which Andro-pov emerged as General Secretary. [*portion marking not declassified*]

*General Perroots's Problem*

10. The events surrounding NATO Exercise Able Archer, however, all occurred some months before the first national-level assessments were written, and General Perroots was confronted with a serious choice of what recommendation to make to the Commander, US Air Forces Europe. The Department of Defense warning indicators system reflected that, [*less than 1 line not declassified*] Soviet air units in Poland and East Germany were observed at a high state of alert, although no other Soviet strategic forces adopted such a posture. [*2½ lines not declassified*] Consequently, the Commander, US Air Forces Europe, was concerned whether he should exercise his discretionary authority to increase the alert posture of his force. General Perroots recommended that no precautionary US alert be instituted, despite the evidence of his own warning system. Several days later, the Soviet air forces returned to normal alert status. [*portion marking not declassified*]

11. [*1 paragraph (10 lines) not declassified*]

12. General Perroots's concerns about this episode are legitimate to the extent that they deal with Washington's support to the US military commands. [*4½ lines not declassified*] Third, national-level assessments of Soviet intentions were not available when most needed. The General's memorandum indicates the Defense Department has taken steps to correct the problems in the processing and dissemination of intelligence. The third problem, of timely national-level support, is continuous. As Director of DIA, General Perroots himself initiated organizational and procedural changes to improve DIA's support to the commands. [*portion marking not declassified*]

13. Underlying all of the above, however, is the paradox that Gen-eral Perroots believes he made a correct judgment, but for the wrong reasons. This is not a new problem nor is there a solution to it. General Perroots has accurately identified inherent limits of the warning sys-tems as they now exist. His candor is a safeguard against complacency

A Case #23-5017   Document #2005450   Filed: 06/28/2023   Page 133 o

and denial that problems exist. Additionally, he raises again the need for better understanding in Washington of the problems facing intelligence in the field. [*portion marking not declassified*]

[*name not declassified*]      [*name not declassified*]
Chief, TFD/RIG/SOVA   Director, National Warning Staff

(Central Intelligence Agency, National Intelligence Council, Job 91B00551: Speeches, Lectures, Briefing Files (1988–1989), Box 1, Folder 2: C/NIC (Ermarth) Chrons March 1989)

The 1990 PFIAB report repeatedly stressed: "During the November 1983 NATO 'Able Archer' nuclear release exercise, the Soviets implemented military and intelligence activities that previously were seen only during actual crises. These included: placing Soviet air forces in Germany and Poland on heightened alert, [*4 lines not declassified*]."

The PFIAB report argued: "The meaning of these events obviously was of crucial importance to American and NATO policymakers. If they were simply part of a Soviet propaganda campaign designed to intimidate the US, deter it from deploying improved weapons, and arouse US domestic opposition to foreign policy initiatives, then they would not be of crucial significance. If they reflected an internal power struggle—for example, a contest between conservatives and pragmatists, or an effort to avoid blame for Soviet economic failures by pointing to (exaggerated) military threats—then they could not be ignored, but they would not imply a fundamental change in Soviet strategy. But if these events were expressions of a genuine belief on the part of Soviet leaders that the US was planning a nuclear first strike, causing the Soviet military to prepare for such an eventuality—by, for example, readying itself for a preemptive strike of its own—then the 'war scare' was a cause for real concern." (PFIAB, page vi)

The PFIAB report concluded that the IC's failure to adequately report on Able Archer and the 1983–1984 Soviet war scare had important implications for the future: "In cases of great importance to the survival of our nation, and especially where there is important contradictory evidence, the Board believes that intelligence estimates must be cast in terms of alternative scenarios that are subjected to comparative risk assessments. This is the critical defect in the war scare episode." (PFIAB, page ix)

# Appendix G

# FOREIGN RELATIONS

## OF THE

# UNITED STATES

## 1981–1988

## VOLUME IV

## SOVIET UNION, JANUARY 1983– MARCH 1985



**DEPARTMENT OF STATE**

**Washington**

JA129



**Foreign Relations of the
United States, 1981–1988**

**Volume IV**

# Soviet Union, January 1983– March 1985

| | |
|---|---|
| *Editor* | Elizabeth C. Charles |
| *General Editor* | Kathleen B. Rasmussen |

United States Government Publishing Office
Washington
2021

DEPARTMENT OF STATE

Office of the Historian

Foreign Service Institute

For sale by the Superintendent of Documents, U.S. Government Publishing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512-1800;   DC area (202) 512-1800
Fax: (202) 512-2250 Mail: Stop IDCC, Washington, DC 20402-0001

# About the Series

The *Foreign Relations of the United States* series presents the official documentary historical record of major foreign policy decisions and significant diplomatic activity of the U.S. Government. The Historian of the Department of State is charged with the responsibility for the preparation of the *Foreign Relations* series. The staff of the Office of the Historian, Foreign Service Institute, under the direction of the General Editor of the *Foreign Relations* series, plans, researches, compiles, and edits the volumes in the series. Secretary of State Frank B. Kellogg first promulgated official regulations codifying specific standards for the selection and editing of documents for the series on March 26, 1925. These regulations, with minor modifications, guided the series through 1991.

Public Law 102–138, the Foreign Relations Authorization Act, established a new statutory charter for the preparation of the series which was signed by President George H.W. Bush on October 28, 1991. Section 198 of P.L. 102–138 added a new Title IV to the Department of State's Basic Authorities Act of 1956 (22 U.S.C. 4351, et seq.).

The statute requires that the *Foreign Relations* series be a thorough, accurate, and reliable record of major U.S. foreign policy decisions and significant U.S. diplomatic activity. The volumes of the series should include all records needed to provide comprehensive documentation of major foreign policy decisions and actions of the U.S. Government. The statute also confirms the editing principles established by Secretary Kellogg: the *Foreign Relations* series is guided by the principles of historical objectivity and accuracy; records should not be altered or deletions made without indicating in the published text that a deletion has been made; the published record should omit no facts that were of major importance in reaching a decision; and nothing should be omitted for the purposes of concealing a defect in policy. The statute also requires that the *Foreign Relations* series be published not more than 30 years after the events recorded. The editors are convinced that this volume meets all regulatory, statutory, and scholarly standards of selection and editing.

*Sources for the* Foreign Relations *Series*

The *Foreign Relations* statute requires that the published record in the *Foreign Relations* series include all records needed to provide comprehensive documentation of major U.S. foreign policy decisions and significant U.S. diplomatic activity. It further requires that government agencies, departments, and other entities of the U.S. Government en-

III

gaged in foreign policy formulation, execution, or support cooperate with the Department of State historians by providing full and complete access to records pertinent to foreign policy decisions and actions and by providing copies of selected records. Most of the sources consulted in the preparation of this volume were located at the Department of State in Washington and the National Archives and Records Administration.

The editors of the *Foreign Relations* series have complete access to all the retired records and papers of the Department of State: the central files of the Department; the special decentralized files ("lot files") of the Department at the bureau, office, and division levels; the files of the Department's Executive Secretariat, which contain the records of international conferences and high-level official visits, correspondence with foreign leaders by the President and Secretary of State, and the memoranda of conversations between the President and the Secretary of State and foreign officials; and the files of overseas diplomatic posts. All of the Department's central files for 1981–1989, which were stored in electronic and microfilm formats, will eventually be transferred to the National Archives. Once these files are declassified and processed, they will be accessible. All of the Department's decentralized office files from this period that the National Archives deems worthy of permanent preservation will also eventually be transferred to the National Archives where they will be available for use after declassification and processing.

Research for *Foreign Relations* volumes in this subseries is undertaken through special access to restricted documents at the Ronald Reagan Presidential Library and other agencies. While all the material printed in this volume has been declassified, some of it is extracted from still-classified documents. The staff of the Reagan Library is processing and declassifying many of the documents used in this volume, but they may not be available in their entirety at the time of publication. Presidential papers maintained and preserved at the Reagan Library include some of the most significant foreign affairs related documentation from White House offices, the Department of State, and other Federal agencies including the National Security Council, the Central Intelligence Agency, the Department of Defense, and the Joint Chiefs of Staff.

Some of the research for volumes in this subseries was done in Reagan Library record collections scanned for the Remote Archive Capture (RAC) project. This project, which is administered by the National Archives and Records Administration's Office of Presidential Libraries, was designed to coordinate the declassification of still-classified records held in various Presidential libraries. As a result of the way in which records were scanned for the RAC, the editors of the

A Case #23-5017    Document #2005450    Filed: 06/28/2023    Page 140 o

*Foreign Relations* series were not always able to determine whether attachments to a given document were in fact attached to the paper copy of the document in the Reagan Library file. In such cases, some editors of the *Foreign Relations* volumes have indicated this ambiguity by stating that the attachments were "Not found attached."

*Editorial Methodology*

The documents are presented chronologically according to time in Washington, DC. Memoranda of conversation are placed according to the time and date of the conversation, rather than the date the memorandum was drafted.

Editorial treatment of the documents published in the *Foreign Relations* series follows Office style guidelines, supplemented by guidance from the General Editor and the Chiefs of the Declassification and Publishing Divisions. The original document is reproduced as exactly as possible, including marginalia or other notations, which are described in the footnotes. Texts are transcribed and printed according to accepted conventions for the publication of historical documents within the limitations of modern typography. A heading has been supplied by the editors for each document included in the volume. Spelling, capitalization, and punctuation are retained as found in the original text, except that obvious typographical errors are silently corrected. Other mistakes and omissions in the documents are corrected by bracketed insertions: a correction is set in italic type; an addition in roman type. Words or phrases underlined in the original document are printed in italics. Abbreviations and contractions are preserved as found in the original text, and a list of abbreviations and terms is included in the front matter of each volume. In telegrams, the telegram number (including special designators such as Secto) is printed at the start of the text of the telegram.

Bracketed insertions are also used to indicate omitted text that deals with an unrelated subject (in roman type) or that remains classified after declassification review (in italic type). The amount and, where possible, the nature of the material not declassified has been noted by indicating the number of lines or pages of text that were omitted. Entire documents withheld after declassification review have been accounted for and are listed in their chronological place with headings, source notes, and the number of pages not declassified.

All brackets that appear in the original document are so identified in the footnotes. All ellipses are in the original documents.

The first footnote to each document indicates the source of the document and its original classification, distribution, and drafting information. This note also provides the background of important docu-

ments and policies and indicates whether the President or his major policy advisers read the document.

Editorial notes and additional annotation summarize pertinent material not printed in the volume, indicate the location of additional documentary sources, provide references to important related documents printed in other volumes, describe key events, and provide summaries of and citations to public statements that supplement and elucidate the printed documents. Information derived from memoirs and other first-hand accounts has been used when appropriate to supplement or explicate the official record.

The numbers in the index refer to document numbers rather than to page numbers.

*Advisory Committee on Historical Diplomatic Documentation*

The Advisory Committee on Historical Diplomatic Documentation, established under the *Foreign Relations* statute, monitors the overall compilation and editorial process of the series and advises on all aspects of the preparation of the series and declassification of records. The Advisory Committee does not necessarily review the contents of individual volumes in the series, but it makes recommendations on issues that come to its attention and reviews volumes as it deems necessary to fulfill its advisory and statutory obligations.

*Declassification Review*

The Office of Information Programs and Services, Bureau of Administration, conducted the declassification review for the Department of State of the documents published in this volume. The review was conducted in accordance with the standards set forth in Executive Order 13526 on Classified National Security Information and applicable laws.

The principle guiding declassification review is to release all information, subject only to the current requirements of national security as embodied in law and regulation. Declassification decisions entailed concurrence of the appropriate geographic and functional bureaus in the Department of State, other concerned agencies of the U.S. Government, and the appropriate foreign governments regarding specific documents of those governments. The declassification review of this volume, which began in 2015 and was completed in 2019, resulted in the decision to withhold 1 document in full, excise a paragraph or more in 13 documents, and make minor excisions of less than a paragraph in 20 documents.

The Office of the Historian is confident, on the basis of the research conducted in preparing this volume and as a result of the declassification review process described above, that the documentation and edito-

rial notes presented here provide a thorough, accurate, and reliable record of the Reagan administration's policy toward the Soviet Union, January 1983–March 1985.

**Adam M. Howard, Ph.D.**       **Kathleen B. Rasmussen, Ph.D.**
*The Historian*       *General Editor*

Foreign Service Institute
February 2021

# Preface

*Structure and Scope of the* Foreign Relations *Series*

This volume is part of a subseries of volumes of the *Foreign Relations* series that documents the most important issues in the foreign policy of the administration of Ronald Reagan. This volume documents U.S. bilateral relations with the Soviet Union from January 1983 to March 1985. Due to the importance of U.S.-Soviet relations during the Reagan administration, the Reagan subseries includes an extensive examination of U.S. bilateral relations with the Soviet Union in four volumes: *Foreign Relations*, 1981–1988, Volume III, Soviet Union, January 1981–January 1983; Volume IV, Soviet Union, January 1983–March 1985; Volume V, Soviet Union, March 1985–October 1986; and Volume VI, Soviet Union, October 1986–January 1989. In conjunction with these volumes, several other volumes in the subseries will provide the reader with a fuller understanding of how U.S.-Soviet relations impacted the global character of the Cold War and U.S. strategy during the Reagan era. For documentation on U.S.-Soviet nuclear arms control negotiations, see *Foreign Relations*, 1981–1988, Volume XI, START I, and Volume XII, INF, 1984–1988. *Foreign Relations*, 1977–1980, Volume V, European Security, 1977–1983, documents the NATO dual-track decision and TNF/INF negotiations through 1983. Documentation dealing with nuclear non-proliferation, nuclear testing, chemical and biological weapons, and space arms control, including anti-satellite systems, will be published in *Foreign Relations*, 1981–1988, Volume XL, Global Issues I. The development of the Strategic Defense Initiative and ABM-related issues and other strategic considerations are addressed in *Foreign Relations*, 1981–1988, Volume XLIII, National Security Policy, 1981–1984, and Volume XLIV, Parts 1 and 2, National Security Policy, 1985–1988. For selected documentation on the human rights situation in the Soviet Union, see *Foreign Relations*, 1981–1988, Volume XLI, Global Issues II.

*Focus of Research and Principles of Selection for* Foreign Relations, *1981–1988, Volume IV*

This volume documents the development of the Reagan administration's policies toward the Soviet Union from January 1983 to March 1985. With Reagan's signature of National Security Decision Directive (NSDD) 75 on January 17, 1983, the administration's approaches and policies toward the Soviet Union were codified in a specific four-part agenda: arms control, human rights, regional issues, and bilateral relations. This volume examines the efforts of administration officials,

IX

namely Secretary of State George Shultz, President's Assistants for National Security Affairs William Clark and later Robert McFarlane, and NSC Staff member Jack Matlock, to implement the four-part agenda in dealing with the Soviet Union. The documentation demonstrates how administration officials developed policies related to the four-part agenda, mainly in the National Security Council (NSC) and Department of State, and then promoted these various tracks during meetings between Shultz, and on occasion Reagan, and Soviet Ambassador Anatoly Dobrynin and Soviet Foreign Minister Andrei Gromyko in various fora. Although no high-level meeting took place between Reagan and either Soviet General Secretaries Yuri Andropov or Konstantin Chernenko during their short tenures, the documents provide a window into how the Reagan administration viewed the Soviet leadership and formulated policies to deal with whomever was in charge.

The volume also documents the bureaucratic struggle Shultz faced against the NSC in implementing the four-part agenda laid out by NSDD 75 and in gaining access to President Reagan. After some wrangling, by June 1983 an understanding emerged between Shultz and Clark, which allowed Shultz regular weekly meetings with Reagan. When Jack Matlock joined the NSC Staff as primary adviser on the Soviet Union, Shultz gained a like-minded ally in approaches to dealing with the USSR. While some administration officials, such as Secretary of Defense Caspar Weinberger, consistently argued that negotiating with the Soviet Union seemed futile, Shultz, Matlock, and others pushed President Reagan to see the value in keeping lines of communication open with the Soviets. Even during tragic events, such as the Soviet downing of the KAL 007 airliner in September 1983, Shultz kept his meeting with Gromyko a few days later in Madrid and used this as an opportunity to admonish the Foreign Minister for this inexplicable act and the inability of the Soviet Union to admit fault on the international stage.

The volume documents several Cold War flashpoints during the contentious months of 1983. The announcement in March 1983 of Reagan's Strategic Defense Initiative (SDI) caused concern for the Soviet Union because it shifted the strategic balance from the theory of mutually assured destruction toward a defensive nuclear posture. Aside from the downing of the KAL airliner, the Euromissiles crisis came to a head with U.S. deployments of INF missiles to several NATO allies in late November 1983. While the bulk of the documentation dealing with these negotiations is covered in two other volumes, the scheduled deployments permeated all other aspects of U.S.-Soviet relations in 1983. The volume also presents selective documentation related to the 1983 Soviet "War Scare" and the November 1983 NATO nuclear exercise, Able Archer (see Appendix A). The volume attempts to dem-

onstrate that even with these challenges, Shultz and others pressed to keep moving ahead with the four-part agenda and promote greater dialogue in U.S.-Soviet relations.

After the Soviet walkout of the INF negotiations in Geneva in late 1983, the administration focused throughout 1984 on developing a framework to restart arms control negotiations; the documents in this volume demonstrate the difficulties involved in opening new talks with the Soviet Union. Reagan's SDI program continued to cause problems. The Soviets believed SDI would "militarize space," and therefore the debates over how SDI would be dealt with during negotiations were a major point of contention during this period. When Shultz and Gromyko met in January 1985, they finally reached an agreement on a new round of umbrella negotiations. The Nuclear and Space Talks (NST), scheduled to begin in Geneva in March 1985, would have three tracks, START, INF, and Defense and Space. The documents in the volume trace how various positions from the Department of State, NSC, the Department of Defense, and the Central Intelligence Agency impacted the decision to move forward with the three arms control tracks. While the other parts of the four-part agenda remained in play during this period and were discussed in bilateral meetings, restarting arms control talks seemed to trump the other areas of concern. Little did the U.S. or Soviet negotiators know that on the eve of these new NST negotiations, Chernenko would die, and a younger, more ambitious Soviet leader would emerge and dramatically change the course of U.S.-Soviet relations.

*Acknowledgments*

The editor wishes to acknowledge the invaluable assistance of officials at the Ronald Reagan Presidential Library in Simi Valley, California, especially Lisa Jones and Cate Sewell. A special thanks to the Central Intelligence Agency staff for providing access and assistance with Reagan Library materials scanned for the Remote Archive Capture project, and to the History Staff of the CIA's Center for the Study of Intelligence for arranging full access to CIA records. The editor wishes to acknowledge the staff at Information Programs and Services at the Department of State for facilitating access to Department of State records and coordinating the review of this volume within the Department. Sandy Meagher was helpful in providing access to Department of Defense materials. The editor extends thanks to the family and executor of the Estate of former Secretary of Defense Caspar W. Weinberger for granting Department of State historians access to the personal papers of Secretary Weinberger deposited at the Library of Congress. Additional thanks are due to officials of the Library of Congress Manuscript Division for facilitating that access.

Elizabeth C. Charles collected, selected, and annotated the documentation for this volume under the supervision of David Geyer, Chief of the Europe Division, and Adam Howard, then General Editor of the *Foreign Relations* series. The volume was reviewed by David Geyer and then Historian Stephen Randolph. Kerry Hite and Chris Tudda coordinated the declassification review under the supervision of Carl Ashley, Chief of the Declassification Coordination Division. Kerry Hite also performed the copy and technical editing under the supervision of Mandy Chalou, Chief of the Editing and Publishing Division.

**Elizabeth C. Charles, Ph.D.**
*Historian*

# Contents

About the Series ………………………………………………… III

Preface ……………………………………………………… IX

Sources ……………………………………………………… XV

Abbreviations and Terms ………………………………………… XIX

Persons ……………………………………………………… XXV

Note on U.S. Covert Actions ……………………………………… XXXI

Soviet Union, January 1983–March 1985

  January 1983–April 1983

    "Dobrynin seemed like he wanted to run. But the
    Secretary is a jogger": Shultz and the Four-Part
    Agenda ………………………………………………… 1

  April 1983–August 1983

    Preparing the Next Steps in U.S.-Soviet Relations:
    Human Rights and Arms Control ……………………… 120

  September 1983–October 1983

    "Controlled Fury": Shootdown of KAL 007 …………… 291

  October 1983–February 1984

    "The Winter of Soviet Discontent": INF Walkout, the
    War Scare, and the 'Ivan and Anya' Speech ………… 429

  February 1984–June 1984

    "Talking about each other rather than to each other":
    Reagan, Chernenko, and U.S.-Soviet Stalemate ……… 606

  June 1984–October 1984

    "Sitting on Mountains of Nuclear Weapons": The
    Reagan-Gromyko Meeting ……………………………… 845

  October 1984–January 1985

    "An iron-ass Secretary of State": Shultz and Gromyko
    in Geneva ……………………………………………… 1079

January 1985–March 1985

"The principal menace to our security?": Reagan and
the Ambiguities of Soviet Leadership ....................    1355

Appendix ...........................................................    1420

JA144

# Appendix

## A.   Editorial Note

Stark deviations in assessments by the U.S. Intelligence Community of the November 1983 NATO exercise Able Archer and the Soviet "war scare" led to a much later 1990 investigation by the President's Foreign Intelligence Advisory Board during the George H.W. Bush administration, resulting in the report, "The Soviet 'War Scare.'" (George H.W. Bush Library, Bush Presidential Records, President's Foreign Intelligence Advisory Board, Subject Files; Reports to the President-War Scare Report 1990 [OA/IDCF01830–020]) The February 15, 1990, PFIAB report analyzed intelligence and reporting on the Soviet war scare, Able Archer, and other related activities. The PFIAB report stated: "During the past year, the President's Foreign Intelligence Advisory Board has carefully reviewed the events of that period to learn what we (the U.S. intelligence community) knew, when we knew it, and how we interpreted it. The Board has read hundreds of documents, conducted more than 75 interviews with American and British officials, and studied the series of National Intelligence Estimates (NIE's) and other intelligence assessments that have attempted over the last six years to interpret the war scare data. Additionally, we have offered our own interpretation of the war scare events." (PFIAB, pages vi–vii) Although outside the normal scope of this volume, the 1990 PFIAB report and other memoranda from 1988 and 1989 are addressed in this editorial note because the documents focus upon crucial events from 1983 to 1984.

Reactions from the Intelligence Community (IC) and policymakers to the events surrounding Able Archer and the Soviet "war scare" differed significantly and evolved over time. The contemporaneous reporting in 1983–1984 from the Central Intelligence Agency (CIA), National Intelligence Council (NIC), [*text not declassified*] drew varied conclusions about Soviet anxieties. While some reporting assessed that "Contrary to the impression conveyed by Soviet propaganda, Moscow does not appear to anticipate a near-term military confrontation with the United States" (see Document 157), another analysis presented evidence that [*text not declassified*].

Retrospective assessments of these events seem to conflate the NATO Able Archer exercise with the broader "war scare" talk emanating from Moscow related to INF deployments. The Soviet military unquestionably reacted to Able Archer differently than to previous NATO exercises. (See Document 134.) Whether the Soviet response was attributable to the circumstances of the time, to the "war scare"

1420

(whether real or Soviet propaganda), or to a credible belief within the Soviet military leadership or the Politburo that the United States was planning to launch a nuclear first strike against the USSR, under the guise of a NATO exercise or otherwise, remains unclear on the basis of the available evidence.

After a year of research and a reassessment of the relevant intelligence and documentation, the PFIAB report stated: "We believe that the Soviets perceived that the correlation of forces had turned against the USSR, that the US was seeking military superiority, and that the chances of the US launching a nuclear first strike—perhaps under cover of a routine training exercise—were growing. We also believe that the US intelligence community did not at the time, and for several years afterwards, attach sufficient weight to the possibility that the war scare was real. As a result, the President was given assessments of Soviet attitudes and actions that understated the risks to the United States. Moreover, these assessments did not lead us to reevaluate our own military and intelligence actions that might be perceived by the Soviets as signaling war preparations.

"In two separate Special National Intelligence Estimates (SNIEs) in May and August 1984, the intelligence community said: 'We believe strongly that Soviet actions are not inspired by, and Soviet leaders do not perceive, a genuine danger of imminent conflict or confrontation with the United States.' Soviet statements to the contrary were judged to be 'propaganda.' [See Documents 221 and 264.]

"The Board believes that the evidence then did not, and certainly does not now, support such categoric conclusions. Even without the benefit of subsequent reporting and looking at the 1984 analysis of then available information, the tone of the intelligence judgments was not adequate to the needs of the President." (PFIAB, pages vi–vii)

During November 1983, Able Archer and the Soviet responses to this exercise received little immediate attention in the U.S. Intelligence Community. (See Document 135.) However, by spring 1984, some in the intelligence communities in the United States [*text not declassified*] believed the Reagan administration should have recognized Soviet sensitivities and anxieties about a potential U.S. first strike. [*text not declassified*].

According to the PFIAB report, [*text not declassified*] "KGB Deputy Resident Colonel Oleg Gordiyevskiy, [*text not declassified*] had witnessed what he saw as Soviet paranoia over a US nuclear first strike; [*text not declassified*] As one of the most senior KGB officers in London, [*text not declassified*]." (PFIAB, page 10)

In a covering memorandum [*less than 1 line not declassified*] to Director of Central Intelligence William Casey and others, Herbert Meyer, Vice Chairman of the National Intelligence Council, wrote: [*text not*

declassified]. The PFIAB report commented that the [*text not declassified*] report was "not well received in the US intelligence community." (PFIAB, pages 10–11)

Another contemporaneous analysis from the CIA, the May 1984 SNIE 11–10–84/JX concluded: "We believe strongly that Soviet actions are not inspired by, and Soviet leaders do not perceive, a genuine danger of imminent conflict or confrontation with the United States." (See Document 221.) The PFIAB report commented on this SNIE: "The estimate boldly declared that 'Recent Soviet war scare propaganda . . . is aimed primarily at discrediting US policies and mobilizing 'peace' pressures among various audiences abroad.' In a more piecemeal fashion, it was judged that 'Each Soviet action has its own military or political purpose sufficient to explain it.' The accelerated tempo of Soviet live exercise activity was explained simply as a reflection of 'long-term Soviet military objectives.'

"The Soviet reaction to Able Archer 83 was dismissed as a 'counter-exercise,' but analysts acknowledged that the 'elaborate Soviet reaction' was 'somewhat greater than usual.' [*less than 1 line not declassified*] prior to and during the exercise indicated that the Warsaw Pact Intelligence services, especially the KGB, were admonished 'to look for any indication that the United States was about to launch a first nuclear strike,' analysts concluded that 'by confining heightened readiness to selected air units, Moscow clearly revealed that it did not, in fact, think there was a possibility at this time of a NATO attack.' The assessment, however, was not specific about what type of defensive or precautionary Soviet activity might be expected—and detected—were they preparing for an offensive NATO move." (PFIAB, page 13)

The PFIAB report continued its critique of SNIE 11–10–84/JX: IC "analysts dismissed [*less than 1 line not declassified*] on the war scare, including the KGB's formal tasking to its Residencies. 'This war scare propaganda has reverberated in Soviet security bureaucracies and emanated through other channels such as human sources. [See for example, Document 144.] We do not believe it reflects authentic leadership fears of imminent conflict.'" The report contended: "Such judgments were made even though the analysis was tempered 'by some uncertainty as to current Soviet leadership perceptions of the United States, by continued uncertainty about the Politburo decisionmaking processes, and by our inability at this point to conduct a detailed examination of how the Soviets might have assessed recent US/NATO military exercises and reconnaissance operations'—which, of course, included the previous Able Archer exercise. In other words, US analysts were unsure of what the Kremlin leadership thought or how it made decisions, nor had they adequately assessed the Soviet reaction to Able Archer 83. This notwithstanding, the estimate concluded: 'We are confident that,

as of now, the Soviets see not an imminent military clash but a costly and—to some extent—more perilous strategic and political struggle over the rest of the decade.'" (PFIAB, page 14)

The Board had similar criticisms of the August 1984 SNIE 11–9–84, "Soviet Policy Toward the United States in 1984" (see Document 264), for its "categorical and unqualified" judgments "about the likelihood of the war scare," and the analysts' conclusions: "We strongly believe that the Soviet actions are not inspired by, and Soviet leaders do not perceive, a genuine danger of imminent conflict or confrontation with the United States. Also, we do not believe that the Soviet war talk and other actions 'mask' Soviet preparations for an imminent move toward confrontation on the part of the USSR." (PFIAB, page 19–20) The PFIAB report continued: "Analysts readily acknowledged that the previous six months had seen extraordinary, unprecedented Soviet activities. Large scale military exercise, 'anomalous behavior' during the troop rotation, withdrawn military support for the harvest (last seen prior to the 1968 Czech invasion), new, deployed weapons systems (termed 'in response to INF deployments'), and heightened internal vigilance and security activities were noted. These events, however, were judged to be 'in line with long-evolving plans and patterns, rather than with sharp acceleration of preparations for major war.'" (PFIAB, page 19)

The PFIAB report acknowledged that its assessment and criticism of the May and August 1984 SNIEs "derives from information not known at the time. Our purpose in presenting this report is not so much to criticize the conclusions of the 1984 SNIE's as to raise questions about the ways these estimates were made and subsequently reassessed." (PFIAB, page ix) The PFIAB report concluded: "Reasonable people can disagree about the conclusions of the 1984 SNIE's. The PFIAB does disagree with many of them. More worrisome to us, however, is the process by which the estimates were made and subsequently reassessed. Although both estimates were reportedly reviewed by outside readers—and both, but particularly the first, contained alternative scenarios—strongly worded interpretations were defended by explaining away facts inconsistent with them. Consequently, both estimates contained, in essence, single outcome forecasting based in large part on near-term anomalous behavior. Moreover, neither alerted the reader to the risks erroneously rejecting the correct scenario." (PFIAB, page 30) The PFIAB report criticized the performance of the IC in 1983–1984, showing that contemporary assessments of Soviet intentions after Able Archer did not go far enough in providing President Reagan with alternative scenarios, explaining that the anxiety from the Soviet leadership could have been real.

In criticizing contemporary estimates, the PFIAB report emphasized intelligence that had not been available to the IC during these

A Case #23-5017   Document #2005450   Filed: 06/28/2023   Page 155 o

years, principally information provided by Gordiyevskiy after he defected in 1985. Robert McFarlane's thoughts on the influence of Gordiyevskiy's information on the President are recorded in a December 16, 1988, memorandum for the record:

**Memorandum for the Record**

16 December 1988

SUBJECT

[*less than 1 line not declassified*] Robert F. McFarlane Regarding the Influence of Oleg Gordiyevskiy's Reporting on President Reagan

On 15 December [*less than 1 line not declassified*] Robert F. ("Bud") McFarlane, formerly National Security Advisor to the President, as to the veracity of claims [*less than 1 line not declassified*] that the reporting of KGB officer [*less than 1 line not declassified*] Oleg Gordiyevskiy about the Kremlin's fear of war greatly influenced President Reagan in the mid-1980s to seek better relations with the USSR. In response, Bud made several points:

He definitely remembered the reporting associated (later) with Gordiyevskiy that conveyed the Kremlin's fear of war. He also specifically recalled [*less than 1 line not declassified*] on Gordiyevskiy's assessments given to the President [*less than 1 line not declassified*].

He noted that he discussed this reporting with the President on several occasions. This was in the course of numerous discussions extending throughout 1983 and part of 1984 about the apparent anxieties being transmitted by Moscow through many channels, [*less than 1 line not declassified*].

The President, according to Bud, saw this reporting attributed to Gordiyevskiy in the larger context of a Soviet "war-scare" campaign arising from the NATO decision to deploy INF and from Reagan's hard line on defense, SDI, etc. In the President's view, either the Soviets were paranoid in strange ways we could not let bother us, or they were fabricating the appearance of fear to intimidate and sway us, which we should even more be prepared to ignore.

Often in these conversations, according to Bud, the President outlined his sustained intention to concentrate on building US strength and credibility in the first term and to move toward diplomatic reengagement in the second. The President's key speech of January 1984 [see Document 158] was a natural step in a long-planned shift of policy. Neither Gordiyevskiy's reporting nor the Soviet "war-scare" campaign in general were responsible for the evolution of the President's policy.

Bud said he'd been queried before on this matter by [*name not declassified*], a journalist, who might be (or have been) writing an article on it. Against the background of the above, Bud said he discounted Gordiyevskiy's impact on the President [*less than 1 line not declassified*].

[*1 paragraph (8½ lines) not declassified*]

[*name not declassified*]

(Central Intelligence Agency, National Intelligence Council, Job 90T00435R: Chronological Files (1988), Box 1, Folder 12: C/NIC Chrono for December 1988)

McFarlane's recollections in this memorandum for the record correlate with a January 1984 memorandum by Jack Matlock, Soviet specialist on the NSC Staff, which demonstrated an awareness of potential Soviet concerns, but concluded:

"—The Soviet leadership is not overly nervous about the immediate prospect of armed confrontation with the U.S.;

"—They are however very nervous about the prospects five to ten years down the road—not so much of a confrontation as such, as of a decisive shift in the balance of military power." (See Document 157.)

As mentioned in the 1988 memorandum for the record, McFarlane did recall "later" reporting to Reagan about Gordiyevskiy. The PFIAB report addressed Gordiyevskiy's situation in relation to the war scare and the 1984 SNIE assessments: "The Board found that after the 1984 assessments were issued, the intelligence community did not again address the war scare until after the defection to Great Britain of KGB Colonel Oleg Gordiyevskiy in July, 1985. Gordiyevskiy had achieved the rank of Acting Resident in the United Kingdom, but he fell under suspicion as a Western agent. Recalled to the Soviet Union, he was placed under house arrest and intensely interrogated. Able to flee his watchers, Gordiyevskiy was exfiltrated from Moscow by the British Secret Intelligence Service."

The report continued: "During lengthy debriefing sessions that followed, Gordiyevskiy supplied a fuller report on the Soviet war hysteria. This report, complete with documentation from KGB Headquarters and entitled 'KGB Response to Soviet Leadership Concern over US Nuclear Attack,' was first disseminated in a restricted manner within the US intelligence community in October 1985. Gordiyevskiy described the extraordinary KGB collection plan, initiated in 1981, to look for signs that the US would conduct a surprise nuclear attack on the Soviet Union. He identified and reviewed factors driving leadership fears. Based on the perception the US was achieving a strategic advantage, those in the Kremlin were said to believe that the US was likely to resort to nuclear weapons much earlier in a crisis than previously expected. They also were concerned the US might seek to exploit its first-strike capability outside the context of a crisis, probably during a

military exercise. He described the leadership's worries of a 'decapitating' strike from the Pershing II's, and its belief that the US could mobilize for a surprise attack in a mere seven to ten days. He explained how the London Residency responded to the requirements, and the effects that reporting had back at Moscow Center in reinforcing Soviet fears. He described conversations he had held with colleagues from Center and from the GRU. The next month, President Reagan held his first summit with Mikhail Gorbachev and relations began to thaw." (PFIAB, pages 22–23)

The PFIAB report also cited a January 1989 "End of Tour Report Addendum" by Lieutenant General Leonard H. Perroots, who had served as Assistant Chief of Staff for Intelligence, US Air Forces Europe, during the 1983 Able Archer exercise, to emphasize the potential consequences of the intelligence gap during the Able Archer exercise. Perroots addressed Able Archer as well as Gordiyevskiy's reporting in that memorandum:

1. (U) In 1983, I was assigned as the DCS for Intelligence, US Air Forces, Europe, Ramstein AB, Germany. The annual NATO Command and Control exercise ABLE ARCHER was scheduled to begin during the first week of November. The context of this nuclear command and control exercise was relatively benign; the scenario had been purposely chosen to be non-controversial, and the exercise itself was a routine annual event. This exercise closely followed the bombing of air defense sites in Lebanon and directly followed the invasion of Grenada. As I recall, however, there was no particular feeling of tension in the European Theater beyond that which is normal.

2. [*portion marking not declassified*] Only the fact that Soviet Intelligence collection assets (primarily low level signals intercept units) had failed to return to garrison after their normal concentrated coverage of NATO's AUTUMN FORGE exercise series could be reckoned strange at all. As the kickoff date of ABLE ARCHER neared it was clear that there was a great deal of Soviet interest in the forthcoming events. Again, this seemed nothing out of the ordinary. We knew that there was a history of intensive Soviet collection against practice Emergency Action Messages (EAM's) related to nuclear release.

3. [*portion marking not declassified*] ABLE ARCHER started in the morning of 3 November, and progressed immediately in the scenario to NATO STATE ORANGE. At 2100Z on 04 November NSA issued an electrical product report G/00/3083-83, entitled "SOVIET AIR FORCES, GSFG, PLACED ON HEIGHTENED READINESS, 2 NOVEMBER 1983." I saw this message on the morning of 5 November and discussed it with my air analysts. It stated that as of 1900Z on 02 November the fighter-bomber divisions of the air force of Group Soviet Forces, Germany had been placed in a status of heightened alert. All

divisional and regimental command posts and supporting command and control elements were to be manned around-the-clock by augmented teams.

4. [*portion marking not declassified*] In addition to the directed command and control changes the fighter-bomber divisions were also ordered to load out one squadron of aircraft in each regiment (if this order applied equally across GSFG the result would have been at least 108 fighter-bombers on alert). These aircraft were to be armed and placed at readiness 3 (30 minute alert) to "destroy first-line enemy targets." The alert aircraft were to be equipped with a self-protection jamming pod. We knew from subsequent NSA reporting that a squadron at Neuruppin, East Germany sought and was apparently granted permission to configure its aircraft without the ECM pod because of an unexpected weight and balance problem. My air analysts opined that this message meant that at least this particular squadron was loading a munitions configuration that they had never actually loaded before, i.e., a warload.

5. [*portion marking not declassified*] At this point, I spoke to CinC-USAFE, General Billy Minter. I told him we had some unusual activity in East Germany that was probably a reaction to the ongoing ABLE ARCHER. He asked if I thought we should increase the real force generation. I said that we would carefully watch the situation, but there was insufficient evidence to justify increasing our real alert posture. At this point in the exercise our forces were in a simulated posture of NATO State ORANGE and local SALTY NATION tests involving simulated generation of combat aircraft were underway at various locations including Ramstein AB. If I had known then what I later found out I am uncertain what advice I would have given.

6. [*portion marking not declassified*] An NSA message dated 022229Z DEC 83 provided the rest of the picture as far as we knew it—at least until the reports began to surface from the British penetration of the KGB, Oleg Gordievskiy. This GAMMA message was entitled "SOVIET 4th AIR ARMY AT HEIGHTENED READINESS IN REACTION TO NATO EXERCISE ABLE ARCHER, 2–11 NOVEMBER 1983." This report stated that the alert had been ordered by the Chief of the Soviet Air Forces, Marshal Kutakhov, and that all units of the Soviet 4th Air Army were involved in the alert "which included preparations for immediate use of nuclear weapons." This report described activity that was contemporaneous with that reflected in East Germany, but because of the specific source of this material it was not available in near realtime. The two pieces taken together present a much more ominous picture.

7. [*portion marking not declassified*] Equally ominous in its own way was the fact that this alert was never reflected at all by the I&W system.

A Case #23-5017    Document #2005450    Filed: 06/28/2023    Page 159 o

At the time of this occurrence there was no distribution of electrically reported GAMMA material to the Tactical Fusion Center at Boerfink. I remedied that shortfall in the aftermath of this activity. Secondly, a real standdown of aircraft was secretly ordered in at least the Soviet Air Forces units facing the Central Region, and that standdown was not detected. The Soviet alert in response to ABLE ARCHER began after nightfall on Wednesday evening, there was no flying on the following two days which led to the weekend, and then the following Monday was 7 November, the revolution holiday. The absence of flying could always be explained, although a warning condition was raised finally on about the ninth of November when overhead photography showed fully armed FLOGGER aircraft on air defense alert at a base in East Germany. When this single indicator was raised, the standdown had been underway for a week.

8. [*portion marking not declassified*] For the next six months I was on a soapbox about ABLE ARCHER whenever I could discuss it at the appropriate classification level. I spoke to the Senior Military Intelligence Officers' Conference (SMIOC), and I buttonholed a lot of people. I suggested that perhaps we should move our annual exercise away from the November 7 holiday, because it is clear to me that the conjunction of the two events causes a warning problem that can never be solved. Our problem here was that we had a couple of very highly classified bits of intelligence evidence about a potentially disastrous situation that never actually came to fruition. For decision-makers it was always difficult to believe that there could have been any serious reaction by the Soviets to such a "benign" exercise as ABLE ARCHER. From the Soviet perspective, however, it might have appeared very different. It was difficult for all of us to grasp that, but Oleg Gordievskiy's reporting began to provide a somewhat more frightening perspective when it became available in the Fall of 1985.

9. (S) By the time Gordievskiy's reporting began to surface for analytical review I was the Director of DIA. Gordievskiy's initial reporting about a "war scare" in 1983 immediately caught my attention. It should be pointed out at the outset that Gordievskiy knew nothing of a military alert during ABLE ARCHER. He did, however, tell us something of a chilling story about Moscow Center's Intelligence tasking during 1983. He related that there was a project called either "RYaN" or "VRYaN," the latter probably being the full form of a Russian acronym meaning "sudden rocket nuclear attack." There was a cadre of specialists in Moscow Center charged with, among other things, finding the evidence of planning for a western attack on the Soviet Union. Beginning in 1982 and continuing into 1983 Gordievskiy says that this group became ever more insistent that an attack was being planned by the West. By March 1983 the KGB officers in Moscow

had decided that ABLE ARCHER 83 would provide an excellent cover for the planned attack, and KGB and GRU residencies around the world were being directed to find the evidence. Gordievskiy, living in London at the time, states that he never believed there was really a threat, and that the London residency of the KGB simply ignored the collection requirements until it began to become clear that Moscow was serious. During the summer of 1983 the London residency sent some reports that, in retrospect, Gordievskiy believed might have hyped the war hysteria. He never really believed in the threat, however, and reported during his debriefing in 1985 that he thought the VRYaN hysteria might have been some kind of internal political ploy. I must reiterate again that Gordievskiy did not know about the secret military alert of November 1983.

10. [*portion marking not declassified*] The US intelligence community has never really closed with this analytical problem. A SNIE addressed this subject, [*1½ lines not declassified*]. The position has been taken again and again that had there been a real alert we would have detected more of it, but this may be whistling through the graveyard. It is not certain that we looked hard enough or broadly enough for information. For Western collectors the context was peacetime without even the most basic ripples of crisis. For the Soviets, however, the view may have looked quite different. It is uncertain how close to war we came or even if that was a possibility at all, but we know from Gordievskiy that the analysts in Moscow had predicted that the West would launch the attack from a posture of NATO State ORANGE. What might have happened that day in November 1983 if we had begun a precautionary generation of forces rather than waiting for further information?

(Central Intelligence Agency, National Intelligence Council, Job 91B00551: Speeches, Lectures, Briefing Files (1988–1989), Box 1, Folder 2: C/NIC (Ermarth) Chrons March 1989)

The PFIAB report commented that "as his parting shot before retirement," Perroots, who served as DIA Director from 1985 to 1989, sent a January 1989 "letter outlining his disquiet over the inadequate treatment of the Soviet war scare to, among others, the DCI and this Board." The report continued: "Following the detection of the Soviet Air Forces' increased alert status, it was his [Perroots's] recommendation, made in ignorance, not to raise US readiness in response—a fortuitous, if ill-informed, decision given the changed political environment at the time." (PFIAB, pages 27–28) In further accord with Perroots's report, the PFIAB report concluded: "As it happened, the military officers in charge of the Able Archer exercise minimized the risk by doing nothing in the face of evidence that parts of the Soviet armed forces were moving to an unusual alert level. But these officials acted correctly out of instinct, not informed guidance, for in the years leading up to Able

Archer they had received no guidance as to the possible significance of apparent changes in Soviet military and political thinking." (PFIAB, page x)

[*name not declassified*] the National Warning Staff and [*name not declassified*] of the Office of Soviet Analysis prepared an undated memorandum reacting to Perroots's comments, which was distributed by Ermarth to the DCI and DDCI for consideration:

SUBJECT

Comments on Memorandum of Lieutenant General Perroots

*Summary*

1. General Perroots's memorandum describes in detail a worrisome episode in which Soviet Air Forces in Central Europe assumed an abnormally high alert posture in early November 1983 in response to a routine NATO command post and communications exercise. Two Special National Intelligence Estimates (SNIEs)—written in May and August 1984 respectively—treated the events described in the General's memorandum in the larger context of US-Soviet relations. Those Estimates judged that the Soviets displayed a heightened sense of concern in many areas of national life primarily because of the more aggressive policies of the US Administration in the early 1980s, the US strategic modernization program that included the peacekeeper ICBM and the D–5 SLBM, the actual implementation of NATO's 1979 decision for Intermediate Range Nuclear Force (INF) modernization by deployment of the first Pershing–II missile systems to Europe, and because of the leadership instability in the USSR from the successive deaths of three general secretaries between 1981 and 1985. A National Intelligence Estimate in 1988 assessed the significance of the events in 1983 with the benefit of a longer time perspective and reached the same broad conclusions. General Perroots's memorandum and its enclosure neither raises no new issues nor contains new data that change the strategic judgements already written. [*portion marking not declassified*]

2. At the tactical and theater level, however, General Perroots's memorandum surfaces a long-standing warning problem, i.e., the need for the Intelligence Community in Washington to provide more timely, discriminating, and accurate warning in support of the theater commander. Perroots, who at the time was Assistant Chief of Staff for Intelligence, US Air Forces Europe (USAFE), describes three serious problems for which there are only partial answers. First, he believes that, despite the enormous amount of resources and energy spent in guarding against a strategic surprise attack, USAFE was not well informed in that the US warning systems did not detect in a timely fashion the extent of Soviet precautionary readiness measures undertaken in November 1983 in response to NATO exercise Able Archer.

Secondly, he believes that Washington-based agencies had relevant information which was not available to the European Command when he recommended against a precautionary US alert by US Air Forces Europe in response to the detection of the increased alert status of the Soviet Air Forces. Finally, [*1½ lines not declassified*], General Perroots is concerned that in similar circumstances—even if there is better intelligence—another officer in his position might recommend a precautionary US Air Force alert in Europe that could have serious escalatory consequences, unless there are timely, national level assessments available. [*portion marking not declassified*]

3. The dilemma that General Perroots has described is characteristic of the warning problems faced by senior US military intelligence chiefs in many past crises, in which decisions about US force posture were dependent upon threat assessments prepared rapidly and based on fragmentary and incomplete intelligence. General Perroots's memorandum reinforces two long-standing lessons of warning: warning systems are no substitute for seasoned, professional judgment and assessments; and they require constant attention and improvement. In terms of process, however, his memorandum reinforces the requests of successive SACEURs and other US theater commanders for better ways to provide more timely national-level warning assessments to the theater intelligence staffs.

*The Setting of Exercise Able Archer, 1983*

4. The larger context of the period, often referred to as the "war scare," reflected increasing Soviet concern over the drift in superpower relations, which some in the Soviet leadership felt indicated an increased threat of war and increased likelihood of the use of nuclear weapons. These concerns were shaped in part by a Soviet perception that the correlation of forces was shifting against the Soviet Union and that the United States was taking steps to achieve military superiority. These fears were exacerbated by planned improvements in US strategic forces, as well as by progress made by NATO to implement its 1979 decision began with NATO's deliberations in the late 1970s to modernize its theater nuclear forces by deploying Pershing–II missiles and Ground Launched Cruise Missiles (GLCMs) to Europe. By 1981, after the new US Administration was inaugurated, the Soviet concern intensified almost concurrently with General Secretary Brezhnev's decline in health [*portion marking not declassified*]

5. [*1½ lines not declassified*] the increased Soviet concern stemmed from a fear by some Soviet leaders that the West might seek to exploit its new capability in Europe for a preemptive nuclear surprise attack against the USSR, for which the Soviets had no defense. From a national security standpoint, this Western capability led to questions about the

long-standing Soviet view that crises and other adverse developments in international affairs would precede the outbreak of war and be the basis for long-term early warning. The Soviets had concern that the West might decide to attack the USSR without warning during a time of vulnerability—such as when military transport was used to support the harvest—thus compelling the Soviets to consider a preemptive strike at the first sign of US preparations for a nuclear strike. [*portion marking not declassified*]

6. From Brezhnev's death in 1982 through late 1984, the Soviets ordered a number of unusual measures not previously detected except during periods of crisis with the West. These included: disruption of the normal troop rotation cycle for Soviet forces in central Europe in 1984; updating civil defense procedures in the USSR from 1982 through 1984; in the spring of 1984 the first, and apparently only, time that Soviet military trucks were not sent to support the harvest since the end of World War II; and increased alert reactions even to routine NATO training from 1982 to 1984. The cumulative effect of these and other measures was to reduce the Soviet and Warsaw Pact vulnerability to a surprise attack. The abnormal Soviet reaction to NATO Exercise Able Archer in November 1983 occurred within this setting. [*portion marking not declassified*]

7. Concurrent with the military dimension, [*less than 1 line not declassified*] other precautionary measures taken by the Soviets probably were a reflection of the political maneuvering in the Kremlin in 1982 and 1983 associated with Andropov's rise to power. In exchange for military support for his bid to become General Secretary, Andropov, then KGB Chairman, may have promised greater allocations of resources for military industrial expansion, improved civil defense readiness, and military modernization. All of these were espoused by the Chief of the General Staff at the time, Marshal Ogarkov. Successful manipulation of threat perceptions by the KGB at Andropov's direction would have helped cultivate the strong military backing Andropov enjoyed when he came to power. In this environment, the heightened Soviet military reactions to NATO exercises would have been expected. [*portion marking not declassified*]

8. Finally, [*less than 1 line not declassified*] the Soviets wanted the new US Administration to tone down its anti-Soviet rhetoric, moderate its hostile attitudes, and begin serious business on trade and arms control. Some analysts believe that the Soviet activities, [*1 line not declassified*], were intended to be detected and were contrived to nudge Washington toward a more conciliatory and cooperative attitude in dealings with Moscow. [*less than 1 line not declassified*]

*Intelligence Community Performance*

9. Since 1983, the Intelligence Community, CIA's Office of Soviet Analysis, and the Defense Intelligence Agency have treated the events

surrounding the Able Archer episode in a number of in-house publications and national estimates. When General Perroots was Director, DIA, analysts concurred in the Community assessments in 1988 that the "war scare" period of heightened Soviet concern was triggered by the change of the US Administration and its policy decisions toward the Soviet threat; that at least some Soviet leaders concluded that a surprise nuclear attack by NATO was possible outside the context of a crisis; and that this led to a number of Soviet responses consistent with such a conclusion, including high priority intelligence collection taskings. DIA believes, however, that the Soviet measures were primarily a function of the internal leadership instability from which Andropov emerged as General Secretary. [*portion marking not declassified*]

### General Perroots's Problem

10. The events surrounding NATO Exercise Able Archer, however, all occurred some months before the first national-level assessments were written, and General Perroots was confronted with a serious choice of what recommendation to make to the Commander, US Air Forces Europe. The Department of Defense warning indicators system reflected that, [*less than 1 line not declassified*] Soviet air units in Poland and East Germany were observed at a high state of alert, although no other Soviet strategic forces adopted such a posture. [*2½ lines not declassified*] Consequently, the Commander, US Air Forces Europe, was concerned whether he should exercise his discretionary authority to increase the alert posture of his force. General Perroots recommended that no precautionary US alert be instituted, despite the evidence of his own warning system. Several days later, the Soviet air forces returned to normal alert status. [*portion marking not declassified*]

11. [*1 paragraph (10 lines) not declassified*]

12. General Perroots's concerns about this episode are legitimate to the extent that they deal with Washington's support to the US military commands. [*4½ lines not declassified*] Third, national-level assessments of Soviet intentions were not available when most needed. The General's memorandum indicates the Defense Department has taken steps to correct the problems in the processing and dissemination of intelligence. The third problem, of timely national-level support, is continuous. As Director of DIA, General Perroots himself initiated organizational and procedural changes to improve DIA's support to the commands. [*portion marking not declassified*]

13. Underlying all of the above, however, is the paradox that General Perroots believes he made a correct judgment, but for the wrong reasons. This is not a new problem nor is there a solution to it. General Perroots has accurately identified inherent limits of the warning systems as they now exist. His candor is a safeguard against complacency

A Case #23-5017   Document #2005450   Filed: 06/28/2023   Page 165 o

and denial that problems exist. Additionally, he raises again the need for better understanding in Washington of the problems facing intelligence in the field. [*portion marking not declassified*]

[*name not declassified*]      [*name not declassified*]
Chief, TFD/RIG/SOVA   Director, National Warning Staff

(Central Intelligence Agency, National Intelligence Council, Job 91B00551: Speeches, Lectures, Briefing Files (1988–1989), Box 1, Folder 2: C/NIC (Ermarth) Chrons March 1989)

The 1990 PFIAB report repeatedly stressed: "During the November 1983 NATO 'Able Archer' nuclear release exercise, the Soviets implemented military and intelligence activities that previously were seen only during actual crises. These included: placing Soviet air forces in Germany and Poland on heightened alert, [*4 lines not declassified*]."

The PFIAB report argued: "The meaning of these events obviously was of crucial importance to American and NATO policymakers. If they were simply part of a Soviet propaganda campaign designed to intimidate the US, deter it from deploying improved weapons, and arouse US domestic opposition to foreign policy initiatives, then they would not be of crucial significance. If they reflected an internal power struggle—for example, a contest between conservatives and pragmatists, or an effort to avoid blame for Soviet economic failures by pointing to (exaggerated) military threats—then they could not be ignored, but they would not imply a fundamental change in Soviet strategy. But if these events were expressions of a genuine belief on the part of Soviet leaders that the US was planning a nuclear first strike, causing the Soviet military to prepare for such an eventuality—by, for example, readying itself for a preemptive strike of its own—then the 'war scare' was a cause for real concern." (PFIAB, page vi)

The PFIAB report concluded that the IC's failure to adequately report on Able Archer and the 1983–1984 Soviet war scare had important implications for the future: "In cases of great importance to the survival of our nation, and especially where there is important contradictory evidence, the Board believes that intelligence estimates must be cast in terms of alternative scenarios that are subjected to comparative risk assessments. This is the critical defect in the war scare episode." (PFIAB, page ix)

The George Washington University
Gelman Library, Suite 701
2130 H St. NW
Washington, DC 20037
Phone/Fax: (202) 994-7000/7005
Email: nsarchiv@gwu.edu
Website: www.nsarchive.org

July 2, 2021

Defense Intelligence Agency

VIA EMAIL AND POST
foia1@dodiis.mil

Defense Intelligence Agency
ATTN: FAC2C (FOIA)
7400 Pentagon
Washington, DC 20301-7400

Re: Request under the FOIA, in reply refer to: 1:19-cv-00529-CJN

Dear Information Officer:

Pursuant to the Freedom of Information Act (FOIA), I hereby request disclosure of the following:

*Two records identified by the Defense Intelligence Agency as:*

*-January 9, 1989 "End of Tour Report (Addendum) General Perroots") and*

*-March 17, 1989 "End of Tour Report (LtGen Perroots)"*

*The documents requested include an after-action letter that Lieutenant General Leonard Perroots wrote in January 1989 describing a narrowly averted nuclear crisis that occurred in Europe in 1983, when North Atlantic Treaty Organization forces' annual exercise practicing nuclear release procedures put Soviet forces on high alert.  Lack of further escalation of the 1983 Soviet "War Scare" was largely due to Lieutenant General Perroots' decision not to raise U.S. readiness in response to Soviet forces' increased alert status.*

*On February 16, 2021, the Department of State ("DOS") Office of the Historian published a transcribed version of this letter in a new volume of its Foreign Relations of the United States series, with limited redactions.  The Transcription is available to the public at the following DOS link: https://static.history.state.gov/frus/frus1981-88v04/pdf/frus1981-88v04.pdf (numbered paragraphs 1–10 on pages 1426–1429; relevant portions attached for reference).  In this publication, DOS provides the following citation to the document, from the CIA: (Central Intelligence Agency, National Intelligence Council, Job 90T00435R: Chronological Files (1988), Box 1, Folder 12: C/NIC Chrono for December 1988).*

*The National Security Archive previously received a copy of the attached Standard Form 135 the Washington D.C. Federal Records Center, which suggested that the documents were located in one of three boxes housed in the Washington Records Center.  A search conducted pursuant to a separate (but related) FOIA request that is now the subject of ongoing litigation,* National Security Archive v. Defense Intelligence Agency, *No. 1:19-cv-529 (D.D.C.), revealed that the letter was not in those boxes.*

An independent non-governmental research institute and library located at the George Washington University, the Archive collects and publishes declassified documents obtained through the Freedom of Information Act.  Publication royalties and tax-deductible contributions through The National Security Archive Fund, Inc. underwrite the Archive's budget.

JA160

The George Washington University
Gelman Library, Suite 701
2130 H St. NW
Washington, DC 20037
Phone/Fax: (202) 994-7000/7005
Email: nsarchiv@gwu.edu
Website: www.nsarchive.org

*This request seeks the two documents described above, whether they are housed in DIA's files stored at the Washington Records Center or elsewhere.*

If you regard any of these documents as potentially exempt from the FOIA's disclosure requirements, I request that you nonetheless exercise your discretion to disclose them. As the FOIA requires, please release all reasonably segregable nonexempt portions of documents. To permit me to reach an informed decision whether or not to file an administrative appeal of any denied material, please describe any withheld records (or portions thereof) and explain the basis for your exemption claims.

The National Security Archive qualifies for "representative of the news media" status under 5 U.S.C. Sec. 552(a)(4)(A)(ii)(II) and, therefore, may not be charged search and review fees. (See *National Security Archive v. U.S. Department of Defense,* 880 F.2d 1381 (D.C. Cir. 1989), *cert denied,* 110 S Ct. 1478 (1990)).  This request is made as part of a scholarly and news research project that is not for commercial use.  For details on the Archive's research and publication activities, visit our website at www.nsarchive.org.

To expedite the release of the requested documents, please disclose them on an interim basis as they become available to you, without waiting until all the documents have been processed. Please notify me before incurring any photocopying costs over $100.

Per the June 30, 2021, agreement (attached) reached between the National Security Archive and the Defense Intelligence Agency in the pending case *National Security Archive v. Defense Intelligence Agency*, No. 1:19-cv-529 (D.D.C.), the National Security Archive understands that the Agency will immediately start processing this request upon receipt, and will provide the National Security Archive and its counsel (John Guttmann and Hilary Jacobs of Beveridge & Diamond, P.C.) with an update on the status of this request three weeks from the date of receiving this FOIA request. Counsel can be reached at jguttmann@bdlaw.com and hjacobs@bdlaw.com.

If you have any questions regarding the identity of these records, their location, the scope of the request or any other matters, call (202) 994-7000 or send an email to foiamail@gwu.edu. I look forward to receiving your response within the twenty-day statutory period.

Sincerely,

Nate Jones

Enclosures

cc:      April Seabrook, Assistant United States Attorney

An independent non-governmental research institute and library located at the George Washington University, the Archive collects and publishes declassified documents obtained through the Freedom of Information Act.  Publication royalties and tax-deductible contributions through The National Security Archive Fund, Inc. underwrite the Archive's budget.

JA161

# SF-135
# Provided by the Washington Records Center

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 → 93-0058

Case 1:19-cv-00529-CJN Document 43-1 Filed 08/05/21 Page 4 of 41

USCA Case #23-5017 Document #2005450 Filed: 06/28/2023 Page 169 of 391

JA163

# RECORDS TRANSMITTAL AND RECEIPT

Complete and send original and two copies of this form to the appropriate Federal Records Center for approval prior to shipment of records. See specific instructions on reverse.

| | | PAGE | OF |
|---|---|---|---|
| | | 1 | 1 PAGES |

**1. TO** (Complete the address for the records center serving your area as shown in 36 CFR 1228.150.)

Federal Records Center

**6. FROM** (Enter the name and complete mailing address of the office retiring the records. The signed receipt of this form will be sent to this address)

Director
Defense Intelligence Agency
ATTN: ESO
Washington, DC 20340-1038

**2. AGENCY TRANSFER AUTHOR-IZATION**
TRANSFERRING AGENCY OFFICIAL (Signature and title)
Ms. Melissa Folz, Records Manager
DATE 2/19/93

**3. AGENCY CONTACT**
TRANSFERRING AGENCY LIAISON OFFICIAL (Name, office and telephone No.)
M.E. Pauly, ESO, (703) 697-8130

**4. RECORDS CENTER RECEIPT**
RECORDS RECEIVED BY (Signature and title)
*[signature]* Chief Accession & Disposal Branch
DATE 4/6/93

## RECORDS DATA

Fold Line

| ACCESSION NUMBER | | | VOLUME (cu. ft) (d) | AGENCY BOX NUMBERS (e) | SERIES DESCRIPTION (With inclusive dates of records) (f) | RESTRIC-TION (g) | DISPOSAL AUTHORITY (Schedule and item number) (h) | DISPOSAL DATE (i) | COMPLETED BY RECORDS CENTER | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RG (a) | FY (b) | NUMBER (c) | | | | | | | LOCATION (j) | SHELF PLAN (k) | CONT. TYPE (l) | AUTO. DISP. (m) |
| 373 | 93 | 0040 | 3 | 1/3 | DR's Official Correspondence File (Jan–Dec 89) | S | DIAM 13-1 Item 200a | Perm 2010 | 1-59-11-6-3 11-6-5 | | | |
| | | | | | DR's Message File (Jan–Dec 89) | S | | | | | | |
| | | | | | DR's Chron Files of Correspondence (1 Jan – 15 May 89) | S | | | | | | |
| | | | | 2/3 | DR's Chron Files of Correspondence (16 May – 15 Nov 89) | S | | | | | | |
| | | | | 3/3 | DR's Chron Files of Correspondence (16 Nov – 31 Dec 89) | S | | | | | | |

NSN 7540-00-634-4093

35-107

Standard Form 135 (Rev. 7-85)
Prescribed by NARA
36 CFR 1228.1

# Excerpt from Foreign Relations of the United States, 1981-1988 Volume IV (2021)

# FOREIGN RELATIONS

## OF THE

# UNITED STATES

---

## 1981–1988

## VOLUME IV

---

## SOVIET UNION, JANUARY 1983– MARCH 1985

---



---

**DEPARTMENT OF STATE**

**Washington**

JA165

**Foreign Relations of the
United States, 1981–1988**

**Volume IV**

# Soviet Union, January 1983– March 1985

*Editor*           Elizabeth C. Charles

*General Editor*   Kathleen B. Rasmussen

United States Government Publishing Office
Washington
2021

JA166

DEPARTMENT OF STATE

Office of the Historian

Foreign Service Institute

For sale by the Superintendent of Documents, U.S. Government Publishing Office
Internet: bookstore.gpo.gov    Phone: toll free (866) 512-1800;    DC area (202) 512-1800
Fax: (202) 512-2250 Mail: Stop IDCC, Washington, DC 20402-0001

# About the Series

The *Foreign Relations of the United States* series presents the official documentary historical record of major foreign policy decisions and significant diplomatic activity of the U.S. Government. The Historian of the Department of State is charged with the responsibility for the preparation of the *Foreign Relations* series. The staff of the Office of the Historian, Foreign Service Institute, under the direction of the General Editor of the *Foreign Relations* series, plans, researches, compiles, and edits the volumes in the series. Secretary of State Frank B. Kellogg first promulgated official regulations codifying specific standards for the selection and editing of documents for the series on March 26, 1925. These regulations, with minor modifications, guided the series through 1991.

Public Law 102–138, the Foreign Relations Authorization Act, established a new statutory charter for the preparation of the series which was signed by President George H.W. Bush on October 28, 1991. Section 198 of P.L. 102–138 added a new Title IV to the Department of State's Basic Authorities Act of 1956 (22 U.S.C. 4351, et seq.).

The statute requires that the *Foreign Relations* series be a thorough, accurate, and reliable record of major U.S. foreign policy decisions and significant U.S. diplomatic activity. The volumes of the series should include all records needed to provide comprehensive documentation of major foreign policy decisions and actions of the U.S. Government. The statute also confirms the editing principles established by Secretary Kellogg: the *Foreign Relations* series is guided by the principles of historical objectivity and accuracy; records should not be altered or deletions made without indicating in the published text that a deletion has been made; the published record should omit no facts that were of major importance in reaching a decision; and nothing should be omitted for the purposes of concealing a defect in policy. The statute also requires that the *Foreign Relations* series be published not more than 30 years after the events recorded. The editors are convinced that this volume meets all regulatory, statutory, and scholarly standards of selection and editing.

*Sources for the* Foreign Relations *Series*

The *Foreign Relations* statute requires that the published record in the *Foreign Relations* series include all records needed to provide comprehensive documentation of major U.S. foreign policy decisions and significant U.S. diplomatic activity. It further requires that government agencies, departments, and other entities of the U.S. Government en-

III

gaged in foreign policy formulation, execution, or support cooperate with the Department of State historians by providing full and complete access to records pertinent to foreign policy decisions and actions and by providing copies of selected records. Most of the sources consulted in the preparation of this volume were located at the Department of State in Washington and the National Archives and Records Administration.

The editors of the *Foreign Relations* series have complete access to all the retired records and papers of the Department of State: the central files of the Department; the special decentralized files ("lot files") of the Department at the bureau, office, and division levels; the files of the Department's Executive Secretariat, which contain the records of international conferences and high-level official visits, correspondence with foreign leaders by the President and Secretary of State, and the memoranda of conversations between the President and the Secretary of State and foreign officials; and the files of overseas diplomatic posts. All of the Department's central files for 1981–1989, which were stored in electronic and microfilm formats, will eventually be transferred to the National Archives. Once these files are declassified and processed, they will be accessible. All of the Department's decentralized office files from this period that the National Archives deems worthy of permanent preservation will also eventually be transferred to the National Archives where they will be available for use after declassification and processing.

Research for *Foreign Relations* volumes in this subseries is undertaken through special access to restricted documents at the Ronald Reagan Presidential Library and other agencies. While all the material printed in this volume has been declassified, some of it is extracted from still-classified documents. The staff of the Reagan Library is processing and declassifying many of the documents used in this volume, but they may not be available in their entirety at the time of publication. Presidential papers maintained and preserved at the Reagan Library include some of the most significant foreign affairs related documentation from White House offices, the Department of State, and other Federal agencies including the National Security Council, the Central Intelligence Agency, the Department of Defense, and the Joint Chiefs of Staff.

Some of the research for volumes in this subseries was done in Reagan Library record collections scanned for the Remote Archive Capture (RAC) project. This project, which is administered by the National Archives and Records Administration's Office of Presidential Libraries, was designed to coordinate the declassification of still-classified records held in various Presidential libraries. As a result of the way in which records were scanned for the RAC, the editors of the

A Case #23-5017     Document #2005450        Filed: 06/28/2023     Page 176 o

*Foreign Relations* series were not always able to determine whether attachments to a given document were in fact attached to the paper copy of the document in the Reagan Library file. In such cases, some editors of the *Foreign Relations* volumes have indicated this ambiguity by stating that the attachments were "Not found attached."

*Editorial Methodology*

The documents are presented chronologically according to time in Washington, DC. Memoranda of conversation are placed according to the time and date of the conversation, rather than the date the memorandum was drafted.

Editorial treatment of the documents published in the *Foreign Relations* series follows Office style guidelines, supplemented by guidance from the General Editor and the Chiefs of the Declassification and Publishing Divisions. The original document is reproduced as exactly as possible, including marginalia or other notations, which are described in the footnotes. Texts are transcribed and printed according to accepted conventions for the publication of historical documents within the limitations of modern typography. A heading has been supplied by the editors for each document included in the volume. Spelling, capitalization, and punctuation are retained as found in the original text, except that obvious typographical errors are silently corrected. Other mistakes and omissions in the documents are corrected by bracketed insertions: a correction is set in italic type; an addition in roman type. Words or phrases underlined in the original document are printed in italics. Abbreviations and contractions are preserved as found in the original text, and a list of abbreviations and terms is included in the front matter of each volume. In telegrams, the telegram number (including special designators such as Secto) is printed at the start of the text of the telegram.

Bracketed insertions are also used to indicate omitted text that deals with an unrelated subject (in roman type) or that remains classified after declassification review (in italic type). The amount and, where possible, the nature of the material not declassified has been noted by indicating the number of lines or pages of text that were omitted. Entire documents withheld after declassification review have been accounted for and are listed in their chronological place with headings, source notes, and the number of pages not declassified.

All brackets that appear in the original document are so identified in the footnotes. All ellipses are in the original documents.

The first footnote to each document indicates the source of the document and its original classification, distribution, and drafting information. This note also provides the background of important docu-

ments and policies and indicates whether the President or his major policy advisers read the document.

Editorial notes and additional annotation summarize pertinent material not printed in the volume, indicate the location of additional documentary sources, provide references to important related documents printed in other volumes, describe key events, and provide summaries of and citations to public statements that supplement and elucidate the printed documents. Information derived from memoirs and other first-hand accounts has been used when appropriate to supplement or explicate the official record.

The numbers in the index refer to document numbers rather than to page numbers.

*Advisory Committee on Historical Diplomatic Documentation*

The Advisory Committee on Historical Diplomatic Documentation, established under the *Foreign Relations* statute, monitors the overall compilation and editorial process of the series and advises on all aspects of the preparation of the series and declassification of records. The Advisory Committee does not necessarily review the contents of individual volumes in the series, but it makes recommendations on issues that come to its attention and reviews volumes as it deems necessary to fulfill its advisory and statutory obligations.

*Declassification Review*

The Office of Information Programs and Services, Bureau of Administration, conducted the declassification review for the Department of State of the documents published in this volume. The review was conducted in accordance with the standards set forth in Executive Order 13526 on Classified National Security Information and applicable laws.

The principle guiding declassification review is to release all information, subject only to the current requirements of national security as embodied in law and regulation. Declassification decisions entailed concurrence of the appropriate geographic and functional bureaus in the Department of State, other concerned agencies of the U.S. Government, and the appropriate foreign governments regarding specific documents of those governments. The declassification review of this volume, which began in 2015 and was completed in 2019, resulted in the decision to withhold 1 document in full, excise a paragraph or more in 13 documents, and make minor excisions of less than a paragraph in 20 documents.

The Office of the Historian is confident, on the basis of the research conducted in preparing this volume and as a result of the declassification review process described above, that the documentation and edito-

rial notes presented here provide a thorough, accurate, and reliable record of the Reagan administration's policy toward the Soviet Union, January 1983–March 1985.

**Adam M. Howard, Ph.D.**           **Kathleen B. Rasmussen, Ph.D.**
*The Historian*                                     *General Editor*

Foreign Service Institute
February 2021

# Preface

*Structure and Scope of the* Foreign Relations *Series*

This volume is part of a subseries of volumes of the *Foreign Relations* series that documents the most important issues in the foreign policy of the administration of Ronald Reagan. This volume documents U.S. bilateral relations with the Soviet Union from January 1983 to March 1985. Due to the importance of U.S.-Soviet relations during the Reagan administration, the Reagan subseries includes an extensive examination of U.S. bilateral relations with the Soviet Union in four volumes: *Foreign Relations*, 1981–1988, Volume III, Soviet Union, January 1981–January 1983; Volume IV, Soviet Union, January 1983–March 1985; Volume V, Soviet Union, March 1985–October 1986; and Volume VI, Soviet Union, October 1986–January 1989. In conjunction with these volumes, several other volumes in the subseries will provide the reader with a fuller understanding of how U.S.-Soviet relations impacted the global character of the Cold War and U.S. strategy during the Reagan era. For documentation on U.S.-Soviet nuclear arms control negotiations, see *Foreign Relations*, 1981–1988, Volume XI, START I, and Volume XII, INF, 1984–1988. *Foreign Relations*, 1977–1980, Volume V, European Security, 1977–1983, documents the NATO dual-track decision and TNF/INF negotiations through 1983. Documentation dealing with nuclear non-proliferation, nuclear testing, chemical and biological weapons, and space arms control, including anti-satellite systems, will be published in *Foreign Relations*, 1981–1988, Volume XL, Global Issues I. The development of the Strategic Defense Initiative and ABM-related issues and other strategic considerations are addressed in *Foreign Relations*, 1981–1988, Volume XLIII, National Security Policy, 1981–1984, and Volume XLIV, Parts 1 and 2, National Security Policy, 1985–1988. For selected documentation on the human rights situation in the Soviet Union, see *Foreign Relations*, 1981–1988, Volume XLI, Global Issues II.

*Focus of Research and Principles of Selection for* Foreign Relations, *1981–1988, Volume IV*

This volume documents the development of the Reagan administration's policies toward the Soviet Union from January 1983 to March 1985. With Reagan's signature of National Security Decision Directive (NSDD) 75 on January 17, 1983, the administration's approaches and policies toward the Soviet Union were codified in a specific four-part agenda: arms control, human rights, regional issues, and bilateral relations. This volume examines the efforts of administration officials,

IX

namely Secretary of State George Shultz, President's Assistants for National Security Affairs William Clark and later Robert McFarlane, and NSC Staff member Jack Matlock, to implement the four-part agenda in dealing with the Soviet Union. The documentation demonstrates how administration officials developed policies related to the four-part agenda, mainly in the National Security Council (NSC) and Department of State, and then promoted these various tracks during meetings between Shultz, and on occasion Reagan, and Soviet Ambassador Anatoly Dobrynin and Soviet Foreign Minister Andrei Gromyko in various fora. Although no high-level meeting took place between Reagan and either Soviet General Secretaries Yuri Andropov or Konstantin Chernenko during their short tenures, the documents provide a window into how the Reagan administration viewed the Soviet leadership and formulated policies to deal with whomever was in charge.

The volume also documents the bureaucratic struggle Shultz faced against the NSC in implementing the four-part agenda laid out by NSDD 75 and in gaining access to President Reagan. After some wrangling, by June 1983 an understanding emerged between Shultz and Clark, which allowed Shultz regular weekly meetings with Reagan. When Jack Matlock joined the NSC Staff as primary adviser on the Soviet Union, Shultz gained a like-minded ally in approaches to dealing with the USSR. While some administration officials, such as Secretary of Defense Caspar Weinberger, consistently argued that negotiating with the Soviet Union seemed futile, Shultz, Matlock, and others pushed President Reagan to see the value in keeping lines of communication open with the Soviets. Even during tragic events, such as the Soviet downing of the KAL 007 airliner in September 1983, Shultz kept his meeting with Gromyko a few days later in Madrid and used this as an opportunity to admonish the Foreign Minister for this inexplicable act and the inability of the Soviet Union to admit fault on the international stage.

The volume documents several Cold War flashpoints during the contentious months of 1983. The announcement in March 1983 of Reagan's Strategic Defense Initiative (SDI) caused concern for the Soviet Union because it shifted the strategic balance from the theory of mutually assured destruction toward a defensive nuclear posture. Aside from the downing of the KAL airliner, the Euromissiles crisis came to a head with U.S. deployments of INF missiles to several NATO allies in late November 1983. While the bulk of the documentation dealing with these negotiations is covered in two other volumes, the scheduled deployments permeated all other aspects of U.S.-Soviet relations in 1983. The volume also presents selective documentation related to the 1983 Soviet "War Scare" and the November 1983 NATO nuclear exercise, Able Archer (see Appendix A). The volume attempts to dem-

onstrate that even with these challenges, Shultz and others pressed to keep moving ahead with the four-part agenda and promote greater dialogue in U.S.-Soviet relations.

After the Soviet walkout of the INF negotiations in Geneva in late 1983, the administration focused throughout 1984 on developing a framework to restart arms control negotiations; the documents in this volume demonstrate the difficulties involved in opening new talks with the Soviet Union. Reagan's SDI program continued to cause problems. The Soviets believed SDI would "militarize space," and therefore the debates over how SDI would be dealt with during negotiations were a major point of contention during this period. When Shultz and Gromyko met in January 1985, they finally reached an agreement on a new round of umbrella negotiations. The Nuclear and Space Talks (NST), scheduled to begin in Geneva in March 1985, would have three tracks, START, INF, and Defense and Space. The documents in the volume trace how various positions from the Department of State, NSC, the Department of Defense, and the Central Intelligence Agency impacted the decision to move forward with the three arms control tracks. While the other parts of the four-part agenda remained in play during this period and were discussed in bilateral meetings, restarting arms control talks seemed to trump the other areas of concern. Little did the U.S. or Soviet negotiators know that on the eve of these new NST negotiations, Chernenko would die, and a younger, more ambitious Soviet leader would emerge and dramatically change the course of U.S.-Soviet relations.

*Acknowledgments*

The editor wishes to acknowledge the invaluable assistance of officials at the Ronald Reagan Presidential Library in Simi Valley, California, especially Lisa Jones and Cate Sewell. A special thanks to the Central Intelligence Agency staff for providing access and assistance with Reagan Library materials scanned for the Remote Archive Capture project, and to the History Staff of the CIA's Center for the Study of Intelligence for arranging full access to CIA records. The editor wishes to acknowledge the staff at Information Programs and Services at the Department of State for facilitating access to Department of State records and coordinating the review of this volume within the Department. Sandy Meagher was helpful in providing access to Department of Defense materials. The editor extends thanks to the family and executor of the Estate of former Secretary of Defense Caspar W. Weinberger for granting Department of State historians access to the personal papers of Secretary Weinberger deposited at the Library of Congress. Additional thanks are due to officials of the Library of Congress Manuscript Division for facilitating that access.

Elizabeth C. Charles collected, selected, and annotated the documentation for this volume under the supervision of David Geyer, Chief of the Europe Division, and Adam Howard, then General Editor of the *Foreign Relations* series. The volume was reviewed by David Geyer and then Historian Stephen Randolph. Kerry Hite and Chris Tudda coordinated the declassification review under the supervision of Carl Ashley, Chief of the Declassification Coordination Division. Kerry Hite also performed the copy and technical editing under the supervision of Mandy Chalou, Chief of the Editing and Publishing Division.

**Elizabeth C. Charles, Ph.D.**
*Historian*

# Contents

About the Series ..................................................... III

Preface ............................................................... IX

Sources ............................................................... XV

Abbreviations and Terms ............................................ XIX

Persons ............................................................... XXV

Note on U.S. Covert Actions ........................................ XXXI

Soviet Union, January 1983–March 1985

  January 1983–April 1983

    "Dobrynin seemed like he wanted to run. But the Secretary is a jogger": Shultz and the Four-Part Agenda ............................................................... 1

  April 1983–August 1983

    Preparing the Next Steps in U.S.-Soviet Relations: Human Rights and Arms Control ............................ 120

  September 1983–October 1983

    "Controlled Fury": Shootdown of KAL 007 ............... 291

  October 1983–February 1984

    "The Winter of Soviet Discontent": INF Walkout, the War Scare, and the 'Ivan and Anya' Speech ............ 429

  February 1984–June 1984

    "Talking about each other rather than to each other": Reagan, Chernenko, and U.S.-Soviet Stalemate ........ 606

  June 1984–October 1984

    "Sitting on Mountains of Nuclear Weapons": The Reagan-Gromyko Meeting ................................. 845

  October 1984–January 1985

    "An iron-ass Secretary of State": Shultz and Gromyko in Geneva ................................................... 1079

January 1985–March 1985

"The principal menace to our security?": Reagan and
the Ambiguities of Soviet Leadership ..................... 1355

Appendix ......................................................... 1420

# Page Left Intentionally Blank

# Appendix

## A.    Editorial Note

Stark deviations in assessments by the U.S. Intelligence Community of the November 1983 NATO exercise Able Archer and the Soviet "war scare" led to a much later 1990 investigation by the President's Foreign Intelligence Advisory Board during the George H.W. Bush administration, resulting in the report, "The Soviet 'War Scare.'" (George H.W. Bush Library, Bush Presidential Records, President's Foreign Intelligence Advisory Board, Subject Files; Reports to the President-War Scare Report 1990 [OA/IDCF01830–020]) The February 15, 1990, PFIAB report analyzed intelligence and reporting on the Soviet war scare, Able Archer, and other related activities. The PFIAB report stated: "During the past year, the President's Foreign Intelligence Advisory Board has carefully reviewed the events of that period to learn what we (the U.S. intelligence community) knew, when we knew it, and how we interpreted it. The Board has read hundreds of documents, conducted more than 75 interviews with American and British officials, and studied the series of National Intelligence Estimates (NIE's) and other intelligence assessments that have attempted over the last six years to interpret the war scare data. Additionally, we have offered our own interpretation of the war scare events." (PFIAB, pages vi–vii) Although outside the normal scope of this volume, the 1990 PFIAB report and other memoranda from 1988 and 1989 are addressed in this editorial note because the documents focus upon crucial events from 1983 to 1984.

Reactions from the Intelligence Community (IC) and policymakers to the events surrounding Able Archer and the Soviet "war scare" differed significantly and evolved over time. The contemporaneous reporting in 1983–1984 from the Central Intelligence Agency (CIA), National Intelligence Council (NIC), [*text not declassified*] drew varied conclusions about Soviet anxieties. While some reporting assessed that "Contrary to the impression conveyed by Soviet propaganda, Moscow does not appear to anticipate a near-term military confrontation with the United States" (see Document 157), another analysis presented evidence that [*text not declassified*].

Retrospective assessments of these events seem to conflate the NATO Able Archer exercise with the broader "war scare" talk emanating from Moscow related to INF deployments. The Soviet military unquestionably reacted to Able Archer differently than to previous NATO exercises. (See Document 134.) Whether the Soviet response was attributable to the circumstances of the time, to the "war scare"

1420

(whether real or Soviet propaganda), or to a credible belief within the Soviet military leadership or the Politburo that the United States was planning to launch a nuclear first strike against the USSR, under the guise of a NATO exercise or otherwise, remains unclear on the basis of the available evidence.

After a year of research and a reassessment of the relevant intelligence and documentation, the PFIAB report stated: "We believe that the Soviets perceived that the correlation of forces had turned against the USSR, that the US was seeking military superiority, and that the chances of the US launching a nuclear first strike—perhaps under cover of a routine training exercise—were growing. We also believe that the US intelligence community did not at the time, and for several years afterwards, attach sufficient weight to the possibility that the war scare was real. As a result, the President was given assessments of Soviet attitudes and actions that understated the risks to the United States. Moreover, these assessments did not lead us to reevaluate our own military and intelligence actions that might be perceived by the Soviets as signaling war preparations.

"In two separate Special National Intelligence Estimates (SNIEs) in May and August 1984, the intelligence community said: 'We believe strongly that Soviet actions are not inspired by, and Soviet leaders do not perceive, a genuine danger of imminent conflict or confrontation with the United States.' Soviet statements to the contrary were judged to be 'propaganda.' [See Documents 221 and 264.]

"The Board believes that the evidence then did not, and certainly does not now, support such categoric conclusions. Even without the benefit of subsequent reporting and looking at the 1984 analysis of then available information, the tone of the intelligence judgments was not adequate to the needs of the President." (PFIAB, pages vi–vii)

During November 1983, Able Archer and the Soviet responses to this exercise received little immediate attention in the U.S. Intelligence Community. (See Document 135.) However, by spring 1984, some in the intelligence communities in the United States [*text not declassified*] believed the Reagan administration should have recognized Soviet sensitivities and anxieties about a potential U.S. first strike. [*text not declassified*].

According to the PFIAB report, [*text not declassified*] "KGB Deputy Resident Colonel Oleg Gordiyevskiy, [*text not declassified*] had witnessed what he saw as Soviet paranoia over a US nuclear first strike; [*text not declassified*] As one of the most senior KGB officers in London, [*text not declassified*]." (PFIAB, page 10)

In a covering memorandum [*less than 1 line not declassified*] to Director of Central Intelligence William Casey and others, Herbert Meyer, Vice Chairman of the National Intelligence Council, wrote: [*text not*

*declassified*]. The PFIAB report commented that the [*text not declassified*] report was "not well received in the US intelligence community." (PFIAB, pages 10–11)

Another contemporaneous analysis from the CIA, the May 1984 SNIE 11–10–84/JX concluded: "We believe strongly that Soviet actions are not inspired by, and Soviet leaders do not perceive, a genuine danger of imminent conflict or confrontation with the United States." (See Document 221.) The PFIAB report commented on this SNIE: "The estimate boldly declared that 'Recent Soviet war scare propaganda . . . is aimed primarily at discrediting US policies and mobilizing 'peace' pressures among various audiences abroad.' In a more piece-meal fashion, it was judged that 'Each Soviet action has its own military or political purpose sufficient to explain it.' The accelerated tempo of Soviet live exercise activity was explained simply as a reflection of 'long-term Soviet military objectives.'

"The Soviet reaction to Able Archer 83 was dismissed as a 'counter-exercise,' but analysts acknowledged that the 'elaborate Soviet reaction' was 'somewhat greater than usual.' [*less than 1 line not declassified*] prior to and during the exercise indicated that the Warsaw Pact Intelligence services, especially the KGB, were admonished 'to look for any indica-tion that the United States was about to launch a first nuclear strike,' analysts concluded that 'by confining heightened readiness to selected air units, Moscow clearly revealed that it did not, in fact, think there was a possibility at this time of a NATO attack.' The assessment, however, was not specific about what type of defensive or precaution-ary Soviet activity might be expected—and detected—were they pre-paring for an offensive NATO move." (PFIAB, page 13)

The PFIAB report continued its critique of SNIE 11–10–84/JX: IC "analysts dismissed [*less than 1 line not declassified*] on the war scare, including the KGB's formal tasking to its Residencies. 'This war scare propaganda has reverberated in Soviet security bureaucracies and ema-nated through other channels such as human sources. [See for example, Document 144.] We do not believe it reflects authentic leadership fears of imminent conflict.'" The report contended: "Such judgments were made even though the analysis was tempered 'by some uncertainty as to current Soviet leadership perceptions of the United States, by continued uncertainty about the Politburo decisionmaking processes, and by our inability at this point to conduct a detailed examination of how the Soviets might have assessed recent US/NATO military exer-cises and reconnaissance operations'—which, of course, included the previous Able Archer exercise. In other words, US analysts were unsure of what the Kremlin leadership thought or how it made decisions, nor had they adequately assessed the Soviet reaction to Able Archer 83. This notwithstanding, the estimate concluded: 'We are confident that,

as of now, the Soviets see not an imminent military clash but a costly and—to some extent—more perilous strategic and political struggle over the rest of the decade.'" (PFIAB, page 14)

The Board had similar criticisms of the August 1984 SNIE 11–9–84, "Soviet Policy Toward the United States in 1984" (see Document 264), for its "categorical and unqualified" judgments "about the likelihood of the war scare," and the analysts' conclusions: "We strongly believe that the Soviet actions are not inspired by, and Soviet leaders do not perceive, a genuine danger of imminent conflict or confrontation with the United States. Also, we do not believe that the Soviet war talk and other actions 'mask' Soviet preparations for an imminent move toward confrontation on the part of the USSR." (PFIAB, page 19–20) The PFIAB report continued: "Analysts readily acknowledged that the previous six months had seen extraordinary, unprecedented Soviet activities. Large scale military exercise, 'anomalous behavior' during the troop rotation, withdrawn military support for the harvest (last seen prior to the 1968 Czech invasion), new, deployed weapons systems (termed 'in response to INF deployments'), and heightened internal vigilance and security activities were noted. These events, however, were judged to be 'in line with long-evolving plans and patterns, rather than with sharp acceleration of preparations for major war.'" (PFIAB, page 19)

The PFIAB report acknowledged that its assessment and criticism of the May and August 1984 SNIEs "derives from information not known at the time. Our purpose in presenting this report is not so much to criticize the conclusions of the 1984 SNIE's as to raise questions about the ways these estimates were made and subsequently reassessed." (PFIAB, page ix) The PFIAB report concluded: "Reasonable people can disagree about the conclusions of the 1984 SNIE's. The PFIAB does disagree with many of them. More worrisome to us, however, is the process by which the estimates were made and subsequently reassessed. Although both estimates were reportedly reviewed by outside readers—and both, but particularly the first, contained alternative scenarios—strongly worded interpretations were defended by explaining away facts inconsistent with them. Consequently, both estimates contained, in essence, single outcome forecasting based in large part on near-term anomalous behavior. Moreover, neither alerted the reader to the risks erroneously rejecting the correct scenario." (PFIAB, page 30) The PFIAB report criticized the performance of the IC in 1983–1984, showing that contemporary assessments of Soviet intentions after Able Archer did not go far enough in providing President Reagan with alternative scenarios, explaining that the anxiety from the Soviet leadership could have been real.

In criticizing contemporary estimates, the PFIAB report emphasized intelligence that had not been available to the IC during these

years, principally information provided by Gordiyevskiy after he defected in 1985. Robert McFarlane's thoughts on the influence of Gordiyevskiy's information on the President are recorded in a December 16, 1988, memorandum for the record:

**Memorandum for the Record**

16 December 1988

SUBJECT

[*less than 1 line not declassified*] Robert F. McFarlane Regarding the Influence of Oleg Gordiyevskiy's Reporting on President Reagan

On 15 December [*less than 1 line not declassified*] Robert F. ("Bud") McFarlane, formerly National Security Advisor to the President, as to the veracity of claims [*less than 1 line not declassified*] that the reporting of KGB officer [*less than 1 line not declassified*] Oleg Gordiyevskiy about the Kremlin's fear of war greatly influenced President Reagan in the mid-1980s to seek better relations with the USSR. In response, Bud made several points:

He definitely remembered the reporting associated (later) with Gordiyevskiy that conveyed the Kremlin's fear of war. He also specifically recalled [*less than 1 line not declassified*] on Gordiyevskiy's assessments given to the President [*less than 1 line not declassified*].

He noted that he discussed this reporting with the President on several occasions. This was in the course of numerous discussions extending throughout 1983 and part of 1984 about the apparent anxieties being transmitted by Moscow through many channels, [*less than 1 line not declassified*].

The President, according to Bud, saw this reporting attributed to Gordiyevskiy in the larger context of a Soviet "war-scare" campaign arising from the NATO decision to deploy INF and from Reagan's hard line on defense, SDI, etc. In the President's view, either the Soviets were paranoid in strange ways we could not let bother us, or they were fabricating the appearance of fear to intimidate and sway us, which we should even more be prepared to ignore.

Often in these conversations, according to Bud, the President outlined his sustained intention to concentrate on building US strength and credibility in the first term and to move toward diplomatic reengagement in the second. The President's key speech of January 1984 [see Document 158] was a natural step in a long-planned shift of policy. Neither Gordiyevskiy's reporting nor the Soviet "war-scare" campaign in general were responsible for the evolution of the President's policy.

Bud said he'd been queried before on this matter by [*name not declassified*], a journalist, who might be (or have been) writing an article on it. Against the background of the above, Bud said he discounted Gordiyevskiy's impact on the President [*less than 1 line not declassified*].

[*1 paragraph (8½ lines) not declassified*]

[*name not declassified*]

(Central Intelligence Agency, National Intelligence Council, Job 90T00435R: Chronological Files (1988), Box 1, Folder 12: C/NIC Chrono for December 1988)

McFarlane's recollections in this memorandum for the record correlate with a January 1984 memorandum by Jack Matlock, Soviet specialist on the NSC Staff, which demonstrated an awareness of potential Soviet concerns, but concluded:

"—The Soviet leadership is not overly nervous about the immediate prospect of armed confrontation with the U.S.;

"—They are however very nervous about the prospects five to ten years down the road—not so much of a confrontation as such, as of a decisive shift in the balance of military power." (See Document 157.)

As mentioned in the 1988 memorandum for the record, McFarlane did recall "later" reporting to Reagan about Gordiyevskiy. The PFIAB report addressed Gordiyevskiy's situation in relation to the war scare and the 1984 SNIE assessments: "The Board found that after the 1984 assessments were issued, the intelligence community did not again address the war scare until after the defection to Great Britain of KGB Colonel Oleg Gordiyevskiy in July, 1985. Gordiyevskiy had achieved the rank of Acting Resident in the United Kingdom, but he fell under suspicion as a Western agent. Recalled to the Soviet Union, he was placed under house arrest and intensely interrogated. Able to flee his watchers, Gordiyevskiy was exfiltrated from Moscow by the British Secret Intelligence Service."

The report continued: "During lengthy debriefing sessions that followed, Gordiyevskiy supplied a fuller report on the Soviet war hysteria. This report, complete with documentation from KGB Headquarters and entitled 'KGB Response to Soviet Leadership Concern over US Nuclear Attack,' was first disseminated in a restricted manner within the US intelligence community in October 1985. Gordiyevskiy described the extraordinary KGB collection plan, initiated in 1981, to look for signs that the US would conduct a surprise nuclear attack on the Soviet Union. He identified and reviewed factors driving leadership fears. Based on the perception the US was achieving a strategic advantage, those in the Kremlin were said to believe that the US was likely to resort to nuclear weapons much earlier in a crisis than previously expected. They also were concerned the US might seek to exploit its first-strike capability outside the context of a crisis, probably during a

A Case #23-5017    Document #2005450    Filed: 06/28/2023    Page 193 o

military exercise. He described the leadership's worries of a 'decapitating' strike from the Pershing II's, and its belief that the US could mobilize for a surprise attack in a mere seven to ten days. He explained how the London Residency responded to the requirements, and the effects that reporting had back at Moscow Center in reinforcing Soviet fears. He described conversations he had held with colleagues from Center and from the GRU. The next month, President Reagan held his first summit with Mikhail Gorbachev and relations began to thaw." (PFIAB, pages 22–23)

The PFIAB report also cited a January 1989 "End of Tour Report Addendum" by Lieutenant General Leonard H. Perroots, who had served as Assistant Chief of Staff for Intelligence, US Air Forces Europe, during the 1983 Able Archer exercise, to emphasize the potential consequences of the intelligence gap during the Able Archer exercise. Perroots addressed Able Archer as well as Gordiyevskiy's reporting in that memorandum:

1. (U) In 1983, I was assigned as the DCS for Intelligence, US Air Forces, Europe, Ramstein AB, Germany. The annual NATO Command and Control exercise ABLE ARCHER was scheduled to begin during the first week of November. The context of this nuclear command and control exercise was relatively benign; the scenario had been purposely chosen to be non-controversial, and the exercise itself was a routine annual event. This exercise closely followed the bombing of air defense sites in Lebanon and directly followed the invasion of Grenada. As I recall, however, there was no particular feeling of tension in the European Theater beyond that which is normal.

2. [*portion marking not declassified*] Only the fact that Soviet Intelligence collection assets (primarily low level signals intercept units) had failed to return to garrison after their normal concentrated coverage of NATO's AUTUMN FORGE exercise series could be reckoned strange at all. As the kickoff date of ABLE ARCHER neared it was clear that there was a great deal of Soviet interest in the forthcoming events. Again, this seemed nothing out of the ordinary. We knew that there was a history of intensive Soviet collection against practice Emergency Action Messages (EAM's) related to nuclear release.

3. [*portion marking not declassified*] ABLE ARCHER started in the morning of 3 November, and progressed immediately in the scenario to NATO STATE ORANGE. At 2100Z on 04 November NSA issued an electrical product report G/00/3083-83, entitled "SOVIET AIR FORCES, GSFG, PLACED ON HEIGHTENED READINESS, 2 NOVEMBER 1983." I saw this message on the morning of 5 November and discussed it with my air analysts. It stated that as of 1900Z on 02 November the fighter-bomber divisions of the air force of Group Soviet Forces, Germany had been placed in a status of heightened alert. All

divisional and regimental command posts and supporting command and control elements were to be manned around-the-clock by augmented teams.

4. [*portion marking not declassified*] In addition to the directed command and control changes the fighter-bomber divisions were also ordered to load out one squadron of aircraft in each regiment (if this order applied equally across GSFG the result would have been at least 108 fighter-bombers on alert). These aircraft were to be armed and placed at readiness 3 (30 minute alert) to "destroy first-line enemy targets." The alert aircraft were to be equipped with a self-protection jamming pod. We knew from subsequent NSA reporting that a squadron at Neuruppin, East Germany sought and was apparently granted permission to configure its aircraft without the ECM pod because of an unexpected weight and balance problem. My air analysts opined that this message meant that at least this particular squadron was loading a munitions configuration that they had never actually loaded before, i.e., a warload.

5. [*portion marking not declassified*] At this point, I spoke to CinC-USAFE, General Billy Minter. I told him we had some unusual activity in East Germany that was probably a reaction to the ongoing ABLE ARCHER. He asked if I thought we should increase the real force generation. I said that we would carefully watch the situation, but there was insufficient evidence to justify increasing our real alert posture. At this point in the exercise our forces were in a simulated posture of NATO State ORANGE and local SALTY NATION tests involving simulated generation of combat aircraft were underway at various locations including Ramstein AB. If I had known then what I later found out I am uncertain what advice I would have given.

6. [*portion marking not declassified*] An NSA message dated 022229Z DEC 83 provided the rest of the picture as far as we knew it—at least until the reports began to surface from the British penetration of the KGB, Oleg Gordievskiy. This GAMMA message was entitled "SOVIET 4th AIR ARMY AT HEIGHTENED READINESS IN REACTION TO NATO EXERCISE ABLE ARCHER, 2–11 NOVEMBER 1983." This report stated that the alert had been ordered by the Chief of the Soviet Air Forces, Marshal Kutakhov, and that all units of the Soviet 4th Air Army were involved in the alert "which included preparations for immediate use of nuclear weapons." This report described activity that was contemporaneous with that reflected in East Germany, but because of the specific source of this material it was not available in near realtime. The two pieces taken together present a much more ominous picture.

7. [*portion marking not declassified*] Equally ominous in its own way was the fact that this alert was never reflected at all by the I&W system.

A Case #23-5017    Document #2005450    Filed: 06/28/2023    Page 195 o

At the time of this occurrence there was no distribution of electrically reported GAMMA material to the Tactical Fusion Center at Boerfink. I remedied that shortfall in the aftermath of this activity. Secondly, a real standdown of aircraft was secretly ordered in at least the Soviet Air Forces units facing the Central Region, and that standdown was not detected. The Soviet alert in response to ABLE ARCHER began after nightfall on Wednesday evening, there was no flying on the following two days which led to the weekend, and then the following Monday was 7 November, the revolution holiday. The absence of flying could always be explained, although a warning condition was raised finally on about the ninth of November when overhead photography showed fully armed FLOGGER aircraft on air defense alert at a base in East Germany. When this single indicator was raised, the standdown had been underway for a week.

8. [*portion marking not declassified*] For the next six months I was on a soapbox about ABLE ARCHER whenever I could discuss it at the appropriate classification level. I spoke to the Senior Military Intelligence Officers' Conference (SMIOC), and I buttonholed a lot of people. I suggested that perhaps we should move our annual exercise away from the November 7 holiday, because it is clear to me that the conjunction of the two events causes a warning problem that can never be solved. Our problem here was that we had a couple of very highly classified bits of intelligence evidence about a potentially disastrous situation that never actually came to fruition. For decision-makers it was always difficult to believe that there could have been any serious reaction by the Soviets to such a "benign" exercise as ABLE ARCHER. From the Soviet perspective, however, it might have appeared very different. It was difficult for all of us to grasp that, but Oleg Gordievskiy's reporting began to provide a somewhat more frightening perspective when it became available in the Fall of 1985.

9. (S) By the time Gordievskiy's reporting began to surface for analytical review I was the Director of DIA. Gordievskiy's initial reporting about a "war scare" in 1983 immediately caught my attention. It should be pointed out at the outset that Gordievskiy knew nothing of a military alert during ABLE ARCHER. He did, however, tell us something of a chilling story about Moscow Center's Intelligence tasking during 1983. He related that there was a project called either "RYaN" or "VRYaN," the latter probably being the full form of a Russian acronym meaning "sudden rocket nuclear attack." There was a cadre of specialists in Moscow Center charged with, among other things, finding the evidence of planning for a western attack on the Soviet Union. Beginning in 1982 and continuing into 1983 Gordievskiy says that this group became ever more insistent that an attack was being planned by the West. By March 1983 the KGB officers in Moscow

had decided that ABLE ARCHER 83 would provide an excellent cover for the planned attack, and KGB and GRU residencies around the world were being directed to find the evidence. Gordievskiy, living in London at the time, states that he never believed there was really a threat, and that the London residency of the KGB simply ignored the collection requirements until it began to become clear that Moscow was serious. During the summer of 1983 the London residency sent some reports that, in retrospect, Gordievskiy believed might have hyped the war hysteria. He never really believed in the threat, however, and reported during his debriefing in 1985 that he thought the VRYaN hysteria might have been some kind of internal political ploy. I must reiterate again that Gordievskiy did not know about the secret military alert of November 1983.

10. [*portion marking not declassified*] The US intelligence community has never really closed with this analytical problem. A SNIE addressed this subject, [*1½ lines not declassified*]. The position has been taken again and again that had there been a real alert we would have detected more of it, but this may be whistling through the graveyard. It is not certain that we looked hard enough or broadly enough for information. For Western collectors the context was peacetime without even the most basic ripples of crisis. For the Soviets, however, the view may have looked quite different. It is uncertain how close to war we came or even if that was a possibility at all, but we know from Gordievskiy that the analysts in Moscow had predicted that the West would launch the attack from a posture of NATO State ORANGE. What might have happened that day in November 1983 if we had begun a precautionary generation of forces rather than waiting for further information?

(Central Intelligence Agency, National Intelligence Council, Job 91B00551: Speeches, Lectures, Briefing Files (1988–1989), Box 1, Folder 2: C/NIC (Ermarth) Chrons March 1989)

The PFIAB report commented that "as his parting shot before retirement," Perroots, who served as DIA Director from 1985 to 1989, sent a January 1989 "letter outlining his disquiet over the inadequate treatment of the Soviet war scare to, among others, the DCI and this Board." The report continued: "Following the detection of the Soviet Air Forces' increased alert status, it was his [Perroots's] recommendation, made in ignorance, not to raise US readiness in response—a fortuitous, if ill-informed, decision given the changed political environment at the time." (PFIAB, pages 27–28) In further accord with Perroots's report, the PFIAB report concluded: "As it happened, the military officers in charge of the Able Archer exercise minimized the risk by doing nothing in the face of evidence that parts of the Soviet armed forces were moving to an unusual alert level. But these officials acted correctly out of instinct, not informed guidance, for in the years leading up to Able

Archer they had received no guidance as to the possible significance of apparent changes in Soviet military and political thinking." (PFIAB, page x)

[*name not declassified*] the National Warning Staff and [*name not declassified*] of the Office of Soviet Analysis prepared an undated memorandum reacting to Perroots's comments, which was distributed by Ermarth to the DCI and DDCI for consideration:

SUBJECT

Comments on Memorandum of Lieutenant General Perroots

*Summary*

1. General Perroots's memorandum describes in detail a worrisome episode in which Soviet Air Forces in Central Europe assumed an abnormally high alert posture in early November 1983 in response to a routine NATO command post and communications exercise. Two Special National Intelligence Estimates (SNIEs)—written in May and August 1984 respectively—treated the events described in the General's memorandum in the larger context of US-Soviet relations. Those Estimates judged that the Soviets displayed a heightened sense of concern in many areas of national life primarily because of the more aggressive policies of the US Administration in the early 1980s, the US strategic modernization program that included the peacekeeper ICBM and the D–5 SLBM, the actual implementation of NATO's 1979 decision for Intermediate Range Nuclear Force (INF) modernization by deployment of the first Pershing–II missile systems to Europe, and because of the leadership instability in the USSR from the successive deaths of three general secretaries between 1981 and 1985. A National Intelligence Estimate in 1988 assessed the significance of the events in 1983 with the benefit of a longer time perspective and reached the same broad conclusions. General Perroots's memorandum and its enclosure neither raises no new issues nor contains new data that change the strategic judgements already written. [*portion marking not declassified*]

2. At the tactical and theater level, however, General Perroots's memorandum surfaces a long-standing warning problem, i.e., the need for the Intelligence Community in Washington to provide more timely, discriminating, and accurate warning in support of the theater commander. Perroots, who at the time was Assistant Chief of Staff for Intelligence, US Air Forces Europe (USAFE), describes three serious problems for which there are only partial answers. First, he believes that, despite the enormous amount of resources and energy spent in guarding against a strategic surprise attack, USAFE was not well informed in that the US warning systems did not detect in a timely fashion the extent of Soviet precautionary readiness measures undertaken in November 1983 in response to NATO exercise Able Archer.

Secondly, he believes that Washington-based agencies had relevant information which was not available to the European Command when he recommended against a precautionary US alert by US Air Forces Europe in response to the detection of the increased alert status of the Soviet Air Forces. Finally, [*1½ lines not declassified*], General Perroots is concerned that in similar circumstances—even if there is better intelligence—another officer in his position might recommend a precautionary US Air Force alert in Europe that could have serious escalatory consequences, unless there are timely, national level assessments available. [*portion marking not declassified*]

3. The dilemma that General Perroots has described is characteristic of the warning problems faced by senior US military intelligence chiefs in many past crises, in which decisions about US force posture were dependent upon threat assessments prepared rapidly and based on fragmentary and incomplete intelligence. General Perroots's memorandum reinforces two long-standing lessons of warning: warning systems are no substitute for seasoned, professional judgment and assessments; and they require constant attention and improvement. In terms of process, however, his memorandum reinforces the requests of successive SACEURs and other US theater commanders for better ways to provide more timely national-level warning assessments to the theater intelligence staffs.

*The Setting of Exercise Able Archer, 1983*

4. The larger context of the period, often referred to as the "war scare," reflected increasing Soviet concern over the drift in superpower relations, which some in the Soviet leadership felt indicated an increased threat of war and increased likelihood of the use of nuclear weapons. These concerns were shaped in part by a Soviet perception that the correlation of forces was shifting against the Soviet Union and that the United States was taking steps to achieve military superiority. These fears were exacerbated by planned improvements in US strategic forces, as well as by progress made by NATO to implement its 1979 decision began with NATO's deliberations in the late 1970s to modernize its theater nuclear forces by deploying Pershing–II missiles and Ground Launched Cruise Missiles (GLCMs) to Europe. By 1981, after the new US Administration was inaugurated, the Soviet concern intensified almost concurrently with General Secretary Brezhnev's decline in health [*portion marking not declassified*]

5. [*1½ lines not declassified*] the increased Soviet concern stemmed from a fear by some Soviet leaders that the West might seek to exploit its new capability in Europe for a preemptive nuclear surprise attack against the USSR, for which the Soviets had no defense. From a national security standpoint, this Western capability led to questions about the

long-standing Soviet view that crises and other adverse developments in international affairs would precede the outbreak of war and be the basis for long-term early warning. The Soviets had concern that the West might decide to attack the USSR without warning during a time of vulnerability—such as when military transport was used to support the harvest—thus compelling the Soviets to consider a preemptive strike at the first sign of US preparations for a nuclear strike. [*portion marking not declassified*]

6. From Brezhnev's death in 1982 through late 1984, the Soviets ordered a number of unusual measures not previously detected except during periods of crisis with the West. These included: disruption of the normal troop rotation cycle for Soviet forces in central Europe in 1984; updating civil defense procedures in the USSR from 1982 through 1984; in the spring of 1984 the first, and apparently only, time that Soviet military trucks were not sent to support the harvest since the end of World War II; and increased alert reactions even to routine NATO training from 1982 to 1984. The cumulative effect of these and other measures was to reduce the Soviet and Warsaw Pact vulnerability to a surprise attack. The abnormal Soviet reaction to NATO Exercise Able Archer in November 1983 occurred within this setting. [*portion marking not declassified*]

7. Concurrent with the military dimension, [*less than 1 line not declassified*] other precautionary measures taken by the Soviets probably were a reflection of the political maneuvering in the Kremlin in 1982 and 1983 associated with Andropov's rise to power. In exchange for military support for his bid to become General Secretary, Andropov, then KGB Chairman, may have promised greater allocations of resources for military industrial expansion, improved civil defense readiness, and military modernization. All of these were espoused by the Chief of the General Staff at the time, Marshal Ogarkov. Successful manipulation of threat perceptions by the KGB at Andropov's direction would have helped cultivate the strong military backing Andropov enjoyed when he came to power. In this environment, the heightened Soviet military reactions to NATO exercises would have been expected. [*portion marking not declassified*]

8. Finally, [*less than 1 line not declassified*] the Soviets wanted the new US Administration to tone down its anti-Soviet rhetoric, moderate its hostile attitudes, and begin serious business on trade and arms control. Some analysts believe that the Soviet activities, [*1 line not declassified*], were intended to be detected and were contrived to nudge Washington toward a more conciliatory and cooperative attitude in dealings with Moscow. [*less than 1 line not declassified*]

*Intelligence Community Performance*

9. Since 1983, the Intelligence Community, CIA's Office of Soviet Analysis, and the Defense Intelligence Agency have treated the events

surrounding the Able Archer episode in a number of in-house publications and national estimates. When General Perroots was Director, DIA, analysts concurred in the Community assessments in 1988 that the "war scare" period of heightened Soviet concern was triggered by the change of the US Administration and its policy decisions toward the Soviet threat; that at least some Soviet leaders concluded that a surprise nuclear attack by NATO was possible outside the context of a crisis; and that this led to a number of Soviet responses consistent with such a conclusion, including high priority intelligence collection taskings. DIA believes, however, that the Soviet measures were primarily a function of the internal leadership instability from which Andropov emerged as General Secretary. [*portion marking not declassified*]

*General Perroots's Problem*

10. The events surrounding NATO Exercise Able Archer, however, all occurred some months before the first national-level assessments were written, and General Perroots was confronted with a serious choice of what recommendation to make to the Commander, US Air Forces Europe. The Department of Defense warning indicators system reflected that, [*less than 1 line not declassified*] Soviet air units in Poland and East Germany were observed at a high state of alert, although no other Soviet strategic forces adopted such a posture. [*2½ lines not declassified*] Consequently, the Commander, US Air Forces Europe, was concerned whether he should exercise his discretionary authority to increase the alert posture of his force. General Perroots recommended that no precautionary US alert be instituted, despite the evidence of his own warning system. Several days later, the Soviet air forces returned to normal alert status. [*portion marking not declassified*]

11. [*1 paragraph (10 lines) not declassified*]

12. General Perroots's concerns about this episode are legitimate to the extent that they deal with Washington's support to the US military commands. [*4½ lines not declassified*] Third, national-level assessments of Soviet intentions were not available when most needed. The General's memorandum indicates the Defense Department has taken steps to correct the problems in the processing and dissemination of intelligence. The third problem, of timely national-level support, is continuous. As Director of DIA, General Perroots himself initiated organizational and procedural changes to improve DIA's support to the commands. [*portion marking not declassified*]

13. Underlying all of the above, however, is the paradox that General Perroots believes he made a correct judgment, but for the wrong reasons. This is not a new problem nor is there a solution to it. General Perroots has accurately identified inherent limits of the warning systems as they now exist. His candor is a safeguard against complacency

and denial that problems exist. Additionally, he raises again the need for better understanding in Washington of the problems facing intelligence in the field. [*portion marking not declassified*]

[*name not declassified*]        [*name not declassified*]
Chief, TFD/RIG/SOVA   Director, National Warning Staff

(Central Intelligence Agency, National Intelligence Council, Job 91B00551: Speeches, Lectures, Briefing Files (1988–1989), Box 1, Folder 2: C/NIC (Ermarth) Chrons March 1989)

The 1990 PFIAB report repeatedly stressed: "During the November 1983 NATO 'Able Archer' nuclear release exercise, the Soviets implemented military and intelligence activities that previously were seen only during actual crises. These included: placing Soviet air forces in Germany and Poland on heightened alert, [*4 lines not declassified*]."

The PFIAB report argued: "The meaning of these events obviously was of crucial importance to American and NATO policymakers. If they were simply part of a Soviet propaganda campaign designed to intimidate the US, deter it from deploying improved weapons, and arouse US domestic opposition to foreign policy initiatives, then they would not be of crucial significance. If they reflected an internal power struggle—for example, a contest between conservatives and pragmatists, or an effort to avoid blame for Soviet economic failures by pointing to (exaggerated) military threats—then they could not be ignored, but they would not imply a fundamental change in Soviet strategy. But if these events were expressions of a genuine belief on the part of Soviet leaders that the US was planning a nuclear first strike, causing the Soviet military to prepare for such an eventuality—by, for example, readying itself for a preemptive strike of its own—then the 'war scare' was a cause for real concern." (PFIAB, page vi)

The PFIAB report concluded that the IC's failure to adequately report on Able Archer and the 1983–1984 Soviet war scare had important implications for the future: "In cases of great importance to the survival of our nation, and especially where there is important contradictory evidence, the Board believes that intelligence estimates must be cast in terms of alternative scenarios that are subjected to comparative risk assessments. This is the critical defect in the war scare episode." (PFIAB, page ix)

# June 30, 2021 Agreement Between the National Security Archive and the Defense Intelligence Agency

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL SECURITY ARCHIVE,  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | |
| v.  ) | Civil Action No. 19-0529 (CJN) |
| ) | |
| DEFENSE INTELLIGENCE AGENCY,  ) | |
| ) | |
| Defendant.  ) | |

**JOINT STATUS REPORT**

Pursuant to the Court's instruction at the June 8, 2021, hearing held in this matter, Plaintiff National Security Archive ("Plaintiff") and Defendant Defense Intelligence Agency ("Defendant" or "DIA"), a component-agency of U.S. Department of Defense ("DOD"), through undersigned counsel, respectfully submit this Joint Status Report.

1. The Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, request that is the subject of this case sought disclosure of files from three specifically-identified boxes of records that were in the possession of the National Archives and Records Administration ("NARA") and located in the Washington Records Center in Suitland, Maryland. The FOIA request and Plaintiff's Complaint identified the requested files by accession number, volume, location, file name and date, and box number. Docket Entry Nos. 1, 1-3, Feb. 28, 2019 (Complaint and Exhibit A to Plaintiff's Complaint, copy of Plaintiff's original FOIA request). Plaintiff's original FOIA request sought copies of all documents stored in the specified boxes at the Washington Records Center. *Id.*

2. On June 8, 2021, the Court held a hearing in this matter to address disputes between the parties regarding two documents that were not contained in the three boxes but were listed

on the indices (that DIA understands NARA created) of the boxes' contents that DIA provided to Plaintiff in the beginning of the case: (i) 1/9/89 "End of Tour Report (Addendum) General Perroots"; and (ii) 3/17/89 "End of Tour Report (LtGen Perroots)". At the close of the hearing, the Court instructed the parties to confer to determine whether they could reach an agreement regarding how to move forward to resolve the disputes.

3.     The parties have conferred and have reached an agreement consisting of the following terms:

    a.   Plaintiff will submit a new FOIA request to Defendant specifically requesting the two documents at issue;

    b.   Defendant will promptly begin processing the request after it is received; and

    c.   Defendant will provide Plaintiff with an update regarding the processing of the new FOIA request three weeks after the request is received.

4.     Defendant clarifies that although it has agreed to accept a new FOIA request and promptly process the request, the parties' agreement does not include litigating any issues that arise regarding the new FOIA request as part of the instant litigation. It is Defendant's position that any issues that arise regarding the new FOIA request should first be channeled through the administrative process like any other FOIA request, because the request that is the subject of this suit specifically identified three boxes, which DIA searched for and located, whereas the new FOIA request is asking DIA to search for specific documents within the Agency, which is a substantively different request and not a subset of the original request. Further, Defendant believes its agreement to promptly process a new FOIA request for the two documents without adding this new FOIA request to this litigation is more than reasonable in light of the fact that Plaintiff has known since December 2019 that Document No. 2 (3/17/89 "End of Tour Report (LtGen Perroots)") was not in the boxes, *see* ECF No. 19 at ¶ 9 (Joint Status Report of 12/20/2019), but Plaintiff never filed a new FOIA

request seeking this document and Plaintiff waited until May 2021 to assert that a search within the Agency should be conducted for this document.

5.    Plaintiff's position is that, because the scope of its original FOIA request sought copies of the two missing documents *wherever* they may exist within DIA's possession, not just within the two boxes, any issues arising from the new FOIA request should be litigated in this case.  NARA and DOD FOIA regulations instruct FOIA requestors to include as much information and specificity as possible about the records being sought, including possible document locations (*i.e.*, file designation and reference number).  36 C.F.R. § 1250.20(a); 32 C.F.R. § 286.5(a).  *See also* NARA, FOIA Reference Guide (2018, https://www.archives.gov/foia/foia-guide.  This is what Plaintiff did.  Further, Plaintiff's Complaint made plain that the two documents at issue were those Plaintiff was most interested in, as have many subsequent filings in this case.  Docket Entry No. 1, Feb. 28, 2019.  *See also, e.g.*, Docket Entry Nos. 35, 37, 39.  Plaintiff reserves the right to raise this issue at a later stage in the case.

6.    Plaintiff further states that its timing of raising these issues is entirely reasonable in light of the fact that it did not learn that the indices were inaccurate until *May 2021*, *two* years into the case.  December 10, 2019 was DIA's first substantive response to Plaintiff's FOIA request — DIA had not previously processed *any* documents in this matter.  In its first response, DIA processed a total of three documents, including Document No. 2.  Docket Entry No. 35, p. 7 (Appendix B to Plaintiff's April 7, 2021 Status Report, outlining history of DIA's processing of documents between December 10, 2019_and March 31, 2019).  Between February 11, 2019 and March 31, 2019, DIA subsequently processed 24 additional documents.  *Id.* at p. 2, 7.  Plaintiff did not learn that <u>any</u> other documents were

JA199

not found in their files or in the boxes until May 5, 2021, when DIA confirmed that the document it had produced on April 31, 2021 purporting to be Document No. 1, was not in fact the "End of Tour Report (Addendum)" listed in the indices as being in the boxes. Docket Entry No. 37 (Plaintiff's May 11, 2021 Status Report). The "End of Tour Report (Addendum)" (Document No. 1), is a separate document from the "End of Tour Report" (Document No. 2). Accordingly, Plaintiff did not know that there was a broader issue regarding the accuracy of the indices and the presence of the records until the spring of 2021, at which point Plaintiff promptly informed DIA and the Court of the missing documents. *Id.;* Docket Entry No. 37-6 (May 2021 Email Thread between H. Jacobs and A. Seabrook).

Dated:  June 29, 2021

*For Plaintiff:*

John S. Guttmann
D.C. Bar No.: 251934
Beveridge & Diamond, P.C.

*//s//  Hilary T. Jacobs*
Hilary T. Jacobs
D.C. Bar No. 1021353;
Beveridge & Diamond, P.C.
1350 I Street, N.W., Suite 700
Washington, D.C. 20005-3311
Telephone: (202) 789-6020
Facsimile: (202) 789-6190
Email: jguttmann@bdlaw.com

Respectfully submitted,

*For Defendant:*

CHANNING D. PHILLIPS,  Bar No. 415793
Acting United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

 By: */s/  April Denise Seabrook*
APRIL DENISE SEABROOK
D.C. Bar No. 993730
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2525
April.Seabrook@usdoj.gov

# EXHIBIT A



# The National Security Archive

The George Washington University
Gelman Library, Suite 701
2130 H Street, NW
Washington, DC 20037

Phone:  202/994-7000
Fax:  202/994-7005
nsarchiv@gwu.edu
http://www.nsarchive.org

## *FAX COVER SHEET*

| | |
|---|---|
| Date: | **August 15, 2018** |
| To: | **Charles Marineau—Chief, Freedom of Information Staff** |
| Organization: | **Defense Intelligence Agency** |
| From: | **Nate Jones, The National Security Archive** |

Number of pages (including cover sheet) – 4

If there is a problem with this transmission, please call us at 202-994-7000 as soon as possible.

---

**Message: FOIA Request Attached.**

**National Security Archive Number:** 20181092DIA046

**Thank you.**

---

An independent non-governmental research institute and li
the Archive collects and publishes declassified documents
Publication royalties and tax-deductible contributions through The Natio

20181092DIA046                  DIA
RECNO:55485              SEQCOR:196635
FOISG: Jones, Nate
SF-135 Director's Official Correspondence Files

JA202

# The National Security Archive

**The George Washington University**
**Gelman Library, Suite 701**
**2130 H Street, N.W.**
**Washington, D.C. 20037**



TOP SECRET

**Phone: 202.994.7000**
**Fax: 202.994.7005**
**nsarchiv@gwu.edu**
**http://www.nsarchive.org**

---

Wednesday, August 15, 2018

Charles Marineau
Freedom of Information Staff
Defense Intelligence Agency
ATTN: FACZAI (FOIA)
7400 Pentagon
Washington, DC 20301-7400

Re: Request under the FOIA, in reply refer to Archive#          **20181092DIA046**

Dear Mr. Marineau:

Pursuant to the Freedom of Information Act (FOIA), I hereby request the following:

*Copies of the following records stored at the Washington Records Center in Suitland, Maryland (accession no. 0040, volume 3): "DR's Official Correspondence File" (Jan-Dec 89), "DR's Message File" (Jan-Dec 89), and "DR's Chron Files of Correspondence" (1 Jan-15 May 89) in DIA Box Numbers 1/3, "DR's Chron Files of Correspondence" (16 May-15 Nov 89) in DIA Box Numbers 2/3, and "DR's Chron Files of Correspondence" (16 Nov-31 Dec 89) in DIA Box Numbers 3/3. I have included a copy of the SF-135, which gives the location information of these documents for your convenience.*

*As you are aware, records such as these, stored at the Washington Records Center but not yet accessioned to NARA must be retrieved from the WRC and reviewed for release under FOIA by the originating agency (the DIA in this case).  For more information, see Title 36 → Chapter XII → Subchapter C → Part 1250  →  (c) of NARA's regulations, available at https://www.ecfr.gov/cgi-bin/text-idx?SID=212c3f863ee5ea2d0d03ca4ab31e4a49&mc=true&node=pt36.3.1250&rgn=div5#se36.3.1250_18.*

If you regard any of these documents as potentially exempt from the FOIA's disclosure requirements, I request that you nonetheless exercise your discretion to disclose them. As the FOIA requires, please release all reasonably segregable non exempt portions of documents. To permit me to reach an intelligent and informed decision whether or not to file an administrative appeal of any denied material, please describe any withheld records (or portions thereof) and explain the basis for your exemption claims.

As a representative of the news media, the National Security Archive qualifies for "representative of the news media" status under 5 U.S.C. Sec. 552(a)(4)(A)(ii)(II) and, therefore, may not be charged and review fees. (See *National Security Archive v. U.S. Department of Defense,*880 F.2d 1381 Cir. 1989), *cert denied,* 110 S Ct. 1478 (1990)). This request is made as part of a scholarly and research project that is intended for publication and is not for commercial use. For details on the Archive's research and extensive publication activities please see our website at www.nsarchive.org.

---

An Independent non-governmental research institute and library located at the George Washington University, the Archive collects and publishes declassified documents obtained through the Freedom of Information Act.  Publication royalties and tax deductible contributions through The National Security Archive Fund, Inc. underwrite the Archive's Budget.

# The National Security Archive



| The George Washington University | Phone: 202.994.7000 |
|---|---|
| Gelman Library, Suite 701 | Fax: 202.994.7005 |
| 2130 H Street, N.W. | nsarchiv@gwu.edu |
| Washington, D.C. 20037 | http://www.nsarchive.org |

To expedite the release of the requested documents, please disclose them on an interim basis as they become available to you, without waiting until all the documents have been processed. Please notify me before incurring any photocopying costs over $100. If you have any questions regarding the identity of the records, their location, the scope of the request or any other matters, please call me at (202) 994-7000 or email me at foiamail@gwu.edu. I look forward to receiving your response within the twenty day statutory time period.

Sincerely yours,

Nate Jones

An Independent non-governmental research institute and library located at the George Washington University, the Archive collects and publishes declassified documents obtained through the Freedom of Information Act. Publication royalties and tax deductible contributions through The National Security Archive Fund, Inc. underwrite the Archive's Budget.

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 → 9

## RECORDS TRANSMITTAL AND RECEIPT

Complete and send original and two copies of this form to the appropriate Federal Records Center for approval prior to shipment of records. See specific instructions on reverse.

| 1. TO | (Complete the address for the records center serving your area as shown in 36 CFR 1228.150.) Federal Records Center |
|---|---|

**6. FROM** (Enter the name and complete mailing address of the office retir... receipt of this form will be sent to this address)

Director
Defense Intelligence Agency
ATTN: ESO
Washington, DC 20340-1038

| 2. AGENCY TRANSFER AUTHORIZATION | TRANSFERRING AGENCY OFFICIAL (Signature and title) *Melissa Folz* Ms. Melissa Folz, Records Manager | DATE 2/19/93 |
|---|---|---|
| 3. AGENCY CONTACT | TRANSFERRING AGENCY LIAISON OFFICIAL (Name, office and telephone No.) M.E. Pauly, ESO, (703) 697-8130 | |
| 4. RECORDS CENTER RECEIPT | RECORDS RECEIVED BY (Signature and title) *Jackie A. Barnes* Chief Accession & Disposal Branch | DATE 4/6/93 |

## RECORDS DATA

| ACCESSION NUMBER | | | VOLUME (cu. ft.) | AGENCY BOX NUMBERS | SERIES DESCRIPTION (With inclusive dates of records) | RESTRICTION | DISPOSAL AUTHORITY (Schedule and item number) | DISPOSAL DATE | COMPL LOC |
|---|---|---|---|---|---|---|---|---|---|
| RG (a) | FY (b) | NUMBER (c) | (d) | (e) | (f) | (g) | (h) | (i) | LOC |
| 373 | 93 | 0040 | 3 | 1/3 | DR's Official Correspondence File (Jan-Dec 89) | S | DIAM 13-1 Item 200a | Perm 2010 | 1-59- |
| | | | | | DR's Message File (Jan-Dec 89) | S | | | |
| | | | | | DR's Chron Files of Correspondence (1 Jan - 15 May 89) | S | | | |
| | | | | 2/3 | DR's Chron Files of Correspondence (16 May - 15 Nov 89) | S | | | |
| | | | | 3/3 | DR's Chron Files of Correspondence (16 Nov - 31 Dec 89) | S | | | |

JA205

```
                        ***   TX REPORT   ***
                        ********************


        TRANSMISSION OK

        TX/RX NO                3857
        DESTINATION TEL #       915713720500pp974236
        DESTINATION ID          DOD
        ST. TIME                08/15 13:09
        TIME USE                00'50
        PAGES SENT                 2
        RESULT                  OK
```



# The National Security Archive

The George Washington University
Gelman Library, Suite 701
2130 H Street, NW
Washington, DC 20037

Phone: 202/994-7000
Fax: 202/994-7005
foiamail@gwu.edu
http://www.nsarchive.org


## *FAX COVER SHEET*


Date:           August 15, 2018

To:             Information Officer

Organization:   Department of Defense Office of Freedom of Information

From:           The National Security Archive

Number of pages (including cover sheet) _2_

If there is a problem with this transmission, please call me at 202-994-7145 as soon as possible.


National Security Archive FOIA Case No. 20181093DOD133


JA206

# EXHIBIT B

# Fax Transmission

**To:**

**Fax:** archivefoia@gwu.edu

**RE:**   New FOIA Request - Archive #20211088CIA128

**From:**  National Security Archive - NJ

**Date:**  8/10/2021 11:26:36 AM EDT

**Pages:**  35

---

**Comments:**

Dear Information and Privacy Coordinator,

Attached is a new FOIA request, Archive #20211088CIA128, submitted on behalf of Nate Jones.
Please send all correspondence for this request to foiamail@gwu.edu.

Sincerely,

Wendy Valdes
FOIA Coordinator
National Security Archive
(202) 994-7213

The George Washington University
Gelman Library, Suite 701
2130 H St. NW
Washington, DC 20037
Phone/Fax: (202) 994-7000/7005
Email: nsarchiv@gwu.edu
Website: www.nsarchive.org

August 2, 2021

Central Intelligence Agency

VIA POST AND FAX

Information and Privacy Coordinator
Central Intelligence Agency
Washington, D.C. 20505

703-613-3007

Re: Request under the FOIA

Dear Information Officer:

Pursuant to the Freedom of Information Act (FOIA), I hereby request disclosure of the following:

-*January 9, 1989 "End of Tour Report (Addendum) General Perroots"*

*The document requested is an after-action letter that Lieutenant General Leonard Perroots wrote in January 1989 describing a narrowly averted nuclear crisis that occurred in Europe in 1983, when North Atlantic Treaty Organization forces' annual exercise practicing nuclear release procedures put Soviet forces on high alert.  Lack of further escalation of the 1983 Soviet "War Scare" was largely due to Lieutenant General Perroots' decision not to raise U.S. readiness in response to Soviet forces' increased alert status.*

*On February 16, 2021, the Department of State ("DOS") Office of the Historian published a transcribed version of this letter in a new volume of its Foreign Relations of the United States series, with limited redactions.  The Transcription is available to the public at the following DOS link: https://static.history.state.gov/frus/frus1981-88v04/pdf/frus1981-88v04.pdf (numbered paragraphs 1--10 on pages 1426—1429; relevant portions attached for reference).*

**In this publication, DOS provides the following citation to the document, from the CIA: (Central Intelligence Agency, National Intelligence Council, Job 90T00435R: Chronological Files (1988), Box 1, Folder 12: C/NIC Chrono for December 1988).**

*This request seeks the document described above, whether it is housed in CIA's files stored at the location listed in the citation above, or elsewhere.*

If you regard this document as potentially exempt from the FOIA's disclosure requirements, I request that you nonetheless exercise your discretion to disclose it. As the FOIA requires, please release all reasonably segregable nonexempt portions of document. To permit me to reach an informed decision whether or not to file an administrative appeal of any denied material, please describe any withheld records (or portions thereof) and explain the basis for your exemption claims.

An independent non-governmental research institute and library located at the George Washington University, the Archive collects and publishes declassified documents obtained through the Freedom of Information Act.  Publication royalties and tax-deductible contributions through The National Security Archive Fund, Inc. underwrite the Archive's budget.



The George Washington University
Gelman Library, Suite 701
2130 H St. NW
Washington, DC 20037
Phone/Fax: (202) 994-7000/7005
Email: nsarchiv@gwu.edu
Website: www.nsarchive.org

The National Security Archive qualifies for "representative of the news media" status under 5 U.S.C. Sec. 552(a)(4)(A)(ii)(II) and, therefore, may not be charged search and review fees. (See *National Security Archive v. U.S. Department of Defense,* 880 F.2d 1381 (D.C. Cir. 1989), *cert denied,* 110 S Ct. 1478 (1990)). This request is made as part of a scholarly and news research project that is not for commercial use. For details on the Archive's research and publication activities, visit our website at www.nsarchive.org.

Please notify me before incurring any photocopying costs over $100.

If you have any questions regarding the identity of these records, their location, the scope of the request or any other matters, call (202) 994-7000 or send an email to foiamail@gwu.edu. I look forward to receiving your response within the twenty-day statutory period.

Sincerely,

Nate Jones

Enclosure

An independent non-governmental research institute and library located at the George Washington University, the Archive collects and publishes declassified documents obtained through the Freedom of Information Act. Publication royalties and tax-deductible contributions through The National Security Archive Fund, Inc. underwrite the Archive's budget.

# Excerpt from Foreign Relations of the United States, 1981-1988 Volume IV (2021)

# FOREIGN RELATIONS

## OF THE

# UNITED STATES

## 1981–1988

## VOLUME IV

## SOVIET UNION, JANUARY 1983– MARCH 1985



## DEPARTMENT OF STATE

Washington

JA212



**Foreign Relations of the
United States, 1981–1988**

**Volume IV**

# Soviet Union, January 1983– March 1985

| | |
|---|---|
| *Editor* | Elizabeth C. Charles |
| *General Editor* | Kathleen B. Rasmussen |

United States Government Publishing Office
Washington
2021

DEPARTMENT OF STATE

Office of the Historian

Foreign Service Institute

For sale by the Superintendent of Documents, U.S. Government Publishing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512-1800;   DC area (202) 512-1800
Fax: (202) 512-2250 Mail: Stop IDCC, Washington, DC 20402-0001

# About the Series

The *Foreign Relations of the United States* series presents the official documentary historical record of major foreign policy decisions and significant diplomatic activity of the U.S. Government. The Historian of the Department of State is charged with the responsibility for the preparation of the *Foreign Relations* series. The staff of the Office of the Historian, Foreign Service Institute, under the direction of the General Editor of the *Foreign Relations* series, plans, researches, compiles, and edits the volumes in the series. Secretary of State Frank B. Kellogg first promulgated official regulations codifying specific standards for the selection and editing of documents for the series on March 26, 1925. These regulations, with minor modifications, guided the series through 1991.

Public Law 102–138, the Foreign Relations Authorization Act, established a new statutory charter for the preparation of the series which was signed by President George H.W. Bush on October 28, 1991. Section 198 of P.L. 102–138 added a new Title IV to the Department of State's Basic Authorities Act of 1956 (22 U.S.C. 4351, et seq.).

The statute requires that the *Foreign Relations* series be a thorough, accurate, and reliable record of major U.S. foreign policy decisions and significant U.S. diplomatic activity. The volumes of the series should include all records needed to provide comprehensive documentation of major foreign policy decisions and actions of the U.S. Government. The statute also confirms the editing principles established by Secretary Kellogg: the *Foreign Relations* series is guided by the principles of historical objectivity and accuracy; records should not be altered or deletions made without indicating in the published text that a deletion has been made; the published record should omit no facts that were of major importance in reaching a decision; and nothing should be omitted for the purposes of concealing a defect in policy. The statute also requires that the *Foreign Relations* series be published not more than 30 years after the events recorded. The editors are convinced that this volume meets all regulatory, statutory, and scholarly standards of selection and editing.

*Sources for the* Foreign Relations *Series*

The *Foreign Relations* statute requires that the published record in the *Foreign Relations* series include all records needed to provide comprehensive documentation of major U.S. foreign policy decisions and significant U.S. diplomatic activity. It further requires that government agencies, departments, and other entities of the U.S. Government en-

III

gaged in foreign policy formulation, execution, or support cooperate with the Department of State historians by providing full and complete access to records pertinent to foreign policy decisions and actions and by providing copies of selected records. Most of the sources consulted in the preparation of this volume were located at the Department of State in Washington and the National Archives and Records Administration.

The editors of the *Foreign Relations* series have complete access to all the retired records and papers of the Department of State: the central files of the Department; the special decentralized files ("lot files") of the Department at the bureau, office, and division levels; the files of the Department's Executive Secretariat, which contain the records of international conferences and high-level official visits, correspondence with foreign leaders by the President and Secretary of State, and the memoranda of conversations between the President and the Secretary of State and foreign officials; and the files of overseas diplomatic posts. All of the Department's central files for 1981–1989, which were stored in electronic and microfilm formats, will eventually be transferred to the National Archives. Once these files are declassified and processed, they will be accessible. All of the Department's decentralized office files from this period that the National Archives deems worthy of permanent preservation will also eventually be transferred to the National Archives where they will be available for use after declassification and processing.

Research for *Foreign Relations* volumes in this subseries is undertaken through special access to restricted documents at the Ronald Reagan Presidential Library and other agencies. While all the material printed in this volume has been declassified, some of it is extracted from still-classified documents. The staff of the Reagan Library is processing and declassifying many of the documents used in this volume, but they may not be available in their entirety at the time of publication. Presidential papers maintained and preserved at the Reagan Library include some of the most significant foreign affairs related documentation from White House offices, the Department of State, and other Federal agencies including the National Security Council, the Central Intelligence Agency, the Department of Defense, and the Joint Chiefs of Staff.

Some of the research for volumes in this subseries was done in Reagan Library record collections scanned for the Remote Archive Capture (RAC) project. This project, which is administered by the National Archives and Records Administration's Office of Presidential Libraries, was designed to coordinate the declassification of still-classified records held in various Presidential libraries. As a result of the way in which records were scanned for the RAC, the editors of the

*Foreign Relations* series were not always able to determine whether attachments to a given document were in fact attached to the paper copy of the document in the Reagan Library file. In such cases, some editors of the *Foreign Relations* volumes have indicated this ambiguity by stating that the attachments were "Not found attached."

*Editorial Methodology*

The documents are presented chronologically according to time in Washington, DC. Memoranda of conversation are placed according to the time and date of the conversation, rather than the date the memorandum was drafted.

Editorial treatment of the documents published in the *Foreign Relations* series follows Office style guidelines, supplemented by guidance from the General Editor and the Chiefs of the Declassification and Publishing Divisions. The original document is reproduced as exactly as possible, including marginalia or other notations, which are described in the footnotes. Texts are transcribed and printed according to accepted conventions for the publication of historical documents within the limitations of modern typography. A heading has been supplied by the editors for each document included in the volume. Spelling, capitalization, and punctuation are retained as found in the original text, except that obvious typographical errors are silently corrected. Other mistakes and omissions in the documents are corrected by bracketed insertions: a correction is set in italic type; an addition in roman type. Words or phrases underlined in the original document are printed in italics. Abbreviations and contractions are preserved as found in the original text, and a list of abbreviations and terms is included in the front matter of each volume. In telegrams, the telegram number (including special designators such as Secto) is printed at the start of the text of the telegram.

Bracketed insertions are also used to indicate omitted text that deals with an unrelated subject (in roman type) or that remains classified after declassification review (in italic type). The amount and, where possible, the nature of the material not declassified has been noted by indicating the number of lines or pages of text that were omitted. Entire documents withheld after declassification review have been accounted for and are listed in their chronological place with headings, source notes, and the number of pages not declassified.

All brackets that appear in the original document are so identified in the footnotes. All ellipses are in the original documents.

The first footnote to each document indicates the source of the document and its original classification, distribution, and drafting information. This note also provides the background of important docu-

ments and policies and indicates whether the President or his major policy advisers read the document.

Editorial notes and additional annotation summarize pertinent material not printed in the volume, indicate the location of additional documentary sources, provide references to important related documents printed in other volumes, describe key events, and provide summaries of and citations to public statements that supplement and elucidate the printed documents. Information derived from memoirs and other first-hand accounts has been used when appropriate to supplement or explicate the official record.

The numbers in the index refer to document numbers rather than to page numbers.

*Advisory Committee on Historical Diplomatic Documentation*

The Advisory Committee on Historical Diplomatic Documentation, established under the *Foreign Relations* statute, monitors the overall compilation and editorial process of the series and advises on all aspects of the preparation of the series and declassification of records. The Advisory Committee does not necessarily review the contents of individual volumes in the series, but it makes recommendations on issues that come to its attention and reviews volumes as it deems necessary to fulfill its advisory and statutory obligations.

*Declassification Review*

The Office of Information Programs and Services, Bureau of Administration, conducted the declassification review for the Department of State of the documents published in this volume. The review was conducted in accordance with the standards set forth in Executive Order 13526 on Classified National Security Information and applicable laws.

The principle guiding declassification review is to release all information, subject only to the current requirements of national security as embodied in law and regulation. Declassification decisions entailed concurrence of the appropriate geographic and functional bureaus in the Department of State, other concerned agencies of the U.S. Government, and the appropriate foreign governments regarding specific documents of those governments. The declassification review of this volume, which began in 2015 and was completed in 2019, resulted in the decision to withhold 1 document in full, excise a paragraph or more in 13 documents, and make minor excisions of less than a paragraph in 20 documents.

The Office of the Historian is confident, on the basis of the research conducted in preparing this volume and as a result of the declassification review process described above, that the documentation and edito-

rial notes presented here provide a thorough, accurate, and reliable record of the Reagan administration's policy toward the Soviet Union, January 1983–March 1985.

**Adam M. Howard, Ph.D.**                    **Kathleen B. Rasmussen, Ph.D.**
*The Historian*                                          *General Editor*

Foreign Service Institute
February 2021

# Preface

*Structure and Scope of the* Foreign Relations *Series*

This volume is part of a subseries of volumes of the *Foreign Relations* series that documents the most important issues in the foreign policy of the administration of Ronald Reagan. This volume documents U.S. bilateral relations with the Soviet Union from January 1983 to March 1985. Due to the importance of U.S.-Soviet relations during the Reagan administration, the Reagan subseries includes an extensive examination of U.S. bilateral relations with the Soviet Union in four volumes: *Foreign Relations*, 1981–1988, Volume III, Soviet Union, January 1981–January 1983; Volume IV, Soviet Union, January 1983–March 1985; Volume V, Soviet Union, March 1985–October 1986; and Volume VI, Soviet Union, October 1986–January 1989. In conjunction with these volumes, several other volumes in the subseries will provide the reader with a fuller understanding of how U.S.-Soviet relations impacted the global character of the Cold War and U.S. strategy during the Reagan era. For documentation on U.S.-Soviet nuclear arms control negotiations, see *Foreign Relations*, 1981–1988, Volume XI, START I, and Volume XII, INF, 1984–1988. *Foreign Relations*, 1977–1980, Volume V, European Security, 1977–1983, documents the NATO dual-track decision and TNF/INF negotiations through 1983. Documentation dealing with nuclear non-proliferation, nuclear testing, chemical and biological weapons, and space arms control, including anti-satellite systems, will be published in *Foreign Relations*, 1981–1988, Volume XL, Global Issues I. The development of the Strategic Defense Initiative and ABM-related issues and other strategic considerations are addressed in *Foreign Relations*, 1981–1988, Volume XLIII, National Security Policy, 1981–1984, and Volume XLIV, Parts 1 and 2, National Security Policy, 1985–1988. For selected documentation on the human rights situation in the Soviet Union, see *Foreign Relations*, 1981–1988, Volume XLI, Global Issues II.

*Focus of Research and Principles of Selection for* Foreign Relations, *1981–1988, Volume IV*

This volume documents the development of the Reagan administration's policies toward the Soviet Union from January 1983 to March 1985. With Reagan's signature of National Security Decision Directive (NSDD) 75 on January 17, 1983, the administration's approaches and policies toward the Soviet Union were codified in a specific four-part agenda: arms control, human rights, regional issues, and bilateral relations. This volume examines the efforts of administration officials,

IX

namely Secretary of State George Shultz, President's Assistants for National Security Affairs William Clark and later Robert McFarlane, and NSC Staff member Jack Matlock, to implement the four-part agenda in dealing with the Soviet Union. The documentation demonstrates how administration officials developed policies related to the four-part agenda, mainly in the National Security Council (NSC) and Department of State, and then promoted these various tracks during meetings between Shultz, and on occasion Reagan, and Soviet Ambassador Anatoly Dobrynin and Soviet Foreign Minister Andrei Gromyko in various fora. Although no high-level meeting took place between Reagan and either Soviet General Secretaries Yuri Andropov or Konstantin Chernenko during their short tenures, the documents provide a window into how the Reagan administration viewed the Soviet leadership and formulated policies to deal with whomever was in charge.

The volume also documents the bureaucratic struggle Shultz faced against the NSC in implementing the four-part agenda laid out by NSDD 75 and in gaining access to President Reagan. After some wrangling, by June 1983 an understanding emerged between Shultz and Clark, which allowed Shultz regular weekly meetings with Reagan. When Jack Matlock joined the NSC Staff as primary adviser on the Soviet Union, Shultz gained a like-minded ally in approaches to dealing with the USSR. While some administration officials, such as Secretary of Defense Caspar Weinberger, consistently argued that negotiating with the Soviet Union seemed futile, Shultz, Matlock, and others pushed President Reagan to see the value in keeping lines of communication open with the Soviets. Even during tragic events, such as the Soviet downing of the KAL 007 airliner in September 1983, Shultz kept his meeting with Gromyko a few days later in Madrid and used this as an opportunity to admonish the Foreign Minister for this inexplicable act and the inability of the Soviet Union to admit fault on the international stage.

The volume documents several Cold War flashpoints during the contentious months of 1983. The announcement in March 1983 of Reagan's Strategic Defense Initiative (SDI) caused concern for the Soviet Union because it shifted the strategic balance from the theory of mutually assured destruction toward a defensive nuclear posture. Aside from the downing of the KAL airliner, the Euromissiles crisis came to a head with U.S. deployments of INF missiles to several NATO allies in late November 1983. While the bulk of the documentation dealing with these negotiations is covered in two other volumes, the scheduled deployments permeated all other aspects of U.S.-Soviet relations in 1983. The volume also presents selective documentation related to the 1983 Soviet "War Scare" and the November 1983 NATO nuclear exercise, Able Archer (see Appendix A). The volume attempts to dem-

onstrate that even with these challenges, Shultz and others pressed to keep moving ahead with the four-part agenda and promote greater dialogue in U.S.-Soviet relations.

After the Soviet walkout of the INF negotiations in Geneva in late 1983, the administration focused throughout 1984 on developing a framework to restart arms control negotiations; the documents in this volume demonstrate the difficulties involved in opening new talks with the Soviet Union. Reagan's SDI program continued to cause problems. The Soviets believed SDI would "militarize space," and therefore the debates over how SDI would be dealt with during negotiations were a major point of contention during this period. When Shultz and Gromyko met in January 1985, they finally reached an agreement on a new round of umbrella negotiations. The Nuclear and Space Talks (NST), scheduled to begin in Geneva in March 1985, would have three tracks, START, INF, and Defense and Space. The documents in the volume trace how various positions from the Department of State, NSC, the Department of Defense, and the Central Intelligence Agency impacted the decision to move forward with the three arms control tracks. While the other parts of the four-part agenda remained in play during this period and were discussed in bilateral meetings, restarting arms control talks seemed to trump the other areas of concern. Little did the U.S. or Soviet negotiators know that on the eve of these new NST negotiations, Chernenko would die, and a younger, more ambitious Soviet leader would emerge and dramatically change the course of U.S.-Soviet relations.

*Acknowledgments*

The editor wishes to acknowledge the invaluable assistance of officials at the Ronald Reagan Presidential Library in Simi Valley, California, especially Lisa Jones and Cate Sewell. A special thanks to the Central Intelligence Agency staff for providing access and assistance with Reagan Library materials scanned for the Remote Archive Capture project, and to the History Staff of the CIA's Center for the Study of Intelligence for arranging full access to CIA records. The editor wishes to acknowledge the staff at Information Programs and Services at the Department of State for facilitating access to Department of State records and coordinating the review of this volume within the Department. Sandy Meagher was helpful in providing access to Department of Defense materials. The editor extends thanks to the family and executor of the Estate of former Secretary of Defense Caspar W. Weinberger for granting Department of State historians access to the personal papers of Secretary Weinberger deposited at the Library of Congress. Additional thanks are due to officials of the Library of Congress Manuscript Division for facilitating that access.

Elizabeth C. Charles collected, selected, and annotated the documentation for this volume under the supervision of David Geyer, Chief of the Europe Division, and Adam Howard, then General Editor of the *Foreign Relations* series. The volume was reviewed by David Geyer and then Historian Stephen Randolph. Kerry Hite and Chris Tudda coordinated the declassification review under the supervision of Carl Ashley, Chief of the Declassification Coordination Division. Kerry Hite also performed the copy and technical editing under the supervision of Mandy Chalou, Chief of the Editing and Publishing Division.

**Elizabeth C. Charles, Ph.D.**
*Historian*

# Contents

About the Series ....................................................... III

Preface ................................................................. IX

Sources ................................................................ XV

Abbreviations and Terms ............................................ XIX

Persons ................................................................ XXV

Note on U.S. Covert Actions ........................................ XXXI

Soviet Union, January 1983–March 1985

  January 1983–April 1983

    "Dobrynin seemed like he wanted to run. But the
    Secretary is a jogger": Shultz and the Four-Part
    Agenda ..................................................... 1

  April 1983–August 1983

    Preparing the Next Steps in U.S.-Soviet Relations:
    Human Rights and Arms Control ......................... 120

  September 1983–October 1983

    "Controlled Fury": Shootdown of KAL 007 ............... 291

  October 1983–February 1984

    "The Winter of Soviet Discontent": INF Walkout, the
    War Scare, and the 'Ivan and Anya' Speech ............ 429

  February 1984–June 1984

    "Talking about each other rather than to each other":
    Reagan, Chernenko, and U.S.-Soviet Stalemate ........ 606

  June 1984–October 1984

    "Sitting on Mountains of Nuclear Weapons": The
    Reagan-Gromyko Meeting .................................. 845

  October 1984–January 1985

    "An iron-ass Secretary of State": Shultz and Gromyko
    in Geneva ................................................... 1079

XIII

January 1985–March 1985

"The principal menace to our security?": Reagan and
    the Ambiguities of Soviet Leadership ....................    1355

Appendix  ..........................................................    1420

# Page Left Intentionally Blank

# Appendix

## A. Editorial Note

Stark deviations in assessments by the U.S. Intelligence Community of the November 1983 NATO exercise Able Archer and the Soviet "war scare" led to a much later 1990 investigation by the President's Foreign Intelligence Advisory Board during the George H.W. Bush administration, resulting in the report, "The Soviet 'War Scare.'" (George H.W. Bush Library, Bush Presidential Records, President's Foreign Intelligence Advisory Board, Subject Files; Reports to the President-War Scare Report 1990 [OA/IDCF01830–020]) The February 15, 1990, PFIAB report analyzed intelligence and reporting on the Soviet war scare, Able Archer, and other related activities. The PFIAB report stated: "During the past year, the President's Foreign Intelligence Advisory Board has carefully reviewed the events of that period to learn what we (the U.S. intelligence community) knew, when we knew it, and how we interpreted it. The Board has read hundreds of documents, conducted more than 75 interviews with American and British officials, and studied the series of National Intelligence Estimates (NIE's) and other intelligence assessments that have attempted over the last six years to interpret the war scare data. Additionally, we have offered our own interpretation of the war scare events." (PFIAB, pages vi–vii) Although outside the normal scope of this volume, the 1990 PFIAB report and other memoranda from 1988 and 1989 are addressed in this editorial note because the documents focus upon crucial events from 1983 to 1984.

Reactions from the Intelligence Community (IC) and policymakers to the events surrounding Able Archer and the Soviet "war scare" differed significantly and evolved over time. The contemporaneous reporting in 1983–1984 from the Central Intelligence Agency (CIA), National Intelligence Council (NIC), [*text not declassified*] drew varied conclusions about Soviet anxieties. While some reporting assessed that "Contrary to the impression conveyed by Soviet propaganda, Moscow does not appear to anticipate a near-term military confrontation with the United States" (see Document 157), another analysis presented evidence that [*text not declassified*].

Retrospective assessments of these events seem to conflate the NATO Able Archer exercise with the broader "war scare" talk emanating from Moscow related to INF deployments. The Soviet military unquestionably reacted to Able Archer differently than to previous NATO exercises. (See Document 134.) Whether the Soviet response was attributable to the circumstances of the time, to the "war scare"

1420

(whether real or Soviet propaganda), or to a credible belief within the Soviet military leadership or the Politburo that the United States was planning to launch a nuclear first strike against the USSR, under the guise of a NATO exercise or otherwise, remains unclear on the basis of the available evidence.

After a year of research and a reassessment of the relevant intelligence and documentation, the PFIAB report stated: "We believe that the Soviets perceived that the correlation of forces had turned against the USSR, that the US was seeking military superiority, and that the chances of the US launching a nuclear first strike—perhaps under cover of a routine training exercise—were growing. We also believe that the US intelligence community did not at the time, and for several years afterwards, attach sufficient weight to the possibility that the war scare was real. As a result, the President was given assessments of Soviet attitudes and actions that understated the risks to the United States. Moreover, these assessments did not lead us to reevaluate our own military and intelligence actions that might be perceived by the Soviets as signaling war preparations.

"In two separate Special National Intelligence Estimates (SNIEs) in May and August 1984, the intelligence community said: 'We believe strongly that Soviet actions are not inspired by, and Soviet leaders do not perceive, a genuine danger of imminent conflict or confrontation with the United States.' Soviet statements to the contrary were judged to be 'propaganda.' [See Documents 221 and 264.]

"The Board believes that the evidence then did not, and certainly does not now, support such categoric conclusions. Even without the benefit of subsequent reporting and looking at the 1984 analysis of then available information, the tone of the intelligence judgments was not adequate to the needs of the President." (PFIAB, pages vi–vii)

During November 1983, Able Archer and the Soviet responses to this exercise received little immediate attention in the U.S. Intelligence Community. (See Document 135.) However, by spring 1984, some in the intelligence communities in the United States [*text not declassified*] believed the Reagan administration should have recognized Soviet sensitivities and anxieties about a potential U.S. first strike. [*text not declassified*].

According to the PFIAB report, [*text not declassified*] "KGB Deputy Resident Colonel Oleg Gordiyevskiy, [*text not declassified*] had witnessed what he saw as Soviet paranoia over a US nuclear first strike; [*text not declassified*] As one of the most senior KGB officers in London, [*text not declassified*]." (PFIAB, page 10)

In a covering memorandum [*less than 1 line not declassified*] to Director of Central Intelligence William Casey and others, Herbert Meyer, Vice Chairman of the National Intelligence Council, wrote: [*text not*

*declassified*]. The PFIAB report commented that the [*text not declassified*] report was "not well received in the US intelligence community." (PFIAB, pages 10–11)

Another contemporaneous analysis from the CIA, the May 1984 SNIE 11–10–84/JX concluded: "We believe strongly that Soviet actions are not inspired by, and Soviet leaders do not perceive, a genuine danger of imminent conflict or confrontation with the United States." (See Document 221.) The PFIAB report commented on this SNIE: "The estimate boldly declared that 'Recent Soviet war scare propaganda . . . is aimed primarily at discrediting US policies and mobilizing 'peace' pressures among various audiences abroad.' In a more piecemeal fashion, it was judged that 'Each Soviet action has its own military or political purpose sufficient to explain it.' The accelerated tempo of Soviet live exercise activity was explained simply as a reflection of 'long-term Soviet military objectives.'

"The Soviet reaction to Able Archer 83 was dismissed as a 'counterexercise,' but analysts acknowledged that the 'elaborate Soviet reaction' was 'somewhat greater than usual.' [*less than 1 line not declassified*] prior to and during the exercise indicated that the Warsaw Pact Intelligence services, especially the KGB, were admonished 'to look for any indication that the United States was about to launch a first nuclear strike,' analysts concluded that 'by confining heightened readiness to selected air units, Moscow clearly revealed that it did not, in fact, think there was a possibility at this time of a NATO attack.' The assessment, however, was not specific about what type of defensive or precautionary Soviet activity might be expected—and detected—were they preparing for an offensive NATO move." (PFIAB, page 13)

The PFIAB report continued its critique of SNIE 11–10–84/JX: IC "analysts dismissed [*less than 1 line not declassified*] on the war scare, including the KGB's formal tasking to its Residencies. 'This war scare propaganda has reverberated in Soviet security bureaucracies and emanated through other channels such as human sources. [See for example, Document 144.] We do not believe it reflects authentic leadership fears of imminent conflict.'" The report contended: "Such judgments were made even though the analysis was tempered 'by some uncertainty as to current Soviet leadership perceptions of the United States, by continued uncertainty about the Politburo decisionmaking processes, and by our inability at this point to conduct a detailed examination of how the Soviets might have assessed recent US/NATO military exercises and reconnaissance operations'—which, of course, included the previous Able Archer exercise. In other words, US analysts were unsure of what the Kremlin leadership thought or how it made decisions, nor had they adequately assessed the Soviet reaction to Able Archer 83. This notwithstanding, the estimate concluded: 'We are confident that,

as of now, the Soviets see not an imminent military clash but a costly and—to some extent—more perilous strategic and political struggle over the rest of the decade.'" (PFIAB, page 14)

The Board had similar criticisms of the August 1984 SNIE 11–9–84, "Soviet Policy Toward the United States in 1984" (see Document 264), for its "categorical and unqualified" judgments "about the likelihood of the war scare," and the analysts' conclusions: "We strongly believe that the Soviet actions are not inspired by, and Soviet leaders do not perceive, a genuine danger of imminent conflict or confrontation with the United States. Also, we do not believe that the Soviet war talk and other actions 'mask' Soviet preparations for an imminent move toward confrontation on the part of the USSR." (PFIAB, page 19–20) The PFIAB report continued: "Analysts readily acknowledged that the previous six months had seen extraordinary, unprecedented Soviet activities. Large scale military exercise, 'anomalous behavior' during the troop rotation, withdrawn military support for the harvest (last seen prior to the 1968 Czech invasion), new, deployed weapons systems (termed 'in response to INF deployments'), and heightened internal vigilance and security activities were noted. These events, however, were judged to be 'in line with long-evolving plans and patterns, rather than with sharp acceleration of preparations for major war.'" (PFIAB, page 19)

The PFIAB report acknowledged that its assessment and criticism of the May and August 1984 SNIEs "derives from information not known at the time. Our purpose in presenting this report is not so much to criticize the conclusions of the 1984 SNIE's as to raise questions about the ways these estimates were made and subsequently reassessed." (PFIAB, page ix) The PFIAB report concluded: "Reasonable people can disagree about the conclusions of the 1984 SNIE's. The PFIAB does disagree with many of them. More worrisome to us, however, is the process by which the estimates were made and subsequently reassessed. Although both estimates were reportedly reviewed by outside readers—and both, but particularly the first, contained alternative scenarios—strongly worded interpretations were defended by explaining away facts inconsistent with them. Consequently, both estimates contained, in essence, single outcome forecasting based in large part on near-term anomalous behavior. Moreover, neither alerted the reader to the risks erroneously rejecting the correct scenario." (PFIAB, page 30) The PFIAB report criticized the performance of the IC in 1983–1984, showing that contemporary assessments of Soviet intentions after Able Archer did not go far enough in providing President Reagan with alternative scenarios, explaining that the anxiety from the Soviet leadership could have been real.

In criticizing contemporary estimates, the PFIAB report emphasized intelligence that had not been available to the IC during these

years, principally information provided by Gordiyevskiy after he defected in 1985. Robert McFarlane's thoughts on the influence of Gordiyevskiy's information on the President are recorded in a December 16, 1988, memorandum for the record:

## Memorandum for the Record

16 December 1988

SUBJECT

[*less than 1 line not declassified*] Robert F. McFarlane Regarding the Influence of Oleg Gordiyevskiy's Reporting on President Reagan

On 15 December [*less than 1 line not declassified*] Robert F. ("Bud") McFarlane, formerly National Security Advisor to the President, as to the veracity of claims [*less than 1 line not declassified*] that the reporting of KGB officer [*less than 1 line not declassified*] Oleg Gordiyevskiy about the Kremlin's fear of war greatly influenced President Reagan in the mid-1980s to seek better relations with the USSR. In response, Bud made several points:

He definitely remembered the reporting associated (later) with Gordiyevskiy that conveyed the Kremlin's fear of war. He also specifically recalled [*less than 1 line not declassified*] on Gordiyevskiy's assessments given to the President [*less than 1 line not declassified*].

He noted that he discussed this reporting with the President on several occasions. This was in the course of numerous discussions extending throughout 1983 and part of 1984 about the apparent anxieties being transmitted by Moscow through many channels, [*less than 1 line not declassified*].

The President, according to Bud, saw this reporting attributed to Gordiyevskiy in the larger context of a Soviet "war-scare" campaign arising from the NATO decision to deploy INF and from Reagan's hard line on defense, SDI, etc. In the President's view, either the Soviets were paranoid in strange ways we could not let bother us, or they were fabricating the appearance of fear to intimidate and sway us, which we should even more be prepared to ignore.

Often in these conversations, according to Bud, the President outlined his sustained intention to concentrate on building US strength and credibility in the first term and to move toward diplomatic reengagement in the second. The President's key speech of January 1984 [see Document 158] was a natural step in a long-planned shift of policy. Neither Gordiyevskiy's reporting nor the Soviet "war-scare" campaign in general were responsible for the evolution of the President's policy.

Bud said he'd been queried before on this matter by [*name not declassified*], a journalist, who might be (or have been) writing an article on it. Against the background of the above, Bud said he discounted Gordiyevskiy's impact on the President [*less than 1 line not declassified*].

[*1 paragraph (8½ lines) not declassified*]

[*name not declassified*]

(Central Intelligence Agency, National Intelligence Council, Job 90T00435R: Chronological Files (1988), Box 1, Folder 12: C/NIC Chrono for December 1988)

McFarlane's recollections in this memorandum for the record correlate with a January 1984 memorandum by Jack Matlock, Soviet specialist on the NSC Staff, which demonstrated an awareness of potential Soviet concerns, but concluded:

"——The Soviet leadership is not overly nervous about the immediate prospect of armed confrontation with the U.S.;

"——They are however very nervous about the prospects five to ten years down the road—not so much of a confrontation as such, as of a decisive shift in the balance of military power." (See Document 157.)

As mentioned in the 1988 memorandum for the record, McFarlane did recall "later" reporting to Reagan about Gordiyevskiy. The PFIAB report addressed Gordiyevskiy's situation in relation to the war scare and the 1984 SNIE assessments: "The Board found that after the 1984 assessments were issued, the intelligence community did not again address the war scare until after the defection to Great Britain of KGB Colonel Oleg Gordiyevskiy in July, 1985. Gordiyevskiy had achieved the rank of Acting Resident in the United Kingdom, but he fell under suspicion as a Western agent. Recalled to the Soviet Union, he was placed under house arrest and intensely interrogated. Able to flee his watchers, Gordiyevskiy was exfiltrated from Moscow by the British Secret Intelligence Service."

The report continued: "During lengthy debriefing sessions that followed, Gordiyevskiy supplied a fuller report on the Soviet war hysteria. This report, complete with documentation from KGB Headquarters and entitled 'KGB Response to Soviet Leadership Concern over US Nuclear Attack,' was first disseminated in a restricted manner within the US intelligence community in October 1985. Gordiyevskiy described the extraordinary KGB collection plan, initiated in 1981, to look for signs that the US would conduct a surprise nuclear attack on the Soviet Union. He identified and reviewed factors driving leadership fears. Based on the perception the US was achieving a strategic advantage, those in the Kremlin were said to believe that the US was likely to resort to nuclear weapons much earlier in a crisis than previously expected. They also were concerned the US might seek to exploit its first-strike capability outside the context of a crisis, probably during a

military exercise. He described the leadership's worries of a 'decapitating' strike from the Pershing II's, and its belief that the US could mobilize for a surprise attack in a mere seven to ten days. He explained how the London Residency responded to the requirements, and the effects that reporting had back at Moscow Center in reinforcing Soviet fears. He described conversations he had held with colleagues from Center and from the GRU. The next month, President Reagan held his first summit with Mikhail Gorbachev and relations began to thaw." (PFIAB, pages 22–23)

The PFIAB report also cited a January 1989 "End of Tour Report Addendum" by Lieutenant General Leonard H. Perroots, who had served as Assistant Chief of Staff for Intelligence, US Air Forces Europe, during the 1983 Able Archer exercise, to emphasize the potential consequences of the intelligence gap during the Able Archer exercise. Perroots addressed Able Archer as well as Gordiyevskiy's reporting in that memorandum:

1. (U) In 1983, I was assigned as the DCS for Intelligence, US Air Forces, Europe, Ramstein AB, Germany. The annual NATO Command and Control exercise ABLE ARCHER was scheduled to begin during the first week of November. The context of this nuclear command and control exercise was relatively benign; the scenario had been purposely chosen to be non-controversial, and the exercise itself was a routine annual event. This exercise closely followed the bombing of air defense sites in Lebanon and directly followed the invasion of Grenada. As I recall, however, there was no particular feeling of tension in the European Theater beyond that which is normal.

2. [*portion marking not declassified*] Only the fact that Soviet Intelligence collection assets (primarily low level signals intercept units) had failed to return to garrison after their normal concentrated coverage of NATO's AUTUMN FORGE exercise series could be reckoned strange at all. As the kickoff date of ABLE ARCHER neared it was clear that there was a great deal of Soviet interest in the forthcoming events. Again, this seemed nothing out of the ordinary. We knew that there was a history of intensive Soviet collection against practice Emergency Action Messages (EAM's) related to nuclear release.

3. [*portion marking not declassified*] ABLE ARCHER started in the morning of 3 November, and progressed immediately in the scenario to NATO STATE ORANGE. At 2100Z on 04 November NSA issued an electrical product report G/00/3083-83, entitled "SOVIET AIR FORCES, GSFG, PLACED ON HEIGHTENED READINESS, 2 NOVEMBER 1983." I saw this message on the morning of 5 November and discussed it with my air analysts. It stated that as of 1900Z on 02 November the fighter-bomber divisions of the air force of Group Soviet Forces, Germany had been placed in a status of heightened alert. All

divisional and regimental command posts and supporting command and control elements were to be manned around-the-clock by augmented teams.

4. [*portion marking not declassified*] In addition to the directed command and control changes the fighter-bomber divisions were also ordered to load out one squadron of aircraft in each regiment (if this order applied equally across GSFG the result would have been at least 108 fighter-bombers on alert). These aircraft were to be armed and placed at readiness 3 (30 minute alert) to "destroy first-line enemy targets." The alert aircraft were to be equipped with a self-protection jamming pod. We knew from subsequent NSA reporting that a squadron at Neuruppin, East Germany sought and was apparently granted permission to configure its aircraft without the ECM pod because of an unexpected weight and balance problem. My air analysts opined that this message meant that at least this particular squadron was loading a munitions configuration that they had never actually loaded before, i.e., a warload.

5. [*portion marking not declassified*] At this point, I spoke to CinC-USAFE, General Billy Minter. I told him we had some unusual activity in East Germany that was probably a reaction to the ongoing ABLE ARCHER. He asked if I thought we should increase the real force generation. I said that we would carefully watch the situation, but there was insufficient evidence to justify increasing our real alert posture. At this point in the exercise our forces were in a simulated posture of NATO State ORANGE and local SALTY NATION tests involving simulated generation of combat aircraft were underway at various locations including Ramstein AB. If I had known then what I later found out I am uncertain what advice I would have given.

6. [*portion marking not declassified*] An NSA message dated 022229Z DEC 83 provided the rest of the picture as far as we knew it—at least until the reports began to surface from the British penetration of the KGB, Oleg Gordievskiy. This GAMMA message was entitled "SOVIET 4th AIR ARMY AT HEIGHTENED READINESS IN REACTION TO NATO EXERCISE ABLE ARCHER, 2–11 NOVEMBER 1983." This report stated that the alert had been ordered by the Chief of the Soviet Air Forces, Marshal Kutakhov, and that all units of the Soviet 4th Air Army were involved in the alert "which included preparations for immediate use of nuclear weapons." This report described activity that was contemporaneous with that reflected in East Germany, but because of the specific source of this material it was not available in near realtime. The two pieces taken together present a much more ominous picture.

7. [*portion marking not declassified*] Equally ominous in its own way was the fact that this alert was never reflected at all by the I&W system.

At the time of this occurrence there was no distribution of electrically reported GAMMA material to the Tactical Fusion Center at Boerfink. I remedied that shortfall in the aftermath of this activity. Secondly, a real standdown of aircraft was secretly ordered in at least the Soviet Air Forces units facing the Central Region, and that standdown was not detected. The Soviet alert in response to ABLE ARCHER began after nightfall on Wednesday evening, there was no flying on the following two days which led to the weekend, and then the following Monday was 7 November, the revolution holiday. The absence of flying could always be explained, although a warning condition was raised finally on about the ninth of November when overhead photography showed fully armed FLOGGER aircraft on air defense alert at a base in East Germany. When this single indicator was raised, the standdown had been underway for a week.

8. [*portion marking not declassified*] For the next six months I was on a soapbox about ABLE ARCHER whenever I could discuss it at the appropriate classification level. I spoke to the Senior Military Intelligence Officers' Conference (SMIOC), and I buttonholed a lot of people. I suggested that perhaps we should move our annual exercise away from the November 7 holiday, because it is clear to me that the conjunction of the two events causes a warning problem that can never be solved. Our problem here was that we had a couple of very highly classified bits of intelligence evidence about a potentially disastrous situation that never actually came to fruition. For decision-makers it was always difficult to believe that there could have been any serious reaction by the Soviets to such a "benign" exercise as ABLE ARCHER. From the Soviet perspective, however, it might have appeared very different. It was difficult for all of us to grasp that, but Oleg Gordievskiy's reporting began to provide a somewhat more frightening perspective when it became available in the Fall of 1985.

9. (S) By the time Gordievskiy's reporting began to surface for analytical review I was the Director of DIA. Gordievskiy's initial reporting about a "war scare" in 1983 immediately caught my attention. It should be pointed out at the outset that Gordievskiy knew nothing of a military alert during ABLE ARCHER. He did, however, tell us something of a chilling story about Moscow Center's Intelligence tasking during 1983. He related that there was a project called either "RYaN" or "VRYaN," the latter probably being the full form of a Russian acronym meaning "sudden rocket nuclear attack." There was a cadre of specialists in Moscow Center charged with, among other things, finding the evidence of planning for a western attack on the Soviet Union. Beginning in 1982 and continuing into 1983 Gordievskiy says that this group became ever more insistent that an attack was being planned by the West. By March 1983 the KGB officers in Moscow

had decided that ABLE ARCHER 83 would provide an excellent cover for the planned attack, and KGB and GRU residencies around the world were being directed to find the evidence. Gordievskiy, living in London at the time, states that he never believed there was really a threat, and that the London residency of the KGB simply ignored the collection requirements until it began to become clear that Moscow was serious. During the summer of 1983 the London residency sent some reports that, in retrospect, Gordievskiy believed might have hyped the war hysteria. He never really believed in the threat, however, and reported during his debriefing in 1985 that he thought the VRYaN hysteria might have been some kind of internal political ploy. I must reiterate again that Gordievskiy did not know about the secret military alert of November 1983.

10. [*portion marking not declassified*] The US intelligence community has never really closed with this analytical problem. A SNIE addressed this subject, [*1½ lines not declassified*]. The position has been taken again and again that had there been a real alert we would have detected more of it, but this may be whistling through the graveyard. It is not certain that we looked hard enough or broadly enough for information. For Western collectors the context was peacetime without even the most basic ripples of crisis. For the Soviets, however, the view may have looked quite different. It is uncertain how close to war we came or even if that was a possibility at all, but we know from Gordievskiy that the analysts in Moscow had predicted that the West would launch the attack from a posture of NATO State ORANGE. What might have happened that day in November 1983 if we had begun a precautionary generation of forces rather than waiting for further information?

(Central Intelligence Agency, National Intelligence Council, Job 91B00551: Speeches, Lectures, Briefing Files (1988–1989), Box 1, Folder 2: C/NIC (Ermarth) Chrons March 1989)

The PFIAB report commented that "as his parting shot before retirement," Perroots, who served as DIA Director from 1985 to 1989, sent a January 1989 "letter outlining his disquiet over the inadequate treatment of the Soviet war scare to, among others, the DCI and this Board." The report continued: "Following the detection of the Soviet Air Forces' increased alert status, it was his [Perroots's] recommendation, made in ignorance, not to raise US readiness in response—a fortuitous, if ill-informed, decision given the changed political environment at the time." (PFIAB, pages 27–28) In further accord with Perroots's report, the PFIAB report concluded: "As it happened, the military officers in charge of the Able Archer exercise minimized the risk by doing nothing in the face of evidence that parts of the Soviet armed forces were moving to an unusual alert level. But these officials acted correctly out of instinct, not informed guidance, for in the years leading up to Able

Archer they had received no guidance as to the possible significance of apparent changes in Soviet military and political thinking." (PFIAB, page x)

[*name not declassified*] the National Warning Staff and [*name not declassified*] of the Office of Soviet Analysis prepared an undated memorandum reacting to Perroots's comments, which was distributed by Ermarth to the DCI and DDCI for consideration:

SUBJECT

Comments on Memorandum of Lieutenant General Perroots

*Summary*

1. General Perroots's memorandum describes in detail a worrisome episode in which Soviet Air Forces in Central Europe assumed an abnormally high alert posture in early November 1983 in response to a routine NATO command post and communications exercise. Two Special National Intelligence Estimates (SNIEs)—written in May and August 1984 respectively—treated the events described in the General's memorandum in the larger context of US-Soviet relations. Those Estimates judged that the Soviets displayed a heightened sense of concern in many areas of national life primarily because of the more aggressive policies of the US Administration in the early 1980s, the US strategic modernization program that included the peacekeeper ICBM and the D–5 SLBM, the actual implementation of NATO's 1979 decision for Intermediate Range Nuclear Force (INF) modernization by deployment of the first Pershing–II missile systems to Europe, and because of the leadership instability in the USSR from the successive deaths of three general secretaries between 1981 and 1985. A National Intelligence Estimate in 1988 assessed the significance of the events in 1983 with the benefit of a longer time perspective and reached the same broad conclusions. General Perroots's memorandum and its enclosure neither raises no new issues nor contains new data that change the strategic judgements already written. [*portion marking not declassified*]

2. At the tactical and theater level, however, General Perroots's memorandum surfaces a long-standing warning problem, i.e., the need for the Intelligence Community in Washington to provide more timely, discriminating, and accurate warning in support of the theater commander. Perroots, who at the time was Assistant Chief of Staff for Intelligence, US Air Forces Europe (USAFE), describes three serious problems for which there are only partial answers. First, he believes that, despite the enormous amount of resources and energy spent in guarding against a strategic surprise attack, USAFE was not well informed in that the US warning systems did not detect in a timely fashion the extent of Soviet precautionary readiness measures undertaken in November 1983 in response to NATO exercise Able Archer.

Secondly, he believes that Washington-based agencies had relevant information which was not available to the European Command when he recommended against a precautionary US alert by US Air Forces Europe in response to the detection of the increased alert status of the Soviet Air Forces. Finally, [1½ *lines not declassified*], General Perroots is concerned that in similar circumstances—even if there is better intelligence—another officer in his position might recommend a precautionary US Air Force alert in Europe that could have serious escalatory consequences, unless there are timely, national level assessments available. [*portion marking not declassified*]

3. The dilemma that General Perroots has described is characteristic of the warning problems faced by senior US military intelligence chiefs in many past crises, in which decisions about US force posture were dependent upon threat assessments prepared rapidly and based on fragmentary and incomplete intelligence. General Perroots's memorandum reinforces two long-standing lessons of warning: warning systems are no substitute for seasoned, professional judgment and assessments; and they require constant attention and improvement. In terms of process, however, his memorandum reinforces the requests of successive SACEURs and other US theater commanders for better ways to provide more timely national-level warning assessments to the theater intelligence staffs.

*The Setting of Exercise Able Archer, 1983*

4. The larger context of the period, often referred to as the "war scare," reflected increasing Soviet concern over the drift in superpower relations, which some in the Soviet leadership felt indicated an increased threat of war and increased likelihood of the use of nuclear weapons. These concerns were shaped in part by a Soviet perception that the correlation of forces was shifting against the Soviet Union and that the United States was taking steps to achieve military superiority. These fears were exacerbated by planned improvements in US strategic forces, as well as by progress made by NATO to implement its 1979 decision began with NATO's deliberations in the late 1970s to modernize its theater nuclear forces by deploying Pershing–II missiles and Ground Launched Cruise Missiles (GLCMs) to Europe. By 1981, after the new US Administration was inaugurated, the Soviet concern intensified almost concurrently with General Secretary Brezhnev's decline in health [*portion marking not declassified*]

5. [1½ *lines not declassified*] the increased Soviet concern stemmed from a fear by some Soviet leaders that the West might seek to exploit its new capability in Europe for a preemptive nuclear surprise attack against the USSR, for which the Soviets had no defense. From a national security standpoint, this Western capability led to questions about the

long-standing Soviet view that crises and other adverse developments in international affairs would precede the outbreak of war and be the basis for long-term early warning. The Soviets had concern that the West might decide to attack the USSR without warning during a time of vulnerability—such as when military transport was used to support the harvest—thus compelling the Soviets to consider a preemptive strike at the first sign of US preparations for a nuclear strike. [*portion marking not declassified*]

6. From Brezhnev's death in 1982 through late 1984, the Soviets ordered a number of unusual measures not previously detected except during periods of crisis with the West. These included: disruption of the normal troop rotation cycle for Soviet forces in central Europe in 1984; updating civil defense procedures in the USSR from 1982 through 1984; in the spring of 1984 the first, and apparently only, time that Soviet military trucks were not sent to support the harvest since the end of World War II; and increased alert reactions even to routine NATO training from 1982 to 1984. The cumulative effect of these and other measures was to reduce the Soviet and Warsaw Pact vulnerability to a surprise attack. The abnormal Soviet reaction to NATO Exercise Able Archer in November 1983 occurred within this setting. [*portion marking not declassified*]

7. Concurrent with the military dimension, [*less than 1 line not declassified*] other precautionary measures taken by the Soviets probably were a reflection of the political maneuvering in the Kremlin in 1982 and 1983 associated with Andropov's rise to power. In exchange for military support for his bid to become General Secretary, Andropov, then KGB Chairman, may have promised greater allocations of resources for military industrial expansion, improved civil defense readiness, and military modernization. All of these were espoused by the Chief of the General Staff at the time, Marshal Ogarkov. Successful manipulation of threat perceptions by the KGB at Andropov's direction would have helped cultivate the strong military backing Andropov enjoyed when he came to power. In this environment, the heightened Soviet military reactions to NATO exercises would have been expected. [*portion marking not declassified*]

8. Finally, [*less than 1 line not declassified*] the Soviets wanted the new US Administration to tone down its anti-Soviet rhetoric, moderate its hostile attitudes, and begin serious business on trade and arms control. Some analysts believe that the Soviet activities, [*1 line not declassified*], were intended to be detected and were contrived to nudge Washington toward a more conciliatory and cooperative attitude in dealings with Moscow. [*less than 1 line not declassified*]

*Intelligence Community Performance*

9. Since 1983, the Intelligence Community, CIA's Office of Soviet Analysis, and the Defense Intelligence Agency have treated the events

surrounding the Able Archer episode in a number of in-house publications and national estimates. When General Perroots was Director, DIA, analysts concurred in the Community assessments in 1988 that the "war scare" period of heightened Soviet concern was triggered by the change of the US Administration and its policy decisions toward the Soviet threat; that at least some Soviet leaders concluded that a surprise nuclear attack by NATO was possible outside the context of a crisis; and that this led to a number of Soviet responses consistent with such a conclusion, including high priority intelligence collection taskings. DIA believes, however, that the Soviet measures were primarily a function of the internal leadership instability from which Andropov emerged as General Secretary. [*portion marking not declassified*]

*General Perroots's Problem*

10. The events surrounding NATO Exercise Able Archer, however, all occurred some months before the first national-level assessments were written, and General Perroots was confronted with a serious choice of what recommendation to make to the Commander, US Air Forces Europe. The Department of Defense warning indicators system reflected that, [*less than 1 line not declassified*] Soviet air units in Poland and East Germany were observed at a high state of alert, although no other Soviet strategic forces adopted such a posture. [*2½ lines not declassified*] Consequently, the Commander, US Air Forces Europe, was concerned whether he should exercise his discretionary authority to increase the alert posture of his force. General Perroots recommended that no precautionary US alert be instituted, despite the evidence of his own warning system. Several days later, the Soviet air forces returned to normal alert status. [*portion marking not declassified*]

11. [*1 paragraph (10 lines) not declassified*]

12. General Perroots's concerns about this episode are legitimate to the extent that they deal with Washington's support to the US military commands. [*4½ lines not declassified*] Third, national-level assessments of Soviet intentions were not available when most needed. The General's memorandum indicates the Defense Department has taken steps to correct the problems in the processing and dissemination of intelligence. The third problem, of timely national-level support, is continuous. As Director of DIA, General Perroots himself initiated organizational and procedural changes to improve DIA's support to the commands. [*portion marking not declassified*]

13. Underlying all of the above, however, is the paradox that General Perroots believes he made a correct judgment, but for the wrong reasons. This is not a new problem nor is there a solution to it. General Perroots has accurately identified inherent limits of the warning systems as they now exist. His candor is a safeguard against complacency

A Case #23-5017   Document #2005450   Filed: 06/28/2023   Page 248 o

and denial that problems exist. Additionally, he raises again the need for better understanding in Washington of the problems facing intelligence in the field. [*portion marking not declassified*]

> [*name not declassified*]          [*name not declassified*]
> Chief, TFD/RIG/SOVA   Director, National Warning Staff

(Central Intelligence Agency, National Intelligence Council, Job 91B00551: Speeches, Lectures, Briefing Files (1988–1989), Box 1, Folder 2: C/NIC (Ermarth) Chrons March 1989)

The 1990 PFIAB report repeatedly stressed: "During the November 1983 NATO 'Able Archer' nuclear release exercise, the Soviets implemented military and intelligence activities that previously were seen only during actual crises. These included: placing Soviet air forces in Germany and Poland on heightened alert, [*4 lines not declassified*]."

The PFIAB report argued: "The meaning of these events obviously was of crucial importance to American and NATO policymakers. If they were simply part of a Soviet propaganda campaign designed to intimidate the US, deter it from deploying improved weapons, and arouse US domestic opposition to foreign policy initiatives, then they would not be of crucial significance. If they reflected an internal power struggle—for example, a contest between conservatives and pragmatists, or an effort to avoid blame for Soviet economic failures by pointing to (exaggerated) military threats—then they could not be ignored, but they would not imply a fundamental change in Soviet strategy. But if these events were expressions of a genuine belief on the part of Soviet leaders that the US was planning a nuclear first strike, causing the Soviet military to prepare for such an eventuality—by, for example, readying itself for a preemptive strike of its own—then the 'war scare' was a cause for real concern." (PFIAB, page vi)

The PFIAB report concluded that the IC's failure to adequately report on Able Archer and the 1983–1984 Soviet war scare had important implications for the future: "In cases of great importance to the survival of our nation, and especially where there is important contradictory evidence, the Board believes that intelligence estimates must be cast in terms of alternative scenarios that are subjected to comparative risk assessments. This is the critical defect in the war scare episode." (PFIAB, page ix)

Case 1:21-cv-02857   Document 1-2   Filed 10/27/21   Page 37 of 37
USCA Case #23-5017      Document #2005450       Filed: 06/28/2023      Page 249 of 391



**National Security Archive, National Security Archive <foiamail@email.gwu.edu>**

---

# Message Sent: 719264924 | 8/10/2021 11:26:36 AM EDT

1 message

---

**Nextiva vFax** <notifications@nextivafax.com>                    Tue, Aug 10, 2021 at 11:57 AM
To: National Security Archive <foiamail@gwu.edu>

**Delivery Information:**

| | |
|---|---|
| Message #: | 719264924 |
| Status: | Success |
| Sender Name: | National Security Archive |
| Sender Company: | National Security Archive |
| Sender Phone: | |
| Remote CSID: | |
| Total Pages: | 35 |
| Start Time: | 8/10/2021 11:26:36 AM EDT |
| End Time: | 8/10/2021 12:27:02 PM EDT |
| Duration: | 1.790 sec |
| Delivery Count: | 3 |

**Recipient List:**
- foiamail@gwu.edu
- archivefoia@gwu.edu
Central Intelligence Agency, Information and Privacy Coordinator - 17036133007

Click here to view this message online

Delivered by **NEXTIVA**... "When Every Fax is Mission Critical"

JA243

# EXHIBIT C

Case 1:21-cv-02857 Document 1-3 Filed 10/27/21 Page 2 of 3

USCA Case #23-5017    Document #2005450    Filed: 06/28/2023    Page 251 of 391

**THE GEORGE WASHINGTON UNIVERSITY**
WASHINGTON, DC

National Security Archive, National Security Archive <foiamail@email.gwu.edu>

## ATTN --N.Jones Initial Response F-2021-02187

1 message

**Public_Access_Request_Branch@ucia.gov** <Public_Access_Request_Branch@ucia.gov> Wed, Aug 11, 2021 at 10:59 AM
To: "foiamail@gwu.edu" <foiamail@gwu.edu>


Dear Requester:


Attached is an initial response to your Freedom of Information Act (FOIA) query of 10 August 2021. Please review the attachment, and should you have any questions, please call the CIA FOIA Hotline at +1 (703) 613-1287.


Regards,

Public Access Requests Branch

Central Intelligence Agency


_____

*Warning – Please DO NOT REPLY to this e-mail. This e-mail is used solely to provide a response to your Freedom of Information Act (FOIA) request of the Central Intelligence Agency (CIA), and is not a means of communicating with CIA regarding your request. As a result, the account from which this message originated is not routinely monitored. Should you have any questions or concerns about our response, please call the CIA FOIA Hotline at +1 (703) 613-1287.*


📄 **F_2021_02187_ACK.pdf**
124K

JA245



Central Intelligence Agency

Washington, D.C. 20505

11 August 2021

Nate Jones
The National Security Archive
The George Washington University
Washington, DC 20037
foiamail@gwu.edu

Reference: F-2021-02187

Dear Requester:

On 10 August 2021, the Office of the Information and Privacy Coordinator received your 2 August 2021 correspondence, submitted on behalf of the National Security Archive, seeking, under the Freedom of Information Act, the **9 January 1989 "End of Tour Report (Addendum) General Perroots."**

This letter serves to acknowledge that CIA received your request, and to further let you know that this office assigned your request the reference number provided above. Citing this number in future correspondence will allow us to more efficiently locate your case information.

In the event that we have questions or require additional information or clarification from you to proceed with processing your request, a representative will contact you. Unless you object, this office will search for CIA-originated records only, up to and including the date that the Agency begins its search.

To check the status of your request, please visit: https://www.cia.gov/readingroom/request/status and input the reference number provided above or call this office at (703) 613-1287.

Sincerely,

Mark Lilly
Information and Privacy Coordinator

JA246

# Exhibit 1

Central Intelligence Agency

Washington, D.C. 20505

15 April 2022

John Guttmann
Beveridge & Diamond, P.C.
1900 N. Street, NW, Suite 100
Washington, D.C. 20036

Reference: F-2021-02187; Civil Action No. 1:20-cv-02857

Dear Mr. Guttmann:

This letter is the final response to the 2 August 2021 Freedom of Information Act (FOIA) request submitted by your client, National Security Archive, and subsequent litigation, seeking the **9 January 1989 "End of Tour Report (Addendum) General Perroots."**

We processed this request in accordance with the FOIA, 5 U.S.C. § 552, as amended, and the CIA Information Act, 50 U.S.C. § 3141, as amended.

We have completed a review of one (1) document and determined that it may be released in segregable form with redactions made on the basis of FOIA exemptions (b)(1) and (b)(3). Exemption (b)(3) pertains to Section 102A(i)(l) of the National Security Act of 1947, 50 U.S.C § 3024(i)(1), noted as exemption "(b)(3)NatSecAct" on the enclosed documents.

The released document may be found on the enclosed CD. This completes our response to the above referenced requests.

Sincerely,

Anthony J. Capitos
Information and Privacy Coordinator

Enclosure

JA248

JA249





(b)(1)
**DEFENSE INTELLIGENCE AGENCY** (b)(3) NatSecAct

WASHINGTON, D.C. 20340-

(b)(1)
(b)(3) NatSecAct

1-89/DR                                                      9 January 1989

MEMORANDUM FOR

(b)(1)
(b)(3) NatSecAct

SUBJECT:  End of Tour Report Addendum

The enclosed memorandum documents a chain of events and an important analytical problem that I believe the U.S. Intelligence Community has never adequately addressed.  I raise it now once again as I leave the service because it remains one of the important loose-ends on my plate that has never been covered to my satisfaction, and because I believe there may be some important "lessons learned" as relates to our I&W capability and exercise planning.

LEONARD H. PERROOTS
Lieutenant General, USAF (Retired)

1 Enclosure
Memo,
(b)(1)
(b)(3) NatSecAct

cc:
SECDEF
CJCS
NSC   (ATTN:  Mr. Paul Stevens,
      Special Assistant to the
      President and Executive
      Secretary)
PFIAB (ATTN:  Ms. Anne Armstrong,
      Chairman, President's
      Foreign Intelligence
      Advisory Board)

(b)(1)
(b)(3) NatSecAct

5106-89
Copy 2 of 8

(b)(1)
(b)(3) NatSecAct

433009/89, Copy 1

(b)(1)
(b)(3) NatSecAct   Upon physical removal of enclosure
                                   this
                   document Unclassified

Copy 1 of 8 Copies

Approved for Release: 2022/04/15 C06914245

(b)(1)
(b)(3) NatSecAct

Approved for Release: 2022/04/15 C06914245

Approved for Release: 2022/04/15 C06914245

(b)(1)
(b)(3) NatSecAct

Approved for Release: 2022/04/15 C06914245

(b)(1)
(b)(3) NatSecAct

# Exhibit 2

**Hilary T. Jacobs**

---

| | |
|---|---|
| **From:** | Quinn, Tony (USADC) <Tony.Quinn2@usdoj.gov> |
| **Sent:** | Thursday, April 28, 2022 5:31 PM |
| **To:** | Hilary T. Jacobs |
| **Cc:** | Mary K. Crowell; John S. Guttmann |
| **Subject:** | RE: NSA v. CIA |

Hilary –

Below is the response that I'm able to provide:

Reasonably segregable content from the document that is the subject of the FOIA request has been released, including the body of the cover letter. The remaining content implicates matters that are exempt from disclosure under FOIA Exemptions (b)(1) and (b)(3).

Tony

---

**From:** Hilary T. Jacobs <HJacobs@bdlaw.com>
**Sent:** Thursday, April 28, 2022 4:43 PM
**To:** Quinn, Tony (USADC) <TQuinn@usa.doj.gov>
**Cc:** Mary K. Crowell <MCrowell@bdlaw.com>; John S. Guttmann <JGuttmann@bdlaw.com>
**Subject:** [EXTERNAL] RE: NSA v. CIA
**Importance:** High

Tony,

Any updates?  Status report due tomorrow.

Hilary

**Hilary T. Jacobs**
She | Her | Hers
Associate

**BEVERIDGE & DIAMOND PC**
O +1.202.789.6086 M +1.443.794.9607 ~ HJacobs@bdlaw.com

---

**From:** Hilary T. Jacobs
**Sent:** Tuesday, April 26, 2022 9:54 AM
**To:** Quinn, Tony (USADC) <Tony.Quinn2@usdoj.gov>
**Cc:** Mary K. Crowell <MCrowell@bdlaw.com>
**Subject:** FW: NSA v. CIA

Tony,

Glad we connected just now.  You mentioned on our call that you had not seen CIA's production in this case.  Per the below email, I sent this to you on April 18, the day we received it, and am resending it to you now.

1

We will stay tuned regarding the issues surrounding security clearance but the agency does need to get back to us regarding these issues.  You may wish to convey to your client that we are prepared to take fully prepared to raise this for the Court.

Hilary

**Hilary T. Jacobs**
She | Her | Hers
Associate

**BEVERIDGE & DIAMOND PC**
O +1.202.789.6086 M +1.443.794.9607 ~ HJacobs@bdlaw.com

---

**From:** Hilary T. Jacobs
**Sent:** Monday, April 18, 2022 5:52 PM
**To:** Quinn, Tony (USADC) <Tony.Quinn2@usdoj.gov>
**Cc:** Mary K. Crowell <MCrowell@bdlaw.com>
**Subject:** NSA v. CIA

Hi Tony,

I hope you had a good holiday weekend.

I'm writing to follow-up on the voicemail I left you a few minutes ago.  We received the attached production in the mail today from the CIA.  We have some serious concerns about this — the document was largely redacted, despite the fact that the Department of State released to the public a transcription of large parts of this document last year in their publication *Foreign Relations of the United States*, as articulated in our complaint in this action.  I have attached Exhibit B to our complaint, which includes the relevant pages from the DOS publication.

I wanted to touch base with you over the phone before we take any further action on this — do you have availability over the next two days to talk?

Thanks,

Hilary

**Hilary T. Jacobs**
She | Her | Hers
Associate



1900 N Street, NW, Suite 100 ~ Washington, DC 20036 ~ bdlaw.com
O +1.202.789.6086 ~ M +1.443.794.9607 ~ HJacobs@bdlaw.com

CONFIDENTIALITY STATEMENT: This electronic message contains information from the law firm of Beveridge & Diamond, P.C. and may be confidential or privileged. The information is intended solely for the use of the individual(s) or entity(ies) named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please notify us immediately by telephone at +1.202.789.6000 or by e-mail reply and delete this message. Thank you.

JA256

# Exhibit 1

# FOREIGN RELATIONS

## OF THE

# UNITED STATES

## 1981–1988

## VOLUME IV

## SOVIET UNION, JANUARY 1983– MARCH 1985



## DEPARTMENT OF STATE

**Washington**

JA258



**Foreign Relations of the
United States, 1981–1988**

**Volume IV**

# Soviet Union, January 1983– March 1985

*Editor*            Elizabeth C. Charles

*General Editor*    Kathleen B. Rasmussen

United States Government Publishing Office
Washington
2021

DEPARTMENT OF STATE

Office of the Historian

Foreign Service Institute

―――――――――――――――――

For sale by the Superintendent of Documents, U.S. Government Publishing Office
Internet: bookstore.gpo.gov    Phone: toll free (866) 512-1800;    DC area (202) 512-1800
Fax: (202) 512-2250 Mail: Stop IDCC, Washington, DC 20402-0001

# About the Series

The *Foreign Relations of the United States* series presents the official documentary historical record of major foreign policy decisions and significant diplomatic activity of the U.S. Government. The Historian of the Department of State is charged with the responsibility for the preparation of the *Foreign Relations* series. The staff of the Office of the Historian, Foreign Service Institute, under the direction of the General Editor of the *Foreign Relations* series, plans, researches, compiles, and edits the volumes in the series. Secretary of State Frank B. Kellogg first promulgated official regulations codifying specific standards for the selection and editing of documents for the series on March 26, 1925. These regulations, with minor modifications, guided the series through 1991.

Public Law 102–138, the Foreign Relations Authorization Act, established a new statutory charter for the preparation of the series which was signed by President George H.W. Bush on October 28, 1991. Section 198 of P.L. 102–138 added a new Title IV to the Department of State's Basic Authorities Act of 1956 (22 U.S.C. 4351, et seq.).

The statute requires that the *Foreign Relations* series be a thorough, accurate, and reliable record of major U.S. foreign policy decisions and significant U.S. diplomatic activity. The volumes of the series should include all records needed to provide comprehensive documentation of major foreign policy decisions and actions of the U.S. Government. The statute also confirms the editing principles established by Secretary Kellogg: the *Foreign Relations* series is guided by the principles of historical objectivity and accuracy; records should not be altered or deletions made without indicating in the published text that a deletion has been made; the published record should omit no facts that were of major importance in reaching a decision; and nothing should be omitted for the purposes of concealing a defect in policy. The statute also requires that the *Foreign Relations* series be published not more than 30 years after the events recorded. The editors are convinced that this volume meets all regulatory, statutory, and scholarly standards of selection and editing.

*Sources for the* Foreign Relations *Series*

The *Foreign Relations* statute requires that the published record in the *Foreign Relations* series include all records needed to provide comprehensive documentation of major U.S. foreign policy decisions and significant U.S. diplomatic activity. It further requires that government agencies, departments, and other entities of the U.S. Government en-

III

gaged in foreign policy formulation, execution, or support cooperate with the Department of State historians by providing full and complete access to records pertinent to foreign policy decisions and actions and by providing copies of selected records. Most of the sources consulted in the preparation of this volume were located at the Department of State in Washington and the National Archives and Records Administration.

The editors of the *Foreign Relations* series have complete access to all the retired records and papers of the Department of State: the central files of the Department; the special decentralized files ("lot files") of the Department at the bureau, office, and division levels; the files of the Department's Executive Secretariat, which contain the records of international conferences and high-level official visits, correspondence with foreign leaders by the President and Secretary of State, and the memoranda of conversations between the President and the Secretary of State and foreign officials; and the files of overseas diplomatic posts. All of the Department's central files for 1981–1989, which were stored in electronic and microfilm formats, will eventually be transferred to the National Archives. Once these files are declassified and processed, they will be accessible. All of the Department's decentralized office files from this period that the National Archives deems worthy of permanent preservation will also eventually be transferred to the National Archives where they will be available for use after declassification and processing.

Research for *Foreign Relations* volumes in this subseries is undertaken through special access to restricted documents at the Ronald Reagan Presidential Library and other agencies. While all the material printed in this volume has been declassified, some of it is extracted from still-classified documents. The staff of the Reagan Library is processing and declassifying many of the documents used in this volume, but they may not be available in their entirety at the time of publication. Presidential papers maintained and preserved at the Reagan Library include some of the most significant foreign affairs related documentation from White House offices, the Department of State, and other Federal agencies including the National Security Council, the Central Intelligence Agency, the Department of Defense, and the Joint Chiefs of Staff.

Some of the research for volumes in this subseries was done in Reagan Library record collections scanned for the Remote Archive Capture (RAC) project. This project, which is administered by the National Archives and Records Administration's Office of Presidential Libraries, was designed to coordinate the declassification of still-classified records held in various Presidential libraries. As a result of the way in which records were scanned for the RAC, the editors of the

A Case #23-5017    Document #2005450    Filed: 06/28/2023    Page 269 o

*Foreign Relations* series were not always able to determine whether attachments to a given document were in fact attached to the paper copy of the document in the Reagan Library file. In such cases, some editors of the *Foreign Relations* volumes have indicated this ambiguity by stating that the attachments were "Not found attached."

*Editorial Methodology*

The documents are presented chronologically according to time in Washington, DC. Memoranda of conversation are placed according to the time and date of the conversation, rather than the date the memorandum was drafted.

Editorial treatment of the documents published in the *Foreign Relations* series follows Office style guidelines, supplemented by guidance from the General Editor and the Chiefs of the Declassification and Publishing Divisions. The original document is reproduced as exactly as possible, including marginalia or other notations, which are described in the footnotes. Texts are transcribed and printed according to accepted conventions for the publication of historical documents within the limitations of modern typography. A heading has been supplied by the editors for each document included in the volume. Spelling, capitalization, and punctuation are retained as found in the original text, except that obvious typographical errors are silently corrected. Other mistakes and omissions in the documents are corrected by bracketed insertions: a correction is set in italic type; an addition in roman type. Words or phrases underlined in the original document are printed in italics. Abbreviations and contractions are preserved as found in the original text, and a list of abbreviations and terms is included in the front matter of each volume. In telegrams, the telegram number (including special designators such as Secto) is printed at the start of the text of the telegram.

Bracketed insertions are also used to indicate omitted text that deals with an unrelated subject (in roman type) or that remains classified after declassification review (in italic type). The amount and, where possible, the nature of the material not declassified has been noted by indicating the number of lines or pages of text that were omitted. Entire documents withheld after declassification review have been accounted for and are listed in their chronological place with headings, source notes, and the number of pages not declassified.

All brackets that appear in the original document are so identified in the footnotes. All ellipses are in the original documents.

The first footnote to each document indicates the source of the document and its original classification, distribution, and drafting information. This note also provides the background of important docu-

ments and policies and indicates whether the President or his major policy advisers read the document.

Editorial notes and additional annotation summarize pertinent material not printed in the volume, indicate the location of additional documentary sources, provide references to important related documents printed in other volumes, describe key events, and provide summaries of and citations to public statements that supplement and elucidate the printed documents. Information derived from memoirs and other first-hand accounts has been used when appropriate to supplement or explicate the official record.

The numbers in the index refer to document numbers rather than to page numbers.

*Advisory Committee on Historical Diplomatic Documentation*

The Advisory Committee on Historical Diplomatic Documentation, established under the *Foreign Relations* statute, monitors the overall compilation and editorial process of the series and advises on all aspects of the preparation of the series and declassification of records. The Advisory Committee does not necessarily review the contents of individual volumes in the series, but it makes recommendations on issues that come to its attention and reviews volumes as it deems necessary to fulfill its advisory and statutory obligations.

*Declassification Review*

The Office of Information Programs and Services, Bureau of Administration, conducted the declassification review for the Department of State of the documents published in this volume. The review was conducted in accordance with the standards set forth in Executive Order 13526 on Classified National Security Information and applicable laws.

The principle guiding declassification review is to release all information, subject only to the current requirements of national security as embodied in law and regulation. Declassification decisions entailed concurrence of the appropriate geographic and functional bureaus in the Department of State, other concerned agencies of the U.S. Government, and the appropriate foreign governments regarding specific documents of those governments. The declassification review of this volume, which began in 2015 and was completed in 2019, resulted in the decision to withhold 1 document in full, excise a paragraph or more in 13 documents, and make minor excisions of less than a paragraph in 20 documents.

The Office of the Historian is confident, on the basis of the research conducted in preparing this volume and as a result of the declassification review process described above, that the documentation and edito-

rial notes presented here provide a thorough, accurate, and reliable record of the Reagan administration's policy toward the Soviet Union, January 1983–March 1985.

**Adam M. Howard, Ph.D.**         **Kathleen B. Rasmussen, Ph.D.**
*The Historian*        *General Editor*

Foreign Service Institute
February 2021

# Preface

*Structure and Scope of the* Foreign Relations *Series*

This volume is part of a subseries of volumes of the *Foreign Relations* series that documents the most important issues in the foreign policy of the administration of Ronald Reagan. This volume documents U.S. bilateral relations with the Soviet Union from January 1983 to March 1985. Due to the importance of U.S.-Soviet relations during the Reagan administration, the Reagan subseries includes an extensive examination of U.S. bilateral relations with the Soviet Union in four volumes: *Foreign Relations*, 1981–1988, Volume III, Soviet Union, January 1981–January 1983; Volume IV, Soviet Union, January 1983–March 1985; Volume V, Soviet Union, March 1985–October 1986; and Volume VI, Soviet Union, October 1986–January 1989. In conjunction with these volumes, several other volumes in the subseries will provide the reader with a fuller understanding of how U.S.-Soviet relations impacted the global character of the Cold War and U.S. strategy during the Reagan era. For documentation on U.S.-Soviet nuclear arms control negotiations, see *Foreign Relations*, 1981–1988, Volume XI, START I, and Volume XII, INF, 1984–1988. *Foreign Relations*, 1977–1980, Volume V, European Security, 1977–1983, documents the NATO dual-track decision and TNF/INF negotiations through 1983. Documentation dealing with nuclear non-proliferation, nuclear testing, chemical and biological weapons, and space arms control, including anti-satellite systems, will be published in *Foreign Relations*, 1981–1988, Volume XL, Global Issues I. The development of the Strategic Defense Initiative and ABM-related issues and other strategic considerations are addressed in *Foreign Relations*, 1981–1988, Volume XLIII, National Security Policy, 1981–1984, and Volume XLIV, Parts 1 and 2, National Security Policy, 1985–1988. For selected documentation on the human rights situation in the Soviet Union, see *Foreign Relations*, 1981–1988, Volume XLI, Global Issues II.

*Focus of Research and Principles of Selection for* Foreign Relations, *1981–1988, Volume IV*

This volume documents the development of the Reagan administration's policies toward the Soviet Union from January 1983 to March 1985. With Reagan's signature of National Security Decision Directive (NSDD) 75 on January 17, 1983, the administration's approaches and policies toward the Soviet Union were codified in a specific four-part agenda: arms control, human rights, regional issues, and bilateral relations. This volume examines the efforts of administration officials,

IX

A Case #23-5017    Document #2005450        Filed: 06/28/2023    Page 274 o

namely Secretary of State George Shultz, President's Assistants for National Security Affairs William Clark and later Robert McFarlane, and NSC Staff member Jack Matlock, to implement the four-part agenda in dealing with the Soviet Union. The documentation demonstrates how administration officials developed policies related to the four-part agenda, mainly in the National Security Council (NSC) and Department of State, and then promoted these various tracks during meetings between Shultz, and on occasion Reagan, and Soviet Ambassador Anatoly Dobrynin and Soviet Foreign Minister Andrei Gromyko in various fora. Although no high-level meeting took place between Reagan and either Soviet General Secretaries Yuri Andropov or Konstantin Chernenko during their short tenures, the documents provide a window into how the Reagan administration viewed the Soviet leadership and formulated policies to deal with whomever was in charge.

The volume also documents the bureaucratic struggle Shultz faced against the NSC in implementing the four-part agenda laid out by NSDD 75 and in gaining access to President Reagan. After some wrangling, by June 1983 an understanding emerged between Shultz and Clark, which allowed Shultz regular weekly meetings with Reagan. When Jack Matlock joined the NSC Staff as primary adviser on the Soviet Union, Shultz gained a like-minded ally in approaches to dealing with the USSR. While some administration officials, such as Secretary of Defense Caspar Weinberger, consistently argued that negotiating with the Soviet Union seemed futile, Shultz, Matlock, and others pushed President Reagan to see the value in keeping lines of communication open with the Soviets. Even during tragic events, such as the Soviet downing of the KAL 007 airliner in September 1983, Shultz kept his meeting with Gromyko a few days later in Madrid and used this as an opportunity to admonish the Foreign Minister for this inexplicable act and the inability of the Soviet Union to admit fault on the international stage.

The volume documents several Cold War flashpoints during the contentious months of 1983. The announcement in March 1983 of Reagan's Strategic Defense Initiative (SDI) caused concern for the Soviet Union because it shifted the strategic balance from the theory of mutually assured destruction toward a defensive nuclear posture. Aside from the downing of the KAL airliner, the Euromissiles crisis came to a head with U.S. deployments of INF missiles to several NATO allies in late November 1983. While the bulk of the documentation dealing with these negotiations is covered in two other volumes, the scheduled deployments permeated all other aspects of U.S.-Soviet relations in 1983. The volume also presents selective documentation related to the 1983 Soviet "War Scare" and the November 1983 NATO nuclear exercise, Able Archer (see Appendix A). The volume attempts to dem-

onstrate that even with these challenges, Shultz and others pressed to keep moving ahead with the four-part agenda and promote greater dialogue in U.S.-Soviet relations.

After the Soviet walkout of the INF negotiations in Geneva in late 1983, the administration focused throughout 1984 on developing a framework to restart arms control negotiations; the documents in this volume demonstrate the difficulties involved in opening new talks with the Soviet Union. Reagan's SDI program continued to cause problems. The Soviets believed SDI would "militarize space," and therefore the debates over how SDI would be dealt with during negotiations were a major point of contention during this period. When Shultz and Gromyko met in January 1985, they finally reached an agreement on a new round of umbrella negotiations. The Nuclear and Space Talks (NST), scheduled to begin in Geneva in March 1985, would have three tracks, START, INF, and Defense and Space. The documents in the volume trace how various positions from the Department of State, NSC, the Department of Defense, and the Central Intelligence Agency impacted the decision to move forward with the three arms control tracks. While the other parts of the four-part agenda remained in play during this period and were discussed in bilateral meetings, restarting arms control talks seemed to trump the other areas of concern. Little did the U.S. or Soviet negotiators know that on the eve of these new NST negotiations, Chernenko would die, and a younger, more ambitious Soviet leader would emerge and dramatically change the course of U.S.-Soviet relations.

*Acknowledgments*

The editor wishes to acknowledge the invaluable assistance of officials at the Ronald Reagan Presidential Library in Simi Valley, California, especially Lisa Jones and Cate Sewell. A special thanks to the Central Intelligence Agency staff for providing access and assistance with Reagan Library materials scanned for the Remote Archive Capture project, and to the History Staff of the CIA's Center for the Study of Intelligence for arranging full access to CIA records. The editor wishes to acknowledge the staff at Information Programs and Services at the Department of State for facilitating access to Department of State records and coordinating the review of this volume within the Department. Sandy Meagher was helpful in providing access to Department of Defense materials. The editor extends thanks to the family and executor of the Estate of former Secretary of Defense Caspar W. Weinberger for granting Department of State historians access to the personal papers of Secretary Weinberger deposited at the Library of Congress. Additional thanks are due to officials of the Library of Congress Manuscript Division for facilitating that access.

Elizabeth C. Charles collected, selected, and annotated the documentation for this volume under the supervision of David Geyer, Chief of the Europe Division, and Adam Howard, then General Editor of the *Foreign Relations* series. The volume was reviewed by David Geyer and then Historian Stephen Randolph. Kerry Hite and Chris Tudda coordinated the declassification review under the supervision of Carl Ashley, Chief of the Declassification Coordination Division. Kerry Hite also performed the copy and technical editing under the supervision of Mandy Chalou, Chief of the Editing and Publishing Division.

**Elizabeth C. Charles, Ph.D.**
*Historian*

# Contents

About the Series ....................................................... III

Preface ................................................................. IX

Sources ................................................................ XV

Abbreviations and Terms ............................................. XIX

Persons ................................................................ XXV

Note on U.S. Covert Actions ......................................... XXXI

Soviet Union, January 1983–March 1985

  January 1983–April 1983

    "Dobrynin seemed like he wanted to run. But the
      Secretary is a jogger": Shultz and the Four-Part
      Agenda ......................................................... 1

  April 1983–August 1983

    Preparing the Next Steps in U.S.-Soviet Relations:
      Human Rights and Arms Control ............................. 120

  September 1983–October 1983

    "Controlled Fury": Shootdown of KAL 007 ................... 291

  October 1983–February 1984

    "The Winter of Soviet Discontent": INF Walkout, the
      War Scare, and the 'Ivan and Anya' Speech ............. 429

  February 1984–June 1984

    "Talking about each other rather than to each other":
      Reagan, Chernenko, and U.S.-Soviet Stalemate ........ 606

  June 1984–October 1984

    "Sitting on Mountains of Nuclear Weapons": The
      Reagan-Gromyko Meeting ................................ 845

  October 1984–January 1985

    "An iron-ass Secretary of State": Shultz and Gromyko
      in Geneva ................................................. 1079

XIII

January 1985–March 1985

"The principal menace to our security?": Reagan and
    the Ambiguities of Soviet Leadership .....................     1355

Appendix .........................................................     1420

# Sources

*Sources for* Foreign Relations*, 1981–1988, Volume IV, Soviet Union
January 1983–March 1985*

The White House Staff and Office Files at the Reagan Library provide a key source of documentation on high-level decision-making toward the Soviet Union from January 1983 to March 1985. The Executive Secretariat files, a subset of this collection, include the National Security Council (NSC) and National Security Planning Group (NSPG) Meeting Files; National Security Decision Directives (NSDD); the Head of State File; and the USSR Country File. Other relevant Staff and Office File collections include the European and Soviet Affairs Directorate: USSR Files; Director of Soviet Affairs Jack Matlock Files; and files of President's Assistants for National Security Affairs William Clark and Robert "Bud" McFarlane. Key collections of other members of the NSC Staff are the files of John Lenczowski, Robert Linhard, Ronald Lehman, and Sven Kraemer, which focus on various aspects of policy development, arms control, and negotiations with the Soviet Union. In some instances, NSC records related to NSDDs and NSC and NSPG meetings have remained in the institutional files of the NSC in Washington. The text of the declassified NSDDs are available on the Reagan Presidential Library website.

The Department of State records most vital for this volume are in the following Executive Secretariat S/S Lot Files: Lot 91D257: Top Secret/Secret Sensitive Memorandum; Lot 92D52: Executive Secretariat Sensitive and Super Sensitive Documents, 1984–1989; Lot 92D630: Executive Secretariat Special Caption Documents, 1979–1989; Lot 93D188: Memorandum of Conversations, 1981–1990; Lot 94D92: NODIS and EXDIS Secretariat Memorandums, 1985; and Lot 96D262: Special Handling Restrictions Memos, 1979–1983. The files of Lawrence Eagleburger in Lot 84D204 and Kenneth Dam in Lot 85D308, as well as the Policy Planning Staff Memoranda in Lot 89D149 and files of the Bureau of European and Canadian Affairs, Office of Soviet Affairs, in Lot 91D231 provide an excellent insight into high-level decision-making in the Department. The Central Foreign Policy File of the Department includes cable traffic between the Embassy in Moscow and Washington, as well as other related cables.

In addition to the paper files cited below, a growing number of documents are available on the Internet. The Office of the Historian maintains a list of these Internet resources on its website and encourages readers to consult that site on a regular basis.

XV

# Unpublished Sources

**Department of State**

*Central Foreign Policy File*

*Lot Files.* These files have been transferred or will be transferred to the National Archives and Records Administration in College Park, Maryland

Lot 03D256: EUR Records, Records of Ambassador Thomas J. Simons, Jr.

Lot 03D314: EUR Records, Arthur Hartman Files

Lot 84D204: Executive Secretariat, S/S, Lawrence Eagleburger Files, 1967–1984

Lot 85D308: Executive Secretariat, S/S–I Records, Deputy Secretary Dam's Official Files

Lot 89D149: S/P, Memoranda/Correspondence from the Director of the Policy Planning Staff

Lot 89D250: A Records, Miscellaneous Papers of Secretary Shultz and Charles Hill

Lot 90D137: Paul Nitze Files, 1953, 1972–1989

Lot 91D231: Bureau of European and Canadian Affairs, Office of Soviet Affairs, 1978–1989

Lot 91D257: Executive Secretariat, S/S, Top Secret/Secret Sensitive Memorandum

Lot 92D52: Executive Secretariat, S/S, Executive Secretariat Sensitive and Super Sensitive Documents, 1984–1989

Lot 92D630: Executive Secretariat, S/S, Executive Secretariat Special Caption Documents, 1979–1989

Lot 93D188: Executive Secretariat, S/S Records, Memorandum of Conversations, 1981–1990

Lot 94D92: Executive Secretariat, S/S Records, NODIS and EXDIS Secretariat Memorandums, 1985

Lot 96D262: Executive Secretariat, S/S, Special Handling Restrictions Memos, 1979–1983

**Ronald Reagan Presidential Library, Simi Valley, California**

Intelligence Directorate
    NSC Records

White House Staff and Office Files
    Frank Carlucci Files
    William Clark Files
    Kenneth deGraffenreid Files
    Files of the Executive Secretariat, National Security Council
        Agency File
        Cable File
        Country File: Europe and Soviet Union
        Head of State File
        Meeting File
        National Security Decision Directives (NSDD) File
        National Security Planning Group (NSPG) File
        National Security Study Directives (NSSD) File

A Case #23-5017    Document #2005450    Filed: 06/28/2023    Page 281 o

System Files, System II Intelligence File
System Files, System IV Intelligence File
Subject File
Files of the European and Soviet Affairs Directorate, National Security Council
Files of the Political Affairs Directorate, National Security Council
Files of the Situation Room, White House
Donald Fortier Files
Fred Ikle Files
Intelligence Directorate, NSC Records, 1981–1989
Sven Kraemer Files
Robert Lehman Files
John Lenczowski Files
Robert Lilac Files
Robert Linhard Files
Jack Matlock Files
Robert McFarlane Files
Edwin Meese Files
John Poindexter Files
Roger Robinson Files
Papers of Charles Hill
Papers of George Shultz
President's Daily Diary

**Central Intelligence Agency**

Office of the Director of Central Intelligence
Job 88B00443R: Policy Files (1980–1986)
Job 85M00363R: Subject Files (1983)
Job 86M00886R: Subject Files (1984)

Office of Congressional Affairs
Job 81M01032R: Subject Committee Files (1943–1980)

Office of Russian and European Analysis
Job 87T01145R: Policy & Substantive Files

National Intelligence Council
Job 09T00367R: Intelligence Publication Files, Production Case Files
Job 88T00528R: Policy Files (1982–1984)
Job 90T00435R: Chronological Files (1988)
Job 91B00551R: Speeches, Lectures, Briefing Files (1988–1989)

History Staff Files

**Library of Congress**

Manuscript Division
Papers of Caspar W. Weinberger

**National Security Council**

Carter Intelligence Files

Institutional Files

**Washington National Records Center, Suitland, Maryland**

RG 330, Records of the Department of Defense

>   FRC 330–85–0023: 1983 Official Files of the Office of the Secretary of Defense and Deputy Secretary of Defense
>
>   FRC 330–86–0048: 1984 Official Files (Top Secret) of the Office of the Secretary of Defense and Deputy Secretary of Defense
>
>   FRC 330–87–0023: 1984 Official Files (Secret and below) of the Office of the Secretary of Defense and Deputy Secretary of Defense

# Published Sources

Brinkley, Douglas, ed. *The Reagan Diaries, Unabridged, Volume I: January 1981–October 1985*. New York: Harper Collins, 2009.

*Current Digest of the Soviet Press.*

Dobrynin, Anatoly. *In Confidence: Moscow's Ambassador to Six Cold War Presidents*. New York: Crown, 1995.

Gates, Robert. *From the Shadows: The Ultimate Insider's Story of Five Presidents and How They Won the Cold War*. New York: Simon and Schuster, 1996.

Matlock, Jack. *Reagan and Gorbachev: How the Cold War Ended*. New York: Random House, 2004.

McFarlane, Robert and Zofia Smardz. *Special Trust*. New York: Cadell and Davies, 1984.

*New York Times.*

Nitze, Paul. *From Hiroshima to Glasnost: At the Center of Decision*. New York: Grove Weidenfeld, 1989.

Pipes, Richard. *VIXI: Memoirs of a Non-Belonger.* New Haven: Yale, 2003.

Reagan, Ronald. *An American Life*. New York: Simon and Schuster, 1990.

Shultz, George P. *Turmoil and Triumph: My Years as Secretary of State.* New York: Scribner's, 1993.

Strober, Deborah H. and Gerald S. Strober. *Reagan: The Man and His Presidency*. New York: Houghton Mifflin, 1998.

United Nations. *Yearbook of the United Nations, 1983, 1984, 1985.* New York: United Nations Publications, 1983–1985.

United States. Arms Control and Disarmament Agency. *Documents on Disarmament, 1982, 1983, 1984, 1985.* Washington: U.S. Government Printing Office, 1982–1985.

———. Department of State. *Bulletin,* 1983–1985.

———. National Archives and Records Administration. *Public Papers of the Presidents of the United States: Ronald Reagan, 1981, 1982, 1983, 1984, 1985*. Washington: U.S. Government Printing Office, 1982–1988.

*Washington Post.*

Weinberger, Caspar. *Fighting for Peace: Seven Critical Years at the Pentagon*. New York: Warner Books, 1990.

# Abbreviations and Terms

**ABM,** anti-ballistic missile
**ACDA,** Arms Control and Disarmament Agency
**ALCM,** air-launched cruise missile
**ASAP,** as soon as possible
**ASAT,** anti-satellite
**ASBM,** air-to-surface ballistic missile
**ASEAN,** Association of Southeast Asian Nations
**ASW,** anti-submarine warfare
**AWAC,** Airborne Warning and Control

**BMD,** Ballistic Missile Defense
**BW,** biological weapon

**C,** Office of the Counselor of the Department of State
**CA,** covert action
**CAB,** Civil Aviation Board
**CBI,** Caribbean Basin Initiative
**CBM,** Confidence-Building Measures
**CC,** Central Committee
**CD,** Conference on Disarmament
**CDE,** Conference on Disarmament in Europe
**CEMA,** Council for Mutual Economic Assistance
**CI,** Counterintelligence
**CIA,** Central Intelligence Agency
**CINCSAC,** Commander in Chief, Strategic Air Command
**CJCS,** Chairman, Joint Chiefs of Staff
**CM,** cruise missile
**CODEL,** Congressional Delegation
**COM,** Chief of Mission
**CP,** Communist Party
**CPPG,** Crisis Pre-Planning Group
**CPSU,** Communist Party of the Soviet Union
**CSCE,** Conference on Security and Cooperation in Europe
**CTB,** Comprehensive Test Ban
**CW,** chemical weapon

**D,** Office of the Deputy Secretary of State; Democrat
**DAO,** Defense Attaché Office
**DATT,** Defense Attaché
**DCM,** Deputy Chief of Mission
**DDI,** Deputy Director for Intelligence, Central Intelligence Agency
**DDO,** Deputy Director for Operations, Central Intelligence Agency
**DIA,** Defense Intelligence Agency
**DIRNSA,** Director of the National Security Agency
**DOD,** Department of Defense
**DST,** Defense and Space Talks

XIX

**EC,** European Community
**EconOff,** Economics Officer
**EE,** Eastern Europe
**EEC,** European Economic Community
**EmbOff,** Embassy Officer
**EOB,** Executive Office Building (houses the Vice President's Office)
**ERW,** enhanced radiation weapon
**EST,** Eastern Standard Time
**EUR,** Bureau of European Affairs, Department of State; after September 15, 1983, Bureau of European and Canadian Affairs
**EUR/SOV,** Office of Soviet Union Affairs, Bureau of European and Canadian Affairs, Department of State
**Exdis,** Exclusive Distribution

**FAA,** Federal Aviation Administration
**FBI,** Federal Bureau of Investigation
**FBIS,** Foreign Broadcast Information Service
**FBS,** forward-based systems
**FCO,** Foreign and Commonwealth Office (United Kingdom)
**FM,** Foreign Minister
**ForMin,** Foreign Ministry; Foreign Minister
**FRG,** Federal Republic of Germany

**G–7,** Group of 7, Canada, Federal Republic of Germany, France, Italy, Japan, United Kingdom, United States
**GDR,** German Democratic Republic
**GLCM,** ground-launched cruise missile
**GOJ,** Government of Japan
**GPS,** George P. Shultz
**GRU,** Soviet military intelligence agency

**HA,** Bureau of Human Rights and Humanitarian Affairs, Department of State
**HPSCI,** House Permanent Select Committee on Intelligence
**HUMINT,** human intelligence

**I&W,** Indications and Warning
**IAEA,** International Atomic Energy Agency
**ICAO,** International Civil Aviation Organization
**ICBM,** intercontinental ballistic missile
**IG,** Interagency Group
**IMEMO,** Institute of World Economy and International Relations
**IMF,** International Monetary Fund
**INF,** Intermediate-Range Nuclear Forces
**INR,** Bureau of Intelligence and Research, Department of State
**IOC,** International Olympic Committee

**JCC,** Joint Commercial Commission
**JCS,** Joint Chiefs of Staff
**JMC,** Joint Military Commission

**KAL,** Korean Airlines
**KGB,** Committee for State Security in the Soviet Union

**L,** Office of the Legal Adviser of the Department of State

JA278

A Case #23-5017     Document #2005450     Filed: 06/28/2023   Page 285 o

**LANDSAT,** Land-Use Satellite
**Limdis,** Limited Distribution
**LRINF,** Long-Range Intermediate Nuclear Forces
**LTA,** Long-Term Agreement on grain

**MAD,** mutual assured destruction
**MBFR,** Mutual Balanced Force Reductions
**memcon,** memorandum of conversation
**MFA,** Ministry of Foreign Affairs
**MFN,** most favored nation
**MIRV,** multiple independently targeted re-entry vehicle
**MOU,** Memorandum of Understanding
**MX or M–X,** missile experimental (intercontinental ballistic missile)

**NAC,** North Atlantic Council
**NAM,** Non-Aligned Movement
**NASA,** National Aeronautics and Space Administration
**NATO,** North Atlantic Treaty Organization
**Niact,** Night Action
**NID,** National Intelligence Daily
**Nocontract,** Not Releasable to Contractors
**Nodis,** No Distribution
**Noforn,** No Foreign Dissemination
**NORAD,** North American Aerospace Defense Command
**NPT,** Non-Proliferation Treaty
**NSA,** National Security Agency
**NSPG,** National Security Planning Group
**NSC,** National Security Council
**NSDD,** National Security Decision Directive
**NSSD,** National Security Study Directive
**NST,** Nuclear and Space Talks
**NTM,** National Technical Means
**NUF,** non-use of force

**OAS,** Organization of American States
**OBE,** overtaken by events
**OECD,** Organization for Economic Cooperation and Development
**Orcon,** Originator Controlled
**OSD,** Office of the Secretary of Defense
**OVP,** Office of the Vice President

**P,** Office of the Under Secretary of State for Political Affairs
**P–II,** Pershing II missile
**PDB,** President's Daily Brief
**PFIAB,** President's Foreign Intelligence Advisory Board
**PM,** Bureau of Politico-Military Affairs, Department of State
**PNE or PNET,** Treaty on Peaceful Nuclear Explosions
**POLAD,** Political Adviser
**PolCouns,** Political Counselor
**Poloff,** Political Officer
**PRC,** Policy Review Committee
**PROFs notes,** internal White House and NSC electronic messages

**R,** Republican

**R&D,** research and development
**reftel,** Reference Telegram
**RFE,** Radio Free Europe
**RL,** Radio Liberty
**RR,** Ronald Reagan
**RW,** radiological weapons

**S,** Office of the Secretary of State
**S/P,** Policy Planning Council, Department of State
**S/S,** Executive Secretariat, Department of State
**S/S–O,** Operations Center, Executive Secretariat, Department of State
**S/S–S,** Secretariat Staff, Executive Secretariat, Department of State
**S&T,** Science and Technology
**SACG,** Senior Arms Control Group
**SACPG,** Senior Arms Control Policy Group
**SALT,** Strategic Arms Limitation Talks
**SCC,** Special Coordinating Committee; Standing Consultative Commission
**SCG,** Special Consultative Group (NATO)
**SDI,** Strategic Defense Initiative
**Secto,** series indicator for telegrams sent from the Secretary of State while away from Washington
**septel,** separate telegram
**SFRC,** Senate Foreign Relations Committee
**SHAPE,** Supreme Headquarters Allied Powers, Europe
**SIG,** Senior Interagency Group
**SIG/I,** Senior Interagency Group on Intelligence
**SIG-IEP,** Senior Interagency Group-International Economic Policy
**SLCM,** surface-launched cruise missile; submarine-launched cruise missile; sea-launched cruise missile
**SNDV,** strategic nuclear delivery vehicle
**SNIE,** Special National Intelligence Estimate
**Specat,** Special Category
**SRINF,** Short-Range Intermediate Nuclear Forces
**START,** Strategic Arms Reduction Talks; Strategic Arms Reduction Treaty

**TASS,** official Soviet news agency
**TNF,** Theater Nuclear Forces
**Tosec,** series indicator for telegrams sent to the Secretary of State while away from Washington
**TTBT,** Threshold Test Ban Treaty

**UK,** United Kingdom
**UN,** United Nations
**UNGA,** United Nations General Assembly
**US,** United States
**USA,** United States of America; United States Army
**USAF,** United States Air Force
**USAFSB,** United States Army Field Station Berlin
**USCINCEUR,** United States Commander in Chief, European Command
**USDel,** United States Delegation
**USDOC,** Department of Commerce
**USG,** United States Government
**USIA,** United States Information Agency
**USN,** United States Navy

A Case #23-5017      Document #2005450      Filed: 06/28/2023      Page 287 o

**USNMR SHAPE,** United States National Military Representative, Supreme Headquarters
   Allied Powers, Europe
**USSR,** Union of Soviet Socialist Republics
**USTR,** United States Trade Representative

**VOA,** Voice of America
**VP,** Vice President

**WH,** White House
**WHSR,** White House Situation Room
**WP,** Warsaw Pact

**Z,** Zulu Time Zone (Greenwich Mean Time)

# Persons

**Abrahamson, James A.,** Lieutenant General, USAF; Director, Strategic Defense Initiative Organization

**Abramowitz, Morton I. (Mort),** U.S. Representative to the Mutual and Balanced Force Reduction Negotiations from March 1983; Director, Bureau of Intelligence and Research, Department of State, from February 1, 1985

**Abrams, Elliott,** Assistant Secretary of State for Human Rights and Humanitarian Affairs until July 1985

**Adelman, Kenneth L. (Ken),** Director, Arms Control and Disarmament Agency from April 1983

**Akhromeyev, Sergei F.,** Marshal of the Soviet Union and Chief of Staff of the Soviet Armed Forces from September 1984

**Allen, Richard V.,** President's Assistant for National Security Affairs until January 1982

**Andreas, Dwayne,** Assistant Secretary of Commerce for International Trade Policy; U.S. Co-Chairman of the US–USSR Trade and Economic Council (USTEC)

**Andropov, Yuri,** General Secretary of the Communist Party of the Soviet Union from November 12, 1982, until February 9, 1984

**Arbatov, Georgii,** Director, Institute for U.S. and Canada Studies, Russian Academy of Sciences, Moscow

**Armacost, Michael,** Under Secretary of State for Political Affairs from May 1984

**Azrael, Jeremy,** member, Policy Planning Council, Department of State, from 1984 until 1985

**Babrak Karmal,** President of Afghanistan from December 1979

**Bailey, Norman,** Director, Planning and Evaluation, National Security Council, from April 1981 until 1983; Special Assistant to the President and Senior Director, International Economic Affairs Directorate, from June 1983 until October 1983; thereafter, consultant to the National Security Council Staff

**Baker, James A., III (Jim),** White House Chief of Staff and Assistant to the President until February 1, 1985; thereafter Secretary of the Treasury

**Baldrige, H. Malcolm, Jr., (Mac),** Secretary of Commerce

**Baraz, Robert,** Director, Office of Analysis for the Soviet Union and Eastern Europe, Bureau of Intelligence and Research, Department of State

**Barker, Robert,** Deputy Assistant Director, Bureau of Verification and Intelligence, Arms Control and Disarmament Agency, from 1983 until 1986; Head of the U.S. Delegation to the U.S.-USSR Nuclear Testing Experts Meetings

**Bessmertnykh, Aleksandr A.,** Minister-Counselor of the Soviet Embassy in the United States, to March 1983; thereafter Chief of the U.S.A. Department, Soviet Ministry of Foreign Affairs from March 1983

**Bishop, Maurice,** Prime Minister of Grenada until October 19, 1983

**Block, John R. (Jack),** Secretary of Agriculture

**Bosworth, Stephen W.,** Chairman, Policy Planning Council, Department of State, from January 3, 1983, until April 7, 1984

**Bova, Michele,** Director, Secretariat Staff, Executive Secretariat, Department of State, from 1984

**Boverie, Richard,** Major General, USAF; National Security Council Staff

**Bremer, L. Paul, III (Jerry),** Special Assistant to the Secretary of State and Executive Secretary of the Department of State until March 27, 1983

**Brezhnev, Leonid,** General Secretary of the Communist Party of the Soviet Union until his death on November 10, 1982

**Brock, William E., III,** U.S. Trade Representative from 1981 to 1985

**Burt, Richard (Rick),** Assistant Secretary of State for European Affairs-designate from May 10, 1982, until February 17, 1983; Assistant Secretary of State for European Affairs (European and Canadian Affairs from September 15, 1983), from February 18, 1983, until July 18, 1985

**Bush, George H.W.,** Vice President of the United States

**Byrd, Robert, W.,** Senator, (D–West Virginia), Senate Minority Leader

**Carter, James Earl (Jimmy),** President of the United States from January 20, 1977, to January 20, 1981

**Casey, William J. (Bill),** Director of Central Intelligence from January 28, 1981

**Chain, John T., Jr.,** General, USAF; Director, Bureau of Politico-Military Affairs, Department of State, from July 1, 1984, until June 14, 1985

**Chernenko, Konstantin,** General Secretary of the Communist Party of the Soviet Union from February 1984 until March 1985

**Clark, William P. (Judge),** President's Assistant for National Security Affairs from February 1982 until November 1983; Secretary of the Interior from November 1983 until February 1985

**Cobb, Tyrus (Ty),** Director, European and Soviet Affairs Directorate, National Security Council Staff

**Cooper, Henry F. (Hank),** Deputy Negotiator for Defense and Space Talks in Geneva, Office of Negotiations on Nuclear and Space Arms with the Soviet Union, Department of State, from March 1985

**Courtney, William H.,** Special Assistant to the Under Secretary of State for Political Affairs, Department of State

**Craxi, Bettino,** Prime Minister of Italy from August 1983

**Crocker, Chester,** Assistant Secretary of State for Inter-American Affairs

**Dam, Kenneth W. (Ken),** Deputy Secretary of State from September 23, 1982, until June 15, 1985

**Deaver, Michael K.,** Deputy White House Chief of Staff and Special Assistant to the President until 1985

**deGraffenreid, Kenneth E.,** Senior Director, Intelligence Directorate, National Security Council Staff

**Dobriansky, Paula J.,** Deputy Director, European and Soviet Affairs Directorate, National Security Council Staff, from 1983 until 1984; thereafter Director, European and Soviet Affairs Directorate

**Dobrynin, Anatoly,** Soviet Ambassador to the United States

**Dolan, Anthony R. (Tony),** Speechwriter, White House Office of Speechwriting until 1985

**Dunkerley, Craig,** Office of Security and Political Affairs, Bureau of European and Canadian Affairs, Department of State

**Eagleburger, Lawrence (Larry),** Under Secretary of State for Political Affairs from February 1982 until May 1984; Career Ambassador from April 1984

**Ermarth, Fritz W.,** National Intelligence Officer for USSR, Central Intelligence Agency, and member, National Intelligence Council Staff, from 1984

**Foley, Thomas,** member, U.S. House of Representatives (D–Washington); House Democratic Whip

A Case #23-5017 Document #2005450 Filed: 06/28/2023 Page 291 o

**Fortier, Donald R. (Don),** Director, Western Europe and NATO, National Security Council Staff, from September 1982 until June 1983; Special Assistant to the President and Senior Director, Political-Military Affairs, National Security Council Staff, until December 1983; Deputy Assistant to the President for National Security Affairs and Senior Director for Policy Development from December 1983

**Gandhi, Rajiv,** Indian Prime Minister

**Garthoff, Douglas F.,** Policy Assistant for Soviet Affairs, Department of Defense

**Gates, Robert (Bob),** Deputy Director for Intelligence, Central Intelligence Agency, from January 1982 until April 1986; also, Chairman, National Intelligence Council, from September 1983

**Genscher, Hans-Dietrich,** Vice Chancellor and Foreign Minister of the Federal Republic of Germany

**George, Clair E.,** Director of the Office of Legislative Liaison, Office of the Director of Central Intelligence, from July 1983 until July 1984; Deputy Director of Operations, Central Intelligence Agency, from July 1984

**George, Douglas (Doug),** Chief of the Arms Control Intelligence Staff, Directorate of Intelligence, Central Intelligence Agency, from June 1982

**Glitman, Maynard W. (Mike),** Negotiator for the Intermediate-Range Nuclear Forces Talks in Geneva, Office of Negotiations on Nuclear and Space Talks with the Soviet Union, Department of State, from March 1985

**Goodby, James E.,** Head of the U.S. Delegation to the Conference on Confidence- and Security-Building Measures and Disarmament in Europe (CDE) from 1983 until 1985

**Gorbachev, Mikhail S.,** General Secretary of the Communist Party of the Soviet Union from March 1985

**Gordievskiy, Oleg,** Colonel, Committee on State Security (KGB), USSR; secret agent for British Security Service from 1974 until his defection to the United Kingdom in 1985

**Grechko, Andrey A.,** Marshal, Soviet Minister of Defense from 1967 until 1976

**Gregg, Donald P.,** Assistant to the Vice President for National Security Affairs

**Grinevsky, Oleg A.,** Head of the Soviet Delegation to the Conference on Confidence- and Security-Building Measures and Disarmament in Europe from 1983 until 1986

**Grobel, Olaf,** Director, Office of Theater Military Policy, Bureau of Politico-Military Affairs, Department of State

**Gromyko, Andrei,** Soviet Minister of Foreign Affairs

**Hartman, Arthur A.,** U.S. Ambassador to the Soviet Union

**Hill, M. Charles,** Special Assistant to the Secretary and Executive Secretary of the Department of State from March 28, 1983, until January 1, 1985; thereafter Executive Assistant to the Secretary

**Horowitz, Larry,** Executive Assistant to Senator Edward M. Kennedy

**Howe, Sir Geoffrey,** British Secretary of State for Foreign and Commonwealth Affairs from June 1983

**Howe, Jonathan T.,** Rear Admiral, USN; Director of the Bureau of Politico-Military Affairs, Department of State, until July 1, 1984

**Iklé, Fred C.,** Under Secretary of Defense for Policy

**Isakov, Viktor,** Minister-Counselor, Soviet Embassy in Washington

**Kamman, Curtis, W.,** Charge d'Affaires, U.S. Embassy in Moscow, until August 1985

**Kampelman, Max,** U.S. Ambassador to the Conference on Security and Cooperation in Europe until 1983; head of U.S. human rights mission to Europe in 1984; head of the Delegation to the Nuclear and Space Talks in Geneva; Negotiator for Defense and Space Talks, Office of Negotiations on Nuclear and Space Arms with the Soviet Union, Department of State, from March 1985

**Keel, Alton B. (Al),** Associate Director, Office of Management and Budget

**Kelly, John H.,** Deputy Assistant Secretary of State for European and Canadian Affairs

**Kennedy, Edward M. (Ted),** Senator (D–Massachusetts)

**Kennedy, Richard T.,** Special Adviser to the Secretary of State on Nonproliferation Policy and Nuclear Energy Affairs from 1983

**Keyes, Alan,** staff member, National Security Council in 1983

**Keyworth, George A., II,** Science Advisor to the President; Director, Office of Science and Technology Policy, Executive Office of the President

**Kimmitt, Robert M.,** Executive Secretary and General Counsel, National Security Council Staff, from 1983

**Kirkpatrick, Jeane J.,** U.S. Representative to the United Nations until April 1985

**Kohl, Helmut,** Chancellor of the Federal Republic of Germany

**Korniyenko, Georgii,** Soviet First Deputy Minister of Foreign Affairs

**Kraemer, Sven,** Director, Arms Control, Defense Programs and Arms Control Directorate, National Security Council Staff

**Kvitsinskiy, Yuliy A.,** Head of the Soviet delegation to the Intermediate-Range Nuclear Force Negotiations in Geneva until December 1983; Head of the Soviet Delegation to the Nuclear and Space Talks in Geneva from March 1985

**Lehman, Ronald F., II (Ron),** Special Assistant to the President and Senior Director, Defense Programs and Arms Control Directorate, National Security Council Staff, from 1983 until January 1986; Deputy Negotiator for Strategic Arms Reduction Talks in Geneva, Office of Negotiations on Nuclear and Space Arms with the Soviet Union, Department of State, from March 1985

**Lenczowski, John,** Director, European and Soviet Affairs Directorate, National Security Council Staff

**Levine, Richard,** Deputy Director, Defense Programs, Defense Policy Directorate, National Security Council Staff

**Lilac, Robert,** Director, Political-Military Affairs Directorate, National Security Council Staff, from 1983 until 1984

**Linhard, Robert E. (Bob),** Colonel, USAF; Director, Defense Programs and Arms Control Directorate, National Security Council Staff

**Marshall, Andrew,** Director, Office of Net Assessment, Department of Defense

**Matlock, Jack F.,** Special Assistant to the President and Senior Director, European and Soviet Affairs Directorate, National Security Council Staff

**McFarlane, Robert C. (Bud),** Colonel, USMC (Ret.); Deputy Assistant to the President for National Security Affairs from 1982 until October 1983; Assistant to the President for National Security Affairs from October 1983 until December 1985

**McKinley, Brunson,** Deputy Executive Secretary of the Department of State until 1985

**McMahon, John N.,** Deputy Director of Central Intelligence from 1982

**Meese, Edwin, III (Ed),** Counselor to the President until February 1985; U.S. Attorney General from February 1985

**Mitterrand, Francois,** President of France

**Montgomery, Hugh,** Director of the Bureau of Intelligence and Research, Department of State

**Moreau, Arthur S.,** Admiral, USN; Assistant to the Chairman of the Joint Chiefs of Staff from 1983 until 1985

**Mulroney, Martin Brian,** Prime Minister of Canada from September 17, 1984

**Murphy, Richard,** Assistant Secretary of State for Near Eastern Affairs

**Nakasone Yasuhiro,** Prime Minister of Japan from November 27, 1982

A Case #23-5017 Document #2005450 Filed: 06/28/2023 Page 293 o

**Nitze, Paul,** Chief U.S. Arms Negotiator, Intermediate-Range Nuclear Force Negotiations, until 1984; Special Advisor to the President and Secretary of State on Arms Control Matters from 1985

**Ogarkov, Nikolai V.,** Marshal, Chief of the General Staff of the Soviet Armed Forces, until September 1984

**O'Neill, Thomas P., Jr., (Tip),** member, U.S. House of Representatives (D–Massachusetts); Speaker of the House

**Palme, Olof,** Prime Minister of Sweden from October 1982

**Palmer, Robie M.H. (Mark),** Deputy Assistant Secretary of State for European and Canadian Affairs

**Parris, Mark R.,** Director, Office of Soviet Union Affairs, Bureau of European and Canadian Affairs, Department of State

**Pascoe, Boris L. (Lynn),** Deputy Director, Office of Soviet Union Affairs, Bureau of European and Canadian Affairs, Department of State

**Pérez de Cuéllar, Javier,** Secretary-General of the United Nations from January 1, 1982

**Perle, Richard,** Assistant Secretary of Defense for International Security Policy

**Pipes, Richard,** Senior Director, East European and Soviet Affairs, National Security Council Staff, until December 1982

**Platt, Nicholas,** Executive Secretary of the Department of State and Special Assistant to the Secretary of State from January 7, 1985

**Poindexter, John M.,** Rear Admiral, USN; Military Assistant to the President's Assistant for National Security Affairs until October 1983; Deputy Assistant to the President for National Security Affairs from October 1983 until December 1985

**Powell, Colin L.,** Major General, USA; Military Assistant to the Secretary of Defense

**Qadhafi, Muammar,** President of Libya

**Raymond, Walter, Jr.,** Senior Director, Intelligence Directorate, National Security Council Staff, from 1982 until 1983; Senior Director, International Communications and Information Directorate, National Security Council Staff, from 1983

**Reagan, Ronald,** President of the United States

**Regan, Donald T. (Don),** Secretary of the Treasury until February 1985; White House Chief of Staff from February 1985

**Robinson, Roger,** Director, International Economic Affairs Directorate, National Security Council Staff, from 1983 until 1984; Senior Director, International Economic Affairs Directorate, National Security Council Staff, from 1984 until 1985

**Robison, Olin C.,** President of Middlebury College

**Rodman, Peter,** member, Policy Planning Council, Department of State until 1984; Chairman, Policy Planning Council, from April 9, 1984

**Rostow, Eugene V. (Gene),** Director of the Arms Control and Disarmament Agency until January 1983

**Rowny, Edward L.,** General, USA; Chief U.S. Arms Negotiator to the Strategic Arms Reduction Talks until 1984; Special Advisor to the President and Secretary of State on Arms Control Matters from 1985

**Sagdeyev, Roald Z.,** Director, USSR Institute of Space Research

**Sakharov, Andrei,** Soviet nuclear physicist and dissident

**Scowcroft, Brent,** Chairman of the President's Commission on Strategic Forces; member of the Dartmouth Group

**Seitz, Raymond G.H.,** Executive Assistant to the Secretary of State until July 1984

**Sestanovich, Stephen,** Director, Political-Military Affairs Directorate, National Security Council Staff, from 1984

**Sharansky, Natan (also Shcharansky, Anatoly),** Soviet dissident and refusenik

**Shultz, George P.,** Secretary of State from July 1982

**Shultz, Helena (Obie),** wife of George Shultz

**Simons, Thomas W., Jr.,** Director, Office of Soviet Union Affairs, Bureau of European and Canadian Affairs, Department of State, from 1982 until 1985

**Sofaer, Abraham,** Legal Adviser, Department of State

**Sokolov, Oleg,** Minister-Counselor at the Soviet Embassy in Washington

**Sokolov, Sergei F.,** Marshal, Soviet Minister of Defense, from December 1984

**Sommer, Peter R.,** member, European and Soviet Affairs Directorate, National Security Council Staff

**Speakes, Larry M.,** Assistant to the President and Principal Deputy Press Secretary from June 17, 1981

**Spiers, Ronald I.,** Under Secretary of State for Management from November 23, 1983

**Stearman, William L.,** member, National Security Council Staff

**Taft, William H., IV.,** Deputy Secretary of Defense from February 1984

**Thatcher, Margaret H.,** Prime Minister of the United Kingdom

**Thayer, Paul,** Deputy Secretary of Defense until January 1984

**Timbie, James P.,** Advisor for Strategic Policy to the Deputy Secretary of State

**Tower, John G.,** Senator (R–Texas) until January 3, 1985; Negotiator for Strategic Arms Reduction Talks in Geneva, Office of Negotiations on Nuclear and Space Arms with the Soviet Union, Department of State, from March 1985

**Ustinov, Dmitri F.,** Soviet Minister of Defense until December 1984

**Velikhov, Yevgeny P.,** Vice President, Soviet Academy of Sciences

**Vershbow, Alexander,** Multilateral Relations Officer, Office of Soviet Union Affairs, Bureau of European and Canadian Affairs, Department of State

**Vessey, John W., Jr.,** General, USA; Chairman of Joint Chiefs of Staff from June 1982

**Wallis, W. Allen,** Under Secretary of State for Economic Affairs, Department of State

**Weinberger, Caspar W. (Cap),** Secretary of Defense

**Wick, Charles Z.,** Director, United States Information Agency

**Wolfowitz, Paul, D.,** Assistant Secretary of State for East Asian and Pacific Affairs

**Zagladin, Vadim,** Deputy Chief, International Department of the Central Committee of the Soviet Union

**Zimmerman, Warren,** Deputy Chief of Mission, U.S. Embassy in Moscow, until July 1984

# Note on U.S. Covert Actions

In compliance with the *Foreign Relations of the United States* statute that requires inclusion in the *Foreign Relations* series of comprehensive documentation on major foreign policy decisions and actions, the editors have identified key documents regarding major covert actions and intelligence activities. The following note will provide readers with some organizational context on how covert actions and special intelligence operations in support of U.S. foreign policy were planned and approved within the U.S. Government. It describes, on the basis of declassified documents, the changing and developing procedures during the Truman, Eisenhower, Kennedy, Johnson, Nixon, Ford, and Carter Presidencies.

*Management of Covert Actions in the Truman Presidency*

The Truman administration's concern over Soviet "psychological warfare" prompted the new National Security Council (NSC) to authorize, in NSC 4–A of December 1947, the launching of peacetime covert action operations. NSC 4–A made the Director of Central Intelligence responsible for psychological warfare, establishing at the same time the principle that covert action was an exclusively executive branch function. The Central Intelligence Agency (CIA) certainly was a natural choice, but it was assigned this function at least in part because the Agency controlled unvouchered funds, by which operations could be funded with minimal risk of exposure in Washington.[1]

The CIA's early use of its new covert action mandate dissatisfied officials at the Departments of State and Defense. The Department of State, believing this role too important to be left to the CIA alone and concerned that the military might create a new rival covert action office in the Pentagon, pressed to reopen the issue of where responsibility for covert action activities should reside. Consequently, on June 18, 1948, a new NSC directive, NSC 10/2, superseded NSC 4–A.

NSC 10/2 directed the CIA to conduct "covert" rather than merely "psychological" operations, defining them as all activities "which are conducted or sponsored by this Government against hostile foreign states or groups or in support of friendly foreign states or groups but which are so planned and executed that any U.S. Government responsibility for them is not evident to unauthorized persons and that if un-

---

[1] NSC 4–A, December 17, 1947, is printed in *Foreign Relations*, 1945–1950, Emergence of the Intelligence Establishment, Document 257.

covered the U.S. Government can plausibly disclaim any responsibility for them."

The type of clandestine activities enumerated under the new directive included: "propaganda; economic warfare; preventive direct action, including sabotage, demolition, and evacuation measures; subversion against hostile states, including assistance to underground resistance movements, guerrillas, and refugee liberations [*sic*] groups; and support of indigenous anti-Communist elements in threatened countries of the free world. Such operations should not include armed conflict by recognized military forces, espionage, counter-espionage, and cover and deception for military operations."[2]

The Office of Policy Coordination (OPC), newly established in the CIA on September 1, 1948, in accordance with NSC 10/2, assumed responsibility for organizing and managing covert actions. The OPC, which was to take its guidance from the Department of State in peacetime and from the military in wartime, initially had direct access to the Department of State and to the military without having to proceed through the CIA's administrative hierarchy, provided the Director of Central Intelligence (DCI) was informed of all important projects and decisions.[3] In 1950 this arrangement was modified to ensure that policy guidance came to the OPC through the DCI.

During the Korean conflict the OPC grew quickly. Wartime commitments and other missions soon made covert action the most expensive and bureaucratically prominent of the CIA's activities. Concerned about this situation, DCI Walter Bedell Smith in early 1951 asked the NSC for enhanced policy guidance and a ruling on the proper "scope and magnitude" of CIA operations. The White House responded with two initiatives. In April 1951 President Truman created the Psychological Strategy Board (PSB) under the NSC to coordinate government-wide psychological warfare strategy. NSC 10/5, issued in October 1951, reaffirmed the covert action mandate given in NSC 10/2 and expanded the CIA's authority over guerrilla warfare.[4] The PSB was soon abolished by the incoming Eisenhower administration, but the expansion of the CIA's covert action writ in NSC 10/5 helped ensure that covert action would remain a major function of the Agency.

As the Truman administration ended, the CIA was near the peak of its independence and authority in the field of covert action. Although the CIA continued to seek and receive advice on specific proj-

---

[2] NSC 10/2, June 18, 1948, is printed ibid., Document 292.

[3] Memorandum of conversation by Frank G. Wisner, "Implementation of NSC–10/2," August 12, 1948, is printed ibid., Document 298.

[4] NSC 10/5, "Scope and Pace of Covert Operations," October 23, 1951, is printed in *Foreign Relations*, 1950–1955, The Intelligence Community, Document 90.

A Case #23-5017    Document #2005450    Filed: 06/28/2023    Page 297 o

ects from the NSC, the PSB, and the Departmental representatives originally delegated to advise the OPC, no group or officer outside of the DCI and the President himself had authority to order, approve, manage, or curtail operations.

*NSC 5412 Special Group; 5412/2 Special Group; 303 Committee*

The Eisenhower administration began narrowing the CIA's latitude in 1954. In accordance with a series of NSC directives, the responsibility of the DCI for the conduct of covert operations was further clarified. President Eisenhower approved NSC 5412 on March 15, 1954, reaffirming the CIA's responsibility for conducting covert actions abroad. A definition of covert actions was set forth; the DCI was made responsible for coordinating with designated representatives of the Secretary of State and the Secretary of Defense to ensure that covert operations were planned and conducted in a manner consistent with U.S. foreign and military policies; and the Operations Coordinating Board was designated the normal channel for coordinating support for covert operations among the Departments of State and Defense and the CIA. Representatives of the Secretary of State, the Secretary of Defense, and the President were to be advised in advance of major covert action programs initiated by the CIA under this policy and were to give policy approval for such programs and secure coordination of support among the Departments of State and Defense and the CIA.[5]

A year later, on March 12, 1955, NSC 5412/1 was issued, identical to NSC 5412 except for designating the Planning Coordination Group as the body responsible for coordinating covert operations. NSC 5412/2 of December 28, 1955, assigned to representatives (of the rank of assistant secretary) of the Secretary of State, the Secretary of Defense, and the President responsibility for coordinating covert actions. By the end of the Eisenhower administration, this group, which became known as the "NSC 5412/2 Special Group" or simply "Special Group," emerged as the executive body to review and approve covert action programs initiated by the CIA.[6] The membership of the Special Group varied depending upon the situation faced. Meetings were infrequent until 1959 when weekly meetings began to be held. Neither the CIA nor the Special Group adopted fixed criteria for bringing projects before the group; initiative remained with the CIA, as members representing

---

[5] William M. Leary, editor, *The Central Intelligence Agency: History and Documents* (The University of Alabama Press, 1984), p. 63; for text of NSC 5412, see *Foreign Relations*, 1950–1955, The Intelligence Community, Document 171.

[6] Leary, *The Central Intelligence Agency: History and Documents*, pp. 63, 147–148; *Final Report of the Select Committee To Study Governmental Operations With Respect to Intelligence Activities, United States Senate*, Book I, *Foreign and Military Intelligence* (1976), pp. 50–51. For texts of NSC 5412/1 and NSC 5412/2, see *Foreign Relations*, 1950–1955, The Intelligence Community, Documents 212 and 250.

other agencies frequently were unable to judge the feasibility of particular projects.[7]

After the Bay of Pigs failure in April 1961, General Maxwell Taylor reviewed U.S. paramilitary capabilities at President Kennedy's request and submitted a report in June that recommended strengthening high-level direction of covert operations. As a result of the Taylor Report, the Special Group, chaired by the President's Special Assistant for National Security Affairs McGeorge Bundy, and including Deputy Under Secretary of State U. Alexis Johnson, Deputy Secretary of Defense Roswell Gilpatric, Director of Central Intelligence Allen Dulles, and Chairman of the Joint Chiefs of Staff General Lyman Lemnitzer, assumed greater responsibility for planning and reviewing covert operations. Until 1963 the DCI determined whether a CIA-originated project was submitted to the Special Group. In 1963 the Special Group developed general but informal criteria, including risk, possibility of success, potential for exposure, political sensitivity, and cost (a threshold of $25,000 was adopted by the CIA), for determining whether covert action projects were submitted to the Special Group.[8]

From November 1961 to October 1962 a Special Group (Augmented), whose membership was the same as the Special Group plus Attorney General Robert Kennedy and General Taylor (as Chairman), exercised responsibility for Operation Mongoose, a major covert action program aimed at overthrowing the Castro regime in Cuba. When President Kennedy authorized the program in November, he designated Brigadier General Edward G. Lansdale, Assistant for Special Operations to the Secretary of Defense, to act as chief of operations, and Lansdale coordinated the Mongoose activities among the CIA and the Departments of State and Defense. The CIA units in Washington and Miami had primary responsibility for implementing Mongoose operations, which included military, sabotage, and political propaganda programs.[9]

President Kennedy also established a Special Group (Counter-Insurgency) on January 18, 1962, when he signed NSAM No. 124. The Special Group (CI), set up to coordinate counter-insurgency activities separate from the mechanism for implementing NSC 5412/2, was to confine itself to establishing broad policies aimed at preventing and resisting subversive insurgency and other forms of indirect aggression in friendly countries. In early 1966, in NSAM No. 341, President Johnson assigned responsibility for the direction and coordination of counter-insurgency activities overseas to the Secretary of State, who estab-

---

[7] Leary, *The Central Intelligence Agency: History and Documents*, p. 63.

[8] Ibid., p. 82.

[9] See *Foreign Relations*, 1961–1963, vol. X, Cuba, 1961–1962, Documents 270 and 278.

lished a Senior Interdepartmental Group to assist in discharging this responsibility.[10]

NSAM No. 303, June 2, 1964, from Bundy to the Secretaries of State and Defense and the DCI, changed the name of "Special Group 5412" to "303 Committee" but did not alter its composition, functions, or responsibility. Bundy was the chairman of the 303 Committee.[11]

The Special Group and the 303 Committee approved 163 covert actions during the Kennedy administration and 142 during the Johnson administration through February 1967. The 1976 Final Report of the Church Committee, however, estimated that of the several thousand projects undertaken by the CIA since 1961, only 14 percent were considered on a case-by-case basis by the 303 Committee and its predecessors (and successors). Those not reviewed by the 303 Committee were low-risk and low-cost operations. The Final Report also cited a February 1967 CIA memorandum that included a description of the mode of policy arbitration of decisions on covert actions within the 303 Committee system. The CIA presentations were questioned, amended, and even on occasion denied, despite protests from the DCI. Department of State objections modified or nullified proposed operations, and the 303 Committee sometimes decided that some agency other than the CIA should undertake an operation or that CIA actions requested by Ambassadors on the scene should be rejected.[12]

The effectiveness of covert action has always been difficult for any administration to gauge, given concerns about security and the difficulty of judging the impact of U.S. initiatives on events. In October 1969 the new Nixon administration required annual 303 Committee reviews for all covert actions that the Committee had approved and automatic termination of any operation that had not been reviewed after 12 months. On February 17, 1970, President Nixon signed National Security Decision Memorandum 40,[13] which superseded NSC 5412/2 and changed the name of the covert action approval group to the 40 Committee, in part because the 303 Committee had been named in the media. The Attorney General was also added to the membership of the Committee. NSDM 40 reaffirmed the DCI's responsibility for the coor-

---

[10] For text of NSAM No. 124, see *Foreign Relations*, 1961–1963, vol. VIII, National Security Policy, Document 68. NSAM No. 341, March 2, 1966, is printed in *Foreign Relations*, 1964–1968, vol. XXXIII, Organization and Management of U.S. Foreign Policy; United Nations, Document 56.

[11] For text of NSAM No. 303, see *Foreign Relations*, 1964–1968, vol. XXXIII, Organization and Management of U.S. Foreign Policy; United Nations, Document 204.

[12] *Final Report of the Select Committee To Study Governmental Operations With Respect to Intelligence Activities, U.S. Senate,* Book I, *Foreign and Military Intelligence,* pp. 56–57.

[13] For text of NSDM 40, see *Foreign Relations*, 1969–1976, vol. II, Organization and Management of U.S. Foreign Policy, 1969–1972, Document 203.

dination, control, and conduct of covert operations and directed him to obtain policy approval from the 40 Committee for all major and "politically sensitive" covert operations. He was also made responsible for ensuring an annual review by the 40 Committee of all approved covert operations.

The 40 Committee met regularly early in the Nixon administration, but over time the number of formal meetings declined and business came to be conducted via couriers and telephone votes. The Committee actually met only for major new proposals. As required, the DCI submitted annual status reports to the 40 Committee for each approved operation. According to the 1976 Church Committee Final Report, the 40 Committee considered only about 25 percent of the CIA's individual covert action projects, concentrating on major projects that provided broad policy guidelines for all covert actions. Congress received briefings on only a few proposed projects. Not all major operations, moreover, were brought before the 40 Committee: President Nixon in 1970 instructed the DCI to promote a coup d' etat against Chilean President Salvador Allende without Committee coordination or approval.[14]

*Presidential Findings Since 1974 and the Operations Advisory Group*

The Hughes-Ryan amendment to the Foreign Assistance Act of 1974 brought about a major change in the way the U.S. Government approved covert actions, requiring explicit approval by the President for each action and expanding congressional oversight and control of the CIA. The CIA was authorized to spend appropriated funds on covert actions only after the President had signed a "finding" and informed Congress that the proposed operation was important to national security.[15]

Executive Order (EO) 11905, issued by President Ford on February 18, 1976, in the wake of major congressional investigations of CIA activities by the Church and Pike Committees, replaced the 40 Committee with the Operations Advisory Group (OAG), composed of the President's Assistant for National Security Affairs, the Secretaries of State and Defense, the Chairman of the Joint Chiefs of Staff, and the DCI, who retained responsibility for the planning and implementation of covert operations. The OAG was required to hold formal meetings to develop recommendations for the President regarding a covert action and to conduct periodic reviews of previously approved operations. EO 11905 also banned all U.S. Government employees from involvement in political assassinations, a prohibition that was retained in succeeding

---

[14] *Final Report of the Select Committee To Study Governmental Operations With Respect to Intelligence Activities*, U.S. Senate, Book I, Foreign and Military Intelligence, pp. 54–55, 57.

[15] P.L. 93–559.

executive orders, and prohibited involvement in domestic intelligence activities.[16]

Approval and oversight requirements for covert action continued to be governed by the Hughes-Ryan amendment well into the Carter administration, even as the new administration made alterations to the executive branch's organizational structure for covert action. President Carter retained the NSC as the highest executive branch organization to review and guide U.S. foreign intelligence activities. As part of a broader NSC reorganization at the outset of his administration, President Carter replaced the OAG with the NSC's Special Coordination Committee (SCC), which explicitly continued the same operating procedures as the former OAG.[17] Membership of the SCC, when meeting for the purpose of reviewing and making recommendations on covert actions (as well as sensitive surveillance activities), replicated that of the former OAG—namely—the Assistant to the President for National Security Affairs, the Secretaries of State and Defense, the DCI, the Chairman of the Joint Chiefs of Staff, and the Attorney General and Director of the Office of Management and Budget (the latter two as observers).

The designated chairman of all SCC meetings was the Assistant to the President for National Security Affairs. Carter formalized the SCC's replacement of the OAG in EO 11985 of May 13, 1977, which amended President Ford's EO 11905 on "United States Foreign Intelligence activities."[18] In practice, the SCC for covert action and sensitive surveillance activities came to be known as the SCC-Intelligence (SCC–I) to distinguish it from other versions of the SCC.

The SCC's replacement of the OAG was reaffirmed in EO 12036 of January 24, 1978, which replaced EO 11905 and its amendments. EO 12036 also reaffirmed the same membership for the SCC–I, but identified the Attorney General and the Director of the Office of Management and Budget as full members of the Committee, rather than merely observers.[19]

---

[16] EO 11905, "United States Foreign Intelligence Activities," *Weekly Compilation of Presidential Documents*, Vol. 12, No. 8, February 23, 1976.

[17] The broader NSC reorganization sought to reduce the number of NSC committees to two: the Policy Review Committee (PRC) and the SCC. The SCC's jurisdiction included all intelligence policy issues other than annual budget and priorities reviews; the SCC also had jurisdiction over other, non-intelligence matters. Presidential Directive 2, "The National Security Council System," January 20, 1977, Carter Library, Vertical File, Presidential Directives. See also Zbigniew Brzezinski, *Power and Principle: Memoirs of the National Security Advisor 1977–1981* (New York: Farrar, Strauss, Giroux, 1983), pp. 59–62.

[18] EO 11985, "United States Foreign Intelligence Activities," May 13, 1977, *Weekly Compilation of Presidential Documents*, Vol. 13, No. 20 (May 16, 1977), pp. 719–720.

[19] EO 12036, "United States Foreign Intelligence Activities," January 24, 1978, *Weekly Compilation of Presidential Documents*, Vol. 14, No. 4 (January 30, 1978), pp. 194–214. Since EO 12036 governed foreign intelligence activities, all references in the EO to the "SCC" were effectively references to what was known in practice as SCC–I.

A Case #23-5017   Document #2005450        Filed: 06/28/2023   Page 302 o

Also in the first days of the Carter administration, the SCC–I established a lower-level working group to study and review proposals for covert action and other sensitive intelligence matters and report to the SCC–I. This interagency working group was chaired by the Deputy Assistant to the President for National Security Affairs (David Aaron), or in his absence, the NSC Director for Intelligence Coordination. The working group was named the Special Activities Working Group (SAWG). The SAWG was active in early Carter administration reviews of ongoing covert action and remained active through at least 1978. NSC officials in mid-1978 sought to downgrade or abolish the SAWG and replace it as needed with ad hoc working groups. Internal NSC reviews at the end of the Carter administration state that the SAWG gradually fell out of use. By late 1979, the means for debating, developing, and guiding certain covert actions was an interagency working group chaired by Aaron at the NSC. This group was referred to by several names during the late Carter administration, including the Deputy's (or Deputies) group, the Aaron group, the interagency group, the Black Chamber, and the Black Room.

The Carter administration made use of a new category of presidential findings for "world-wide" or "general" (or "generic") covert operations. This continued a practice initiated late in the Ford administration in response to the Hughes-Ryan requirement for presidential findings. The worldwide category covered lower-risk operations that were directed at broad policy goals implemented on a worldwide basis as assets allowed. These operations utilized existing assets as well as existing liaison contacts with foreign intelligence or security services, and in some cases also consisted of routine training or procurement undertaken to assist foreign intelligence partners or other agencies of the U.S. Government. A new type of document—known as "Perspectives"—provided more specific tasking guidance for these general, worldwide covert activities. Perspectives detailed the themes to be stressed in furtherance of a particular policy goal. Riskier operations required their own presidential findings or Memorandum of Notification (MON). Perspectives were drafted by the CIA and cleared by the Department of State, so the CIA could vet the operational feasibility and risks of the program while the Department of State could assess the diplomatic risks and verify that the program was consistent with overall foreign policy goals. At least initially, Perspectives did not require further coordination with OAG, SCC, or the President. Once an agreed-upon Perspectives document was finalized by CIA and the Department of State, it was transmitted to the field, and posts were required to make periodic reports on any achievements under the Perspectives guidelines. Beginning in 1978, actions in this worldwide category were authorized by the President as specific line-item addi-

A Case #23-5017    Document #2005450    Filed: 06/28/2023    Page 303 o

tions to a previously existing "world-wide" finding, though Perspectives were still used to provide additional details.

The Carter administration initially used MONs to introduce higher-risk, significantly higher-cost, or more geographically specific operations under a previously approved worldwide or general objective outlined in a Perspectives document. Like Perspectives, MONs had to be coordinated between the CIA and the Department of State, but they also required broader interagency coordination within the SAWG or SCC. MONs subsequently came to be used for significant changes to any type of finding, not just worldwide ones. Entirely new covert actions continued to require new presidential findings. The Hughes-Ryan amendment stipulated that Congress be notified of new findings "in a timely fashion," but did not specify how much time that meant. During the Carter administration, the CIA typically notified Congress of new covert initiatives within 48 hours, including those outlined in Perspectives or MONs.

In October 1980, the Intelligence Authorization Act for Fiscal Year 1981—also known as the Intelligence Oversight Act of 1980—scaled back the Hughes-Ryan amendment's provisions for congressional oversight of covert action. While the requirement to notify Congress about presidential findings remained in place, the new Act limited the Committees of Congress that had to be briefed to the two intelligence Committees, and also explicitly clarified that this requirement to keep the Committees "fully and currently informed" did not constitute a requirement for congressional approval of covert action or other intelligence activities. Moreover, the new Act stipulated that if the President determined it was "essential to limit prior notice to meet extraordinary circumstances affecting vital interests of the United States," the President could limit prior notice to the chairmen and ranking minority members of the two intelligence Committees, the Speaker and minority leader of the House, and the majority and minority leaders of the Senate—a group that came to be known as the "Gang of Eight." If prior notice of a covert action was withheld, the President was required to inform the two intelligence Committees "in a timely fashion" and provide a statement of the reasons for not giving prior notice.[20]

---

[20] P.L. 96–450, Sec. 407 (October 14, 1980). See also the description of the Hughes-Ryan amendment and its replacement by P.L. 96–450 in: Richard A. Best, Jr., "Covert Action: Legislative Background and Possible Policy Questions," Congressional Research Service, RL33715, December 27, 2011, pp.1–2; and L. Britt Snider, *The Agency and the Hill: CIA'S Relationship with Congress, 1946–2004*, Washington: Center for the Study of Intelligence, Central Intelligence Agency, 2008, pp. 280–281.

Page Left Intentionally
Blank

# Appendix

## A.    Editorial Note

Stark deviations in assessments by the U.S. Intelligence Community of the November 1983 NATO exercise Able Archer and the Soviet "war scare" led to a much later 1990 investigation by the President's Foreign Intelligence Advisory Board during the George H.W. Bush administration, resulting in the report, "The Soviet 'War Scare.'" (George H.W. Bush Library, Bush Presidential Records, President's Foreign Intelligence Advisory Board, Subject Files; Reports to the President-War Scare Report 1990 [OA/IDCF01830–020]) The February 15, 1990, PFIAB report analyzed intelligence and reporting on the Soviet war scare, Able Archer, and other related activities. The PFIAB report stated: "During the past year, the President's Foreign Intelligence Advisory Board has carefully reviewed the events of that period to learn what we (the U.S. intelligence community) knew, when we knew it, and how we interpreted it. The Board has read hundreds of documents, conducted more than 75 interviews with American and British officials, and studied the series of National Intelligence Estimates (NIE's) and other intelligence assessments that have attempted over the last six years to interpret the war scare data. Additionally, we have offered our own interpretation of the war scare events." (PFIAB, pages vi–vii) Although outside the normal scope of this volume, the 1990 PFIAB report and other memoranda from 1988 and 1989 are addressed in this editorial note because the documents focus upon crucial events from 1983 to 1984.

Reactions from the Intelligence Community (IC) and policymakers to the events surrounding Able Archer and the Soviet "war scare" differed significantly and evolved over time. The contemporaneous reporting in 1983–1984 from the Central Intelligence Agency (CIA), National Intelligence Council (NIC), [*text not declassified*] drew varied conclusions about Soviet anxieties. While some reporting assessed that "Contrary to the impression conveyed by Soviet propaganda, Moscow does not appear to anticipate a near-term military confrontation with the United States" (see Document 157), another analysis presented evidence that [*text not declassified*].

Retrospective assessments of these events seem to conflate the NATO Able Archer exercise with the broader "war scare" talk emanating from Moscow related to INF deployments. The Soviet military unquestionably reacted to Able Archer differently than to previous NATO exercises. (See Document 134.) Whether the Soviet response was attributable to the circumstances of the time, to the "war scare"

1420

(whether real or Soviet propaganda), or to a credible belief within the Soviet military leadership or the Politburo that the United States was planning to launch a nuclear first strike against the USSR, under the guise of a NATO exercise or otherwise, remains unclear on the basis of the available evidence.

After a year of research and a reassessment of the relevant intelligence and documentation, the PFIAB report stated: "We believe that the Soviets perceived that the correlation of forces had turned against the USSR, that the US was seeking military superiority, and that the chances of the US launching a nuclear first strike—perhaps under cover of a routine training exercise—were growing. We also believe that the US intelligence community did not at the time, and for several years afterwards, attach sufficient weight to the possibility that the war scare was real. As a result, the President was given assessments of Soviet attitudes and actions that understated the risks to the United States. Moreover, these assessments did not lead us to reevaluate our own military and intelligence actions that might be perceived by the Soviets as signaling war preparations.

"In two separate Special National Intelligence Estimates (SNIEs) in May and August 1984, the intelligence community said: 'We believe strongly that Soviet actions are not inspired by, and Soviet leaders do not perceive, a genuine danger of imminent conflict or confrontation with the United States.' Soviet statements to the contrary were judged to be 'propaganda.' [See Documents 221 and 264.]

"The Board believes that the evidence then did not, and certainly does not now, support such categoric conclusions. Even without the benefit of subsequent reporting and looking at the 1984 analysis of then available information, the tone of the intelligence judgments was not adequate to the needs of the President." (PFIAB, pages vi–vii)

During November 1983, Able Archer and the Soviet responses to this exercise received little immediate attention in the U.S. Intelligence Community. (See Document 135.) However, by spring 1984, some in the intelligence communities in the United States [*text not declassified*] believed the Reagan administration should have recognized Soviet sensitivities and anxieties about a potential U.S. first strike. [*text not declassified*].

According to the PFIAB report, [*text not declassified*] "KGB Deputy Resident Colonel Oleg Gordiyevskiy, [*text not declassified*] had witnessed what he saw as Soviet paranoia over a US nuclear first strike; [*text not declassified*] As one of the most senior KGB officers in London, [*text not declassified*]." (PFIAB, page 10)

In a covering memorandum [*less than 1 line not declassified*] to Director of Central Intelligence William Casey and others, Herbert Meyer, Vice Chairman of the National Intelligence Council, wrote: [*text not*

A Case #23-5017   Document #2005450   Filed: 06/28/2023   Page 307 c

*declassified*]. The PFIAB report commented that the [*text not declassified*] report was "not well received in the US intelligence community." (PFIAB, pages 10–11)

Another contemporaneous analysis from the CIA, the May 1984 SNIE 11–10–84/JX concluded: "We believe strongly that Soviet actions are not inspired by, and Soviet leaders do not perceive, a genuine danger of imminent conflict or confrontation with the United States." (See Document 221.) The PFIAB report commented on this SNIE: "The estimate boldly declared that 'Recent Soviet war scare propaganda . . . is aimed primarily at discrediting US policies and mobilizing 'peace' pressures among various audiences abroad.' In a more piecemeal fashion, it was judged that 'Each Soviet action has its own military or political purpose sufficient to explain it.' The accelerated tempo of Soviet live exercise activity was explained simply as a reflection of 'long-term Soviet military objectives.'

"The Soviet reaction to Able Archer 83 was dismissed as a 'counterexercise,' but analysts acknowledged that the 'elaborate Soviet reaction' was 'somewhat greater than usual.' [*less than 1 line not declassified*] prior to and during the exercise indicated that the Warsaw Pact Intelligence services, especially the KGB, were admonished 'to look for any indication that the United States was about to launch a first nuclear strike,' analysts concluded that 'by confining heightened readiness to selected air units, Moscow clearly revealed that it did not, in fact, think there was a possibility at this time of a NATO attack.' The assessment, however, was not specific about what type of defensive or precautionary Soviet activity might be expected—and detected—were they preparing for an offensive NATO move." (PFIAB, page 13)

The PFIAB report continued its critique of SNIE 11–10–84/JX: IC "analysts dismissed [*less than 1 line not declassified*] on the war scare, including the KGB's formal tasking to its Residencies. 'This war scare propaganda has reverberated in Soviet security bureaucracies and emanated through other channels such as human sources. [See for example, Document 144.] We do not believe it reflects authentic leadership fears of imminent conflict.'" The report contended: "Such judgments were made even though the analysis was tempered 'by some uncertainty as to current Soviet leadership perceptions of the United States, by continued uncertainty about the Politburo decisionmaking processes, and by our inability at this point to conduct a detailed examination of how the Soviets might have assessed recent US/NATO military exercises and reconnaissance operations'—which, of course, included the previous Able Archer exercise. In other words, US analysts were unsure of what the Kremlin leadership thought or how it made decisions, nor had they adequately assessed the Soviet reaction to Able Archer 83. This notwithstanding, the estimate concluded: 'We are confident that,

as of now, the Soviets see not an imminent military clash but a costly and—to some extent—more perilous strategic and political struggle over the rest of the decade.'" (PFIAB, page 14)

The Board had similar criticisms of the August 1984 SNIE 11–9–84, "Soviet Policy Toward the United States in 1984" (see Document 264), for its "categorical and unqualified" judgments "about the likelihood of the war scare," and the analysts' conclusions: "We strongly believe that the Soviet actions are not inspired by, and Soviet leaders do not perceive, a genuine danger of imminent conflict or confrontation with the United States. Also, we do not believe that the Soviet war talk and other actions 'mask' Soviet preparations for an imminent move toward confrontation on the part of the USSR." (PFIAB, page 19–20) The PFIAB report continued: "Analysts readily acknowledged that the previous six months had seen extraordinary, unprecedented Soviet activities. Large scale military exercise, 'anomalous behavior' during the troop rotation, withdrawn military support for the harvest (last seen prior to the 1968 Czech invasion), new, deployed weapons systems (termed 'in response to INF deployments'), and heightened internal vigilance and security activities were noted. These events, however, were judged to be 'in line with long-evolving plans and patterns, rather than with sharp acceleration of preparations for major war.'" (PFIAB, page 19)

The PFIAB report acknowledged that its assessment and criticism of the May and August 1984 SNIEs "derives from information not known at the time. Our purpose in presenting this report is not so much to criticize the conclusions of the 1984 SNIE's as to raise questions about the ways these estimates were made and subsequently reassessed." (PFIAB, page ix) The PFIAB report concluded: "Reasonable people can disagree about the conclusions of the 1984 SNIE's. The PFIAB does disagree with many of them. More worrisome to us, however, is the process by which the estimates were made and subsequently reassessed. Although both estimates were reportedly reviewed by outside readers—and both, but particularly the first, contained alternative scenarios—strongly worded interpretations were defended by explaining away facts inconsistent with them. Consequently, both estimates contained, in essence, single outcome forecasting based in large part on near-term anomalous behavior. Moreover, neither alerted the reader to the risks erroneously rejecting the correct scenario." (PFIAB, page 30) The PFIAB report criticized the performance of the IC in 1983–1984, showing that contemporary assessments of Soviet intentions after Able Archer did not go far enough in providing President Reagan with alternative scenarios, explaining that the anxiety from the Soviet leadership could have been real.

In criticizing contemporary estimates, the PFIAB report emphasized intelligence that had not been available to the IC during these

years, principally information provided by Gordiyevskiy after he defected in 1985. Robert McFarlane's thoughts on the influence of Gordiyevskiy's information on the President are recorded in a December 16, 1988, memorandum for the record:

**Memorandum for the Record**

16 December 1988

SUBJECT

[*less than 1 line not declassified*] Robert F. McFarlane Regarding the Influence of Oleg Gordiyevskiy's Reporting on President Reagan

On 15 December [*less than 1 line not declassified*] Robert F. ("Bud") McFarlane, formerly National Security Advisor to the President, as to the veracity of claims [*less than 1 line not declassified*] that the reporting of KGB officer [*less than 1 line not declassified*] Oleg Gordiyevskiy about the Kremlin's fear of war greatly influenced President Reagan in the mid-1980s to seek better relations with the USSR. In response, Bud made several points:

He definitely remembered the reporting associated (later) with Gordiyevskiy that conveyed the Kremlin's fear of war. He also specifically recalled [*less than 1 line not declassified*] on Gordiyevskiy's assessments given to the President [*less than 1 line not declassified*].

He noted that he discussed this reporting with the President on several occasions. This was in the course of numerous discussions extending throughout 1983 and part of 1984 about the apparent anxieties being transmitted by Moscow through many channels, [*less than 1 line not declassified*].

The President, according to Bud, saw this reporting attributed to Gordiyevskiy in the larger context of a Soviet "war-scare" campaign arising from the NATO decision to deploy INF and from Reagan's hard line on defense, SDI, etc. In the President's view, either the Soviets were paranoid in strange ways we could not let bother us, or they were fabricating the appearance of fear to intimidate and sway us, which we should even more be prepared to ignore.

Often in these conversations, according to Bud, the President outlined his sustained intention to concentrate on building US strength and credibility in the first term and to move toward diplomatic reengagement in the second. The President's key speech of January 1984 [see Document 158] was a natural step in a long-planned shift of policy. Neither Gordiyevskiy's reporting nor the Soviet "war-scare" campaign in general were responsible for the evolution of the President's policy.

Bud said he'd been queried before on this matter by [*name not declassified*], a journalist, who might be (or have been) writing an article on it. Against the background of the above, Bud said he discounted Gordiyevskiy's impact on the President [*less than 1 line not declassified*].

[*1 paragraph (8½ lines) not declassified*]

[*name not declassified*]

(Central Intelligence Agency, National Intelligence Council, Job 90T00435R: Chronological Files (1988), Box 1, Folder 12: C/NIC Chrono for December 1988)

McFarlane's recollections in this memorandum for the record correlate with a January 1984 memorandum by Jack Matlock, Soviet specialist on the NSC Staff, which demonstrated an awareness of potential Soviet concerns, but concluded:

"—The Soviet leadership is not overly nervous about the immediate prospect of armed confrontation with the U.S.;

"—They are however very nervous about the prospects five to ten years down the road—not so much of a confrontation as such, as of a decisive shift in the balance of military power." (See Document 157.)

As mentioned in the 1988 memorandum for the record, McFarlane did recall "later" reporting to Reagan about Gordiyevskiy. The PFIAB report addressed Gordiyevskiy's situation in relation to the war scare and the 1984 SNIE assessments: "The Board found that after the 1984 assessments were issued, the intelligence community did not again address the war scare until after the defection to Great Britain of KGB Colonel Oleg Gordiyevskiy in July, 1985. Gordiyevskiy had achieved the rank of Acting Resident in the United Kingdom, but he fell under suspicion as a Western agent. Recalled to the Soviet Union, he was placed under house arrest and intensely interrogated. Able to flee his watchers, Gordiyevskiy was exfiltrated from Moscow by the British Secret Intelligence Service."

The report continued: "During lengthy debriefing sessions that followed, Gordiyevskiy supplied a fuller report on the Soviet war hysteria. This report, complete with documentation from KGB Headquarters and entitled 'KGB Response to Soviet Leadership Concern over US Nuclear Attack,' was first disseminated in a restricted manner within the US intelligence community in October 1985. Gordiyevskiy described the extraordinary KGB collection plan, initiated in 1981, to look for signs that the US would conduct a surprise nuclear attack on the Soviet Union. He identified and reviewed factors driving leadership fears. Based on the perception the US was achieving a strategic advantage, those in the Kremlin were said to believe that the US was likely to resort to nuclear weapons much earlier in a crisis than previously expected. They also were concerned the US might seek to exploit its first-strike capability outside the context of a crisis, probably during a

A Case #23-5017   Document #2005450   Filed: 06/28/2023   Page 311 of

military exercise. He described the leadership's worries of a 'decapitat-ing' strike from the Pershing II's, and its belief that the US could mobilize for a surprise attack in a mere seven to ten days. He explained how the London Residency responded to the requirements, and the effects that reporting had back at Moscow Center in reinforcing Soviet fears. He described conversations he had held with colleagues from Center and from the GRU. The next month, President Reagan held his first summit with Mikhail Gorbachev and relations began to thaw." (PFIAB, pages 22–23)

The PFIAB report also cited a January 1989 "End of Tour Report Addendum" by Lieutenant General Leonard H. Perroots, who had served as Assistant Chief of Staff for Intelligence, US Air Forces Europe, during the 1983 Able Archer exercise, to emphasize the potential conse-quences of the intelligence gap during the Able Archer exercise. Per-roots addressed Able Archer as well as Gordiyevskiy's reporting in that memorandum:

1. (U) In 1983, I was assigned as the DCS for Intelligence, US Air Forces, Europe, Ramstein AB, Germany. The annual NATO Command and Control exercise ABLE ARCHER was scheduled to begin during the first week of November. The context of this nuclear command and control exercise was relatively benign; the scenario had been purposely chosen to be non-controversial, and the exercise itself was a routine annual event. This exercise closely followed the bombing of air defense sites in Lebanon and directly followed the invasion of Grenada. As I recall, however, there was no particular feeling of tension in the Euro-pean Theater beyond that which is normal.

2. [*portion marking not declassified*] Only the fact that Soviet Intelli-gence collection assets (primarily low level signals intercept units) had failed to return to garrison after their normal concentrated coverage of NATO's AUTUMN FORGE exercise series could be reckoned strange at all. As the kickoff date of ABLE ARCHER neared it was clear that there was a great deal of Soviet interest in the forthcoming events. Again, this seemed nothing out of the ordinary. We knew that there was a history of intensive Soviet collection against practice Emergency Action Messages (EAM's) related to nuclear release.

3. [*portion marking not declassified*] ABLE ARCHER started in the morning of 3 November, and progressed immediately in the scenario to NATO STATE ORANGE. At 2100Z on 04 November NSA issued an electrical product report G/00/3083-83, entitled "SOVIET AIR FORCES, GSFG, PLACED ON HEIGHTENED READINESS, 2 NOVEMBER 1983." I saw this message on the morning of 5 November and discussed it with my air analysts. It stated that as of 1900Z on 02 November the fighter-bomber divisions of the air force of Group Soviet Forces, Germany had been placed in a status of heightened alert. All

divisional and regimental command posts and supporting command and control elements were to be manned around-the-clock by augmented teams.

4. [*portion marking not declassified*] In addition to the directed command and control changes the fighter-bomber divisions were also ordered to load out one squadron of aircraft in each regiment (if this order applied equally across GSFG the result would have been at least 108 fighter-bombers on alert). These aircraft were to be armed and placed at readiness 3 (30 minute alert) to "destroy first-line enemy targets." The alert aircraft were to be equipped with a self-protection jamming pod. We knew from subsequent NSA reporting that a squadron at Neuruppin, East Germany sought and was apparently granted permission to configure its aircraft without the ECM pod because of an unexpected weight and balance problem. My air analysts opined that this message meant that at least this particular squadron was loading a munitions configuration that they had never actually loaded before, i.e., a warload.

5. [*portion marking not declassified*] At this point, I spoke to CinC-USAFE, General Billy Minter. I told him we had some unusual activity in East Germany that was probably a reaction to the ongoing ABLE ARCHER. He asked if I thought we should increase the real force generation. I said that we would carefully watch the situation, but there was insufficient evidence to justify increasing our real alert posture. At this point in the exercise our forces were in a simulated posture of NATO State ORANGE and local SALTY NATION tests involving simulated generation of combat aircraft were underway at various locations including Ramstein AB. If I had known then what I later found out I am uncertain what advice I would have given.

6. [*portion marking not declassified*] An NSA message dated 022229Z DEC 83 provided the rest of the picture as far as we knew it—at least until the reports began to surface from the British penetration of the KGB, Oleg Gordievskiy. This GAMMA message was entitled "SOVIET 4th AIR ARMY AT HEIGHTENED READINESS IN REACTION TO NATO EXERCISE ABLE ARCHER, 2–11 NOVEMBER 1983." This report stated that the alert had been ordered by the Chief of the Soviet Air Forces, Marshal Kutakhov, and that all units of the Soviet 4th Air Army were involved in the alert "which included preparations for immediate use of nuclear weapons." This report described activity that was contemporaneous with that reflected in East Germany, but because of the specific source of this material it was not available in near realtime. The two pieces taken together present a much more ominous picture.

7. [*portion marking not declassified*] Equally ominous in its own way was the fact that this alert was never reflected at all by the I&W system.

A Case #23-5017    Document #2005450    Filed: 06/28/2023    Page 313 o

At the time of this occurrence there was no distribution of electrically reported GAMMA material to the Tactical Fusion Center at Boerfink. I remedied that shortfall in the aftermath of this activity. Secondly, a real standdown of aircraft was secretly ordered in at least the Soviet Air Forces units facing the Central Region, and that standdown was not detected. The Soviet alert in response to ABLE ARCHER began after nightfall on Wednesday evening, there was no flying on the following two days which led to the weekend, and then the following Monday was 7 November, the revolution holiday. The absence of flying could always be explained, although a warning condition was raised finally on about the ninth of November when overhead photography showed fully armed FLOGGER aircraft on air defense alert at a base in East Germany. When this single indicator was raised, the standdown had been underway for a week.

8. [*portion marking not declassified*] For the next six months I was on a soapbox about ABLE ARCHER whenever I could discuss it at the appropriate classification level. I spoke to the Senior Military Intelligence Officers' Conference (SMIOC), and I buttonholed a lot of people. I suggested that perhaps we should move our annual exercise away from the November 7 holiday, because it is clear to me that the conjunction of the two events causes a warning problem that can never be solved. Our problem here was that we had a couple of very highly classified bits of intelligence evidence about a potentially disastrous situation that never actually came to fruition. For decision-makers it was always difficult to believe that there could have been any serious reaction by the Soviets to such a "benign" exercise as ABLE ARCHER. From the Soviet perspective, however, it might have appeared very different. It was difficult for all of us to grasp that, but Oleg Gordievskiy's reporting began to provide a somewhat more frightening perspective when it became available in the Fall of 1985.

9. (S) By the time Gordievskiy's reporting began to surface for analytical review I was the Director of DIA. Gordievskiy's initial reporting about a "war scare" in 1983 immediately caught my attention. It should be pointed out at the outset that Gordievskiy knew nothing of a military alert during ABLE ARCHER. He did, however, tell us something of a chilling story about Moscow Center's Intelligence tasking during 1983. He related that there was a project called either "RYaN" or "VRYaN," the latter probably being the full form of a Russian acronym meaning "sudden rocket nuclear attack." There was a cadre of specialists in Moscow Center charged with, among other things, finding the evidence of planning for a western attack on the Soviet Union. Beginning in 1982 and continuing into 1983 Gordievskiy says that this group became ever more insistent that an attack was being planned by the West. By March 1983 the KGB officers in Moscow

had decided that ABLE ARCHER 83 would provide an excellent cover for the planned attack, and KGB and GRU residencies around the world were being directed to find the evidence. Gordievskiy, living in London at the time, states that he never believed there was really a threat, and that the London residency of the KGB simply ignored the collection requirements until it began to become clear that Moscow was serious. During the summer of 1983 the London residency sent some reports that, in retrospect, Gordievskiy believed might have hyped the war hysteria. He never really believed in the threat, however, and reported during his debriefing in 1985 that he thought the VRYaN hysteria might have been some kind of internal political ploy. I must reiterate again that Gordievskiy did not know about the secret military alert of November 1983.

10. [*portion marking not declassified*] The US intelligence community has never really closed with this analytical problem. A SNIE addressed this subject, [*1½ lines not declassified*]. The position has been taken again and again that had there been a real alert we would have detected more of it, but this may be whistling through the graveyard. It is not certain that we looked hard enough or broadly enough for information. For Western collectors the context was peacetime without even the most basic ripples of crisis. For the Soviets, however, the view may have looked quite different. It is uncertain how close to war we came or even if that was a possibility at all, but we know from Gordievskiy that the analysts in Moscow had predicted that the West would launch the attack from a posture of NATO State ORANGE. What might have happened that day in November 1983 if we had begun a precautionary generation of forces rather than waiting for further information?

(Central Intelligence Agency, National Intelligence Council, Job 91B00551: Speeches, Lectures, Briefing Files (1988–1989), Box 1, Folder 2: C/NIC (Ermarth) Chrons March 1989)

The PFIAB report commented that "as his parting shot before retirement," Perroots, who served as DIA Director from 1985 to 1989, sent a January 1989 "letter outlining his disquiet over the inadequate treatment of the Soviet war scare to, among others, the DCI and this Board." The report continued: "Following the detection of the Soviet Air Forces' increased alert status, it was his [Perroots's] recommendation, made in ignorance, not to raise US readiness in response—a fortuitous, if ill-informed, decision given the changed political environment at the time." (PFIAB, pages 27–28) In further accord with Perroots's report, the PFIAB report concluded: "As it happened, the military officers in charge of the Able Archer exercise minimized the risk by doing nothing in the face of evidence that parts of the Soviet armed forces were moving to an unusual alert level. But these officials acted correctly out of instinct, not informed guidance, for in the years leading up to Able

Archer they had received no guidance as to the possible significance of apparent changes in Soviet military and political thinking." (PFIAB, page x)

[*name not declassified*] the National Warning Staff and [*name not declassified*] of the Office of Soviet Analysis prepared an undated memorandum reacting to Perroots's comments, which was distributed by Ermarth to the DCI and DDCI for consideration:

SUBJECT

Comments on Memorandum of Lieutenant General Perroots

*Summary*

1. General Perroots's memorandum describes in detail a worrisome episode in which Soviet Air Forces in Central Europe assumed an abnormally high alert posture in early November 1983 in response to a routine NATO command post and communications exercise. Two Special National Intelligence Estimates (SNIEs)—written in May and August 1984 respectively—treated the events described in the General's memorandum in the larger context of US-Soviet relations. Those Estimates judged that the Soviets displayed a heightened sense of concern in many areas of national life primarily because of the more aggressive policies of the US Administration in the early 1980s, the US strategic modernization program that included the peacekeeper ICBM and the D–5 SLBM, the actual implementation of NATO's 1979 decision for Intermediate Range Nuclear Force (INF) modernization by deployment of the first Pershing–II missile systems to Europe, and because of the leadership instability in the USSR from the successive deaths of three general secretaries between 1981 and 1985. A National Intelligence Estimate in 1988 assessed the significance of the events in 1983 with the benefit of a longer time perspective and reached the same broad conclusions. General Perroots's memorandum and its enclosure neither raises no new issues nor contains new data that change the strategic judgements already written. [*portion marking not declassified*]

2. At the tactical and theater level, however, General Perroots's memorandum surfaces a long-standing warning problem, i.e., the need for the Intelligence Community in Washington to provide more timely, discriminating, and accurate warning in support of the theater commander. Perroots, who at the time was Assistant Chief of Staff for Intelligence, US Air Forces Europe (USAFE), describes three serious problems for which there are only partial answers. First, he believes that, despite the enormous amount of resources and energy spent in guarding against a strategic surprise attack, USAFE was not well informed in that the US warning systems did not detect in a timely fashion the extent of Soviet precautionary readiness measures undertaken in November 1983 in response to NATO exercise Able Archer.

Secondly, he believes that Washington-based agencies had relevant information which was not available to the European Command when he recommended against a precautionary US alert by US Air Forces Europe in response to the detection of the increased alert status of the Soviet Air Forces. Finally, [*1½ lines not declassified*], General Perroots is concerned that in similar circumstances—even if there is better intelligence—another officer in his position might recommend a precautionary US Air Force alert in Europe that could have serious escalatory consequences, unless there are timely, national level assessments available. [*portion marking not declassified*]

3. The dilemma that General Perroots has described is characteristic of the warning problems faced by senior US military intelligence chiefs in many past crises, in which decisions about US force posture were dependent upon threat assessments prepared rapidly and based on fragmentary and incomplete intelligence. General Perroots's memorandum reinforces two long-standing lessons of warning: warning systems are no substitute for seasoned, professional judgment and assessments; and they require constant attention and improvement. In terms of process, however, his memorandum reinforces the requests of successive SACEURs and other US theater commanders for better ways to provide more timely national-level warning assessments to the theater intelligence staffs.

*The Setting of Exercise Able Archer, 1983*

4. The larger context of the period, often referred to as the "war scare," reflected increasing Soviet concern over the drift in superpower relations, which some in the Soviet leadership felt indicated an increased threat of war and increased likelihood of the use of nuclear weapons. These concerns were shaped in part by a Soviet perception that the correlation of forces was shifting against the Soviet Union and that the United States was taking steps to achieve military superiority. These fears were exacerbated by planned improvements in US strategic forces, as well as by progress made by NATO to implement its 1979 decision began with NATO's deliberations in the late 1970s to modernize its theater nuclear forces by deploying Pershing–II missiles and Ground Launched Cruise Missiles (GLCMs) to Europe. By 1981, after the new US Administration was inaugurated, the Soviet concern intensified almost concurrently with General Secretary Brezhnev's decline in health [*portion marking not declassified*]

5. [*1½ lines not declassified*] the increased Soviet concern stemmed from a fear by some Soviet leaders that the West might seek to exploit its new capability in Europe for a preemptive nuclear surprise attack against the USSR, for which the Soviets had no defense. From a national security standpoint, this Western capability led to questions about the

long-standing Soviet view that crises and other adverse developments in international affairs would precede the outbreak of war and be the basis for long-term early warning. The Soviets had concern that the West might decide to attack the USSR without warning during a time of vulnerability—such as when military transport was used to support the harvest—thus compelling the Soviets to consider a preemptive strike at the first sign of US preparations for a nuclear strike. [*portion marking not declassified*]

6. From Brezhnev's death in 1982 through late 1984, the Soviets ordered a number of unusual measures not previously detected except during periods of crisis with the West. These included: disruption of the normal troop rotation cycle for Soviet forces in central Europe in 1984; updating civil defense procedures in the USSR from 1982 through 1984; in the spring of 1984 the first, and apparently only, time that Soviet military trucks were not sent to support the harvest since the end of World War II; and increased alert reactions even to routine NATO training from 1982 to 1984. The cumulative effect of these and other measures was to reduce the Soviet and Warsaw Pact vulnerability to a surprise attack. The abnormal Soviet reaction to NATO Exercise Able Archer in November 1983 occurred within this setting. [*portion marking not declassified*]

7. Concurrent with the military dimension, [*less than 1 line not declassified*] other precautionary measures taken by the Soviets probably were a reflection of the political maneuvering in the Kremlin in 1982 and 1983 associated with Andropov's rise to power. In exchange for military support for his bid to become General Secretary, Andropov, then KGB Chairman, may have promised greater allocations of resources for military industrial expansion, improved civil defense readiness, and military modernization. All of these were espoused by the Chief of the General Staff at the time, Marshal Ogarkov. Successful manipulation of threat perceptions by the KGB at Andropov's direction would have helped cultivate the strong military backing Andropov enjoyed when he came to power. In this environment, the heightened Soviet military reactions to NATO exercises would have been expected. [*portion marking not declassified*]

8. Finally, [*less than 1 line not declassified*] the Soviets wanted the new US Administration to tone down its anti-Soviet rhetoric, moderate its hostile attitudes, and begin serious business on trade and arms control. Some analysts believe that the Soviet activities, [*1 line not declassified*], were intended to be detected and were contrived to nudge Washington toward a more conciliatory and cooperative attitude in dealings with Moscow. [*less than 1 line not declassified*]

*Intelligence Community Performance*

9. Since 1983, the Intelligence Community, CIA's Office of Soviet Analysis, and the Defense Intelligence Agency have treated the events

surrounding the Able Archer episode in a number of in-house publications and national estimates. When General Perroots was Director, DIA, analysts concurred in the Community assessments in 1988 that the "war scare" period of heightened Soviet concern was triggered by the change of the US Administration and its policy decisions toward the Soviet threat; that at least some Soviet leaders concluded that a surprise nuclear attack by NATO was possible outside the context of a crisis; and that this led to a number of Soviet responses consistent with such a conclusion, including high priority intelligence collection taskings. DIA believes, however, that the Soviet measures were primarily a function of the internal leadership instability from which Andropov emerged as General Secretary. [*portion marking not declassified*]

### General Perroots's Problem

10. The events surrounding NATO Exercise Able Archer, however, all occurred some months before the first national-level assessments were written, and General Perroots was confronted with a serious choice of what recommendation to make to the Commander, US Air Forces Europe. The Department of Defense warning indicators system reflected that, [*less than 1 line not declassified*] Soviet air units in Poland and East Germany were observed at a high state of alert, although no other Soviet strategic forces adopted such a posture. [*2½ lines not declassified*] Consequently, the Commander, US Air Forces Europe, was concerned whether he should exercise his discretionary authority to increase the alert posture of his force. General Perroots recommended that no precautionary US alert be instituted, despite the evidence of his own warning system. Several days later, the Soviet air forces returned to normal alert status. [*portion marking not declassified*]

11. [*1 paragraph (10 lines) not declassified*]

12. General Perroots's concerns about this episode are legitimate to the extent that they deal with Washington's support to the US military commands. [*4½ lines not declassified*] Third, national-level assessments of Soviet intentions were not available when most needed. The General's memorandum indicates the Defense Department has taken steps to correct the problems in the processing and dissemination of intelligence. The third problem, of timely national-level support, is continuous. As Director of DIA, General Perroots himself initiated organizational and procedural changes to improve DIA's support to the commands. [*portion marking not declassified*]

13. Underlying all of the above, however, is the paradox that General Perroots believes he made a correct judgment, but for the wrong reasons. This is not a new problem nor is there a solution to it. General Perroots has accurately identified inherent limits of the warning systems as they now exist. His candor is a safeguard against complacency

A Case #23-5017   Document #2005450   Filed: 06/28/2023   Page 319 o

and denial that problems exist. Additionally, he raises again the need for better understanding in Washington of the problems facing intelligence in the field. [*portion marking not declassified*]

[*name not declassified*]        [*name not declassified*]
Chief, TFD/RIG/SOVA   Director, National Warning Staff

(Central Intelligence Agency, National Intelligence Council, Job 91B00551: Speeches, Lectures, Briefing Files (1988–1989), Box 1, Folder 2: C/NIC (Ermarth) Chrons March 1989)

The 1990 PFIAB report repeatedly stressed: "During the November 1983 NATO 'Able Archer' nuclear release exercise, the Soviets implemented military and intelligence activities that previously were seen only during actual crises. These included: placing Soviet air forces in Germany and Poland on heightened alert, [*4 lines not declassified*]."

The PFIAB report argued: "The meaning of these events obviously was of crucial importance to American and NATO policymakers. If they were simply part of a Soviet propaganda campaign designed to intimidate the US, deter it from deploying improved weapons, and arouse US domestic opposition to foreign policy initiatives, then they would not be of crucial significance. If they reflected an internal power struggle—for example, a contest between conservatives and pragmatists, or an effort to avoid blame for Soviet economic failures by pointing to (exaggerated) military threats—then they could not be ignored, but they would not imply a fundamental change in Soviet strategy. But if these events were expressions of a genuine belief on the part of Soviet leaders that the US was planning a nuclear first strike, causing the Soviet military to prepare for such an eventuality—by, for example, readying itself for a preemptive strike of its own—then the 'war scare' was a cause for real concern." (PFIAB, page vi)

The PFIAB report concluded that the IC's failure to adequately report on Able Archer and the 1983–1984 Soviet war scare had important implications for the future: "In cases of great importance to the survival of our nation, and especially where there is important contradictory evidence, the Board believes that intelligence estimates must be cast in terms of alternative scenarios that are subjected to comparative risk assessments. This is the critical defect in the war scare episode." (PFIAB, page ix)

**B.   Note of a Meeting Between President Reagan and Secretary of State Shultz by the Executive Secretary of the Department of State (Hill)[1]**

Washington, March 25, 1983

[Omitted here is material unrelated to the Soviet Union.]



Declassified
A/GIS/IPS
Department of State
EO 13526
Date:

---

[1] Source: Reagan Library, Charles Hill Papers, Charles Hill Notebooks, Entry for March 25, 1983. No classification marking. For the transcribed text of the note, see Document 27.

A Case #23-5017    Document #2005450    Filed: 06/28/2023    Page 321 o

## C. Letter From President Reagan to Soviet General Secretary Andropov[1]

Washington, July 11, 1983

THE WHITE HOUSE
WASHINGTON

July 11, 1983

Dear Gen. Secretary Andropov

I appreciate very much your letter pledging an "unbending commitment of the Soviet leadership and the people of the Soviet Union to the course of peace, the elimination of the nuclear threat and the development of relations based on mutual benefit and equality with all nations."

Let me assure you the government & the people of the United States are dedicated to, "the course of peace" and "the elimination of the nuclear threat." It goes without saying that we also seek relations with all nations based on "mutual benefit and equality." Our record since we were allied in W.W. II confirms that.

Mr. General Secretary could we not begin to approach these goals in the meetings now going on in Geneva? You and I share an enormous responsibility for the preservation of stability in the world. I believe we can fulfill that mandate but to do so will require a more active level of exchange than we have heretofore been able to establish. We have much to talk about with regard to the situation in Eastern Europe, South Asia, and particularly this hemisphere as well as in such areas as arms control, trade between our two countries and other ways in which we can expand east-west contacts.

Historically our predecessors have made better progress when communicating has been private and candid. If you wish to engage in such communication you will find me ready. I await your reply.

Sincerely
Ronald Reagan

Declassified
A/GIS/IPS
Department of State
E.O. 13526

---

[1] Source: Reagan Library, Executive Secretariat, NSC Head of State File, U.S.S.R.: General Secretary Andropov (8290913, 8391028, 8391032). No classification marking. For the transcribed text of the note, see Document 70.

JA315

**D.** **Notes by Secretary of Defense Weinberger of a National Security Planning Group Meeting**[1]

Washington, September 2, 1983

Declassified
A/GIS/IPS
Department of State
EO 13526
Date:

9/2/83

THE WHITE HOUSE
WASHINGTON

NSC - Sit Rm.
President
V.P.

G.P.S.    Even USSR Thought it was a US Recon
Plane - They Shot it down w/
any inquiry - no hot line, etc -
Shows They'd cover / 1st Strike -
We Showed we can run it help us
Get Big Reform Budget. +
to get rid of Boland Zablocki -
and. _

[Aggression] + maybe in Lebanon.

Sanctions - They won't hurt us.

USSR - Says They regret loss, human life
_____

_____
[1] Source: Library of Congress, Manuscript Division, Weinberger Papers, Appointment and Diary File, Box 9, Notes Set B, 1983 #25–41. No classification marking. For the transcribed text of the note, see Document 91.

A Case #23-5017    Document #2005450    Filed: 06/28/2023    Page 323 o

Declassified
A/GIS/IPS
Department of State
EO 13526
Date:

2

THE WHITE HOUSE
WASHINGTON

options

State

Civil evacuation options —

RR — Bus Something to ser preparation

Cw — Ct. of Intl Justice — +
       desist demand of USSR for
                Npanshon

RR — They Shoot down our planes
          in 50's & 60's

RR — what if we just turn around
        a USSR Ship going into
      Corinto.
                such meeting in
Cw — NATO / ASEAN —
          Get
3 R — other countries to join
          with us for reparations + in
       actions to block USSR Aeroflot

Declassified
A/GIS/IPS
Department of State
EO 13526
Date:

THE WHITE HOUSE
WASHINGTON

~~RR~~
Make public lying vs plane shot down by USSR in 50's & 60's

CW

Don Regan –
~~[illegible]~~
Economic Sanctions
Probably would get agreement of other countries
~~Econ. Sanct~~

---

Stop Tourism & ask other nations to do same until we could get assurances fr USSR

Stop imports from ~~[illegible]~~ USSR – allies wouldn't help.

[illegible] & [illegible]
Ng – on blocking USSR assets deposits –

A Case #23-5017     Document #2005450     Filed: 06/28/2023     Page 325 o

Declassified
A/GIS/IPS
Department of State
EO 13526
Date:

**THE WHITE HOUSE**
**WASHINGTON**

CWOW. — Rescue task force

INF

GPS Group So. meeting.

Bernard Verney — Slush fund
missing.

RR. need arms reductions. &
Oz About proved & meet
with Ron —

Rescue mission →
Reparations. —

Stop Andis' styes to headquar. or will
Stop Prep for your

Declassified
A/GIS/IPS
Department of State
EO 13526
Date:

THE WHITE HOUSE
WASHINGTON

GPS
Mistake [illegible] to go to media
n To open to talk to people

Shorter meeting
agenda
Shoot down
human rights - Schansky
Complain w/ Trade

Ed Meese - need to do more
things that [illegible]
to air safety

Memorial Service at Natl. Cathedral
calendar

A Case #23-5017    Document #2005450    Filed: 06/28/2023    Page 327 of

Declassified
A/GIS/IPS
Department of State
EO 13526
Date:

THE WHITE HOUSE
WASHINGTON

RR - Attitude

INF - great opportunity
to go a/the USSR - The best
way to stop deployment -
1) you eliminate & we will agree
2) we can't leave Europe if you
leave Europe!

You have Moscow upset

Statement by President -

Planning - what can & done a behalf
of others

Papers

Pts - Range of options

Comments

Ask for Resol. of Condemnation

& General Support

pd

---

Lebanon -

McFarlane

---

Declassified
A/GIS/IPS
Department of State
EO 13526
Date:

A Case #23-5017 — Document #2005450 — Filed: 06/28/2023 — Page 329 o

**E.   Notes of a National Security Council Meeting**[1]

Washington, March 4, 1985

Declassified
A/GIS/IPS
Department of State
EO 13526
Date:

---

[1] Source: Reagan Library, Sven Kraemer Files, Geneva—NSC Meeting, 03/04/1985. No classification marking. For the transcribed text of the note, see Document 375. No formal notes of the meeting were found.

- go over each area in which nuclear ASn ②
  - Krsn radar
  - Transportas. ly
    upgrad
    concurrent Ops, that they have nuclear
    a very solid record of deter
    oxidity data of deter
- compl probl undermines in each of ac
  " at heart of any prospect or
  if no chap in Sov viewed, cant expect
  ac for reman viable instrument of deploy

- Emerging Technologies

In coming months one further
  - what imitation/restriction might be found
    havent found as yet
  - what CBRES might take for better cle
  - " us need in Ar Def
  - 3 or 4 oth

Comment? Mox?

Kampelman —
  - yes ok
  - agreement throughout just
  - we're not demanding
  - our plan to suggest a less log sesson
    about a month — look over
    + come back to recomend
  - exchange, inform, explain, inceive, hea

Nitze —
  - SDI = research progr not to be lim ted
  - Begin discss Transition phase

Declassified
A/GIS/IPS
Department of State
EO 13526

②

INF

Current Balance
   Sov. have 10:1 warhead adv
2 options
   1. Current
      zero zero, Inf & prem,
      Sept 83 - aircraft, global, PII, 420 glosa
         geog songu

      is really an infinitive number of position
      e.g. 0 - 572  e.g. 420
      is not a take it or leave it posit-
      ment criterion
         - eq, verif, not export to Asia
            excl Fr Brit

   Comments
      Weins — footnote re 2) system in transit
         — prob re Dutch

      Adelm  → shows probl of any non zero - zr--
         1) very diff to verify — low degree
         2) repres coming prob re mobile land based
            e.g Sov 24 & 25  rail/road mobile

   2. Equal. to Red
      work only under very narrowly defined posit in t.
         o even then conceding Sov INF monop in Asia
      from 400 (Sov) lancher to about 200 (50% red)
                                   130 in Eur, 80 in East
      from      +5    "    t- 112 lancher in Eur
                            (warhead rag of 112-448

   Comments
      Weins - strongly opposed
         = = go red not = equals
         = mobiler mean can rapidly move
            from East  can easily
            is not useful or safe distrib
         — get any from surfe, easy expl

Declassified
A/GIS/IPS
Department of State
EO 13526
Date:

(4)

Shultz — cares mobility concern applies to all
— go red not principle we want to endure
but might make it negotiable

Weinb — S—t 200:112 launchers = far ad
& West/East distance meaningless

Sh— — merely = variant of option 1
Nitze — change chart to show US global rt to 200

Pres — Verify??
Best spot in world to which deliver tu
number of demands by unless.
Adel — not know if all exist missiles delivered here
Pres — at least this way we'd know
(ang — can now observe best
Weinb — all non zero = hard fird
" have define problem

Weinberger —
— either option can be worked well
— could be used in sequence
— should have treaty with = warheads (?)

Weinb — is launchers, not warheads
or dangerous move away from one warhead force

Sh — if Opt 1 again,
Sovs accepts, but such make more specific
+ propose Opt 2 within flavors
of Opt 1
Opt 2 is an illustration of
which may not nail an balance change

W — can't say Opt 2 = illust of Opt 1
when 1 = global equal
Sh — need add for rc US right to 200 globally
But — all + to same warhead

Declassified
A/GIS/IPS
Department of State
EO 13526
Date:

A Case #23-5017    Document #2005450    Filed: 06/28/2023    Page 333 o

⑤

Wms — movement away from = launchers
∴ negl refire
— Opt 2 = increase, not reduction
∴ back to SALT ~~He~~ + Leoy

B–d — Gen Vissey
Vissey — Must limit all so Sovs can't move to Eur.

⟨ START ⟩

Balance
Current 12,50 , 5000 , 400 , 2.5 mil KG
vs Trade offs

Alt 1.
1250 , 5000 , 350

Alt 2 ( ALMs lim to 4,000)
1800 launchers
Sov category d demise — wd meet 1/2 way
but we'd still try reduce heavy ICBMs
from 308 ) to 200
and if want add ALCMs would need reduce 200 further

RVs — 6,500 in 95 [ 25% below current
instead of 5,000 proposal today 8,300 ]

Reagan —
d this is end game
after Sovs have reduced Leaver

Alt 3 — adds ALM (1500–2000) [ 35 % reduct in
— 1800 SNDVs ) Aggregate MIRVd Missiles 4500 + 35% cut in
+ 1500 ACM Sov
— Shultz — most rad reduct
In most threat system

Declassified
A/GIS/IPS
Department of State
EO 13526

NSL — Mar 4    ⑥

Alt 4

Bd - premised in what is militarily essential to target
(that's my pers opin re its advantage)

— aggregate to 1800 launchers
   adds  sublimits to restrain Sovs
— permits us 700 Midgetman
— price = 7700 warheads = very high
        of which 7,000 in '85
        ~~satellites~~

— 20% fewer SNDVs than SII
        & roughly double SII nels
     33% MIRV'd sell Mls warhead cut

Nisses — right, primate is too moderate
      — also needs look at SDI & Def/Sp
      — probe closer to what Sovs want
        ..risk tear ok, then press m SDI
      ✓

Pres — relatively cut? how perceived
Vis — buy not in destabilies they

Alt 5

Goes to heart of reducing most urgt reasons
   warheads/ & TW — sy 50% in T power
   & not dictate Sov force restructuring

Eg 5,300 MIRV RVs, TW & heavy bombers
   Trade-offs specific re bombers ~~us mice~~

Weins — bomber deff recogn we need more bombers
      ~~bec~~ of Sov air defenses
      — also recogn get deff in TW
        (much narrower us/Sov imbal than other ey
      — "Radical rid" per Sov Vocal
      — Simple, 50%

Declassified
/BIS/IPS
Department of State
O 13526
ate:

A Case #23-5017   Document #2005450   Filed: 06/28/2023   Page 335 o

(2)

per Vessey, may not give in all areas for all t[?]'s
but reduce in #'s, TW & compus at [?] av [?] = [?]

<u>Alt 6</u>
Inspired by your Sept speech on Road map ∴ 20 yr
∴ 20 yr instead of [?] 10 year horizon

Proposes we discuss outcomes at end of day
but not so demanding we dictate how
get there, replace etc

<u>'95 benchmark</u>
- 5,000 warheads
- 3½ MKG Sov        (25% [?]
- 400 US   320 Sov

Adelman — give negot view of 1st Round
set of [?]
∟ RV bad, TW & Sensors
all count most imp't factor
- lays out factors w/ [?] partic adornment
not include SNDV limit
hath not a service to us, of [?]
- not include ALCM limit
Sovs are demanders

<u>Brch</u>
you asked JCS address [?] sufficiency
chiefs have addressed at [?]

Vessey — Most imp't = assumptions
① one assumption = will be able to complete our mod prog
some of these damage
but you most issue on mod so pol [?]
none of these proposals OK, unless we mis

Declassified
A/GIS/IPS
Department of State
EO 13526
Date:

8

Q you must pick a point in time when we
can check US & Sov force structure
we've picked 1995
— all of these prop OK at '85
same for better ie US must
ie Sov
MIRVd mobile land based missiles
extremely threatening
∴ should add power to all opt for Sov

Q how affects other negotiations

Rowny
— all proposals should be kept single
— we ought to talk Trade offs
hone in in Sov ICBM vs Bourse
US
— need offensive vs offensive deal
otherwise Sovs will accept # deal
& zero in on SDI
— ∴ go back to off vs off capab

Tower
— not know whether Sovs are serious
— I'm reluctant seek reveal their valid al
— I'd prefer hold on current position
flexible not even discussed it
& it was new
— We need discuss trade-offs, in code
— Prefer to probe, report back on our findings
such flexibility to probe
keep our moral posture on 5,000 Warheads/n
& maybe plg with sublimits

Declassified
A/GIS/IPS
Department of State
EO 13526

JA330

Pres — Sovs have talked re goal of total elim
— Shouldn't we pick feat up
N.tre — agree
        repeat goal & art path toward it
Sh-ltz — Gromyko not answer in Geneva
Pres — but since Geneva
B-d —

Declassified
A/GIS/IPS
Department of State
EO 13526

# Exhibit B

Approved for Release: 2022/04/15 C06914245



(b)(1)
**DEFENSE INTELLIGENCE AGENCY** (b)(3) NatSecAct

WASHINGTON, D.C. 20340-

(b)(1)
(b)(3) NatSecAct

☐ 1-89/DR                                                    9 January 1989

MEMORANDUM FOR ☐                    (b)(1)
                                   (b)(3) NatSecAct

SUBJECT:  End of Tour Report Addendum

The enclosed memorandum documents a chain of events and an important analytical problem that I believe the U.S. Intelligence Community has never adequately addressed. I raise it now once again as I leave the service because it remains one of the important loose-ends on my plate that has never been covered to my satisfaction, and because I believe there may be some important "lessons learned" as relates to our I&W capability and exercise planning.

1 Enclosure
Memo,
        (b)(1)
        (b)(3) NatSecAct

cc:
SECDEF
CJCS
NSC   (ATTN:  Mr. Paul Stevens,
       Special Assistant to the
       President and Executive
       Secretary)
PFIAB (ATTN:  Ms. Anne Armstrong,
       Chairman, President's
       Foreign Intelligence
       Advisory Board)

*Leonard H. Perroots*
LEONARD H. PERROOTS
Lieutenant General, USAF (Retired)

(b)(1)
(b)(3) NatSecAct

                                        ☐ 5106-89
                                          Copy  2  of  8

        (b)(1)
        (b)(3) NatSecAct

                           ☐ 433009/89, Copy 1

    (b)(1)
    (b)(3) NatSecAct  .  **Upon physical** removal of enclosure
                        ☐                    this
                           document Unclassified

                        Copy  1  of  8  Copies

Approved for Release: 2022/04/15 C06914245

JA333

Approved for Release: 2022/04/15 C06914245

(b)(1)
(b)(3) NatSecAct

Approved for Release: 2022/04/15 C06914245

Approved for Release: 2022/04/15 C06914245

(b)(1)
(b)(3) NatSecAct

Approved for Release: 2022/04/15 C06914245

(b)(1)
(b)(3) NatSecAct

UNCLASSIFIED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL SECURITY ARCHIVE,

Plaintiff,

v.

CENTRAL INTELLIGENCE AGENCY,

Defendant.

Case No. 1:21-cv-2857 (JEB)

DECLARATION OF LAUREN HOLM, ACTING INFORMATION REVIEW OFFICER FOR
THE LITIGATION INFORMATION REVIEW OFFICE,
CENTRAL INTELLIGENCE AGENCY

I, LAUREN HOLM, hereby declare and state:

I.   **INTRODUCTION**

1.   I currently serve as the Freedom of Information Act ("FOIA")/ Privacy Act ("PA") Team Lead for the Litigation Information Review Office ("LIRO") at the Central Intelligence Agency ("CIA" or "Agency"). I assumed this position in July 2022.

2.   Prior to becoming the FOIA/PA Team Lead for LIRO, I served as a Data Management Officer/Classification Officer for 23 months. In that role, I was responsible for making initial classification determinations, as well as second-line reviews, of Agency-wide information. Prior to that, I was an archivist with the George W. Bush Presidential Library and Museum, part of the National Archives and Records Administration for over ten years.

3.   As the FOIA/PA Team Lead for LIRO, I serve as the Acting IRO for that office in the IRO's absence. As Acting IRO for LIRO, I hold original classification authority at the TOP SECRET level under written

UNCLASSIFIED

JA337

UNCLASSIFIED

delegation of authority pursuant to section 1.3(c) of Executive Order 13526, 75 Fed. Reg. 707 (Jan. 5, 2010). This means I am authorized to assess the current, proper classification of CIA information, up to and including TOP SECRET information, based on the classification criteria of Executive Order 13526 and applicable regulations. Among other things, I am responsible for the classification review of CIA documents and information that may be the subject of court proceedings or public requests for information under FOIA, 5 U.S.C. Section 552, and the Privacy Act of 1974, 5 U.S.C. Section 552a.

4.   Through the exercise of my official duties, I have become familiar with this civil action and the underlying FOIA request. I make the following statements based upon my personal knowledge and information made available to me in my official capacity.

5.   I submit this declaration in support of the Motion for Summary Judgment the United States Department of Justice has filed in this proceeding. The purpose of this declaration is to explain and justify, to the greatest extent possible on the public record, the Central Intelligence Agency's ("CIA" or "Agency") application of Freedom of Information Act ("FOIA") Exemptions (b)(1) and (b)(3) to protect classified and statutorily protected information. Part II of this declaration provides the administrative history of the case, and Part III explains the basis for CIA's FOIA Exemptions.

## II.   PLAINTIFF'S FOIA REQUEST

6.   By letter dated 2 August 2021, Plaintiff submitted a FOIA request to the CIA seeking the:

2

UNCLASSIFIED

JA338

UNCLASSIFIED

"January 9, 1989 'End of Tour Report (Addendum) General Perroots.'"

A true and correct copy of Plaintiff's FOIA request is attached as Exhibit A.

7.   By a letter dated 11 August 2021, the CIA acknowledged receipt of Plaintiff's request.  A true and correct copy of CIA's receipt is attached as Exhibit B.

8.   The CIA searched for and located the responsive document.  By a letter dated 15 December 2021, the CIA referred the responsive document to external agency stakeholders.

9.   By a letter dated 15 April 2022, the CIA reported that it had reviewed the document and determined that the document could be released in segregable form with redactions made on the basis of FOIA exemptions (b)(1) and (b)(3).  A true and correct copy of this letter is attached as Exhibit C.

III. **EXEMPTIONS CLAIMED**

A.   **FOIA Exemption (b)(1)**

10.  Exemption (b)(1) provides that FOIA does not require the production of records that are: "(A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive Order."  5. U.S.C. § 552(b)(1).  Here, the information withheld pursuant to Exemption (b)(1) satisfies the procedural and the substantive requirements of E.O. 13526, which governs the classification of national security information.  See E.O. 13526 § 1.1 (a), § 1.4 (c), §1.6, §1.7 (a).

3

UNCLASSIFIED

JA339

UNCLASSIFIED

11. As an original classification authority, I have determined that discrete portions of the document at issue here are currently and properly classified and appropriately withheld from disclosure. Additionally, this information is owned by and is under the control of the U.S. Government. As described below, the information falls under classification category § 1.4(c) of the Executive Order because it concerns "intelligence activities (including covert action), [or] intelligence sources or methods." Further, its unauthorized disclosure could reasonably be expected to result in serious, and in some cases exceptionally grave, damage to U.S. national security. In accordance with § 1.7(a) of the Order, none of the information at issue has been classified in order to conceal violations of law, inefficiency or administrative error; prevent embarrassment to a person, organization or agency; restrain competition; or prevent or delay the release of information that does not require protection in the interests of national security. Moreover, the responsive document that contains classified information is properly marked in accordance with § 1.6 of the Executive Order.

12. In his January 9, 1989 End of Tour Report (Addendum), General Perroots provided observations and commentary on indications and warnings capabilities and exercise planning. This information, withheld pursuant to Exemption (b)(1), contain and, as a result, would tend to reveal specific intelligence activities, sources, and methods that are either still actively in use or which remain viable for use today, despite the age of the document. The CIA must guard against the

4

UNCLASSIFIED

UNCLASSIFIED

disclosure of the clandestine methods it uses to collect and analyze intelligence. Intelligence methods are the techniques and means by which an intelligence agency accomplishes its mission, to include how the CIA trains officers to accomplish the mission, and the classified internal regulations, approvals, and authorities that govern CIA officers' conduct. Such intelligence sources and methods must be protected to prevent foreign adversaries, terrorist organizations, and others from learning about the ways in which the CIA operates, that would allow them to use countermeasures to undermine U.S. intelligence capabilities and render collection efforts ineffective. Clandestine intelligence collection methods are effective as long as they remain unknown and unsuspected. If the techniques or sources used are disclosed, their usefulness expires, and the CIA's ability to employ them in other operations is significantly downgraded. Even revealing intelligence methods that are identified as "prohibited" can provide insight into the ways in which the CIA does or does not operate. In any case, such information tends to be particularly valuable to our adversaries in their attempts to interfere with the CIA's intelligence operations.

13. Consequently, the CIA must carefully evaluate whether its response to a particular FOIA request could jeopardize the clandestine nature of its intelligence activities or otherwise reveal previously undisclosed information about its sources, capabilities, authorities, interests, strengths, weaknesses, personnel, or resources. I have made this evaluation here and have determined that disclosure of the information at issue would jeopardize these interests despite the age

5

UNCLASSIFIED

UNCLASSIFIED

of the information.  The passage of time does not, in and of itself, necessarily obviate the damage to national security that may be reasonably likely to result from disclosure of the information and the need to protect this information.

14.  The information withheld from the challenged document consists of observations and commentary on specific intelligence sources and collection methods, and revealing those observations and commentary would tend to reveal the underlying sources and methods.  I have determined that the unauthorized disclosure of such information is reasonably likely to cause damage to the national security, for the reasons stated above.  As a result, I have determined that this information remains currently and properly classified pursuant to the criteria of Executive Order 13526.  As described in further detail below, Exemption (b)(3) in conjunction with the National Security Act of 1947 applies to all of the information protected by Exemption (b)(1).

15.  I have also reviewed the Government's classified submission and hereby incorporate it by reference.  That submission further supports my invocation of Exemption (b)(1) above.

**B.   FOIA Exemption (b)(3)**

16.  FOIA Exemption (b)(3) provides that FOIA does not apply to matters that are:

> Specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the  public  in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld. . .

5  U.S.C. § 552(b)(3).

6

UNCLASSIFIED

JA342

UNCLASSIFIED

17. Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 403- 1(i)(1) (the "National Security Act"), which provides that the Director of National Intelligence ("DNI") "shall protect intelligence sources and methods from unauthorized disclosure," applies to the withheld classified information described above. As an initial matter, the National Security Act is well-established as an Exemption (b)(3) withholding statute that both refers to particular types of matters to be withheld, and "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue." 5 U.S.C. § 552(b)(3). Under the direction of the DNI pursuant to section 102A of the National Security Act, as amended, and in accordance and consistent with section 1.6(d) of Executive Order 12333, the Director of the CIA is required to protect CIA sources and methods from unauthorized disclosure. Accordingly, the CIA relies on the National Security Act to withhold information that would reveal intelligence sources and methods.

18. The National Security Act's statutory requirement to protect intelligence sources and methods does not require the CIA to identify or describe the damage to national security that reasonably could be expected to result from their unauthorized disclosure. Nonetheless, in this case, the protections of the National Security Act Exemption (b)(3) apply to the same information for which Exemption (b)(1) was asserted. Disclosure of such information could significantly impair the CIA's ability to carry out its core mission of gathering and analyzing foreign

7

UNCLASSIFIED

UNCLASSIFIED

intelligence, and is precisely the type of intelligence information, the disclosure of which the statute prohibits.

19. In addition, the CIA withheld additional unclassified intelligence methods pertaining to the manner in which the Agency protects its intelligence. The Agency protects intelligence methods that may be unclassified, but nevertheless if disclosed, would reveal sensitive intelligence sources and methods. For example, the dissemination control methods were redacted from the challenged document. Disclosure of the dissemination controls used for particular information itself risks revealing the sources or methods from which the information was derived.

20. I have also reviewed the Government's classified submission and hereby incorporate it by reference. That submission further supports my invocation of Exemption (b)(3) above.

## C. SEGREGABILITY

21. In evaluating a responsive document, the CIA conducts a line-by-line review and releases all reasonably segregable, non-exempt information. In this case, after conducting a line-by-line review of the record at issue, I have determined that no additional information contained in the document that was released in part, may be released without jeopardizing classified intelligence sources and methods and/or other statutorily-protected information that falls within the scope of one or more FOIA exemptions.

22. Therefore, the Agency has segregated all non-exempt, reasonably segregable material.

8

UNCLASSIFIED

UNCLASSIFIED

\*      \*      \*

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of July 2022.

Lauren C. Holm
Acting Information Review Officer
Litigation Information Review Office
Central Intelligence Agency

9

UNCLASSIFIED

JA345

# EXHIBIT A

08/10/2021 08:26 AM #270-670 36733007 FROM:2028972123 Page: 2



The George Washington University
Gelman Library, Suite 701
2130 H St. NW
Washington, DC 20037
Phone/Fax: (202) 994-7000/7005
Email: nsarchiv@gwu.edu
Website: www.nsarchive.org

August 2, 2021

Central Intelligence Agency

VIA POST AND FAX

Information and Privacy Coordinator
Central Intelligence Agency
Washington, D.C. 20505

703-613-3007

Re: Request under the FOIA

Dear Information Officer:

Pursuant to the Freedom of Information Act (FOIA), I hereby request disclosure of the following:

-*January 9, 1989 "End of Tour Report (Addendum) General Perroots"*

*The document requested is an after-action letter that Lieutenant General Leonard Perroots wrote in January 1989 describing a narrowly averted nuclear crisis that occurred in Europe in 1983, when North Atlantic Treaty Organization forces' annual exercise practicing nuclear release procedures put Soviet forces on high alert. Lack of further escalation of the 1983 Soviet "War Scare" was largely due to Lieutenant General Perroots' decision not to raise U.S. readiness in response to Soviet forces' increased alert status.*

*On February 16, 2021, the Department of State ("DOS") Office of the Historian published a transcribed version of this letter in a new volume of its Foreign Relations of the United States series, with limited redactions. The Transcription is available to the public at the following DOS link: https://static.history.state.gov/frus/frus1981-88v04/pdf/frus1981-88v04.pdf (numbered paragraphs 1--10 on pages 1426—1429; relevant portions attached for reference).*

**In this publication, DOS provides the following citation to the document, from the CIA: (Central Intelligence Agency, National Intelligence Council, Job 90T00435R: Chronological Files (1988), Box 1, Folder 12: C/NIC Chrono for December 1988).**

*This request seeks the document described above, whether it is housed in CIA's files stored at the location listed in the citation above, or elsewhere.*

If you regard this document as potentially exempt from the FOIA's disclosure requirements, I request that you nonetheless exercise your discretion to disclose it. As the FOIA requires, please release all reasonably segregable nonexempt portions of document. To permit me to reach an informed decision whether or not to file an administrative appeal of any denied material, please describe any withheld records (or portions thereof) and explain the basis for your exemption claims.

An independent non-governmental research institute and library located at the George Washington University, the Archive collects and publishes declassified documents obtained through the Freedom of Information Act. Publication royalties and tax-deductible contributions through The National Security Archive Fund, Inc. underwrite the Archive's budget.



The George Washington University
Gelman Library, Suite 701
2130 H St. NW
Washington, DC 20037
Phone/Fax: (202) 994-7000/7005
Email: nsarchiv@gwu.edu
Website: www.nsarchive.org

The National Security Archive qualifies for "representative of the news media" status under 5 U.S.C. Sec. 552(a)(4)(A)(ii)(II) and, therefore, may not be charged search and review fees. (See *National Security Archive v. U.S. Department of Defense*, 880 F.2d 1381 (D.C. Cir. 1989), *cert denied*, 110 S Ct. 1478 (1990)). This request is made as part of a scholarly and news research project that is not for commercial use. For details on the Archive's research and publication activities, visit our website at www.nsarchive.org.

Please notify me before incurring any photocopying costs over $100.

If you have any questions regarding the identity of these records, their location, the scope of the request or any other matters, call (202) 994-7000 or send an email to foiamail@gwu.edu. I look forward to receiving your response within the twenty-day statutory period.

Sincerely,

Nate Jones

Enclosure

An independent non-governmental research institute and library located at the George Washington University, the Archive collects and publishes declassified documents obtained through the Freedom of Information Act. Publication royalties and tax-deductible contributions through The National Security Archive Fund, Inc. underwrite the Archive's budget.

# Excerpt from Foreign Relations of the United States, 1981-1988 Volume IV (2021)

# FOREIGN
# RELATIONS
#### OF THE
# UNITED
# STATES

## 1981–1988

## VOLUME IV

## SOVIET UNION,
## JANUARY 1983–
## MARCH 1985



## DEPARTMENT
## OF
## STATE

### Washington

08/10/202 USCA Case #23-5103 Document #05450 Page: 6   Filed: 06/28/2023   Page 357 of 391



**Foreign Relations of the
United States, 1981–1988**

**Volume IV**

# Soviet Union, January 1983– March 1985

*Editor*            Elizabeth C. Charles

*General Editor*    Kathleen B. Rasmussen

United States Government Publishing Office
Washington
2021

Case 1:21-cv-02857-JEB   Document 23-1   Filed 07/28/22   Page 16 of 49

08/10/2021  08:26 AM  TO: 67036733007  FROM: 2028972123  Page: 7   USCA Case #23-5037  Document #2005450   Filed: 06/28/2023   Page 358 of 391

DEPARTMENT OF STATE

OFFICE OF THE HISTORIAN

FOREIGN SERVICE INSTITUTE

For sale by the Superintendent of Documents, U.S. Government Publishing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512-1800;   DC area (202) 512-1800
Fax: (202) 512-2250 Mail: Stop IDCC, Washington, DC 20402-0001

# About the Series

The *Foreign Relations of the United States* series presents the official documentary historical record of major foreign policy decisions and significant diplomatic activity of the U.S. Government. The Historian of the Department of State is charged with the responsibility for the preparation of the *Foreign Relations* series. The staff of the Office of the Historian, Foreign Service Institute, under the direction of the General Editor of the *Foreign Relations* series, plans, researches, compiles, and edits the volumes in the series. Secretary of State Frank B. Kellogg first promulgated official regulations codifying specific standards for the selection and editing of documents for the series on March 26, 1925. These regulations, with minor modifications, guided the series through 1991.

Public Law 102–138, the Foreign Relations Authorization Act, established a new statutory charter for the preparation of the series which was signed by President George H.W. Bush on October 28, 1991. Section 198 of P.L. 102–138 added a new Title IV to the Department of State's Basic Authorities Act of 1956 (22 U.S.C. 4351, et seq.).

The statute requires that the *Foreign Relations* series be a thorough, accurate, and reliable record of major U.S. foreign policy decisions and significant U.S. diplomatic activity. The volumes of the series should include all records needed to provide comprehensive documentation of major foreign policy decisions and actions of the U.S. Government. The statute also confirms the editing principles established by Secretary Kellogg: the *Foreign Relations* series is guided by the principles of historical objectivity and accuracy; records should not be altered or deletions made without indicating in the published text that a deletion has been made; the published record should omit no facts that were of major importance in reaching a decision; and nothing should be omitted for the purposes of concealing a defect in policy. The statute also requires that the *Foreign Relations* series be published not more than 30 years after the events recorded. The editors are convinced that this volume meets all regulatory, statutory, and scholarly standards of selection and editing.

*Sources for the* Foreign Relations *Series*

The *Foreign Relations* statute requires that the published record in the *Foreign Relations* series include all records needed to provide comprehensive documentation of major U.S. foreign policy decisions and significant U.S. diplomatic activity. It further requires that government agencies, departments, and other entities of the U.S. Government en-

gaged in foreign policy formulation, execution, or support cooperate with the Department of State historians by providing full and complete access to records pertinent to foreign policy decisions and actions and by providing copies of selected records. Most of the sources consulted in the preparation of this volume were located at the Department of State in Washington and the National Archives and Records Administration.

The editors of the *Foreign Relations* series have complete access to all the retired records and papers of the Department of State: the central files of the Department; the special decentralized files ("lot files") of the Department at the bureau, office, and division levels; the files of the Department's Executive Secretariat, which contain the records of international conferences and high-level official visits, correspondence with foreign leaders by the President and Secretary of State, and the memoranda of conversations between the President and the Secretary of State and foreign officials; and the files of overseas diplomatic posts. All of the Department's central files for 1981–1989, which were stored in electronic and microfilm formats, will eventually be transferred to the National Archives. Once these files are declassified and processed, they will be accessible. All of the Department's decentralized office files from this period that the National Archives deems worthy of permanent preservation will also eventually be transferred to the National Archives where they will be available for use after declassification and processing.

Research for *Foreign Relations* volumes in this subseries is undertaken through special access to restricted documents at the Ronald Reagan Presidential Library and other agencies. While all the material printed in this volume has been declassified, some of it is extracted from still-classified documents. The staff of the Reagan Library is processing and declassifying many of the documents used in this volume, but they may not be available in their entirety at the time of publication. Presidential papers maintained and preserved at the Reagan Library include some of the most significant foreign affairs related documentation from White House offices, the Department of State, and other Federal agencies including the National Security Council, the Central Intelligence Agency, the Department of Defense, and the Joint Chiefs of Staff.

Some of the research for volumes in this subseries was done in Reagan Library record collections scanned for the Remote Archive Capture (RAC) project. This project, which is administered by the National Archives and Records Administration's Office of Presidential Libraries, was designed to coordinate the declassification of still-classified records held in various Presidential libraries. As a result of the way in which records were scanned for the RAC, the editors of the

*Foreign Relations* series were not always able to determine whether attachments to a given document were in fact attached to the paper copy of the document in the Reagan Library file. In such cases, some editors of the *Foreign Relations* volumes have indicated this ambiguity by stating that the attachments were "Not found attached."

*Editorial Methodology*

The documents are presented chronologically according to time in Washington, DC. Memoranda of conversation are placed according to the time and date of the conversation, rather than the date the memorandum was drafted.

Editorial treatment of the documents published in the *Foreign Relations* series follows Office style guidelines, supplemented by guidance from the General Editor and the Chiefs of the Declassification and Publishing Divisions. The original document is reproduced as exactly as possible, including marginalia or other notations, which are described in the footnotes. Texts are transcribed and printed according to accepted conventions for the publication of historical documents within the limitations of modern typography. A heading has been supplied by the editors for each document included in the volume. Spelling, capitalization, and punctuation are retained as found in the original text, except that obvious typographical errors are silently corrected. Other mistakes and omissions in the documents are corrected by bracketed insertions: a correction is set in italic type; an addition in roman type. Words or phrases underlined in the original document are printed in italics. Abbreviations and contractions are preserved as found in the original text, and a list of abbreviations and terms is included in the front matter of each volume. In telegrams, the telegram number (including special designators such as Secto) is printed at the start of the text of the telegram.

Bracketed insertions are also used to indicate omitted text that deals with an unrelated subject (in roman type) or that remains classified after declassification review (in italic type). The amount and, where possible, the nature of the material not declassified has been noted by indicating the number of lines or pages of text that were omitted. Entire documents withheld after declassification review have been accounted for and are listed in their chronological place with headings, source notes, and the number of pages not declassified.

All brackets that appear in the original document are so identified in the footnotes. All ellipses are in the original documents.

The first footnote to each document indicates the source of the document and its original classification, distribution, and drafting information. This note also provides the background of important docu-

ments and policies and indicates whether the President or his major policy advisers read the document.

Editorial notes and additional annotation summarize pertinent material not printed in the volume, indicate the location of additional documentary sources, provide references to important related documents printed in other volumes, describe key events, and provide summaries of and citations to public statements that supplement and elucidate the printed documents. Information derived from memoirs and other first-hand accounts has been used when appropriate to supplement or explicate the official record.

The numbers in the index refer to document numbers rather than to page numbers.

*Advisory Committee on Historical Diplomatic Documentation*

The Advisory Committee on Historical Diplomatic Documentation, established under the *Foreign Relations* statute, monitors the overall compilation and editorial process of the series and advises on all aspects of the preparation of the series and declassification of records. The Advisory Committee does not necessarily review the contents of individual volumes in the series, but it makes recommendations on issues that come to its attention and reviews volumes as it deems necessary to fulfill its advisory and statutory obligations.

*Declassification Review*

The Office of Information Programs and Services, Bureau of Administration, conducted the declassification review for the Department of State of the documents published in this volume. The review was conducted in accordance with the standards set forth in Executive Order 13526 on Classified National Security Information and applicable laws.

The principle guiding declassification review is to release all information, subject only to the current requirements of national security as embodied in law and regulation. Declassification decisions entailed concurrence of the appropriate geographic and functional bureaus in the Department of State, other concerned agencies of the U.S. Government, and the appropriate foreign governments regarding specific documents of those governments. The declassification review of this volume, which began in 2015 and was completed in 2019, resulted in the decision to withhold 1 document in full, excise a paragraph or more in 13 documents, and make minor excisions of less than a paragraph in 20 documents.

The Office of the Historian is confident, on the basis of the research conducted in preparing this volume and as a result of the declassification review process described above, that the documentation and edito-

08/10/2021   USCA Case #23-5017   Document #2005450   Filed: 06/28/2023   Page 363 of 391

About the Series   VII

rial notes presented here provide a thorough, accurate, and reliable record of the Reagan administration's policy toward the Soviet Union, January 1983–March 1985.

**Adam M. Howard, Ph.D.**
*The Historian*

**Kathleen B. Rasmussen, Ph.D.**
*General Editor*

Foreign Service Institute
February 2021

08/10/2021  08:26 AM  TO 7036133007  FROM 2029972122  Page: 13

# Preface

*Structure and Scope of the* Foreign Relations *Series*

This volume is part of a subseries of volumes of the *Foreign Relations* series that documents the most important issues in the foreign policy of the administration of Ronald Reagan. This volume documents U.S. bilateral relations with the Soviet Union from January 1983 to March 1985. Due to the importance of U.S.-Soviet relations during the Reagan administration, the Reagan subseries includes an extensive examination of U.S. bilateral relations with the Soviet Union in four volumes: *Foreign Relations*, 1981–1988, Volume III, Soviet Union, January 1981–January 1983; Volume IV, Soviet Union, January 1983–March 1985; Volume V, Soviet Union, March 1985–October 1986; and Volume VI, Soviet Union, October 1986–January 1989. In conjunction with these volumes, several other volumes in the subseries will provide the reader with a fuller understanding of how U.S.-Soviet relations impacted the global character of the Cold War and U.S. strategy during the Reagan era. For documentation on U.S.-Soviet nuclear arms control negotiations, see *Foreign Relations*, 1981–1988, Volume XI, START I, and Volume XII, INF, 1984–1988. *Foreign Relations*, 1977–1980, Volume V, European Security, 1977–1983, documents the NATO dual-track decision and TNF/INF negotiations through 1983. Documentation dealing with nuclear non-proliferation, nuclear testing, chemical and biological weapons, and space arms control, including anti-satellite systems, will be published in *Foreign Relations*, 1981–1988, Volume XL, Global Issues I. The development of the Strategic Defense Initiative and ABM-related issues and other strategic considerations are addressed in *Foreign Relations*, 1981–1988, Volume XLIII, National Security Policy, 1981–1984, and Volume XLIV, Parts 1 and 2, National Security Policy, 1985–1988. For selected documentation on the human rights situation in the Soviet Union, see *Foreign Relations*, 1981–1988, Volume XLI, Global Issues II.

*Focus of Research and Principles of Selection for* Foreign Relations, *1981–1988, Volume IV*

This volume documents the development of the Reagan administration's policies toward the Soviet Union from January 1983 to March 1985. With Reagan's signature of National Security Decision Directive (NSDD) 75 on January 17, 1983, the administration's approaches and policies toward the Soviet Union were codified in a specific four-part agenda: arms control, human rights, regional issues, and bilateral relations. This volume examines the efforts of administration officials,

IX

X  Preface

namely Secretary of State George Shultz, President's Assistants for National Security Affairs William Clark and later Robert McFarlane, and NSC Staff member Jack Matlock, to implement the four-part agenda in dealing with the Soviet Union. The documentation demonstrates how administration officials developed policies related to the four-part agenda, mainly in the National Security Council (NSC) and Department of State, and then promoted these various tracks during meetings between Shultz, and on occasion Reagan, and Soviet Ambassador Anatoly Dobrynin and Soviet Foreign Minister Andrei Gromyko in various fora. Although no high-level meeting took place between Reagan and either Soviet General Secretaries Yuri Andropov or Konstantin Chernenko during their short tenures, the documents provide a window into how the Reagan administration viewed the Soviet leadership and formulated policies to deal with whomever was in charge.

The volume also documents the bureaucratic struggle Shultz faced against the NSC in implementing the four-part agenda laid out by NSDD 75 and in gaining access to President Reagan. After some wrangling, by June 1983 an understanding emerged between Shultz and Clark, which allowed Shultz regular weekly meetings with Reagan. When Jack Matlock joined the NSC Staff as primary adviser on the Soviet Union, Shultz gained a like-minded ally in approaches to dealing with the USSR. While some administration officials, such as Secretary of Defense Caspar Weinberger, consistently argued that negotiating with the Soviet Union seemed futile, Shultz, Matlock, and others pushed President Reagan to see the value in keeping lines of communication open with the Soviets. Even during tragic events, such as the Soviet downing of the KAL 007 airliner in September 1983, Shultz kept his meeting with Gromyko a few days later in Madrid and used this as an opportunity to admonish the Foreign Minister for this inexplicable act and the inability of the Soviet Union to admit fault on the international stage.

The volume documents several Cold War flashpoints during the contentious months of 1983. The announcement in March 1983 of Reagan's Strategic Defense Initiative (SDI) caused concern for the Soviet Union because it shifted the strategic balance from the theory of mutually assured destruction toward a defensive nuclear posture. Aside from the downing of the KAL airliner, the Euromissiles crisis came to a head with U.S. deployments of INF missiles to several NATO allies in late November 1983. While the bulk of the documentation dealing with these negotiations is covered in two other volumes, the scheduled deployments permeated all other aspects of U.S.-Soviet relations in 1983. The volume also presents selective documentation related to the 1983 Soviet "War Scare" and the November 1983 NATO nuclear exercise, Able Archer (see Appendix A). The volume attempts to dem-

Preface    XI

onstrate that even with these challenges, Shultz and others pressed to keep moving ahead with the four-part agenda and promote greater dialogue in U.S.-Soviet relations.

After the Soviet walkout of the INF negotiations in Geneva in late 1983, the administration focused throughout 1984 on developing a framework to restart arms control negotiations; the documents in this volume demonstrate the difficulties involved in opening new talks with the Soviet Union. Reagan's SDI program continued to cause problems. The Soviets believed SDI would "militarize space," and therefore the debates over how SDI would be dealt with during negotiations were a major point of contention during this period. When Shultz and Gromyko met in January 1985, they finally reached an agreement on a new round of umbrella negotiations. The Nuclear and Space Talks (NST), scheduled to begin in Geneva in March 1985, would have three tracks, START, INF, and Defense and Space. The documents in the volume trace how various positions from the Department of State, NSC, the Department of Defense, and the Central Intelligence Agency impacted the decision to move forward with the three arms control tracks. While the other parts of the four-part agenda remained in play during this period and were discussed in bilateral meetings, restarting arms control talks seemed to trump the other areas of concern. Little did the U.S. or Soviet negotiators know that on the eve of these new NST negotiations, Chernenko would die, and a younger, more ambitious Soviet leader would emerge and dramatically change the course of U.S.-Soviet relations.

*Acknowledgments*

The editor wishes to acknowledge the invaluable assistance of officials at the Ronald Reagan Presidential Library in Simi Valley, California, especially Lisa Jones and Cate Sewell. A special thanks to the Central Intelligence Agency staff for providing access and assistance with Reagan Library materials scanned for the Remote Archive Capture project, and to the History Staff of the CIA's Center for the Study of Intelligence for arranging full access to CIA records. The editor wishes to acknowledge the staff at Information Programs and Services at the Department of State for facilitating access to Department of State records and coordinating the review of this volume within the Department. Sandy Meagher was helpful in providing access to Department of Defense materials. The editor extends thanks to the family and executor of the Estate of former Secretary of Defense Caspar W. Weinberger for granting Department of State historians access to the personal papers of Secretary Weinberger deposited at the Library of Congress. Additional thanks are due to officials of the Library of Congress Manuscript Division for facilitating that access.

08/10/2021 08:26 AM #23-5036133007 FROM:2028972122005450 Page: 17   Filed: 06/28/2023   Page 368 of 391

XII   Preface

Elizabeth C. Charles collected, selected, and annotated the documentation for this volume under the supervision of David Geyer, Chief of the Europe Division, and Adam Howard, then General Editor of the *Foreign Relations* series. The volume was reviewed by David Geyer and then Historian Stephen Randolph. Kerry Hite and Chris Tudda coordinated the declassification review under the supervision of Carl Ashley, Chief of the Declassification Coordination Division. Kerry Hite also performed the copy and technical editing under the supervision of Mandy Chalou, Chief of the Editing and Publishing Division.

**Elizabeth C. Charles, Ph.D.**
*Historian*

# Contents

About the Series ..................................................... III

Preface ................................................................ IX

Sources ............................................................... XV

Abbreviations and Terms ........................................ XIX

Persons .............................................................. XXV

Note on U.S. Covert Actions ...................................... XXXI

Soviet Union, January 1983–March 1985

January 1983–April 1983

"Dobrynin seemed like he wanted to run. But the
    Secretary is a jogger": Shultz and the Four-Part
    Agenda ......................................................    1

April 1983–August 1983

Preparing the Next Steps in U.S.-Soviet Relations:
    Human Rights and Arms Control ........................    120

September 1983–October 1983

"Controlled Fury": Shootdown of KAL 007 ...............    291

October 1983–February 1984

"The Winter of Soviet Discontent": INF Walkout, the
    War Scare, and the 'Ivan and Anya' Speech ...........    429

February 1984–June 1984

"Talking about each other rather than to each other":
    Reagan, Chernenko, and U.S.-Soviet Stalemate ........    606

June 1984–October 1984

"Sitting on Mountains of Nuclear Weapons": The
    Reagan-Gromyko Meeting ..............................    845

October 1984–January 1985

"An iron-ass Secretary of State": Shultz and Gromyko
    in Geneva ...................................................    1079

XIII

XIV   Contents

January 1985–March 1985

"The principal menace to our security?": Reagan and
the Ambiguities of Soviet Leadership ....................   1355

Appendix ...........................................................   1420

08/10/2021   08:26 AM   #27036233007   FROM:20289721230054500Page: 20

# Page Left Intentionally Blank

# Appendix

## A.   Editorial Note

Stark deviations in assessments by the U.S. Intelligence Community of the November 1983 NATO exercise Able Archer and the Soviet "war scare" led to a much later 1990 investigation by the President's Foreign Intelligence Advisory Board during the George H.W. Bush administration, resulting in the report, "The Soviet 'War Scare.'" (George H.W. Bush Library, Bush Presidential Records, President's Foreign Intelligence Advisory Board, Subject Files; Reports to the President-War Scare Report 1990 [OA/IDCF01830–020]) The February 15, 1990, PFIAB report analyzed intelligence and reporting on the Soviet war scare, Able Archer, and other related activities. The PFIAB report stated: "During the past year, the President's Foreign Intelligence Advisory Board has carefully reviewed the events of that period to learn what we (the U.S. intelligence community) knew, when we knew it, and how we interpreted it. The Board has read hundreds of documents, conducted more than 75 interviews with American and British officials, and studied the series of National Intelligence Estimates (NIE's) and other intelligence assessments that have attempted over the last six years to interpret the war scare data. Additionally, we have offered our own interpretation of the war scare events." (PFIAB, pages vi–vii) Although outside the normal scope of this volume, the 1990 PFIAB report and other memoranda from 1988 and 1989 are addressed in this editorial note because the documents focus upon crucial events from 1983 to 1984.

Reactions from the Intelligence Community (IC) and policymakers to the events surrounding Able Archer and the Soviet "war scare" differed significantly and evolved over time. The contemporaneous reporting in 1983–1984 from the Central Intelligence Agency (CIA), National Intelligence Council (NIC), [text not declassified] drew varied conclusions about Soviet anxieties. While some reporting assessed that "Contrary to the impression conveyed by Soviet propaganda, Moscow does not appear to anticipate a near-term military confrontation with the United States" (see Document 157), another analysis presented evidence that [text not declassified].

Retrospective assessments of these events seem to conflate the NATO Able Archer exercise with the broader "war scare" talk emanating from Moscow related to INF deployments. The Soviet military unquestionably reacted to Able Archer differently than to previous NATO exercises. (See Document 134.) Whether the Soviet response was attributable to the circumstances of the time, to the "war scare"

1420

Appendix   1421

(whether real or Soviet propaganda), or to a credible belief within the Soviet military leadership or the Politburo that the United States was planning to launch a nuclear first strike against the USSR, under the guise of a NATO exercise or otherwise, remains unclear on the basis of the available evidence.

After a year of research and a reassessment of the relevant intelligence and documentation, the PFIAB report stated: "We believe that the Soviets perceived that the correlation of forces had turned against the USSR, that the US was seeking military superiority, and that the chances of the US launching a nuclear first strike—perhaps under cover of a routine training exercise—were growing. We also believe that the US intelligence community did not at the time, and for several years afterwards, attach sufficient weight to the possibility that the war scare was real. As a result, the President was given assessments of Soviet attitudes and actions that understated the risks to the United States. Moreover, these assessments did not lead us to reevaluate our own military and intelligence actions that might be perceived by the Soviets as signaling war preparations.

"In two separate Special National Intelligence Estimates (SNIEs) in May and August 1984, the intelligence community said: 'We believe strongly that Soviet actions are not inspired by, and Soviet leaders do not perceive, a genuine danger of imminent conflict or confrontation with the United States.' Soviet statements to the contrary were judged to be 'propaganda.' [See Documents 221 and 264.]

"The Board believes that the evidence then did not, and certainly does not now, support such categoric conclusions. Even without the benefit of subsequent reporting and looking at the 1984 analysis of then available information, the tone of the intelligence judgments was not adequate to the needs of the President." (PFIAB, pages vi–vii)

During November 1983, Able Archer and the Soviet responses to this exercise received little immediate attention in the U.S. Intelligence Community. (See Document 135.) However, by spring 1984, some in the intelligence communities in the United States [text not declassified] believed the Reagan administration should have recognized Soviet sensitivities and anxieties about a potential U.S. first strike. [text not declassified].

According to the PFIAB report, [text not declassified] "KGB Deputy Resident Colonel Oleg Gordiyevskiy, [text not declassified] had witnessed what he saw as Soviet paranoia over a US nuclear first strike; [text not declassified] As one of the most senior KGB officers in London, [text not declassified]." (PFIAB, page 10)

In a covering memorandum [less than 1 line not declassified] to Director of Central Intelligence William Casey and others, Herbert Meyer, Vice Chairman of the National Intelligence Council, wrote: [text not

*declassified*]. The PFIAB report commented that the [*text not declassified*] report was "not well received in the US intelligence community." (PFIAB, pages 10–11)

Another contemporaneous analysis from the CIA, the May 1984 SNIE 11–10–84/JX concluded: "We believe strongly that Soviet actions are not inspired by, and Soviet leaders do not perceive, a genuine danger of imminent conflict or confrontation with the United States." (See Document 221.) The PFIAB report commented on this SNIE: "The estimate boldly declared that 'Recent Soviet war scare propaganda . . . is aimed primarily at discrediting US policies and mobilizing 'peace' pressures among various audiences abroad.' In a more piecemeal fashion, it was judged that 'Each Soviet action has its own military or political purpose sufficient to explain it.' The accelerated tempo of Soviet live exercise activity was explained simply as a reflection of 'long-term Soviet military objectives.'

"The Soviet reaction to Able Archer 83 was dismissed as a 'counter-exercise,' but analysts acknowledged that the 'elaborate Soviet reaction' was 'somewhat greater than usual.' [*less than 1 line not declassified*] prior to and during the exercise indicated that the Warsaw Pact Intelligence services, especially the KGB, were admonished 'to look for any indication that the United States was about to launch a first nuclear strike,' analysts concluded that 'by confining heightened readiness to selected air units, Moscow clearly revealed that it did not, in fact, think there was a possibility at this time of a NATO attack.' The assessment, however, was not specific about what type of defensive or precautionary Soviet activity might be expected—and detected—were they preparing for an offensive NATO move." (PFIAB, page 13)

The PFIAB report continued its critique of SNIE 11–10–84/JX: IC "analysts dismissed [*less than 1 line not declassified*] on the war scare, including the KGB's formal tasking to its Residencies. 'This war scare propaganda has reverberated in Soviet security bureaucracies and emanated through other channels such as human sources. [See for example, Document 144.] We do not believe it reflects authentic leadership fears of imminent conflict.'" The report contended: "Such judgments were made even though the analysis was tempered 'by some uncertainty as to current Soviet leadership perceptions of the United States, by continued uncertainty about the Politburo decisionmaking processes, and by our inability at this point to conduct a detailed examination of how the Soviets might have assessed recent US/NATO military exercises and reconnaissance operations'—which, of course, included the previous Able Archer exercise. In other words, US analysts were unsure of what the Kremlin leadership thought or how it made decisions, nor had they adequately assessed the Soviet reaction to Able Archer 83. This notwithstanding, the estimate concluded: 'We are confident that,

Appendix  1423

as of now, the Soviets see not an imminent military clash but a costly and—to some extent—more perilous strategic and political struggle over the rest of the decade.'" (PFIAB, page 14)

The Board had similar criticisms of the August 1984 SNIE 11–9–84, "Soviet Policy Toward the United States in 1984" (see Document 264), for its "categorical and unqualified" judgments "about the likelihood of the war scare," and the analysts' conclusions: "We strongly believe that the Soviet actions are not inspired by, and Soviet leaders do not perceive, a genuine danger of imminent conflict or confrontation with the United States. Also, we do not believe that the Soviet war talk and other actions 'mask' Soviet preparations for an imminent move toward confrontation on the part of the USSR." (PFIAB, page 19–20) The PFIAB report continued: "Analysts readily acknowledged that the previous six months had seen extraordinary, unprecedented Soviet activities. Large scale military exercise, 'anomalous behavior' during the troop rotation, withdrawn military support for the harvest (last seen prior to the 1968 Czech invasion), new, deployed weapons systems (termed 'in response to INF deployments'), and heightened internal vigilance and security activities were noted. These events, however, were judged to be 'in line with long-evolving plans and patterns, rather than with sharp acceleration of preparations for major war.'" (PFIAB, page 19)

The PFIAB report acknowledged that its assessment and criticism of the May and August 1984 SNIEs "derives from information not known at the time. Our purpose in presenting this report is not so much to criticize the conclusions of the 1984 SNIE's as to raise questions about the ways these estimates were made and subsequently reassessed." (PFIAB, page ix) The PFIAB report concluded: "Reasonable people can disagree about the conclusions of the 1984 SNIE's. The PFIAB does disagree with many of them. More worrisome to us, however, is the process by which the estimates were made and subsequently reassessed. Although both estimates were reportedly reviewed by outside readers—and both, but particularly the first, contained alternative scenarios—strongly worded interpretations were defended by explaining away facts inconsistent with them. Consequently, both estimates contained, in essence, single outcome forecasting based in large part on near-term anomalous behavior. Moreover, neither alerted the reader to the risks erroneously rejecting the correct scenario." (PFIAB, page 30) The PFIAB report criticized the performance of the IC in 1983–1984, showing that contemporary assessments of Soviet intentions after Able Archer did not go far enough in providing President Reagan with alternative scenarios, explaining that the anxiety from the Soviet leadership could have been real.

In criticizing contemporary estimates, the PFIAB report emphasized intelligence that had not been available to the IC during these

years, principally information provided by Gordiyevskiy after he defected in 1985. Robert McFarlane's thoughts on the influence of Gordiyevskiy's information on the President are recorded in a December 16, 1988, memorandum for the record:

## Memorandum for the Record

16 December 1988

SUBJECT

[*less than 1 line not declassified*] Robert F. McFarlane Regarding the Influence of Oleg Gordiyevskiy's Reporting on President Reagan

On 15 December [*less than 1 line not declassified*] Robert F. ("Bud") McFarlane, formerly National Security Advisor to the President, as to the veracity of claims [*less than 1 line not declassified*] that the reporting of KGB officer [*less than 1 line not declassified*] Oleg Gordiyevskiy about the Kremlin's fear of war greatly influenced President Reagan in the mid-1980s to seek better relations with the USSR. In response, Bud made several points:

He definitely remembered the reporting associated (later) with Gordiyevskiy that conveyed the Kremlin's fear of war. He also specifically recalled [*less than 1 line not declassified*] on Gordiyevskiy's assessments given to the President [*less than 1 line not declassified*].

He noted that he discussed this reporting with the President on several occasions. This was in the course of numerous discussions extending throughout 1983 and part of 1984 about the apparent anxieties being transmitted by Moscow through many channels, [*less than 1 line not declassified*].

The President, according to Bud, saw this reporting attributed to Gordiyevskiy in the larger context of a Soviet "war-scare" campaign arising from the NATO decision to deploy INF and from Reagan's hard line on defense, SDI, etc. In the President's view, either the Soviets were paranoid in strange ways we could not let bother us, or they were fabricating the appearance of fear to intimidate and sway us, which we should even more be prepared to ignore.

Often in these conversations, according to Bud, the President outlined his sustained intention to concentrate on building US strength and credibility in the first term and to move toward diplomatic reengagement in the second. The President's key speech of January 1984 [see Document 158] was a natural step in a long-planned shift of policy. Neither Gordiyevskiy's reporting nor the Soviet "war-scare" campaign in general were responsible for the evolution of the President's policy.

Appendix   1425

Bud said he'd been queried before on this matter by [*name not declassified*], a journalist, who might be (or have been) writing an article on it. Against the background of the above, Bud said he discounted Gordiyevskiy's impact on the President [*less than 1 line not declassified*].

[*1 paragraph (8½ lines) not declassified*]

[*name not declassified*]

(Central Intelligence Agency, National Intelligence Council, Job 90T00435R: Chronological Files (1988), Box 1, Folder 12: C/NIC Chrono for December 1988)

McFarlane's recollections in this memorandum for the record correlate with a January 1984 memorandum by Jack Matlock, Soviet specialist on the NSC Staff, which demonstrated an awareness of potential Soviet concerns, but concluded:

"—The Soviet leadership is not overly nervous about the immediate prospect of armed confrontation with the U.S.;

"—They are however very nervous about the prospects five to ten years down the road—not so much of a confrontation as such, as of a decisive shift in the balance of military power." (See Document 157.)

As mentioned in the 1988 memorandum for the record, McFarlane did recall "later" reporting to Reagan about Gordiyevskiy. The PFIAB report addressed Gordiyevskiy's situation in relation to the war scare and the 1984 SNIE assessments: "The Board found that after the 1984 assessments were issued, the intelligence community did not again address the war scare until after the defection to Great Britain of KGB Colonel Oleg Gordiyevskiy in July, 1985. Gordiyevskiy had achieved the rank of Acting Resident in the United Kingdom, but he fell under suspicion as a Western agent. Recalled to the Soviet Union, he was placed under house arrest and intensely interrogated. Able to flee his watchers, Gordiyevskiy was exfiltrated from Moscow by the British Secret Intelligence Service."

The report continued: "During lengthy debriefing sessions that followed, Gordiyevskiy supplied a fuller report on the Soviet war hysteria. This report, complete with documentation from KGB Headquarters and entitled 'KGB Response to Soviet Leadership Concern over US Nuclear Attack,' was first disseminated in a restricted manner within the US intelligence community in October 1985. Gordiyevskiy described the extraordinary KGB collection plan, initiated in 1981, to look for signs that the US would conduct a surprise nuclear attack on the Soviet Union. He identified and reviewed factors driving leadership fears. Based on the perception the US was achieving a strategic advantage, those in the Kremlin were said to believe that the US was likely to resort to nuclear weapons much earlier in a crisis than previously expected. They also were concerned the US might seek to exploit its first-strike capability outside the context of a crisis, probably during a

military exercise. He described the leadership's worries of a 'decapitating' strike from the Pershing II's, and its belief that the US could mobilize for a surprise attack in a mere seven to ten days. He explained how the London Residency responded to the requirements, and the effects that reporting had back at Moscow Center in reinforcing Soviet fears. He described conversations he had held with colleagues from Center and from the GRU. The next month, President Reagan held his first summit with Mikhail Gorbachev and relations began to thaw." (PFIAB, pages 22–23)

The PFIAB report also cited a January 1989 "End of Tour Report Addendum" by Lieutenant General Leonard H. Perroots, who had served as Assistant Chief of Staff for Intelligence, US Air Forces Europe, during the 1983 Able Archer exercise, to emphasize the potential consequences of the intelligence gap during the Able Archer exercise. Perroots addressed Able Archer as well as Gordiyevskiy's reporting in that memorandum:

1. (U) In 1983, I was assigned as the DCS for Intelligence, US Air Forces, Europe, Ramstein AB, Germany. The annual NATO Command and Control exercise ABLE ARCHER was scheduled to begin during the first week of November. The context of this nuclear command and control exercise was relatively benign; the scenario had been purposely chosen to be non-controversial, and the exercise itself was a routine annual event. This exercise closely followed the bombing of air defense sites in Lebanon and directly followed the invasion of Grenada. As I recall, however, there was no particular feeling of tension in the European Theater beyond that which is normal.

2. [portion marking not declassified] Only the fact that Soviet Intelligence collection assets (primarily low level signals intercept units) had failed to return to garrison after their normal concentrated coverage of NATO's AUTUMN FORGE exercise series could be reckoned strange at all. As the kickoff date of ABLE ARCHER neared it was clear that there was a great deal of Soviet interest in the forthcoming events. Again, this seemed nothing out of the ordinary. We knew that there was a history of intensive Soviet collection against practice Emergency Action Messages (EAM's) related to nuclear release.

3. [portion marking not declassified] ABLE ARCHER started in the morning of 3 November, and progressed immediately in the scenario to NATO STATE ORANGE. At 2100Z on 04 November NSA issued an electrical product report G/00/3083-83, entitled "SOVIET AIR FORCES, GSFG, PLACED ON HEIGHTENED READINESS, 2 NOVEMBER 1983." I saw this message on the morning of 5 November and discussed it with my air analysts. It stated that as of 1900Z on 02 November the fighter-bomber divisions of the air force of Group Soviet Forces, Germany had been placed in a status of heightened alert. All

Case 1:21-cv-02857-JEB   Document 23-1   Filed 07/28/22   Page 37 of 49
08/10/2023  08:26 AM  #23-5036733007  FROM:20289721231 2005450  Page: 28   Filed: 06/28/2023   Page 379 of 391

Appendix   1427

divisional and regimental command posts and supporting command and control elements were to be manned around-the-clock by augmented teams.

4. [*portion marking not declassified*] In addition to the directed command and control changes the fighter-bomber divisions were also ordered to load out one squadron of aircraft in each regiment (if this order applied equally across GSFG the result would have been at least 108 fighter-bombers on alert). These aircraft were to be armed and placed at readiness 3 (30 minute alert) to "destroy first-line enemy targets." The alert aircraft were to be equipped with a self-protection jamming pod. We knew from subsequent NSA reporting that a squadron at Neuruppin, East Germany sought and was apparently granted permission to configure its aircraft without the ECM pod because of an unexpected weight and balance problem. My air analysts opined that this message meant that at least this particular squadron was loading a munitions configuration that they had never actually loaded before, i.e., a warload.

5. [*portion marking not declassified*] At this point, I spoke to CinC-USAFE, General Billy Minter. I told him we had some unusual activity in East Germany that was probably a reaction to the ongoing ABLE ARCHER. He asked if I thought we should increase the real force generation. I said that we would carefully watch the situation, but there was insufficient evidence to justify increasing our real alert posture. At this point in the exercise our forces were in a simulated posture of NATO State ORANGE and local SALTY NATION tests involving simulated generation of combat aircraft were underway at various locations including Ramstein AB. If I had known then what I later found out I am uncertain what advice I would have given.

6. [*portion marking not declassified*] An NSA message dated 022229Z DEC 83 provided the rest of the picture as far as we knew it—at least until the reports began to surface from the British penetration of the KGB, Oleg Gordievskiy. This GAMMA message was entitled "SOVIET 4th AIR ARMY AT HEIGHTENED READINESS IN REACTION TO NATO EXERCISE ABLE ARCHER, 2–11 NOVEMBER 1983." This report stated that the alert had been ordered by the Chief of the Soviet Air Forces, Marshal Kutakhov, and that all units of the Soviet 4th Air Army were involved in the alert "which included preparations for immediate use of nuclear weapons." This report described activity that was contemporaneous with that reflected in East Germany, but because of the specific source of this material it was not available in near realtime. The two pieces taken together present a much more ominous picture.

7. [*portion marking not declassified*] Equally ominous in its own way was the fact that this alert was never reflected at all by the I&W system.

At the time of this occurrence there was no distribution of electrically reported GAMMA material to the Tactical Fusion Center at Boerfink. I remedied that shortfall in the aftermath of this activity. Secondly, a real standdown of aircraft was secretly ordered in at least the Soviet Air Forces units facing the Central Region, and that standdown was not detected. The Soviet alert in response to ABLE ARCHER began after nightfall on Wednesday evening, there was no flying on the following two days which led to the weekend, and then the following Monday was 7 November, the revolution holiday. The absence of flying could always be explained, although a warning condition was raised finally on about the ninth of November when overhead photography showed fully armed FLOGGER aircraft on air defense alert at a base in East Germany. When this single indicator was raised, the standdown had been underway for a week.

8. [*portion marking not declassified*] For the next six months I was on a soapbox about ABLE ARCHER whenever I could discuss it at the appropriate classification level. I spoke to the Senior Military Intelligence Officers' Conference (SMIOC), and I buttonholed a lot of people. I suggested that perhaps we should move our annual exercise away from the November 7 holiday, because it is clear to me that the conjunction of the two events causes a warning problem that can never be solved. Our problem here was that we had a couple of very highly classified bits of intelligence evidence about a potentially disastrous situation that never actually came to fruition. For decision-makers it was always difficult to believe that there could have been any serious reaction by the Soviets to such a "benign" exercise as ABLE ARCHER. From the Soviet perspective, however, it might have appeared very different. It was difficult for all of us to grasp that, but Oleg Gordievskiy's reporting began to provide a somewhat more frightening perspective when it became available in the Fall of 1985.

9. (S) By the time Gordievskiy's reporting began to surface for analytical review I was the Director of DIA. Gordievskiy's initial reporting about a "war scare" in 1983 immediately caught my attention. It should be pointed out at the outset that Gordievskiy knew nothing of a military alert during ABLE ARCHER. He did, however, tell us something of a chilling story about Moscow Center's Intelligence tasking during 1983. He related that there was a project called either "RYaN" or "VRYaN," the latter probably being the full form of a Russian acronym meaning "sudden rocket nuclear attack." There was a cadre of specialists in Moscow Center charged with, among other things, finding the evidence of planning for a western attack on the Soviet Union. Beginning in 1982 and continuing into 1983 Gordievskiy says that this group became ever more insistent that an attack was being planned by the West. By March 1983 the KGB officers in Moscow

Appendix  1429

had decided that ABLE ARCHER 83 would provide an excellent cover for the planned attack, and KGB and GRU residencies around the world were being directed to find the evidence. Gordievskiy, living in London at the time, states that he never believed there was really a threat, and that the London residency of the KGB simply ignored the collection requirements until it began to become clear that Moscow was serious. During the summer of 1983 the London residency sent some reports that, in retrospect, Gordievskiy believed might have hyped the war hysteria. He never really believed in the threat, however, and reported during his debriefing in 1985 that he thought the VRYaN hysteria might have been some kind of internal political ploy. I must reiterate again that Gordievskiy did not know about the secret military alert of November 1983.

10. [*portion marking not declassified*] The US intelligence community has never really closed with this analytical problem. A SNIE addressed this subject, [*1½ lines not declassified*]. The position has been taken again and again that had there been a real alert we would have detected more of it, but this may be whistling through the graveyard. It is not certain that we looked hard enough or broadly enough for information. For Western collectors the context was peacetime without even the most basic ripples of crisis. For the Soviets, however, the view may have looked quite different. It is uncertain how close to war we came or even if that was a possibility at all, but we know from Gordievskiy that the analysts in Moscow had predicted that the West would launch the attack from a posture of NATO State ORANGE. What might have happened that day in November 1983 if we had begun a precautionary generation of forces rather than waiting for further information?

(Central Intelligence Agency, National Intelligence Council, Job 91B00551: Speeches, Lectures, Briefing Files (1988–1989), Box 1, Folder 2: C/NIC (Ermarth) Chrons March 1989)

The PFIAB report commented that "as his parting shot before retirement," Perroots, who served as DIA Director from 1985 to 1989, sent a January 1989 "letter outlining his disquiet over the inadequate treatment of the Soviet war scare to, among others, the DCI and this Board." The report continued: "Following the detection of the Soviet Air Forces' increased alert status, it was his [Perroots's] recommendation, made in ignorance, not to raise US readiness in response—a fortuitous, if ill-informed, decision given the changed political environment at the time." (PFIAB, pages 27–28) In further accord with Perroots's report, the PFIAB report concluded: "As it happened, the military officers in charge of the Able Archer exercise minimized the risk by doing nothing in the face of evidence that parts of the Soviet armed forces were moving to an unusual alert level. But these officials acted correctly out of instinct, not informed guidance, for in the years leading up to Able

Archer they had received no guidance as to the possible significance of apparent changes in Soviet military and political thinking." (PFIAB, page x)

[*name not declassified*] the National Warning Staff and [*name not declassified*] of the Office of Soviet Analysis prepared an undated memorandum reacting to Perroots's comments, which was distributed by Ermarth to the DCI and DDCI for consideration:

SUBJECT

Comments on Memorandum of Lieutenant General Perroots

*Summary*

1. General Perroots's memorandum describes in detail a worrisome episode in which Soviet Air Forces in Central Europe assumed an abnormally high alert posture in early November 1983 in response to a routine NATO command post and communications exercise. Two Special National Intelligence Estimates (SNIEs)—written in May and August 1984 respectively—treated the events described in the General's memorandum in the larger context of US-Soviet relations. Those Estimates judged that the Soviets displayed a heightened sense of concern in many areas of national life primarily because of the more aggressive policies of the US Administration in the early 1980s, the US strategic modernization program that included the peacekeeper ICBM and the D–5 SLBM, the actual implementation of NATO's 1979 decision for Intermediate Range Nuclear Force (INF) modernization by deployment of the first Pershing–II missile systems to Europe, and because of the leadership instability in the USSR from the successive deaths of three general secretaries between 1981 and 1985. A National Intelligence Estimate in 1988 assessed the significance of the events in 1983 with the benefit of a longer time perspective and reached the same broad conclusions. General Perroots's memorandum and its enclosure neither raises no new issues nor contains new data that change the strategic judgements already written. [*portion marking not declassified*]

2. At the tactical and theater level, however, General Perroots's memorandum surfaces a long-standing warning problem, i.e., the need for the Intelligence Community in Washington to provide more timely, discriminating, and accurate warning in support of the theater commander. Perroots, who at the time was Assistant Chief of Staff for Intelligence, US Air Forces Europe (USAFE), describes three serious problems for which there are only partial answers. First, he believes that, despite the enormous amount of resources and energy spent in guarding against a strategic surprise attack, USAFE was not well informed in that the US warning systems did not detect in a timely fashion the extent of Soviet precautionary readiness measures undertaken in November 1983 in response to NATO exercise Able Archer.

Appendix 1431

Secondly, he believes that Washington-based agencies had relevant information which was not available to the European Command when he recommended against a precautionary US alert by US Air Forces Europe in response to the detection of the increased alert status of the Soviet Air Forces. Finally, [1½ lines not declassified], General Perroots is concerned that in similar circumstances—even if there is better intelligence—another officer in his position might recommend a precautionary US Air Force alert in Europe that could have serious escalatory consequences, unless there are timely, national level assessments available. [portion marking not declassified]

3. The dilemma that General Perroots has described is characteristic of the warning problems faced by senior US military intelligence chiefs in many past crises, in which decisions about US force posture were dependent upon threat assessments prepared rapidly and based on fragmentary and incomplete intelligence. General Perroots's memorandum reinforces two long-standing lessons of warning: warning systems are no substitute for seasoned, professional judgment and assessments; and they require constant attention and improvement. In terms of process, however, his memorandum reinforces the requests of successive SACEURs and other US theater commanders for better ways to provide more timely national-level warning assessments to the theater intelligence staffs.

*The Setting of Exercise Able Archer, 1983*

4. The larger context of the period, often referred to as the "war scare," reflected increasing Soviet concern over the drift in superpower relations, which some in the Soviet leadership felt indicated an increased threat of war and increased likelihood of the use of nuclear weapons. These concerns were shaped in part by a Soviet perception that the correlation of forces was shifting against the Soviet Union and that the United States was taking steps to achieve military superiority. These fears were exacerbated by planned improvements in US strategic forces, as well as by progress made by NATO to implement its 1979 decision began with NATO's deliberations in the late 1970s to modernize its theater nuclear forces by deploying Pershing–II missiles and Ground Launched Cruise Missiles (GLCMs) to Europe. By 1981, after the new US Administration was inaugurated, the Soviet concern intensified almost concurrently with General Secretary Brezhnev's decline in health [portion marking not declassified]

5. [1½ lines not declassified] the increased Soviet concern stemmed from a fear by some Soviet leaders that the West might seek to exploit its new capability in Europe for a preemptive nuclear surprise attack against the USSR, for which the Soviets had no defense. From a national security standpoint, this Western capability led to questions about the

1432 Foreign Relations, 1981–1988, Volume IV

long-standing Soviet view that crises and other adverse developments in international affairs would precede the outbreak of war and be the basis for long-term early warning. The Soviets had concern that the West might decide to attack the USSR without warning during a time of vulnerability—such as when military transport was used to support the harvest—thus compelling the Soviets to consider a preemptive strike at the first sign of US preparations for a nuclear strike. [*portion marking not declassified*]

6. From Brezhnev's death in 1982 through late 1984, the Soviets ordered a number of unusual measures not previously detected except during periods of crisis with the West. These included: disruption of the normal troop rotation cycle for Soviet forces in central Europe in 1984; updating civil defense procedures in the USSR from 1982 through 1984; in the spring of 1984 the first, and apparently only, time that Soviet military trucks were not sent to support the harvest since the end of World War II; and increased alert reactions even to routine NATO training from 1982 to 1984. The cumulative effect of these and other measures was to reduce the Soviet and Warsaw Pact vulnerability to a surprise attack. The abnormal Soviet reaction to NATO Exercise Able Archer in November 1983 occurred within this setting. [*portion marking not declassified*]

7. Concurrent with the military dimension, [*less than 1 line not declassified*] other precautionary measures taken by the Soviets probably were a reflection of the political maneuvering in the Kremlin in 1982 and 1983 associated with Andropov's rise to power. In exchange for military support for his bid to become General Secretary, Andropov, then KGB Chairman, may have promised greater allocations of resources for military industrial expansion, improved civil defense readiness, and military modernization. All of these were espoused by the Chief of the General Staff at the time, Marshal Ogarkov. Successful manipulation of threat perceptions by the KGB at Andropov's direction would have helped cultivate the strong military backing Andropov enjoyed when he came to power. In this environment, the heightened Soviet military reactions to NATO exercises would have been expected. [*portion marking not declassified*]

8. Finally, [*less than 1 line not declassified*] the Soviets wanted the new US Administration to tone down its anti-Soviet rhetoric, moderate its hostile attitudes, and begin serious business on trade and arms control. Some analysts believe that the Soviet activities, [*1 line not declassified*], were intended to be detected and were contrived to nudge Washington toward a more conciliatory and cooperative attitude in dealings with Moscow. [*less than 1 line not declassified*]

*Intelligence Community Performance*

9. Since 1983, the Intelligence Community, CIA's Office of Soviet Analysis, and the Defense Intelligence Agency have treated the events

Appendix   1433

surrounding the Able Archer episode in a number of in-house publications and national estimates. When General Perroots was Director, DIA, analysts concurred in the Community assessments in 1988 that the "war scare" period of heightened Soviet concern was triggered by the change of the US Administration and its policy decisions toward the Soviet threat; that at least some Soviet leaders concluded that a surprise nuclear attack by NATO was possible outside the context of a crisis; and that this led to a number of Soviet responses consistent with such a conclusion, including high priority intelligence collection taskings. DIA believes, however, that the Soviet measures were primarily a function of the internal leadership instability from which Andropov emerged as General Secretary. [portion marking not declassified]

*General Perroots's Problem*

10. The events surrounding NATO Exercise Able Archer, however, all occurred some months before the first national-level assessments were written, and General Perroots was confronted with a serious choice of what recommendation to make to the Commander, US Air Forces Europe. The Department of Defense warning indicators system reflected that, [less than 1 line not declassified] Soviet air units in Poland and East Germany were observed at a high state of alert, although no other Soviet strategic forces adopted such a posture. [2½ lines not declassified] Consequently, the Commander, US Air Forces Europe, was concerned whether he should exercise his discretionary authority to increase the alert posture of his force. General Perroots recommended that no precautionary US alert be instituted, despite the evidence of his own warning system. Several days later, the Soviet air forces returned to normal alert status. [portion marking not declassified]

11. [1 paragraph (10 lines) not declassified]

12. General Perroots's concerns about this episode are legitimate to the extent that they deal with Washington's support to the US military commands. [4½ lines not declassified] Third, national-level assessments of Soviet intentions were not available when most needed. The General's memorandum indicates the Defense Department has taken steps to correct the problems in the processing and dissemination of intelligence. The third problem, of timely national-level support, is continuous. As Director of DIA, General Perroots himself initiated organizational and procedural changes to improve DIA's support to the commands. [portion marking not declassified]

13. Underlying all of the above, however, is the paradox that General Perroots believes he made a correct judgment, but for the wrong reasons. This is not a new problem nor is there a solution to it. General Perroots has accurately identified inherent limits of the warning systems as they now exist. His candor is a safeguard against complacency

and denial that problems exist. Additionally, he raises again the need for better understanding in Washington of the problems facing intelligence in the field. [*portion marking not declassified*]

> [*name not declassified*]        [*name not declassified*]
> Chief, TFD/RIG/SOVA   Director, National Warning Staff

(Central Intelligence Agency, National Intelligence Council, Job 91B00551: Speeches, Lectures, Briefing Files (1988–1989), Box 1, Folder 2: C/NIC (Ermarth) Chrons March 1989)

The 1990 PFIAB report repeatedly stressed: "During the November 1983 NATO 'Able Archer' nuclear release exercise, the Soviets implemented military and intelligence activities that previously were seen only during actual crises. These included: placing Soviet air forces in Germany and Poland on heightened alert, [*4 lines not declassified*]."

The PFIAB report argued: "The meaning of these events obviously was of crucial importance to American and NATO policymakers. If they were simply part of a Soviet propaganda campaign designed to intimidate the US, deter it from deploying improved weapons, and arouse US domestic opposition to foreign policy initiatives, then they would not be of crucial significance. If they reflected an internal power struggle—for example, a contest between conservatives and pragmatists, or an effort to avoid blame for Soviet economic failures by pointing to (exaggerated) military threats—then they could not be ignored, but they would not imply a fundamental change in Soviet strategy. But if these events were expressions of a genuine belief on the part of Soviet leaders that the US was planning a nuclear first strike, causing the Soviet military to prepare for such an eventuality—by, for example, readying itself for a preemptive strike of its own—then the 'war scare' was a cause for real concern." (PFIAB, page vi)

The PFIAB report concluded that the IC's failure to adequately report on Able Archer and the 1983–1984 Soviet war scare had important implications for the future: "In cases of great importance to the survival of our nation, and especially where there is important contradictory evidence, the Board believes that intelligence estimates must be cast in terms of alternative scenarios that are subjected to comparative risk assessments. This is the critical defect in the war scare episode." (PFIAB, page ix)

Case 1:21-cv-02857-JEB  Document 23-1  Filed 07/28/22  Page 45 of 49

08/10/2021 08:26 AM #230 6 7036733007 FROM: 20296721230 USCA Case #23-5017 Document #2005450 Page: 1  Filed: 06/28/2023  Page 387 of 391

# Fax Transmission

**To:** Central Intelligence Agency, Information and Priv   **From:** National Security Archive - NJ

**Fax:** 17036133007                                        **Date:** 8/10/2021 11:26:36 AM EDT

**RE:** New FOIA Request - Archive #20211088CIA128         **Pages:** 35

---

**Comments:**

Dear Information and Privacy Coordinator,

Attached is a new FOIA request, Archive #20211088CIA128, submitted on behalf of Nate Jones.
Please send all correspondence for this request to foiamail@gwu.edu.

Sincerely,

Wendy Valdes
FOIA Coordinator
National Security Archive
(202) 994-7213

AUG 10 2021

# EXHIBIT B

Central Intelligence Agency

Washington, D.C. 20505

11 August 2021

Nate Jones
The National Security Archive
The George Washington University
Washington, DC 20037
foiamail@gwu.edu

Reference: F-2021-02187

Dear Requester:

On 10 August 2021, the Office of the Information and Privacy Coordinator received your 2 August 2021 correspondence, submitted on behalf of the National Security Archive, seeking, under the Freedom of Information Act, the **9 January 1989 "End of Tour Report (Addendum) General Perroots."**

This letter serves to acknowledge that CIA received your request, and to further let you know that this office assigned your request the reference number provided above. Citing this number in future correspondence will allow us to more efficiently locate your case information.

In the event that we have questions or require additional information or clarification from you to proceed with processing your request, a representative will contact you. Unless you object, this office will search for CIA-originated records only, up to and including the date that the Agency begins its search.

To check the status of your request, please visit: https://www.cia.gov/readingroom/request/status and input the reference number provided above or call this office at (703) 613-1287.

Sincerely,

Mark Lilly
Information and Privacy Coordinator

JA383

# EXHIBIT C

JA384



Central Intelligence Agency

Washington, D.C. 20505

15 April 2022

John Guttmann
Beveridge & Diamond, P.C.
1900 N. Street, NW, Suite 100
Washington, D.C. 20036

Reference: F-2021-02187; Civil Action No. 1:20-cv-02857

Dear Mr. Guttmann:

This letter is the final response to the 2 August 2021 Freedom of Information Act (FOIA) request submitted by your client, National Security Archive, and subsequent litigation, seeking the **9 January 1989 "End of Tour Report (Addendum) General Perroots."**

We processed this request in accordance with the FOIA, 5 U.S.C. § 552, as amended, and the CIA Information Act, 50 U.S.C. § 3141, as amended.

We have completed a review of one (1) document and determined that it may be released in segregable form with redactions made on the basis of FOIA exemptions (b)(1) and (b)(3). Exemption (b)(3) pertains to Section 102A(i)(l) of the National Security Act of 1947, 50 U.S.C § 3024(i)(1), noted as exemption "(b)(3)NatSecAct" on the enclosed documents.

The released document may be found on the enclosed CD. This completes our response to the above referenced requests.

Sincerely,

Anthony J. Capitos
Information and Privacy Coordinator

Enclosure

JA385